```
1                 IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3  UNITED STATES OF AMERICA    )      DOCKET NO. 1:08CR233-1
                               )
4          vs.                 )
                               )      Winston-Salem, North Carolina
5  CLEVE ALEXANDER JOHNSON     )      December 16, 2008
                                      9:50 a.m.
6  _____    VOLUME I OF III

7

8        TRANSCRIPT OF THE TRIAL -- JURY SELECTION/OPENINGS
           BEFORE THE HONORABLE THOMAS D. SCHROEDER
9              UNITED STATES DISTRICT COURT JUDGE

10  APPEARANCES:

11  For the Government:        RANDALL GALYON, AUSA
                               Office of the U.S. Attorney
12                             251 N. Main Street, Suite 726
                               Winston-Salem, North Carolina 27101
13

14  For the Defendant:         WAYNE HARRISON, ESQ.
                               101 S. Elm Street, Suite 230
15                             Greensboro, North Carolina 27401

16

17  Court Reporter:            BRIANA NESBIT, RPR
                               Official Court Reporter
18                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120
19

20

21

22

23

24        Proceedings recorded by mechanical stenotype reporter.
           Transcript produced by computer-aided transcription.
25
```

```
 1                            INDEX

 2   MOTIONS IN LIMINE:                           3, 167

 3   JURY SELECTION:                              79

 4   OPENING STATEMENT BY MR. GAYLON:             150

 5   OPENING STATEMENT BY MR. HARRISON:           157

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

BRIANA NESBIT, RPR        OFFICIAL COURT REPORTER    (336) 254-7464

```
 1              P R O C E E D I N G S
 2       (The Defendant was present.)
 3            THE COURT:  Mr. Galyon, if you would, call the case,
 4  please.
 5            MR. GALYON:  Good morning, Your Honor.  If it please
 6  the Court, United States of America calls United States of
 7  America versus Cleve Alexander Johnson.  It is 1:08CR233-1.  He
 8  is represented by Wayne Harrison, and this matter is on for
 9  trial.
10       Your Honor, there were a few motions in limine filed by the
11  defense.  One of the specific issues that the Government had
12  requested to be heard on pretrial was the issue of admissibility
13  related to this defendant's arrest in California on July 24 of
14  this year.  Your Honor, the Government's contention is that that
15  evidence is relevant to consciousness of guilt based on the
16  concealment.
17       As the Court is aware from the trial briefs and the facts
18  submitted therein, this defendant was wanted as of mid-June of
19  this year in the Middle District based on a complaint.  The
20  Government's evidence would be that his co-defendant was arrested
21  in mid-June, that the defendant's then attorney, who represented
22  him on a civil forfeiture action related to the $16,000 that had
23  been seized in December of the previous year, was notified that
24  there was a warrant for this defendant's arrest, that at the end
25  of the July --
```

1              **THE COURT:**  Arrest for?

2              **MR. GALYON:**  For the instant offense.

3              **THE COURT:**  For the instant offense?

4              **MR. GALYON:**  That's correct.  And then he was arrested

5    some six weeks later in California as a passenger in one of the

6    trucks that he owns with a driver and another passenger.

7         Of course, the circumstances of that arrest were that

8    officers had received information about his whereabouts, that

9    they had actually visually identified him at a bus -- or at a gas

10   stop while they were getting gas, that thereafter, some 20

11   minutes later, as the officers followed -- there was no other

12   stop that took place so they knew he was still in the vehicle.

13   They then effected a traffic stop with a marked patrol unit; that

14   when the marked patrol stopped the vehicle, they actually used a

15   PA system to order the driver and passenger out.

16        And as the Court is aware from the trial brief, the reason

17   for that was because they had information about a potential

18   firearms possession by this defendant.  So when they got the two

19   other occupants of the vehicle out, those individuals originally

20   lied about whether or not this defendant was in the vehicle; and

21   then as the officers used the PA system to continue to tell the

22   defendant that they had a warrant for his arrest, that he needed

23   to come out, he refused to do so.  He didn't do anything.  He

24   didn't respond in any way.

25             **THE COURT:**  Did they indicate what the charge was for

1 the arrest warrant?

2        **MR. GALYON:**  They didn't say specifically, no.  They

3 didn't say we got a federal warrant for your arrest on these two

4 charges.

5     After an hour-long standoff in one-hundred-plus degree heat

6 there in Southern Central California, they eventually put tear

7 gas and a flash bang into the vehicle in order to try to get him

8 out; and they eventually did get him out.

9        **THE COURT:**  Let me interrupt you, if you don't mind for

10 just a minute.  Miss Harvey?

11     (Off-the-record discussion between the Court and Law Clerk.)

12        **THE COURT:**  I'm sorry to interrupt you, Mr. Galyon.  I

13 had some more notes that I wanted to have.

14     Let me back up a minute just from a scheduling point of view

15 since this is on my mind right now.  Tell me -- we are looking at

16 a two- to three-day trial; is that about right?

17        **MR. GALYON:**  Yes, sir.

18        **THE COURT:**  All right.  Mr. Harrison?

19        **MR. HARRISON:**  I would concur, yes, sir.

20        **THE COURT:**  All right.  So today is Tuesday; right?  So

21 if we start today, do you think we'll be finished by end of the

22 day Thursday?

23        **MR. HARRISON:**  I would say this trial is going -- the

24 length of this trial is going to depend substantially on the

25 issues having to do with the admissibility of co-conspirators'

1   statements.

2       I am aware, of course, that the Court can conditionally

3   admit those statements on the basis of possibly -- if a

4   conspiracy is not shown, at least with some independent evidence,

5   then all that could be stricken.

6       But it is going to be fairly lengthy, two to three days, if

7   all the co-conspirators' statements that Mr. Galyon wants in come

8   in.

9       There are a lot of other issues with regard to whether or

10  not some or many, if not most, of these statements are, in fact,

11  in furtherance of the conspiracy.  There are going to be all

12  kinds of evidentiary issues that will affect the length of the

13  trial.

14          **THE COURT:**  In terms of convenience to the lawyers in

15  terms of timing, because the other matter was set before this

16  one -- you've got people from California you are proposing to

17  bring for the Government; right, Mr. Galyon?

18      In terms of your other witnesses, are there people already

19  on the way, so to speak?  What kind of inconvenience would it be

20  to start the other case tomorrow and put this one off until after

21  that one?

22          **MR. GALYON:**  Well, Your Honor, I have the witnesses

23  here.  There are two individuals who are civilian witnesses who

24  are actually the informants in the case that have regular jobs

25  and actually came from those jobs --

1          **THE COURT:**  All right.

2          **MR. GALYON:**  -- off site in order to be here.  So we

3  are certainly prepared and ready to go, but I'll certainly do

4  whatever the Court wants to do.

5          **THE COURT:**  Sure.  Okay.  Well, I'll be inclined to

6  continue this one to trial then.  I mean, you all are ready.  You

7  anticipated going today, and your witnesses are here or

8  anticipated to be ready to be here.  I'll go ahead and keep this

9  one on the trial calendar then.  We'll deal with the other one

10  after that.

11      Okay.  I'm sorry.  I wanted to at least get that set in my

12  mind before we got too deep into where we are going with the

13  issues that are in the case.

14      So I have a motion from the Government -- or request, I

15  guess, about the concealment evidence.  I also have a motion in

16  limine from the defendant as to the scope of some of the

17  statements by co-defendant Melvin Johnson; is that right,

18  Mr. Harrison?

19          **MR. HARRISON:**  Correct, Your Honor.

20          **THE COURT:**  All right.  Well, let's continue on with

21  what you had, Mr. Galyon, on your argument about the concealment

22  evidence.  How many witnesses are we talking about?

23          **MR. GALYON:**  Your Honor, as to that particular issue,

24  three witnesses could testify.  There is an officer who visually

25  identified this defendant when the vehicle was stopped.  That's

1  Eric Ogaz.  He is with the San Bernardino County Sheriff's

2  Department there in California, and he also was the officer who

3  was driving a marked patrol unit and actually effected the stop.

4          **THE COURT:**  So he identified him at the truck stop?

5          **MR. GALYON:**  Correct.  And then the second witness is

6  Joe Braaten, B-R-A-A-T-E-N.  He is a detective with San

7  Bernardino County Sheriff's Department and works on their S.W.A.T

8  team, and he was the one that actually did the approach and got

9  Mr. Johnson out of the vehicle; and, of course, he, along with

10  Deputy Ogaz, would be able to testify about, obviously, what they

11  saw and heard during the course of the stop itself and the

12  circumstances of that.

13      In addition, Your Honor, Hank Valencia is a task force

14  officer with DEA out of Riverside, California.  He was present

15  during the stop and arrest and also was present when this

16  defendant waived his Miranda rights and gave a statement about

17  information and his involvement with individuals in El Paso, and

18  that was based on his 2001 federal conviction for marijuana.

19      He had discussed with the officers how he had recently, as

20  recently as two weeks prior to his arrest, been in contact with

21  those individuals about methamphetamine and marijuana; and he was

22  aware of their ability to transport or provide 150 pounds of meth

23  and 4- to 500-pounds of marijuana in terms of shipments, and also

24  indicated that -- after discussing some of that information, he

25  then told the officers, well, he wanted to talk to his attorney

 1  so that he could potentially use that information to help himself

 2  on the current charge.

 3          **THE COURT:**   That's when the interview stopped.

 4          **MR. GALYON:**   That's when the interview ended; that's

 5  correct.

 6      So the flight and concealment is the one issue related to

 7  the stop; and then, as I understood it, in discussion yesterday

 8  with Mr. Harrison, I think he would certainly lodge an objection

 9  related to the relevance of the statement, the Mirandized

10  statement.  I don't think there is a question about

11  involuntariness but, rather, just whether or not it is relevant.

12      So I think to clear up those two issues on the front end, if

13  we could.

14          **THE COURT:**   All right.  What is on the statement that

15  the defendant allegedly made to the DEA agent?  How do you tie

16  that to the case?

17          **MR. GALYON:**  Your Honor, I would argue that that's

18  relevant evidence related to his knowledge of drug trafficking

19  and sort of specifically related to the methamphetamine.  While

20  the 2001 incident was related to marijuana, his information to

21  the officers is that these individuals supply meth and marijuana.

22      In addition to that, the fact that he talks about he wanted

23  to essentially save the details in order to help himself on the

24  current charge I think also goes to consciousness of guilt

25  related to the current charge, that an individual provides

1  information in the hopes of gaining leniency because they know

2  they are guilty of the crime charged.  If he was not guilty,

3  arguably, he wouldn't need to say anything.  He would say, I

4  didn't have anything to do with this; I don't know what you are

5  talking about.

6      So I think that that evidence is inextricably intertwined

7  with the current case because it certainly goes to the

8  defendant's knowledge.  It goes to issues of intent and the fact

9  that he has engaged in that behavior in the past and because we

10 have to show that the conspiracy was, one, both to distribute

11 methamphetamine and also that he attempted to possess

12 methamphetamine with intent to distribute.  Again, these issues

13 of distribution and his intent, specific intent, to distribute

14 are, of course, important; and so I would argue that it is

15 relevant in that respect.

16     In addition, it is also relevant because the defendant

17 himself in his January 23 meeting with the undercover officer

18 tells the undercover officer about the fact that he had just

19 gotten out of federal prison for a marijuana offense and says, I

20 can move -- he refers to it as "the shit," referring to

21 methamphetamine and essentially he is qualifying himself.  He is

22 saying, look, I am a player.  Even during the course of the

23 conversation with the UC, says, "I am a straight up

24 motherfucker," talking about the fact that he is an individual

25 who is familiar with drug trafficking and is ready to proceed.

1       And I think all of those qualifying statements are part and

2   parcel of not only the January 23 meeting but also of the later

3   arrest, again, to show knowledge, intent -- all of those things.

4           **THE COURT:**  All right.  Let me back you up just a

5   minute.  You said what led to the arrest of the defendant at the

6   time that he was found in the truck.  The trial brief refers to

7   phone calls, which I can only regard as threatening phone calls,

8   to -- I think it was a sheriff's deputy; is that right?

9       Is that in any way related to this incident?  Because the

10  way it is juxtaposed in the trial brief, I was a little confused

11  as to how that related to this.

12          **MR. GALYON:**  Your Honor, it is only related -- it is

13  related in two ways.  Let me tell the Court right off the bat

14  that I don't intend to put that evidence on.

15          **THE COURT:**  Okay.

16          **MR. GALYON:**  I don't intend to put that evidence on.  I

17  will tell the Court how it is related just to give the Court a

18  better understanding of the framework.

19      This defendant -- and he actually talks about it in the

20  January 23 meeting with the UC how he had had $30,000 of his

21  money seized by law enforcement; 16,000 had been seized on

22  December 11.  That's based on the attempt -- the attempt to

23  possess with intent to distribute.

24      In January of 2007, about 12 months before, he had an

25  additional $11,300 seized by the Guilford County Sheriff's

 1  Office; and Kevin Cornell, who is a detective with the Guilford

 2  County Sheriff's Office, is also a task force officer with the

 3  DEA.  So he handled the seizure.  That's how he knew this

 4  defendant.

 5      So then when the threat occurs, that's what sort of got the

 6  ball rolling on being able to locate this defendant.

 7          **THE COURT:**  Okay.  So your proof would be that the

 8  charge from which the defendant was allegedly trying to conceal

 9  himself is the charge in this case?

10          **MR. GALYON:**  Yes, sir.

11          **THE COURT:**  All right.

12          **MR. GALYON:**  Yes, sir.

13          **THE COURT:**  That's why I was confused.  The trial brief

14  suggested that it might have been an earlier seizure, the way it

15  was juxtaposed with the facts of the trial brief.  That was the

16  genesis of my question.

17      Mr. Harrison, I will hear from you in just a minute.

18          **MR. HARRISON:**  Of course, Your Honor.

19          **THE COURT:**  Okay.  Mr. Harrison, do you want to be

20  heard on the concealment issue?

21          **MR. HARRISON:**  I do, Your Honor.  The concealment, of

22  course, must be in relation to the crime with which the defendant

23  was ultimately charged; and while it very may well be that

24  Mr. Galyon can produce proof of a statement from someone to my

25  client's civil lawyer, we don't know whether that was ever

1  communicated to my client or whether any details of any alleged

2  charge -- what they were, what the description of the charges

3  were, we have no idea.  It is totally speculative.

4      As a matter of fact, someone in his shoes who is not -- who

5  is not very familiar with and adept at an understanding of the

6  law of conspiracy and the law of attempt is going to be

7  relatively challenged on the face of the facts of this case to

8  think that there is a crime.

9      I know that that's a pretty bold statement, but I am going

10 to make it because of what I perceive to be the discovery in this

11 case.

12      Cleve Johnson -- I mean, he went through the activities

13 described in the discovery.  He didn't think anything had

14 happened.  First of all, the police took sixteen grand, prevented

15 any kind of transaction from taking place with regard to the

16 imaginary pound of methamphetamine, and let him go.  They didn't

17 charge him with anything.

18      How could he figure -- a man in his position is going to

19 reasonably think, well, I didn't buy any drugs and they took my

20 money so what -- I mean, he's not going to think they are

21 charging me with attempted possession with intent to distribute.

22 He is just not going to think that.

23      Then with regard to a conspiracy with his cousin Melvin, the

24 evidence that the Government is going to present to this Court

25 will indicate that he was a broker, that Melvin clearly didn't

1  have any monetary or any other interest in the proposed sale or

2  transfer of the imaginary methamphetamine.  He just arranged a

3  willing buyer and willing seller.  He didn't know the identity,

4  of course, of the seller but --

5          **THE COURT:**  I suspect not.  He wouldn't have been

6  there.

7          **MR. HARRISON:**  Exactly.  And it is such a -- it is

8  very -- I don't know.  It presumes a great deal on the part of

9  the Government to think that he -- this man will think, well, I'm

10  guilty of a conspiracy to distribute methamphetamine with my

11  cousin Melvin when, in this man's mind, all Melvin did was get

12  him in touch with a guy from whom he was going to buy -- who he

13  intended initially with conditions to possibly buy the drugs

14  from.

15      It is not what he would think.  It is not what he would

16  anticipate.  He didn't know the details, as far as we know, about

17  why he was being arrested.  I mean, he is not an angel.  There is

18  any number of things that he could have thought might be a

19  possibility for arrest; but to suggest that he specifically knew

20  that these two counts were awaiting him is to create just an

21  unrealistic view of what his state of mind was at the time of his

22  arrest.

23      You can't just be a guy who doesn't want to be arrested for

24  something and then have that used in a specific case against you.

25          **THE COURT:**  Okay.  Thank you.

1           **MR. HARRISON:**  With regard to the other -- should I --

2           **THE COURT:**  Let me do this, because I see the lawyers

3    are here from the other matter, take just a pause in this case

4    and call the Arnold case back again and just report to everybody

5    where we are in that, so I can discharge everybody in that case.

6           (The Court heard matters pertaining to another case.)

7           **THE COURT:**  Okay.  We are now back on the record in the

8    United States of America versus Cleve Alexander Johnson, Case

9    Number 1:08CR233-1.

10          Before we move on to another argument, I want to resolve

11   this issue first.

12          As I understand the law from the Fourth Circuit, which is

13   within our circuit, it appears to differ at least from some rules

14   in other circuits on this, at least looking at two of the cases

15   that I have.  One of them is United States v. Obi, 239 F.3d 662.

16   The other one is an unreported decision at 1 F.App. 108.  That is

17   United States v. Gardner.

18          It would appear that the circuit requires a link between the

19   flight or concealment or resistance to arrest and the crime for

20   which the defendant is charged, at least that appears from the

21   Obi case.

22          According to Obi, which was a flight case, slightly

23   different factual situation, the Court says:

24              "To establish this causal chain, there must be

25              evidence the defendant fled or attempted to flee,

1               and that supports inferences that, one, the

2               defendant's flight was the product of

3               consciousness of guilt and, two, his consciousness

4               of guilt was in relation to the crime with which

5               he was ultimately charged and which the evidence

6               is offered."

7      The Gardner case is not very helpful, from my point of view,

8  because it doesn't tell us what the facts are.  It simply says he

9  resisted arrest.  Based on that, the Court allowed evidence of

10 resisting arrest and some fairly broad statements that it would

11 be relevant to consciousness of guilt under Rule 401.

12      I have to -- it is unreported, and I have to believe that

13 the Gardner case still had a requirement that the arrest be

14 related to the charge for which he is charged -- or the crime for

15 which he was charged.

16      Let me ask you, Mr. Galyon, how are you proposing the

17 Government is going to tie up the link between the consciousness

18 of guilt and the crime in this case, and does the defendant have

19 to have a reasonable consciousness of guilt, so to speak, which

20 is what I understood Mr. Harrison's argument to be?  In other

21 words, how could anybody in this scenario have anticipated that

22 they would be subject to criminal charges for what they had done?

23      So let me stop right there.  I have a few other questions,

24 but let me have you walk me through that part.  How, again, will

25 the Government tie up the consciousness of guilty link to this

 1  crime?

 2      You had mentioned, I think, as I recall, that the

 3  defendant's lawyer had been advised criminal charges were coming;

 4  is that right?

 5          **MR. GALYON:**  He was told that there was actually an

 6  arrest warrant.

 7          **THE COURT:**  An arrest warrant?

 8          **MR. GALYON:**  Yes.

 9          **THE COURT:**  For the instant offense?

10          **MR. GALYON:**  Correct.

11          **THE COURT:**  And how much in advance of that was that in

12  terms of when he was arrested -- the defendant was arrested?

13          **MR. GALYON:**  Roughly six weeks.  Roughly six weeks.

14  That's why I am not arguing about flight or immediate flight, but

15  I do think that the concealment portion is relevant; and,

16  granted, I am not calling the lawyer to have him testify

17  adversely to his client.

18          **THE COURT:**  I am trying to figure out how do you make

19  the link from the lawyer to the client without invading

20  privilege?

21          **MR. GALYON:**  Right.  And I don't intend to go there as

22  to that portion of it; but I do think that there is certainly an

23  arguable inference that, one, the defendant's attorney was

24  notified about the fact that there was an arrest warrant out

25  there and, two, that the co-defendant was arrested, and that's

1  relevant, I would argue, because of the constant -- literally

2  constant contact between this defendant and his co-defendant

3  during the months preceding their arrest such that it certainly

4  seems arguably that, once I get arrested, I or my people are

5  going to let my co-defendant know because he's going to have the

6  warrant in front of him that says, Melvin Herbert Johnson and

7  Cleve Alexander Johnson are charged in a conspiracy to deliberate

8  50 grams or more of methamphetamine.  They have phones at the

9  jail.

10        **THE COURT:**  When was Melvin Johnson notified vis-a-vis

11  the arrest of Cleve Johnson?

12        **MR. GALYON:**  Melvin Johnson was picked up mid-June.

13  So, again, six weeks prior to this defendant's arrest, and it was

14  that same week when Melvin Johnson was arrested that this

15  defendant's civil attorney in the forfeiture action was notified

16  about the fact that there were warrants out there.

17        **THE COURT:**  So you are saying there is a reasonable

18  inference that could be made that the defendant, because of his

19  conversations with the co-defendant, would have known that he was

20  hunted, if you will, for his arrest; is that right?

21        **MR. GALYON:**  That's my argument, yes, sir.

22        **THE COURT:**  Is there -- are there recordings or any

23  conversations or evidence that they're conversations between

24  co-defendant, Melvin Johnson, and the defendant, Cleve Johnson,

25  from the time that Melvin Johnson was arrested to the time Cleve

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 18 of 172

 1  Johnson was arrested?

 2          **MR. GALYON:**  No, Your Honor.

 3          **THE COURT:**  So how do we connect the consciousness of

 4  guilt of the defendant with these two incidents other than having

 5  to speculate that they, in fact, had some conversation to notify

 6  the defendant of the charge?

 7          **MR. GALYON:**  There is not any other evidence.  It is an

 8  inference and there is -- I guess it is also the lack of any

 9  other information that he's involved in any other criminal

10  activity such that he would think, oh, it is for another charge

11  that I am being arrested.

12          **THE COURT:**  Talk to me about that for a minute.  What

13  else -- what about his civil -- the previous civil forfeiture, is

14  that all part and parcel with this same conspiracy?

15          **MR. GALYON:**  Your Honor, it is not charged as part of

16  that same conspiracy.  In fact, this defendant was violated on a

17  supervised release last year, and that issue about the forfeiture

18  was actually part of the supervised release violation; and the

19  Court in that case did not find that there was sufficient

20  evidence.

21      So I think it would have put him on notice that there is not

22  enough evidence there to go forward; they are not arresting me on

23  that charge.  They didn't make it out in a preponderance standard

24  at my supervised release violation hearing because that was

25  actually one of the things charged, if I'm not mistaken, was that

1  he was consorting with a known felon, which was in violation of

2  his supervised release; and there was an argument about whether

3  or not he, in fact, knew that the individual was a convicted

4  felon.

5      Again, I think that that certainly bolsters the Government's

6  argument, if anything, that he would not have believed that he

7  was being charged related to that $11,300 seizure from January of

8  2007; but certainly, Your Honor, there is not a specific

9  statement related to this defendant saying, at some point, I knew

10  that there was a charge out for me from North Carolina.  I don't

11  have that particular statement.

12          **THE COURT:**  Is the evidence going to indicate that the

13  defendant at the time he was arrested was engaged in his -- in

14  some form of business, like a trucking business?

15          **MR. GALYON:**  Right, that he was in a truck that was

16  part of his trucking business.

17          **THE COURT:**  Okay.

18          **MR. GALYON:**  He was --

19          **THE COURT:**  For lawful means, or at least not for

20  unlawful means?

21          **MR. GALYON:**  Right.

22          **THE COURT:**  Okay.  All right.  I want to hear you on

23  the other issue before I make a decision on this one because I

24  think in some ways they may be related, particularly given

25  Mr. Harrison's argument in response to the concealment issue,

1  which goes to the reasonableness of whether the defendant would

2  have had consciousness of guilt, at least that's what I

3  understood the argument to be, Mr. Harrison.  I am not adopting

4  your argument.  I am just trying to repeat it so I understand

5  what the argument is.

6      Let's go to the second issue that's raised, and that is the

7  issue of the statements.  I read the cases.  I understand, in

8  essence, the argument is that co-defendant M. Johnson -- I forget

9  his first name.  Was it Michael?

10         **MR. HARRISON:**  Melvin.

11         **THE COURT:**  -- Melvin Johnson acted merely as a broker

12  and, therefore, could not have been part of any conspiracy and so

13  there is lack of unity of purpose.  Is that in essence the

14  argument?

15         **MR. HARRISON:**  Yes, Your Honor, that's correct.

16         **THE COURT:**  Let me hear from you first on that.  Then

17  I'm interested to hear from the Government in a little more

18  detail as to the extent the Government wants to lay out what the

19  evidence is going to be so that I can get a bigger picture of the

20  nature of the alleged conspiracy.

21         **MR. HARRISON:**  Well, Judge, this thing originates with

22  the efforts of a young man who was arrested and agreed to do

23  whatever he could to try to find folks who were engaging in

24  illegal activities with regard to drugs of any sort.  He had

25  dealt in the past with Melvin Johnson.  So he contacted Melvin

1 with a view towards trying to set him up, and what developed was

2 a situation where Melvin says -- it is clear that Melvin has no

3 money, or at least has insufficient funds to join in the purchase

4 of a pound of methamphetamine, but the young man will clearly --

5 and discovery has indicated that.  I think he will admit it on

6 the stand if he testifies.

7      It is clear also that my client was the only person who was

8 going to be distributing that methamphetamine that he bought or

9 was planning on buying.

10     His intent, if everything ran right, if he got the right

11 price, and if the quality of the goods were sufficient -- and

12 there will be evidence to show that that was clearly in his mind

13 during -- throughout this entire factual situation.  He was not

14 going to deal unless he got his price and unless the quality of

15 the goods were up to his standards.

16     But Melvin never -- there is no evidence that Melvin has an

17 expectation of taking part in whatever Cleve was going to do with

18 the methamphetamine once Cleve paid the $16,000 for it.  This was

19 not -- there is no evidence of any windfall.

20          **THE COURT:**  A distribution is a transfer; right?

21          **MR. HARRISON:**  Correct, yes.

22          **THE COURT:**  So why wouldn't the intended distribution

23 from the undercover agent to your client have been also a

24 transfer?

25          **MR. HARRISON:**  But my client can't conspire with the

1  undercover agent.  The only person --

2          **THE COURT:**  He can conspire with Melvin.

3          **MR. HARRISON:**  He could conspire with Melvin, but they

4  don't have an agreement.  They don't have the agreement charged.

5  That's the problem with the Government's case.

6      The Government wants the Court initially and then later the

7  jury to say this is a bad man, this is a drug dealer, he was

8  going to buy $16,000 worth of methamphetamine; therefore, he was

9  in a conspiracy with Melvin Johnson.

10     It doesn't work that way.  The conspiracy law requires more

11 than -- as the cases indicate, it requires an agreement --

12         **THE COURT:**  Can your client --

13         **MR. HARRISON:**  -- an agreement to distribute.

14         **THE COURT:**  Can your client and Melvin enter into a

15 conspiracy -- put aside the question of Melvin's unity of purpose

16 for a minute.  Let's assume Melvin has unity of purpose with your

17 client to purchase methamphetamine from an undercover source.  Is

18 that a conspiracy?

19         **MR. HARRISON:**  It is a conspiracy but not the

20 conspiracy charged.  The conspiracy charged is a conspiracy to

21 distribute not to possess with the intent to distribute.  It is a

22 conspiracy that charges the distribution, the actual

23 distribution.

24         **THE COURT:**  That's what I was asking.  Can the transfer

25 from the undercover agent to the two co-defendants be a

1  distribution?

2       **MR. HARRISON:**  No.  The distribution -- the only

3  possible contemplated distribution would be after the actual fact

4  of the transfer of the methamphetamine from the imaginary source

5  to my client.

6       **THE COURT:**  Are you saying, no, factually or, no,

7  legally?

8       **MR. HARRISON:**  No, actually as the facts will rule out

9  both.

10      **THE COURT:**  Let me back up.  Okay.  I understand you

11 cannot conspire with a government agent, but can you conspire

12 among yourselves as co-defendants to engage in a purchase from a

13 government agent?

14      **MR. HARRISON:**  You certainly can but that's not -- I'm

15 sorry.

16      **THE COURT:**  I'm sorry.  Let me just take it step by

17 step.  Is that purchase from the government agent a distribution?

18      **MR. HARRISON:**  No, that's a possession.  That's a

19 possession.  Before you can distribute, you have to possess.  In

20 fact, I have a case on that.

21    My -- I may be able to find it.  I've got it right here in

22 my trial notebook, but I can't call the name of it to the Court

23 right this instant.

24      **THE COURT:**  All right.  Let me stop right there for

25 just a minute.  I want to hear from Mr. Galyon.  Tell me, if you

1  would -- well, first of all, how do you respond to that argument

2  about there can't be a conspiracy here under these facts because

3  you have a government agent and, if anything, the conspiracy is

4  one to possess not to distribute?

5         **MR. GALYON:**  Your Honor, as to that specific issue,

6  quite honestly, I don't have a case dealing with that, and

7  probably the reason that I don't is because it doesn't matter in

8  our case because there was a conspiracy to distribute and --

9         **THE COURT:**  To distribute after the contemplated

10  possession?

11         **MR. GALYON:**  During the timeframe of the conspiracy.

12  That contemplate -- the attempted possession was just one of the

13  parts of that conspiracy.

14         **THE COURT:**  Okay.

15         **MR. GALYON:**  There is evidence that the Government will

16  put forward based on recorded conversations with co-defendant,

17  Melvin Johnson, wherein he describes the fact that he has a

18  quantity of methamphetamine that he has received from this

19  defendant that he has to get sold so that he can then pay this

20  defendant and re-up, or get more dope; and that is spelled out

21  very specifically in one of the recorded conversations.

22      So the fact that they -- that he is -- he, Melvin Johnson,

23  is engaged in brokering this deal is simply in furtherance of

24  their conspiracy to distribute methamphetamine.  He is not

25  distributing any other drug.  He, Melvin Johnson, is getting his

1  methamphetamine from this defendant and so the attempted

2  possession with intent to distribute is simply one of the acts in

3  furtherance of that conspiracy.

4       So it is not -- I mean, the argument about the fact that

5  this one incident on December 11th is somehow the entire

6  conspiracy when -- the conspiracy dates are not simply

7  December 11th.  The conspiracy dates are December 7th through

8  July 1st when the indictment came back, July 1 of 2008; and even

9  during that time, even after the attempted possession does not

10 happen, in January of 2008, Melvin Johnson with this CS -- both

11 of the confidential informants go to take Melvin Johnson to meet

12 with Cleve Johnson so that he can pay off a portion of a drug

13 debt, and they also intended for him to get some -- he, Melvin

14 Johnson, to get some additional methamphetamine.

15      Now, this defendant had some methamphetamine but not that he

16 gave to Melvin Johnson on that occasion in early January, and

17 then sort of the focus of the investigation or proceedings of the

18 investigation changed in order to sort of push Melvin out and

19 deal directly with this defendant, you know, because during the

20 early part of the conspiracy -- or early part of the

21 investigation into the conspiracy, the informant had to deal

22 through Melvin, A, because Melvin was the person he knew and, B,

23 because Melvin wanted it that way.  He wanted the control over

24 how the deal was going to go and to basically be the conduit, or

25 the broker, for that deal.

1      So the fact that that one incident on December 11th does not

2   happen doesn't change the nature of the conspiracy.  I mean, it

3   is simply one of the acts that's part of this conspiracy to

4   distribute methamphetamine and, of course, the fact that the

5   defendant was attempting to get a pound of methamphetamine, you

6   know, 460-odd grams of methamphetamine, certainly well in excess

7   of 50.

8      And while there was no specific argument -- or specific

9   statement by Melvin Johnson of I plan -- I'm sure that I will get

10  some of that at some point fronted to me, just like I have on

11  other occasions, and then sell it so I can then pay this

12  defendant back and get more -- you know, I mean, that certainly

13  seems completely logical in the context of the conspiracy itself,

14  based on their previous dealings, based on their subsequent

15  dealings after the attempt goes haywire.

16         **THE COURT:**  All right.  Is there going to be evidence

17  in this case then that Melvin Johnson -- and by the way, what is

18  his status?

19         **MR. GALYON:**  Your Honor, he pled guilty to the

20  conspiracy.  He is not going to testify.

21         **THE COURT:**  He what?

22         **MR. GALYON:**  He is not going to testify, at least not

23  for the Government.  I don't know if he -- Mr. Harrison has

24  anything worked out, but he's already been sentenced.  He pled

25  and was sentenced.

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 27 of 172

1    His case was moved a little bit faster, obviously, because

2  he was arrested earlier.  There was -- because this defendant was

3  arrested in late July in California, there was some delay in

4  getting him back from California; and so that's why his case is

5  on at a later setting.

6         **THE COURT:**  You are saying that the Government will put

7  on testimony that there was, in fact, an agreement between this

8  defendant, Cleve Johnson, and Melvin Johnson to distribute

9  methamphetamine apart from the purchase of the pound that

10 Mr. Harrison is talking about; is that right?

11        **MR. GALYON:**  Yes, sir.

12        **THE COURT:**  That that purchase of a pound was --

13        **MR. GALYON:**  Just simply one of the parts of the

14 conspiracy.  I mean, it was in furtherance of their conspiracy to

15 distribute methamphetamine.

16        **THE COURT:**  All right.  Thank you.  Now, Mr. Harrison,

17 do you want to be heard any further?

18        **MR. HARRISON:**  Yes, Your Honor.  There is no evidence

19 of that.  That's what my colleague would like to be able to

20 argue, but there is no inference -- there is no evidence from

21 which you can make that conclusion.

22        **THE COURT:**  I'm afraid I don't know the answer to that

23 until I hear whether there is any evidence.  That may be a Rule

24 29 argument.

25        **MR. HARRISON:**  Correct.

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1        **THE COURT:**  Obviously, I would be glad to hear you at

2  that time; but at this time, in terms of the allegations, unless

3  the Government wants to concede there is no evidence, I have to

4  assume there is evidence because the Government is telling me

5  there is evidence.

6        So I am interested at this point as a pretrial matter what

7  your argument is as a pretrial matter.  Now, if it turns out that

8  there is no evidence, then we'll deal with it at that point and

9  make the appropriate ruling.

10        **MR. HARRISON:**  I would like to say one thing in this

11  vein.  Mr. Galyon's situation where Melvin owes Cleve money for

12  meth that he bought from Cleve does not –– the purchase –– a

13  buy-sell agreement is not evidence of a conspiracy.  The fact

14  that he bought some amount, relatively small actually –– if you

15  go by what the evidence will show an ounce costs, which is about

16  $1,000, I believe, then the amount that he had bought from Cleve

17  was less than an ounce; and that's all the evidence will show

18  about their deal.

19        You might presume all kinds of things; but in terms of

20  evidence that's going to come from that witness stand, the only

21  evidence about dealing is a single buy-sell situation between

22  this man and his cousin; and every case that you can read in

23  every circuit will say that the existence of simply a sale of an

24  amount of drugs on a single occasion is not a conspiracy.  It

25  does not make out an agreement between the two parties beyond the

1  act of the sale itself.

2      That's what the problem is with this case.  The Government

3  wants to make a conspiracy in spite of the law of conspiracy.

4      The Court has been very patient to hear me out on this.  I

5  understand most of what I am talking about has application at a

6  later date in this case, depending on what the evidence actually

7  is.  I am just making a prediction based on what the Government

8  has given me.

9          **THE COURT:**  I appreciate that.  I understand Mr. Galyon

10  to say that the Government is going to have evidence of

11  distribution during this course of time; is that right,

12  Mr. Galyon?

13          **MR. GALYON:**  The Government will have evidence that

14  Melvin Johnson, the co-defendant, had received methamphetamine

15  from this defendant, that he had -- specifically, in early

16  December, had already distributed half of what he had received.

17          **THE COURT:**  Received from whom?

18          **MR. GALYON:**  That he had received from this defendant.

19  He had distributed, that is, he had sold it, to other customers

20  about half of what he had received from this defendant.

21          **THE COURT:**  Within the conspiracy time period?

22          **MR. GALYON:**  Yes, sir.  And was still trying to sell

23  the rest of it to other customers, and there is actually -- as

24  part of the conversation on December 7th, Melvin Johnson talked

25  about how -- he actually calls this defendant on the phone.

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 30 of 172

1      **THE COURT:**  Is this all going to be in evidence?

2      **MR. GALYON:**  Yes, sir.

3      **THE COURT:**  Without Melvin Johnson being a witness?

4      **MR. GALYON:**  Yes, sir.

5      **THE COURT:**  Okay.

6      **MR. GALYON:**  A, because it was heard -- not only

7  because there is a tape recording of it, but also because the CIs

8  will testify about it.

9      **THE COURT:**  I am not questioning the foundation of it.

10  I just am questioning whether it is coming in -- at least, I

11  should say, whether it is going to be proposed, that would be

12  more accurate to say, by the Government.

13      Don't take what I said to be any kind of prediction on

14  whether there is or is not proper foundation.  There are a number

15  of ways you can get that kind of stuff into evidence.  My only

16  question was whether somebody is going to be here to hope to

17  testify about it in the absence of Melvin Johnson.  That's all I

18  meant by that.

19      **MR. GALYON:**  Yes, sir.  And consistent with the rules

20  and as laid out in the trial brief, with respect to the recording

21  of that conversation, the Government has two witnesses who can

22  identify the voice of Melvin Johnson as the speaker in a phone

23  conversation and it is the Government's --

24      **THE COURT:**  Were they participants in the conversation?

25      **MR. GALYON:**  They were not participants.  They were

1  present while Melvin Johnson was having the conversation, and it

2  is the Government's argument, of course, that evidence is not

3  hearsay because it is statements during the course and in

4  furtherance of the conspiracy.

5      The conversation is a discussion between Melvin Johnson and

6  this defendant about whether he is going to -- whether he, Cleve

7  Johnson, wants to get pills and anhydrous ammonia, which are

8  precursor chemicals, or if he wants to get a pound of

9  methamphetamine that's already prepared and there is -- based on

10 the Melvin Johnson portion of the conversation, there is

11 certainly a discussion about price because Melvin Johnson talks

12 about thousands and so, from that one conversation, there is

13 certainly a discussion related to what is going to happen with

14 this proposed dope deal; and then, thereafter, Melvin Johnson

15 actually recounts to the CIs what the conversation was in order

16 to satisfy them that, yes, Cleve Johnson wants to get a pound of

17 methamphetamine, et cetera, to make the deal go forward?

18         THE COURT:  Okay.  But in your -- you are saying that

19 within this period from December 7th, I think it is -- is that

20 right?

21         MR. GALYON:  Right, yes, sir.

22         THE COURT:  So hold on just a minute.  December 7,

23 2007, through I guess technically the date of the indictment,

24 July 1, 2008, that the two defendants, Cleve Johnson and Melvin

25 Johnson, had agreed to distribute actual -- that there will be

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER   (336) 254-7464

1  evidence that they had agreed to distribute methamphetamine

2  either from this pound they are talking about or other -- from

3  some other source; is that right?

4         **MR. GALYON:**  Yes.  Because, again, there is evidence

5  that prior to December 11th, when they attempted to get that

6  methamphetamine, they already had methamphetamine that this

7  defendant had distributed to Melvin Johnson; and that Melvin

8  Johnson had distributed at least part of that and was still

9  trying to distribute the rest of it when he has a conversation

10 with this defendant on December 7th about setting up this

11 additional source of supply.

12        **THE COURT:**  All right.  The motion before the Court

13 right now from the defendant is a motion in limine to hold

14 inadmissible any out-of-court statements from Melvin Johnson, the

15 alleged co-conspirator in the case.

16     The argument is made that the statements are not made by a

17 co-conspirator during the course of and in furtherance of the

18 charged conspiracy.  The argument is also made that the

19 defendant -- I'm sorry, the argument is made by the defendant

20 that the Government would not be able to offer sufficient proof

21 that a conspiracy to distribute methamphetamine existed as

22 between Cleve Johnson, the defendant in this case, and Melvin

23 Johnson, a co-defendant in the case, who has already offered a

24 plea.

25     The Court finds -- well, actually, I should say further the

1  argument is made that Melvin Johnson merely sought to arrange a

2  possible meeting between a potential buyer and a potential seller

3  and had no unity of purpose or concert of interest or shared goal

4  with the defendant, Cleve Johnson, to distribute the

5  methamphetamine.

6       Based on the presentation, the Government has indicated that

7  it intends to offer evidence that the defendant Melvin Johnson,

8  in fact, did conspire with the defendant Cleve Johnson to

9  distribute methamphetamine and that there will be evidence of a

10 shared goal in that respect and that the role of Melvin Johnson

11 was more than merely seeking to introduce a possible buyer and

12 possible seller.

13      So based on that, the Court finds that at this point it is

14 premature to rule on this.  This motion depends upon the

15 evidence, and the Court will wait and see what the evidence

16 produces and deal with the motion at that time.  So the motion in

17 limine is denied at this time.

18      As to the motion as to concealment, I can't give you a firm

19 ruling at this point because I think it is going to depend in

20 part upon the nature of the evidence that would have given rise

21 to consciousness of guilt within the defendant's mind.  Under the

22 case law, as I read it, there needs to be a connection between

23 the defendant's conduct.  Here it would be the concealment and

24 his consciousness of guilt in relation to the very crime being

25 charged.

1      While it would appear to me at this time that there was --
2  let me say it this way:  It would appear to me that if the
3  evidence were to show that an ongoing conspiracy to distribute
4  methamphetamine over a long course of time, and in the absence of
5  any other possibility for a basis of a criminal charge, that
6  there may very well be sufficient evidence for an inference of
7  consciousness of guilt where the defendant, once he knew that
8  someone was calling for his arrest, would have in his mind
9  reasonably connected or linked the arrest to the charge in this
10 case.
11     So in my mind, it is going to depend on whether the evidence
12 in the case is strong enough to show that would have been a
13 reasonable inference.
14     The fact that the defense attorney for Defendant Cleve
15 Johnson was notified some six weeks prior that the arrest of the
16 defendant was being sought because the defendant had been
17 indicted and the fact that the co-defendant was arrested some six
18 weeks prior is certainly evidence tending to show to a reasonable
19 juror that the defendant may have had some consciousness of
20 guilt, but what concerns me is there is a missing link there in
21 tying up the knowledge to the co-defendant or knowledge to the
22 attorney, on the one hand, to the knowledge of consciousness of
23 the defendant on the other hand.
24     I don't know how we tie it up as to the attorney without
25 invading the attorney-client privilege.  In the absence of any

1   testimony from Melvin Johnson that he notified the defendant that
2   he had been arrested or any discussions that indicated that the
3   co-defendant had been arrested, that link seems to be tenuous at
4   this point.  I am not saying it is not existent.  I am just
5   saying I don't know what all the evidence is going to be.  I
6   don't know if there is going to be other evidence that anybody
7   else communicated with the defendant about whether -- or about,
8   rather, the fact that the indictment had been filed so that the
9   defendant was aware of the presence of the indictment.
10      So I don't read the cases to say that the defendant has to
11  have knowledge of the indictment being filed.  I don't mean to
12  suggest that -- unless somebody wants to argue that that is, in
13  fact, required, I will hear you on that; but I don't see that as
14  being required.  They only have to have consciousness of guilt,
15  and the guilt has to be in relation with the crime charged.
16      In fact, I think the Obi case ties it up by showing that the
17  defendant was well aware of the criminal acts and knew or should
18  have known that those were criminal acts; and, therefore, that
19  was sufficient, at least as to that part, the consciousness of
20  guilt.
21      So at this point, I am inclined to let it in if the evidence
22  is strong that there was an ongoing conspiracy and the defendant
23  was in the thick of it, so to speak, and so he would have
24  reasonably tied up in his own mind at the time they were calling
25  for his arrest that they were arresting him for the very crime

1  for which he was being charged.

2     I'm afraid that may be not as helpful to the Government as

3  what the Government wanted in order to determine whether to bring

4  the witnesses out, but that's the best I can do at this point.

5     The stronger the evidence on the conspiracy claim, the more

6  likely it is that I think the evidence ought to come in.  Based

7  on what I heard, it would appear that there really was no other

8  criminal activity that the defendant was engaged in.  I would be

9  inclined to let it in.  It will depend on the strength of the

10 Government's case.

11     Yes, Mr. Harrison?

12        **MR. HARRISON:**  Your Honor, I can't help but note that

13 the Government is trying to get into evidence an inculpatory

14 statement --

15        **THE COURT:**  I haven't ruled on the statement yet.

16        **MR. HARRISON:**  Right.  But the content of that

17 statement would make him -- I mean, he's talking about dealing

18 with Mexicans out in the western part -- he is in the western

19 part of the United States.  If he is going to think he is going

20 to be arrested for something, it would seem to me he would more

21 logically think that it was because of his two weeks ago dealing

22 with the Mexicans, but I mean --

23        **THE COURT:**  I am not sure the law requires that if you

24 are a pervasive drug trafficker and are selling nationwide and

25 are subject to indictment in multiple jurisdictions that you have

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 37 of 172

 1   to have in your mind's eye the very indictment or crime being

 2   charged to the exclusion of others.  So if he is, in fact,

 3   involved in drug dealing throughout the country -- I am not

 4   saying he is.  Hypothetically, according to what you were

 5   saying -- let's say in the Southwest, under your example, as long

 6   as it is reasonable that he would have consciousness of guilt

 7   that he could have been picked up for one or the other, I don't

 8   think the subjective belief of the defendant appears to be what's

 9   required under the law.  It is a question of -- appears to be one

10   of objective reasonableness of whether it was reasonable to

11   infer.

12            MR. HARRISON:  All right, sir.

13            THE COURT:  I have not ruled on the statements.  What

14   you brought up was the question of the statements.  I think I am

15   not going to issue a ruling on them right now, but I will say

16   that as to knowledge of drug trafficking activity, particularly

17   that involving methamphetamine, that may very well be relevant to

18   prove knowledge of the business.  I will need to know more about

19   the context of the statements.  We can either talk more about it,

20   or we can deal with it at a break or sometime later.

21        As to the inculpatory statement, I do have one concern with

22   that and, that is, that at some point he invokes his right to

23   counsel.  My one concern is whether his invocation of his right

24   to counsel can in any way be presented to the jury; and as I

25   understand the law, it cannot be.  He has a right to remain

1  silent, his Fifth Amendment right; and if he wants to call off

2  the interview at some point, which he did, that he would have a

3  right under the constitution to do that and that the jury cannot

4  draw any inference from that.

5      Now, he may have in some way modified or waived that by

6  giving the other information.  I don't know.  I would like to

7  hear more from you all about whether his -- invocation of his

8  right, how that affects the admissibility of the statement.  We

9  can either do that now, if you are ready, or we can do that

10  later.

11      I've got a jury upstairs.  We can pick a jury.  Then we can

12  deal with that issue.  It sounds like that's not going to come up

13  for a while.

14          **MR. GALYON:**  Well, Your Honor, just quickly, the report

15  that I have and, as I understand it, during the course of that

16  interview, this defendant said he didn't want to provide any

17  additional specific details because he wanted to use the

18  knowledge in order to possibly gain or receive consideration for

19  his current charges; at which point, the interview was

20  terminated.

21      So I may have misspoken actually when I said he wanted to

22  talk to his lawyer.  It was simply that the interview was

23  terminated because he didn't want to talk anymore.  He wanted to

24  be able to use that information to help himself.  So he wasn't

25  going to provide any more information.

1      There is no indication here that he actually says that I

2  want to talk to my lawyer about being able to use that

3  information.

4          **THE COURT:**  What is it exactly that -- what is the

5  inculpatory statement?  What is it that he said about the -- just

6  before that about the drug activity and contacts and Southwest?

7          **MR. GALYON:**  Right, Your Honor.  It is during the

8  interview that he had stated he was aware of Hispanic subjects in

9  the El Paso, Texas, area who were capable of obtaining

10 approximately 150 pounds of methamphetamine and 4- to 500 pounds

11 of marijuana.

12     He said that in 2001 he was busted with approximately 30

13 pounds of marijuana he was transporting in his vehicle. the

14 subjects in El Paso would supply him with methamphetamine and

15 marijuana because he did not reveal his source after his arrest.

16         **THE COURT:**  Is this from a brief?

17         **MR. GALYON:**  A DEA-6.

18         **THE COURT:**  This is not something that I have yet, the

19 summary of the statement?

20         **MR. GALYON:**  Right.  Well, actually, I did summarize it

21 in the trial brief.

22         **THE COURT:**  I was looking back to your brief to see if

23 I could find what page that is on.  I've got page 8 of your trial

24 brief.

25         **MR. GALYON:**  Yes, sir, page 8.  There is the discussion

1  about the statement itself and how he -- because he didn't reveal

2  his source, that they would supply him.

3          **THE COURT:**  In other words, he was a trusted adviser,

4  so to speak; is that the essence of it?

5          **MR. GALYON:**  Yes, sir.  And that he spoke with a

6  subject approximately two weeks ago, and they were asking when he

7  would be available to transport marijuana and/or methamphetamine;

8  and then while discussing his knowledge of narcotics, he then

9  stated he didn't want to provide any additional specific details

10 because he wanted to use the knowledge in order to possibly gain

11 or receive consideration for his current charges, and then the

12 interview was terminated.

13         **THE COURT:**  Okay.  Mr. Harrison, do you want to speak

14 to that real quick?

15         **MR. HARRISON:**  Please.

16         **THE COURT:**  I don't mean real quick.  Speak to it to

17 the fullest extent you need to.

18         **MR. HARRISON:**  Thank you, sir.  Actually, Your Honor, I

19 have two problems at least.  First of all, we are not -- our

20 defense in this case has nothing to do with trying to establish

21 that he had no intent at any time to do anything or that he had

22 no knowledge of dealing in methamphetamine.

23     To the contrary, the evidence, if it's going to be admitted,

24 will show that.  That's not our defense.  That's not our theory

25 of the case; and if it's not, then there is a serious 403 problem

 1  here with getting into evidence matters such as talking to

 2  Mexicans about dealing in methamphetamine when there is

 3  absolutely no showing of a connection between a conspiracy with

 4  his cousin Melvin and him buying drugs from the Mexicans.

 5      The problem is that the Government's evidentiary net in this

 6  case is just utterly -- I've never seen such a widespread --

 7  everything according to the Government's theory, everything he

 8  does, if he does anything illegal with regard to the purchase or

 9  sale of drugs, is presumed to be part of a conspiracy to

10  distribute methamphetamine with his cousin Melvin.

11          **THE COURT:**  I am not --

12          **MR. HARRISON:**  I just can't believe that anything a man

13  does that's criminal involving the transfer or purchase of drugs

14  gets into evidence under a theory of, well, it is related to the

15  charged conspiracy.

16          **THE COURT:**  Let me ask Mr. Galyon.  Is it the

17  contention of the Government that this relates to his conspiracy,

18  or is the Government arguing that it comes in for any other

19  purpose?

20          **MR. GALYON:**  Well, I think there are -- I think there

21  certainly are two bases for it.  One is -- you know, the reality

22  is that this defendant is getting methamphetamine from somewhere

23  that he is then distributing along with his cousin.  We know that

24  because, based on the evidence that will be put forward, he

25  actually had provided, during the course of the conspiracy, a

1  quantity of methamphetamine to his cousin Melvin for

2  distribution; and as an additional part of that, he also tried to

3  get some quantity of methamphetamine from an Hispanic supplier

4  there in North Carolina.

5      Those actions don't change the fact that if an individual is

6  involved or receiving methamphetamine from some additional source

7  that he can't continue to conspire with the people in North

8  Carolina.  It is simply part of the overall conspiracy.  I mean,

9  there is certainly not a problem with that.

10      The fact that the people in North Carolina are basically

11  distributing for individuals who are supplying them from the

12  Southwest, that doesn't -- I mean, it is a hierarchy essentially.

13  You know, you got the supplier from Mexico who is supplying the

14  supplier in North Carolina; this defendant, who is supplying the

15  distributor in North Carolina; his cousin, who is supplying the

16  customers in North Carolina, people who smoke meth in Surry

17  County.

18          **THE COURT:**  Is there going to be evidence from the

19  Government's case that a jury can draw, in your view, a

20  reasonable inference that these contacts that the defendant

21  allegedly talked about in his interview with the DEA agent were,

22  in fact, one of his sources for methamphetamine during the period

23  of the conspiracy?

24          **MR. GALYON:**  Well, based on the statement -- and I can

25  certainly clarify that, but it says, "Johnson stated that in

1  2001, he was busted with approximately 30 pounds of marijuanas he

2  was transporting in his vehicle, and the subjects in El Paso

3  would supply him with methamphetamine and marijuana because he

4  did not reveal his source after his arrest."

5      Now, I can certainly clarify that as a -- was the defendant

6  saying that because he wanted to do something proactive, he knew

7  that those folks would still supply him, or was he saying that

8  they would, as in had been, supplying him during that period, you

9  know, the period since he got out of prison essentially.

10      **THE COURT:**  It is one thing to say somebody is capable

11  of supplying during the period of time of the conspiracy, but

12  that may not be sufficient to get it into evidence as to being

13  part of the conspiracy.

14      The other question in my mind, as to the 2001 event, is

15  whether that -- it is clearly not part of the conspiracy because

16  it is outside the conspiracy time period.  The question is

17  whether it's admissible to show as a -- 404(b) to show some type

18  of the knowledge of the drug trade.

19      Okay.  I can't -- I am not going to issue a definitive

20  ruling on that right now, but that's what I am thinking about.

21  That will give you some sense of where I am coming from.  You can

22  decide on how want you to bring your witnesses in.  I will be

23  happy to rule on it when it becomes a little more concrete as to

24  exactly what they are going to say.

25      **MR. GALYON:**  Certainly.  I know the Court wants to get

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  to the jury.  The one last issue for purposes of opening

2  statement -- because I'll still steer clear of all these other

3  things we talked about because of the Court's preliminary

4  rulings.  The one last thing is this issue of the meeting that

5  occurred on January 23 between this defendant and the undercover

6  officer wherein -- essentially, the first thing that this

7  defendant talks about when he meets with the undercover -- I got

8  this and Mr. Harrison has a copy of the redacted transcript that

9  we did.

10          THE COURT:  This is as of what date?  January 23?

11          MR. GALYON:  Your Honor, this is January 23 of 2008.

12  That's correct, sir.

13          THE COURT:  All right.

14          MR. GALYON:  Essentially, the first statement that the

15  defendant says on page 1 -- I'll be happy to provide the Court a

16  copy of the redacted transcript for the Court to look at it.

17          THE COURT:  That would be helpful if you have one.

18          MR. GALYON:  Certainly.

19     (Assistant U.S. Attorney handed document to Deputy Clerk.)

20          MR. GALYON:  I tried to summarize it as verbatim as I

21  could in the trial brief, but this is what we got from page 1 at

22  line 4, where it says:

23          "What's up, man.  Look here, man.  I have had

24          30-fucking-thousand dollars took me.  The feds

25          took it, right, the DEA, all right.  I just got

```
 1              out of federal prison for trafficking marijuana.
 2              Okay.  I can -- I can -- I can -- I can move this
 3              shit.  Hell, I was on my way up there to buy a
 4              fucking pound then, you know, if it was right.  I
 5              guess I was going to see you; right?"
 6         THE COURT:  That's from the defendant?
 7         MR. GALYON:  That's from the defendant to the
 8  undercover officer who he had been introduced to by the informant
 9  in this case, Robby Todd, who was the same individual who worked
10  with Melvin Johnson to set up this deal from December 11th where
11  they were going to get that pound.
12      So he's relating back directly to that seizure from December
13  where 16,000 was taken.  Actually, later on, the transcript
14  specifically references the fact that he had gone up and met with
15  Robby.  He calls Robby by name, about how he is good people and
16  all that kind of stuff, and specifically references that he had
17  gone -- on page 13 -- page 13, line 9 -- actually, starting at
18  line 7, where he says, "Yeah, Robby is good people, man.  Where
19  is Lori at?"
20      And Lori is Robby Todd's girlfriend.  She also is an
21  informant and will testify.
22         THE COURT:  And this is the defendant speaking?
23         MR. GALYON:  This is the defendant, Cleve Johnson.  And
24  then the undercover says, "No, she didn't come."  And then he
25  says:
```

Case 1:08-cr-00233-TDS   Document 31   Filed 06/22/09   Page 46 of 172

1              "Okay.  They are good people, man.  I like them.

2              They are all right.  Yeah, I went to his house

3              with 16,000 that morning and we sat around and

4              then drive into fucking Mount Airy and get

5              stopped, man.  That's a fucking son of bitch.

6              But, look here, I got a lawyer.  I got a fucking

7              lawyer that's going get me my fucking money back.

8              They didn't find no drugs.  Didn't even find no"

9              --

10     And then he talks about this issue with the Mercedes.  It is

11 actually from January of '07 where they had seized the 11,300.

12 So he references that.

13      Then the undercover says, "Yeah, I have been there before.

14 So don't worry about it."  So he is specifically referencing

15 that, but the reason that I bring this up is also because of the

16 fact that the defendant says, "I just got out of federal prison

17 for trafficking marijuana, and I can move this shit."

18      Now, technically, I think there is an argument that that is

19 404(b), but it is 404(b) that the defendant brings on his own;

20 and I would liken it to that Chin case from the Fourth Circuit

21 where the defendant talks about a murder for hire in the context

22 of the drug deal.  You know, it is part and parcel.

23      I mean, essentially, this defendant is qualifying himself as

24 a drug dealer.  He just got out of federal prison for trafficking

25 in marijuana.  He can move the meth, and their meeting is for a

1   discussion related to getting that pound of methamphetamine that

2   he intended to get on December 11th of 2007, and they discuss

3   that.  During the course of the transcript, they discuss price

4   for methamphetamine.  Then the defendant volunteers how much --

5   asked how much is it going to be to get a kilo of cocaine.

6           **THE COURT:**  Where is the reference to just getting out

7   of prison?  Where do we see that?

8           **MR. GALYON:**  Your Honor, that is page 1, lines 5 and 6,

9   where it says, "I just got out of federal prison for trafficking

10  marijuana.  Okay.  I can move this shit.  Hell, I was on my way

11  up there to buy a fucking pound then, you know, if it was right."

12      And, actually, this defendant has methamphetamine on him.

13  When the undercover says it is good quality ice, this defendant

14  says, "Is it as good as this?"  He actually has a quantity of

15  methamphetamine on him that the undercover will testify about,

16  and it is referenced in the --

17          **THE COURT:**  That's the one where the camera didn't pick

18  it up?

19          **MR. GALYON:**  Right.  There is a video camera.  It

20  basically is looking more at the window and not down at the

21  defendant's hand.  You see essentially the front windshield, and

22  then there is a portion of video where you see basically a

23  head-and-shoulder shot of the defendant during the discussion.

24      So you don't see the methamphetamine on camera; but,

25  clearly, within the context of the conversation they are talking

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

 1  about meth.  This defendant says, "Is it as good as this?"  The

 2  UC says, "It is exactly like that."  And then the defendant goes

 3  on to talk about, you know, how he needs to have a good source,

 4  essentially; that there is a lot of methamphetamine that's cut.

 5  You know, there is too much cut in the methamphetamine out there,

 6  and how he had to actually to take some methamphetamine back to a

 7  distributor that he had gotten from recently.

 8          **THE COURT:**  So the issue before the Court at this point

 9  is whether the statements can come in with reference to the prior

10  -- is that the concern, reference to the prior --

11          **MR. GALYON:**  Yes, sir, because I would intend to put

12  that out in the opening statement, if the Court would rule on it.

13          **THE COURT:**  What is the Chin case?  Do you have the

14  cite?

15          **MR. GALYON:**  I don't have the cite right off the bat,

16  but I do have a copy that I can get you.  Your Honor, that's 83

17  F.3d 83.  In that case the testimony about contract murder fits

18  into the intrinsic category of evidence.  The statements

19  regarding murder were made during an exchange of heroin for cash.

20  Thus, it was an intrinsic part of the drug deal and the

21  witnesses' account of the context and circumstances surrounding

22  the deal.

23          **THE COURT:**  All right.  I'll give you a ruling on that

24  when I get back.  We are going to take a break in just a minute

25  since we've been going for a couple of hours.

 1      Let me also say that on the previous issue that one of the

 2    cases that I rely on on the issue of the conspiracy in the

 3    argument Mr. Harrison made was United States v. Burgos, 94 F.3d

 4    849, Fourth Circuit case, which clarifies and, to some extent,

 5    disavows portions of Guinta, G-U-I-N-T-A.

 6           MR. HARRISON:  Not the portions, though, that I was

 7    citing, Your Honor.  Guinta is disfavored, in fact, overruled

 8    from the standpoint of whether or not there is a different or a

 9    higher level of review -- evidentiary review for conspiracy cases

10    as opposed to any other case.

11           THE COURT:  I understand.  All right.

12           MR. HARRISON:  May I be heard on the issue, Your Honor

13    --

14           THE COURT:  Yes.

15           MR. HARRISON:  -- of the January 23 meeting?

16      If you will turn, please, sir, to page 3, beginning at line

17    8 and continuing through line 16, it is clear that this entire

18    transaction or negotiation, initial meeting, whatever you want to

19    call it, whatever else you can say about it, it is not an

20    activity contemplated in any fashion to be in furtherance of a

21    conspiracy between Melvin and my client because, in fact, the

22    exact opposite is shown.

23      This is a point at which my client says, in essence, look,

24    this is just between you and me.  This is not going to involve

25    Robby.  It is not going to involve Melvin.  This is -- whatever

1  happens is going to be between you and me.

2      Now, there is just no way that you can then say, well, this

3  is actually part of that conspiracy charged in this indictment

4  because it is a denial of any involvement with the conspiracy

5  charged in the indictment.  He doesn't want to have any

6  relationship with Melvin Johnson in regard to this transaction,

7  and it is right there in black and white in the Government's own

8  recording.

9      I don't see how you can then say that it is admissible.  It

10  would be admissible if he was charged with a conspiracy with --

11  involving some other people or if he was charged with some other

12  crime rather than distributing cocaine in a conspiracy with

13  Melvin Johnson, but it is just patent that he has no intent

14  whatsoever to involve this transaction and Melvin Johnson, or

15  Robby for that matter.

16      I don't believe that it can be admitted on any of that kind

17  of basis.  It is simply not relevant to the conspiracy charge.

18          **THE COURT:**  All right.  Mr. Galyon?

19          **MR. GALYON:**  Your Honor, just so the record will

20  reflect that it says at page 3, line 8, this defendant says,

21  "Look here, Robby" -- referring to the informant -- "do you know

22  Melvin, my cousin?"  Basically, he is sort of jumping from the

23  informant to Melvin, my cousin.  "Do you know Melvin?"  And the

24  undercover says, "I probably" -- and we don't know what the rest

25  of that is.  I don't know if it's "I probably do."

1      Then the defendant says, "Okay, all right.  Look, Robby

2   wants -- instead of Robby getting -- Robby don't want to get

3   involved.  So he wants to introduce me to you so I can just leave

4   him out of the picture.  I can just say, hey, just me and you."

5   And the undercover says, "For now, it will be business between me

6   and you, okay?"  And then the defendant says, "That's it.  That's

7   it, Buddy."  And then the informant says -- or the undercover

8   says, "Let's get everybody out.  It is only me and you, okay?"

9      That has nothing to do with whether or not this defendant

10  can still be conspiring with Melvin Johnson to distribute

11  methamphetamine, has nothing to do with that.  I mean, he even

12  references Melvin.  When he references Melvin, he doesn't say

13  Robby and Melvin want out.  He says Robby doesn't want to be in

14  it.

15          **THE COURT:**  Okay.

16      **MR. GALYON:**  Your Honor, so based on that, I think that

17  in no way somehow excludes Melvin Johnson from being in the

18  conspiracy.  It is simply saying that the defendant now wants to

19  deal directly with an individual that he was introduced to

20  through Melvin Johnson and the informant.

21          **THE COURT:**  Okay.  Do you want to be heard any further,

22  Mr. Harrison?

23          **MR. HARRISON:**  No, Your Honor.

24          **THE COURT:**  All right.  Okay.  I am going to hand out

25  during the break here my preliminary instructions.  During the

1  break, take a look at that.  It is essentially what has become my

2  standard set of instructions.

3      I would direct your attention, in particular, to the

4  discussion of the summary of the applicable law.  It starts on

5  page 2 and goes through the beginning of page 6.  That's what's

6  tailored to this case, I believe.  I want you to read it all, of

7  course; but I believe that's the section that would be of most

8  interest to you.  Before I read it, I'll hear from you on any

9  objections you may have to it.

10     Let me just say for the record that I intend to pick two

11  alternates.  I think we'll probably put six in the box, and you

12  will have your one peremptory charge -- challenge.  We'll just go

13  with the lowest number alternates who will remain out of the six.

14     Somebody asked me once, just so the record is clear, your

15  peremptories do not carry over to the alternates.  You start

16  over, and you get one peremptory for the alternates.

17     Any questions from you all about any practice that I may

18  have?  I'll be glad to answer any questions or inquiries you may

19  have.

20         **MR. HARRISON:**  Your Honor, I had supplied my colleague

21  with a copy of my proposed opening statement.  I have never tried

22  a case with Your Honor and I don't -- I want to avoid, if at all

23  possible, an interruption while I'm making an opening statement

24  to the jury.

25     I don't believe that Mr. Galyon has any objection to my

1  opening statement, but out of abundance of caution -- it is not

2  that long.  It is a page -- just over a page, but I wondered if

3  the Court might take a look at it and tell me, if you will, if

4  there is something that you think is not proper, in which case, I

5  can --

6          **THE COURT:**  Well, I'm loathe to pass on reviewing draft

7  openings and things of that nature.  If you have any question

8  about anything that you would like to raise in the opening, I

9  would be more than happy to resolve that.  So if there is

10 anything in there that's of any concern --

11         **MR. HARRISON:**  No, not to me and apparently not to

12 Mr. Galyon.  I just want -- I think that part of the function of

13 the opening statement I am convinced -- of course, I've done it

14 all my career for 40 years -- is to present the jury with a

15 theory of your defense, and that involves, necessarily, in

16 cases -- especially in cases such as this, my defense is the

17 Government's facts will not make out the legal charge contained

18 in the indictment.

19     So I am going to necessarily have to discuss what I have

20 determined to be from reading case law what is the law in the

21 case.  I mention, of course, that the ultimate arbiter of what is

22 the law and what law they should follow is the Court.  I think

23 that it is necessary for me, in order to make a statement of my

24 theory of this case or the defense of this case, to talk about

25 the law and, consequently, I have.

1           **THE COURT:**  All right.  Until I hear exactly how it is

2     presented, I can't tell you how I would rule on anything.  I

3     certainly think you are entitled to put into context your

4     presentation of the facts.  If that involves some reference to

5     what the law is, it is likely that there would be no problem from

6     my point of view.

7         Does that give you enough guidance to help you out?

8           **MR. HARRISON:**  Yes, sir.  And matters having to do with

9     legal issues are, frankly, taken right from, for instance, United

10    States v. Pratt, one case from the Fourth Circuit, then some

11    other case law that is universal.

12          **THE COURT:**  In the absence of an objection from

13    opposing counsel, I am, of course, less likely to jump in and

14    interrupt any counsel.  I would like to let counsel try their

15    case, but I also don't like to get off on tangents; and, of

16    course, I am going to keep an eye on making sure nothing improper

17    occurs, not that it would.

18        In the absence of an objection, that's some evidence of --

19    or some guidance, I guess I should say, for you.  If Mr. Galyon

20    is not objecting to anything that's in there or doesn't lodge an

21    objection during your opening, then it is unlikely the Court will

22    get involved.

23          **MR. HARRISON:**  Thank you, sir.

24          **THE COURT:**  Anything else you all want to cover at this

25    point?

1             MR. GALYON:   No, Your Honor.

2             THE COURT:   Let's take a break for -- until quarter to.

3   We'll take a ten-minute break.  If you would, review the drafts

4   of the summary of the law.  I will be glad to hear from you at

5   some point on that.

6        I am also going to, in the jury selection, read just a

7   summary of the charges as I related to the jury; and it would

8   read as follows:

9        I am now going to summarize the charges in the case for you.

10  Remember, these are only charges; they are simply allegations,

11  not proof.

12       When there is more than one charge brought in an indictment,

13  each charge is contained in a separately-numbered section called

14  "a count."  There are two counts in this indictment.  The

15  defendant, Cleve Alexander Johnson, is charged in both counts of

16  the indictment.

17       Count One:  Count One alleges that from on or about

18  December 7, 2007, up to and including July 1, 2008, Mr. Johnson

19  knowingly and intentionally did unlawfully conspire, combine,

20  confederate, and agree with another person to knowingly,

21  intentionally, and unlawfully distribute 50 grams or more of a

22  mixture and substance containing a detectable amount of

23  methamphetamine, a Schedule II controlled substance within the

24  meaning Title 21, Section 812, in violation of Title 21, United

25  States Code, Section 841(a)(1).  This is alleged to be a

Case 1:08-cr-00233-TDS   Document 31   Filed 06/22/09   Page 56 of 172

1  violation of 21 U.S.C., Section 846.

2      Count Two:  Count Two alleges that on or about December 11,

3  2007, Mr. Johnson attempted to possess with the intent to

4  distribute 50 grams or more of a mixture and substance containing

5  a detectable amount of methamphetamine, a Schedule II controlled

6  substance within the meaning of Title 21, U.S. Code, Section 812

7  in violation of Title 21, U.S. Code, Section 841(a)(1).  This is

8  alleged to be a violation of -- hold on just a minute.  This is

9  alleged to be a violation of 21 U.S.C., Section 846.

10     As to all these charges against him, the defendant has

11  entered a plea of not guilty.

12     That is what I would intend to read.  Any objection to that?

13          **MR. GALYON:**  No, Your Honor.

14          **THE COURT:**  Mr. Harrison, any objection?

15          **MR. HARRISON:**  No, Your Honor.

16          **THE COURT:**  All right.  We are going to take a break.

17  I'll come back and give a ruling on that.  I've got a few issues

18  as to cause challenges.  Then we'll proceed from there.  All

19  right.

20     (The Court recessed at 11:35 a.m.)

21     (The Court was called back to order at 11:53 a.m.)

22     (The Defendant was present.)

23          **THE COURT:**  All right.  As to the issue of reference to

24  the transcript, more specifically, the alleged statement by the

25  defendant that during the course of his discussion with the

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 57 of 172

1  confidential informant that the defendant -- and this was a

2  discussion within which the evidence would tend to show that some

3  type of drug trafficking deal was about to -- was contemplated,

4  at least I should say, that the defendant allegedly said that he,

5  quote, just got out of federal prison for trafficking marijuana,

6  closed quote, the Court concludes that this statement is an

7  intrinsic statement, part of the intrinsic act at the time, and

8  that was that the defendant was, according to the proffer, trying

9  to demonstrate his bona fides for being a drug trafficker.

10     Under United States v. Chin, 83 F.3d 83 at page 88, the

11  Court discusses a similar situation; and this Court concludes,

12  meaning myself, that the proposed statement is necessary to

13  complete a part of the story that was being told at the time and

14  is not being sought to be admitted solely to demonstrate bad

15  character.  It is inextricably intertwined or part of a criminal

16  episode that's alleged here.  It was an intrinsic part of the

17  drug deal that was being discussed.  As I said, it is not being

18  admitted solely for demonstration of bad character.

19     The Court has also weighed the probative effect and value of

20  the statement versus its prejudicial effect and concludes under

21  the 401-403 balance that the probative value outweighs its

22  prejudicial effect.

23     Even if the statement were not intrinsic, the Court would

24  allow it under 404(b).  It is relevant to an issue other than

25  character, that is, to knowledge about the drug trafficking

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 58 of 172

1 trade.  It is necessary in that it furnishes part of the context

2 of the crime, and it is reliable.

3    As I said, the Court has also balanced the probative value

4 and the prejudicial effect and determines that the probative

5 value is not substantially outweighed by the danger of undue

6 prejudice.  So you may refer to it in your opening.

7    All right.  Any comments or objections on the proposed

8 preliminary instructions, Mr. Harrison?

9        **MR. HARRISON:**  Yes, Your Honor.  I would ask that the

10 Court include a very brief statement to the effect that a

11 defendant cannot be convicted of any crime that he is not charged

12 with in the indictments returned before this jury, or words to

13 that effect.  In other words, he can only -- a man can only be

14 convicted of what he is charged with in the indictment that is

15 before the jury.

16        **THE COURT:**  All right.  Is there a particular spot

17 where you propose that I indicate that?

18        **MR. HARRISON:**  In the Court's initial rules for

19 criminal cases, between second and third.  That would make it

20 second and third and fourth, I suppose.

21        **THE COURT:**  All right.  You mentioned after the second

22 one.  It relates to the charge.  Do you think it ought to go

23 after the first one?  I will put it wherever you want it.

24        **MR. HARRISON:**  I think the Court -- that would be fine.

25        **THE COURT:**  After the first one?

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER   (336) 254-7464

1              MR. HARRISON:  Yes, sir.

2              THE COURT:  We are talking about the indictment is not

3    proof of guilt or anything else?

4              MR. HARRISON:  Correct.  And then he can only be found

5    guilty of the charge contained in the indictment -- or charges.

6              THE COURT:  Mr. Galyon, do you have any objection to

7    that?

8              MR. GALYON:  No, Your Honor.

9              THE COURT:  Do you want to say he can only be found

10   guilty of the charge in the indictment?  Or I usually say

11   something in the final charges about -- let me see if I can find

12   it for you.

13      I usually say something to the effect that the defendant --

14   you are only here, rather, to determine guilt or innocence as to

15   the charges contained in the indictment.  You tell me what

16   language you would like.

17             MR. HARRISON:  That would be satisfactory to me.  I am

18   just concerned, of course, and I didn't know -- I haven't seen

19   that part of Your Honor's earlier charges to juries.  I didn't

20   know -- I wanted to make sure that at some point that concept was

21   introduced to the jury and the earlier the better, in my opinion.

22             THE COURT:  So if I add at the end of the first section

23   on page 2 -- it would be actually now the fifth sentence of page

24   2 -- the following, you are only here to determine guilt or

25   innocence as to the charges in the indictment, is that

 1  sufficient?

 2           **MR. HARRISON:**  Yes, sir.

 3           **THE COURT:**  Okay.  Anything else from the defendant?

 4           **MR. HARRISON:**  No, Your Honor.

 5           **THE COURT:**  Mr. Galyon, any objections?

 6           **MR. GALYON:**  No, Your Honor.  There was only one other

 7  housekeeping matter, and that was related to what I saw as to the

 8  preliminary instructions.

 9       The Government would move -- and we had indicated this in

10  the trial brief.  The Government would move without objection to

11  correct the date related to the attempt to December 11th as

12  opposed to December 7th.

13           **THE COURT:**  Okay.  Without objection?

14           **MR. HARRISON:**  That's correct, Your Honor.

15           **THE COURT:**  The indictment will be deemed so amended.

16  All right.  It's 12:00.  I have several potential cause

17  challenges.  Let me see -- let me go through these quick, and

18  then I'll show you the sheets.

19       I have one juror, Number 6, who had some suspicion -- may

20  have an alcohol issue because of the odor about her.  I would be

21  inclined to bring her down separately.  I am not sure how to

22  politely ask that.  Maybe you all had experience with that.

23           **MR. HARRISON:**  I've been doing this quite a while.  I

24  really never had that problem come up.

25           **MR. GALYON:**  No.

 1          MR. HARRISON:  I've had it a couple of times with

 2  opposing counsel.

 3          MR. GALYON:  Not present opposing counsel.

 4          THE COURT:  Let me ask you, what do you all propose if

 5  there is some suspicion of that?  I don't know exactly what the

 6  facts are.  We can just have her come down and come in the box,

 7  or I can bring her down separately.

 8          MR. HARRISON:  I would want to avoid a public inquiry

 9  insofar as it can be avoided.

10          THE COURT:  All right.  I'll bring her down separately.

11  I suppose the only way I can think of to do it is politely ask

12  her and suggest to her that there may be some suspicion as to

13  whether -- I could ask her this, ask her whether she drinks and

14  whether there is any kind of problem with her with any kind of

15  alcoholic beverage or other medication or substance.

16      You all tell me what you propose.  I'm all ears.

17          MR. HARRISON:  I mean, how did this come about?

18          THE COURT:  I was notified that the jury coordinator

19  upstairs has made an observation.  So it was just brought to our

20  attention that there is an odor of alcohol or what they thought

21  was an odor of alcohol about her.  She may have some --

22          MR. HARRISON:  Was there any observation about her

23  conduct or physical?

24          THE COURT:  That I do not recall.  Miss Solomon?

25      (Off-the-record discussion between the Court and Deputy

1      Clerk.)

2          It may be something that we can observe if she can come in

3  here and ask her a few questions.  If you have any in particular

4  you think I ought to ask or not to ask, please speak now.  All

5  right.  I'll take it step by step; and when I'm done asking her

6  questions, I'll ask you to approach the bench and see if there is

7  anything else you want me to ask at that time.

8          I have -- well, I'll just hand these back to you and you can

9  look at them and then we'll talk about them.  Maybe that's the

10  easiest way to deal with them.  All right.  Let me hand these out

11  to you.  If you all would take a look at these information

12  questionnaires, and then we'll address each one separately.

13          (Deputy Clerk handed documents to counsel.)

14              **THE COURT:**  You might divide them up.  That way we can

15  get through them a little more quickly.  Are you all prepared to

16  speak to those yet?

17              **MR. GALYON:**  Almost, Your Honor.  I have three left.

18          (Counsel handed documents back to Deputy Clerk.)

19              **THE COURT:**  Let's take these in order, if we can.

20  Start with Number 6, who is the one who has the potential issue

21  about alcohol.  I would propose just bringing Number 6 in and

22  just observing Number 6 and seeing what the deal is.  I'll ask

23  her a few questions.  Any objection?

24              **MR. GALYON:**  No, Your Honor.

25              **MR. HARRISON:**  No, Your Honor.

 1        **THE COURT:**  All right.  Number 17 had indicated there

 2  might be something that -- question 4, where it would be

 3  embarrassing for them to talk about.  She indicates some kind of

 4  declaratory interpretation of her mother's will and potentially

 5  some other matter.

 6      Anybody want to bring her in for questioning, or do you want

 7  to just deal with that in the ordinary course?

 8        **MR. HARRISON:**  I don't feel any need to.

 9        **THE COURT:**  We'll not bring Juror Number 17 in.  Juror

10  19 has a prior felony breaking and entering in 1999.

11      I can tell you in my short experience here already -- I

12  would propose to bring them in and find out whether they

13  served -- or completed their sentence because they may not be

14  eligible to serve.  Under North Carolina law, as I understand it,

15  you get your rights restored if you complete your sentence.  From

16  1999, it would appear that they completed their sentence.  I

17  think we would need to know that before we put that person in the

18  box.

19      Does anybody object to that approach?

20        **MR. GALYON:**  No, Your Honor.

21        **MR. HARRISON:**  No, sir.

22        **THE COURT:**  All right.  As to Number 22, potential

23  medical problem, having to go to the restroom in an emergency;

24  and I have a note from their doctor.  I would propose we bring

25  that person in and find out if that's going to be a problem

 1  because it may be of an embarrassing nature in front of everybody

 2  else.

 3      Any objection?

 4          **MR. GALYON:**  No, Your Honor.

 5          **MR. HARRISON:**  No, sir.

 6          **THE COURT:**  Number 23 indicates high blood pressure and

 7  diabetes.  Does anybody desire to bring that person in at this

 8  time?

 9          **MR. GALYON:**  No.

10          **THE COURT:**  All right.  Mr. Harrison?

11          **MR. HARRISON:**  No.  I'm sorry, Your Honor.

12          **THE COURT:**  Number 25 has had a heart attack

13  November 24, some memory problems.  I propose we bring that

14  person in separately, unless you want to dismiss for cause at

15  this point?

16          **MR. GALYON:**  I have no objection to dismissing for

17  cause.

18          **MR. HARRISON:**  I don't either.

19          **THE COURT:**  All right.  Twenty-five will be dismissed

20  for cause.  Thirty-one -- I don't know what 31 has.  It looks

21  like they tried to write something down as "yes" and then says,

22  "no."  I am going to take that as a no, unless you all want to

23  bring 31 in?

24      This was as to question Number 4 as to whether there is --

25  have you been in a court case before and whether it might be

 1  embarrassing.  It looks like in pencil they said, "yes," and then

 2  they -- from what I could tell, it looks like something -- spouse

 3  had a DUI and son had an animal cruelty charge dismissed.

 4      Would either of you like to bring that person in separately?

 5          **MR. GALYON:**  No, Your Honor.

 6          **MR. HARRISON:**  No, sir.

 7          **THE COURT:**  All right.  I am not sure that they would

 8  necessarily answer responsively to any question I have about

 9  those anyway.

10      Number 32 answered Number 4, "yes," indicated he has a

11  daughter who pressed charges against her ex-boyfriend for killing

12  her dog.  He was found guilty and went to jail.

13      Anybody want to bring that person in separately?

14          **MR. GALYON:**  No.

15          **MR. HARRISON:**  No, Your Honor.

16          **THE COURT:**  All right.  Mr. Galyon, any request to

17  bring that person in?

18          **MR. GALYON:**  No, Your Honor.

19          **THE COURT:**  Number 48 answered Question 4, "yes,"

20  indicates her husband was abusive and dangerous to the kids.  She

21  lost her children in '97 and '98 and apparently got them back,

22  says things are great at this time.

23      Anybody want to bring that person in at this time?

24          **MR. HARRISON:**  No, Your Honor.

25          **MR. GALYON:**  I don't.  I guess one of the questions --

1  I don't know if Court normally asks this question about whether

2  or not they have friends or family who have had drug problems.  I

3  don't know if that will then touch on this domestic violence

4  issue, if there's that part of it, if it's either a drug or

5  alcohol problem that was fueling the domestic violence.

6          **THE COURT:**  I normally do not.  I usually ask whether

7  because the case involves a controlled substance, in this case

8  methamphetamine, whether that would cause anybody to have

9  difficulty.  Specifically, what I'm intending to ask is is there

10  anything about the nature of this case itself, that is, the fact

11  that the defendant is charged with certain offenses involving a

12  drug here, methamphetamine, that would prevent you from being

13  able to render a fair and impartial verdict?

14      So we are not going to bring 48 in; is that right?

15          **MR. HARRISON:**  That's correct, Your Honor.

16          **MR. GALYON:**  No, Your Honor.

17          **THE COURT:**  Last one is Number 59, if we get that far,

18  misdemeanor breaking or entering, four counts and also on

19  Question 4 indicated had one count of assault on a female, said

20  he would be embarrassed about mentioning that.

21      At this point my only concern is whether they are eligible

22  to be a juror.  I don't know if assault on a female is a felony

23  or not.

24          **MR. GALYON:**  It is not, Your Honor.  It is Class A1

25  misdemeanor in this state.

1              THE COURT:  Does anybody want to bring in Juror Number

2    59?

3              MR. HARRISON:  I do not.

4              MR. GALYON:  No, Your Honor.

5              THE COURT:  So we are going to bring in Jurors 6, 19,

6    and 22, or at least as many as we can before the lunch break.

7          (Prospective Juror No. 6 entered the courtroom.)

8              THE COURT:  Good morning, ma'am.

9              PROSPECTIVE JUROR NO. 6:  Good morning.

10             THE COURT:  How are you?

11             PROSPECTIVE JUROR NO. 6:  Nervous.

12             THE COURT:  You don't need to be nervous.  What is your

13   full name, please, ma'am?

14             PROSPECTIVE JUROR NO. 6:  Karen Brawley (phonetic)

15   Hill.

16             THE COURT:  At some point we are going to bring the

17   full jury pool in here, but I wanted to ask you just a few

18   questions, if you don't mind.  Please, as I said, don't take

19   offense to anything I ask.  There is no intent to pry into any

20   personal matters with any of the jurors.  You'll probably hear me

21   say that to the full group this morning.

22       Is there any reason you can think of, ma'am, that would

23   prevent you today from sitting on a jury?

24             PROSPECTIVE JUROR NO. 6:  My granddaughter is having

25   surgery as we speak.  That kind of makes things a little rougher;

1  but other than that, no.

2          **THE COURT:**  What kind of surgery is she having?

3          **PROSPECTIVE JUROR NO. 6:**  She is having a light run

4  down her throat.  She's quit breathing.  They decided yesterday

5  to just put her in the surgery today.  They didn't even know

6  until yesterday evening that she had to go.  She is only

7  six-and-a-half months old.

8          **THE COURT:**  How long will that take, ma'am?

9          **PROSPECTIVE JUROR NO. 6:**  They didn't have any idea,

10  and it is in Concord.

11          **THE COURT:**  All right.  Do you think that is going to

12  -- will that affect your ability to be able to sit as a juror and

13  concentrate on the evidence in a trial?

14          **PROSPECTIVE JUROR NO. 6:**  It might because I'm very

15  worried about her because I had a son myself that died at

16  three-and-a-half months.  This is my granddaughter.  So, yes, it

17  has definitely affected me.

18          **THE COURT:**  Let met ask counsel to approach the bench,

19  please.

20     (The following proceedings were had at the bench by the

21     Court and Counsel out of the hearing of the jury:)

22          **THE COURT:**  It takes a minute just to set up the court

23  reporter.  Do you all want me to go further?  I'll be glad to ask

24  whatever you want me to ask.

25          **MR. HARRISON:**  I don't think so.  I think she can be

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 69 of 172

1  removed for cause.

2          THE COURT:  Both of you agree to that?

3          MR. GALYON:  Yes, sir.

4          THE COURT:  I'll let her go then.  Thank you.

5      (Thereupon, the following proceedings continued within the

6      hearing of the jury:)

7          THE COURT:  Miss Hill, I thank you for your candor here

8  this afternoon.  You may return back up to the fourth floor.

9  Good luck with your family situation.

10     (Prospective Juror No. 6 departed the courtroom.)

11         THE COURT:  Let the record reflect she will be removed

12 for cause by agreement of counsel for the Government and the

13 defendant.  They will let her go up there.  Since it is

14 lunchtime, I just decided to send her back upstairs.  They will

15 dismiss her at that time.

16     (Prospective Juror No. 19 entered the courtroom.)

17         THE COURT:  Good afternoon, sir.

18         PROSPECTIVE JUROR NO. 19:  Good afternoon, sir.

19         THE COURT:  Would you give us your full name, please,

20 sir?

21         PROSPECTIVE JUROR NO. 19:  Rahim Norwood Skinner.

22         THE COURT:  Mr. Skinner, I asked you to come in

23 separately because on the questionnaire that you filled out you

24 indicated that you had been convicted in 1999 of felony breaking

25 or entering; is that right, sir?

1          **PROSPECTIVE JUROR NO. 19:**  Yes, sir.

2          **THE COURT:**  All right.  I wanted to ask you just a few

3  questions about that.  Were you sentenced as a result of that

4  conviction?

5          **PROSPECTIVE JUROR NO. 19:**  Yes, sir, I was.

6          **THE COURT:**  What was the sentence you received?

7          **PROSPECTIVE JUROR NO. 19:**  I was sentenced to

8  probation.  I absconded, went to New Jersey.  When I came back, I

9  turned myself in to the magistrate; and I was issued six to eight

10  months in the state facility, and I stayed for about six months

11  and I left.

12         **THE COURT:**  Did you complete your sentence?

13         **PROSPECTIVE JUROR NO. 19:**  Yes, sir.

14         **THE COURT:**  Were you -- was your sentence then

15  discharged to your knowledge?

16         **PROSPECTIVE JUROR NO. 19:**  Yes, it was.

17         **THE COURT:**  As being completed?

18         **PROSPECTIVE JUROR NO. 19:**  As being completed, yes, it

19  was.

20         **THE COURT:**  Were you sentenced here in North Carolina?

21  Was this a North Carolina offense?

22         **PROSPECTIVE JUROR NO. 19:**  Yes, sir, it was.

23         **THE COURT:**  All right.  Counsel wish to have a bench

24  conference or not?

25      (The following proceedings were had at the bench by the

1          Court and Counsel out of the hearing of the jury:)

2          **MR. GALYON:**  I just have a question about when -- since

3  he absconded, I don't know if he just completed the sentence, you

4  know, three years ago; in which case, he wouldn't be eligible to

5  get his civil rights restored.  It is a five-year term after --

6          **MR. HARRISON:**  -- completion of the sentence.

7          **MR. GALYON:**  -- after the completion of the sentence.

8  So he may -- if he absconded and was gone for several years, he

9  may not be eligible.  So I think the date is just the issue.

10          **THE COURT:**  Okay.  Thank you.

11      (Thereupon, the following proceedings continued within the

12      hearing of the jury:)

13          **THE COURT:**  Mr. Skinner, you said you had completed

14  your sentence.  When did you complete your sentence?

15          **PROSPECTIVE JUROR NO. 19:**  May 28, 2000.

16          **THE COURT:**  All right.  Anything further from counsel

17  at this time?

18          **MR. GALYON:**  No, Your Honor.

19          **MR. HARRISON:**  No.

20          **THE COURT:**  All right.  Thank you very much.  Sir, you

21  may return with Miss Solomon.

22      (Prospective Juror No. 19 departed the courtroom.)

23      (Prospective Juror No. 22 entered the courtroom.)

24          **THE COURT:**  Good morning, ma'am.

25          **PROSPECTIVE JUROR NO. 22:**  Good morning.

1          **THE COURT:**  Would you tell us your full name, please,

2    ma'am.

3          **PROSPECTIVE JUROR NO. 22:**  Sybil Barnes Edwards

4    McKinney.

5          **THE COURT:**  Miss McKinney, I've asked you to come in

6    separately because on your questionnaire you indicated that you

7    have what may be a medical condition.  Can you explain that to

8    us, please?

9          **PROSPECTIVE JUROR NO. 22:**  It is kind of like irritable

10   bowel --

11         **THE COURT:**  I am going to ask you, if you would, to

12   speak up so the lawyers can hear you, too.

13         **PROSPECTIVE JUROR NO. 22:**  It is like irritable bowel

14   kind of like.  Some foods sets it off.  I didn't know if it

15   affected the courts if I had to go to the bathroom in the middle

16   of something, you know.

17         **THE COURT:**  All right.  Well, we typically would be in

18   here from 9:30 to 11:00.  We would take a break from 11:00 to

19   roughly 11:15 and then go again until 12:30, and then take a

20   lunch break until -- 1:30 is when you would report back upstairs

21   if you are chosen for the jury.  You would actually come back

22   down here and start at 2:00.  There is facilities upstairs and

23   where you are right now.  We'd go from 2:00 to 3:30.  We'd take a

24   15-minute break and then go until 5:00.

25         With that as the schedule, do you think that would present a

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  medical issue for you?

2          **PROSPECTIVE JUROR NO. 22:**  I am not sure.  I never

3  know.  You know, it just happens.

4          **THE COURT:**  How much -- I don't mean to be indelicate.

5  I apologize, but we can take breaks if the jury needs a break.

6          **PROSPECTIVE JUROR NO. 22:**  That's what I want to know.

7          **THE COURT:**  We can certainly do that.  In fact, my last

8  trial, somebody needed to use restroom.  So we just took a break

9  at that time.

10          **PROSPECTIVE JUROR NO. 22:**  I am willing to serve.

11          **THE COURT:**  Do you think --

12          **PROSPECTIVE JUROR NO. 22:**  It is my duty.

13          **THE COURT:**  Do you believe, ma'am, that it would be a

14  frequent event?  If the case is estimated to go --

15          **PROSPECTIVE JUROR NO. 22:**  No.

16          **THE COURT:**  The case is estimated to be a two- to

17  three-day trial.  So given the schedule I just informed you of,

18  do you think that would be a concern on your part as to whether

19  --

20          **PROSPECTIVE JUROR NO. 22:**  Well, I would be a little

21  nervous about it, but I think if I could raise my hand or

22  something and be excused.

23          **THE COURT:**  All right.

24          **PROSPECTIVE JUROR NO. 22:**  It is not an everyday thing

25  either see.

1          **THE COURT:**  About how often does it happen?

2          **PROSPECTIVE JUROR NO. 22:**  Well, I never know.  I never

3    know.

4          **THE COURT:**  If you had a medical need arise where you

5    needed to take a break such as that -- typically, what I do is

6    excuse the jury to the jury room, which is right to my left here;

7    and there are two restrooms in there.

8       Would that be adequate for your needs, do you think, or is

9    it the kind of thing where there could be an emergency where that

10   would be difficult?

11         **PROSPECTIVE JUROR NO. 22:**  Well, sometimes it is kind

12   of sudden, but a lot of time I have a warning.

13         **THE COURT:**  Okay.

14         **PROSPECTIVE JUROR NO. 22:**  I'm willing to serve.

15         **THE COURT:**  Thank you for that.  Do you believe in any

16   way it would impair your ability to concentrate given your

17   medical condition?

18         **PROSPECTIVE JUROR NO. 22:**  No, I don't think so.

19         **THE COURT:**  Do you believe you could listen to the

20   evidence and concentrate on what's being presented in the

21   courtroom?

22         **PROSPECTIVE JUROR NO. 22:**  Yes, but I hate to interrupt

23   right in the middle of something.

24         **THE COURT:**  I understand.  It usually comes without

25   warning?

1          **PROSPECTIVE JUROR NO. 22:**  Not all the time.

2          **THE COURT:**  Okay.  All right.  Counsel wish to approach

3    the bench or not?

4          **MR. GALYON:**  No, Your Honor.

5          **MR. HARRISON:**  No, sir.

6          **THE COURT:**  Okay.  Thank you very much.

7        (Prospective Juror No. 22 departed the courtroom.)

8          **THE COURT:**  All right.  Is there any motion as to Juror

9    Number 22?

10         **MR. GALYON:**  Your Honor, I think in the grand scheme,

11   given her responses to the questions, that it would probably be

12   just as well if we excused her for cause.

13         **MR. HARRISON:**  I would concur with that, Your Honor.

14         **THE COURT:**  All right.  Juror Number 22 will be excused

15   for cause.  So we are going to excuse Jurors 6 and 22 for cause

16   and determined that Juror 19 is eligible to serve because he

17   completed his sentence more than five years before today.

18       All right.  Anything further from counsel at this time?

19         **MR. HARRISON:**  No, Your Honor.

20         **MR. GALYON:**  No, sir.

21         **THE COURT:**  On this matter, we are going to take a

22   break.  I have another matter that was set at 12:30.  We'll take

23   a break and we'll bring the pool down at 2:00 and begin jury

24   selection at 2:00.

25       (The Court recessed to hear other matters at 12:37 p.m.)

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1         (The Court was called back to order at 2:06 p.m.)

2         (The Defendant was present.)

3         **THE COURT:**  I found one, I think, typo in the

4    preliminary charge.  So take a look at your draft real quick.  I

5    tell you what I found and that was -- if you look at the

6    description of Count Two, the first element, if you are with me,

7    it ought to read the defendant had a requisite intent to commit

8    the crime, that is, on or about December 7, 2007, to knowingly or

9    intentionally possess with intent to distribute.

10        I think it got jumbled up in that version.  So that's what I

11   would intend to read, and then it continues on with the rest of

12   the description of it; but it would read, again, "the defendant

13   had the requisite intent to commit the crime, that is, on or

14   about December 11th, 2007, to knowingly or intentionally possess

15   with intent to distribute 50 grams of a mixture and substance

16   containing a detectable amount of methamphetamine; and then the

17   description of the statutory citations.

18        Any objection to that?

19        **MR. HARRISON:**  No, Your Honor.

20        **MR. GALYON:**  No, Your Honor.

21        **THE COURT:**  I think it got jumbled somehow in that

22   draft.  I just wanted to make sure you are aware of that.

23        The other thing I was going to mention, as to the ruling I

24   made about the reference in the tape to the prior conviction of

25   the defendant, I am prepared to give a 404(b) instruction at the

1 time that that would come into evidence unless for some reason

2 the defendant does not wish such an instruction.

3          **MR. HARRISON:**  Thank you.  Yes, Your Honor.

4          **THE COURT:**  And the instruction would -- well, let me

5 ask this, at what point do you think that evidence will actually

6 be introduced?  Is it going to be early today, or will it be

7 after today?

8          **MR. GALYON:**  That evidence will come in probably

9 through the fourth witness.  So I don't know that we will get

10 there today.  It is entirely possible.

11          **THE COURT:**  If for any reason we get to that point,

12 approach the bench, remind me.  I've got a draft limiting

13 instruction.  It is essentially the instruction in Judge Carl

14 Horn's book on that, but I want to review it with you before I

15 read it.

16     Anything else we need to cover before we bring the jury

17 down?

18          **MR. GALYON:**  No, Your Honor.

19          **THE COURT:**  If you would, Miss Solomon, bring the

20 jurors down.

21     While we are waiting, I don't have a proposed witness list

22 from the defendant.  I just wanted to make sure you are aware of

23 that.

24          **MR. HARRISON:**  We would have no witnesses in addition

25 to the evidence that I might induce on the cross-examination.

1        **THE COURT:**  Thank you.  I just wanted to make sure in

2   terms of notifying the jury.

3        (Prospective members of the jury panel entered the

4        courtroom.)

5        **THE COURT:**  Good afternoon, ladies and gentlemen.

6   Miss Solomon, if you would, please administer the oath.

7        (Prospective members of the jury panel were duly sworn.)

8        **THE COURT:**  Was anybody unable to say I do just now?

9   If so, raise your hand.

10       (Negative response from members of the prospective jury

11       panel.)

12       The Court sees no hands raised.

13       Good afternoon, ladies and gentlemen.  My name is Tom

14   Schroeder.  I am a United States District judge.  I want to

15   welcome each of you as you begin your jury service.

16       We do understand that when people are summoned to come here

17   for jury service that you do that at some sacrifice to other

18   plans in your life, whether it's work outside the home, work

19   inside the home, vacation plans, or those types of things.  Every

20   effort will be made to see that the time that you have here is

21   used effectively while you are here.

22       Our jury system is what sets this great nation apart from

23   other nations.  Jury service is one of the highest callings of

24   citizenship in the United States and, while it involves some

25   sacrifice, I can assure you that it is a very worthwhile service

1  because this jury system is truly your system.  By participating

2  in this process, you are fulfilling one of the guarantees that

3  was set forth by our nation's founders over 200 years ago:  The

4  right to decide disputes by a trial by jury.

5       In our system of justice, it is the jurors, not the judges,

6  who determine the facts.  I do not determine who wins or loses

7  trials; jurors do.

8       We are here today to select 12 people who will be judges of

9  the facts in this case.  The case is brought by the attorneys,

10  who you will meet in a moment.  They estimate that the trial will

11  take approximately three days.

12       This is a criminal case.  A criminal case is when a person

13  is accused of violating one of the laws passed by congress which

14  sets out criminal offenses.  When a criminal case is charged, the

15  allegations are brought in a document called an indictment.  An

16  indictment only describes the charge brought.  It is not evidence

17  of guilt.

18       One of the most valued and fundamental principles under our

19  constitution is that every person charged with a crime is

20  presumed to be not guilty of that charge unless the prosecution

21  is able to prove each and every element of that charge beyond a

22  reasonable doubt.

23       Another valuable and fundamental principle is that no

24  defendant is ever expected to prove himself or herself not guilty

25  of a charge.  The Government always has the burden of proof.  In

1  fact, if a defendant in a criminal case elects not to testify or

2  not to present any evidence at all, the jury may not consider

3  that election for any purpose during its deliberations.

4      I am now going to summarize the charges in the case for you.

5  Remember, these are only charges.  They are simply allegations,

6  not proof.

7      When there is more than one charge brought in an indictment,

8  each charge is contained in a separately-numbered section called

9  "a count."  There are two counts in this indictment.  The

10  defendant Cleve Alexander Johnson is charged in both counts of

11  the indictment.

12      Count One alleges that from on or about December 7, 2007, up

13  to and including July 1, 2008, Mr. Johnson knowingly and

14  intentionally did unlawfully, conspire, combine, confederate, and

15  agree with another person to knowingly intentionally and

16  unlawfully distribute 50 grams or more of a mixture and substance

17  containing a detectable amount of methamphetamine, a Schedule II

18  controlled substance within the meaning of Title 21 of the United

19  States Code, Section 812, in violation of Title 21 of the United

20  States, Section 841(a)(1).  This is alleged to be a violation of

21  21 U.S.C., or United States Code, Section 846.

22      Count Two alleges that on or about December 11, 2007,

23  Mr. Johnson attempted to possess with the intent to distribute

24  50 grams or more of a mixture and substance containing a

25  detectable amount of methamphetamine, a Schedule II controlled

1  substance within the meaning of Title 21 of the United States

2  Code, Section 812, in violation of Title 21, United States Code,

3  Section 841(a)(1).  This is alleged to be a violation of Title

4  21, United States Code, Section 846.

5      As to all these charges against him, the defendant has

6  entered a plea of not guilty.

7      Let me describe for you the procedure that we will use to

8  select our jury.  We are going to select twelve jurors and two

9  alternates.  We will place twelve people into the jury box on my

10 left, and I will then ask a series of questions for immediate

11 response from those who are in the box; but everybody, including

12 those of you who are not put into the box at first, need to

13 listen very carefully to all of my questions.  If anyone in the

14 courtroom cannot hear my questions, please raise your hand so I

15 can repeat them.

16     It may be that some of those initially put into the box may

17 be returned to the full group.  Then we will select more from the

18 remainder of you.  I do not want to repeat my questions again for

19 those of you selected later if we can avoid it.  So everybody

20 please listen carefully, and remember if you have any response to

21 any one of my questions so that you can tell me if and when you

22 are put into the box.

23     My first question to the new members who will be added to

24 the box will be as follows:  Would you have answered "yes" to any

25 of the questions I've already asked?

1      Each of the parties in this case has a certain number of

2  what we call peremptory challenges, meaning that they can excuse

3  a certain number of jurors.  The goal of the parties and of the

4  Court is to select jurors who will be fair and impartial in this

5  case.

6      What do I mean by that?  The jury must determine this case,

7  whether the Government has proven the charges beyond a reasonable

8  doubt, whether to believe or not to believe the testimony of the

9  witnesses that are called during the trial, whether to believe

10  any other evidence that may be presented.

11     A fair and impartial juror is one who has not yet made up

12  his or her mind prior to hearing all of the witnesses and seeing

13  all the evidence but is one who can listen to the witnesses'

14  testimony and judge their credibility and to follow all of the

15  instructions that I give, not leaving out some instruction that

16  you do not like or choosing to follow some and not others.

17     A fair and impartial juror follows all of the Court's

18  instructions.  A fair and impartial juror will wait until all of

19  the evidence is presented before making up his or her mind, and a

20  fair and impartial juror will decide the facts of the case based

21  solely on the evidence and not based on bias, sympathy, or

22  prejudice.

23     Remember, if you are not selected, it does not mean that you

24  cannot be a fair and impartial person.  Do not take it as any

25  indication of what anyone here thinks of your ability to do so.

1  It just means that this may not be the right case for you based

2  on something the lawyers know about the case.

3     Let me now ask the attorneys, Mr. Galyon and Mr. Harrison,

4  to stand and introduce themselves to all the prospective jurors

5  before we place twelve people into the box.  If you would, please

6  introduce the person seated with you.

7         **MR. GALYON:**  Good afternoon, ladies and gentlemen.  My

8  name is Randall Galyon.  I'm an Assistant U.S. Attorney here in

9  the Middle District of North Carolina.  I work for the United

10  States Attorney, Ann Mills Wagoner, and seated here with me at

11  counsel table is Billy Denney.  He is a special agent with the

12  Drug Enforcement Administration.

13         **MR. HARRISON:**  Ladies and gentlemen, my name is Wayne

14  Harrison.  I am a lawyer, private lawyer, from Greensboro, North

15  Carolina, and seated with me here is my client, Cleve Johnson.

16         **THE COURT:**  Thank you.  I am now going to ask

17  Miss Solomon to call twelve jurors to be placed into the jury

18  box.

19         **THE CLERK:**  Ladies and gentlemen, as I call your name,

20  please proceed through the gates and take a seat in the jury box

21  as directed.  Miss Jonita Henry, Seat Number 1 inside the jury

22  box; Miss Rubilee Pansib, Seat Number 2 inside the jury box;

23  Mr. Jimmy Mitchell, Seat Number 3 inside the jury box; Mr. Dennis

24  Burnette, Seat Number 4 inside the jury box; Miss Melinda

25  Stevens, Seat Number 5 inside the jury box; Miss Nancy Wallace,

 1  Seat Number 6; Miss Caroline Kolbet, Seat Number 7 on the second

 2  row; Miss Dora Smith, Seat Number 8 on the second row;

 3  Miss Kristi Bryson, Seat Number 9 on the second row;

 4  Miss Jennifer Cochran, Seat Number 10 on the second row;

 5  Miss Judy Holland, Seat Number 11 on the second row; Mr. David

 6  Underwood, Seat Number 12 on the second row.

 7      **THE COURT:**  Good afternoon, ladies and gentlemen.  I am

 8  going to direct my questions now to the twelve of you in the jury

 9  box; but, again, if everybody else would listen carefully because

10  if you have any questions to which you would answer yes, I want

11  you to remember that if and when you are ever called into the

12  jury box.  It will help expedite matters.

13      I am going to ask a series of very general questions of you,

14  and then I will address each of you individually with some very

15  simple background questions.  Let me just say at this stage no

16  one intends to pry into any matters that are personal or

17  embarrassing.  While I do not anticipate it, if for any reason

18  you think that an answer you may give would be embarrassing to

19  you, simply let me know that and we'll arrange to ask you about

20  that in private.

21      As I said, I am now going to ask you some very general

22  questions.  If you answer yes to any of my questions, please

23  raise your hand.

24      Is anyone in the jury box employed by the United States

25  Government or by an agency of the federal government?  If so,

1  raise your hand.

2       (Negative response from members of the prospective jury

3       panel.)

4       Is anybody currently employed or ever formerly employed by

5  any law enforcement agency?  If so, raise your hand.

6       (Negative response from members of the prospective jury

7       panel.)

8       All right.  Seeing no hands, this case may involve the

9  testimony of law enforcement officers.  Would any of you tend to

10 give more or less weight to their testimony simply because they

11 are law enforcement officers?  If so raise, your hand.

12      (Negative response from members of the prospective jury

13      panel.)

14      All right.  I see no hands.  Does anybody know any of the

15 attorneys involved in this case or have any business relationship

16 with them?  If so please, raise your hand.

17      (Negative response from members of the prospective jury

18      panel.)

19      I see no hands.  I am informed that the witnesses will come

20 from a list, and this is a list of all possible witnesses,

21 perhaps not all will be called.  As I read it, please raise your

22 hand if you know or think you know any of them:  Tim Hodges, Hank

23 Valencia, Chad Corbin, C-O-R-B-I-N, Jim Mendez, Lori Wilson,

24 Jonathan Watson, Joe Braaten, B-R-A-A-T-E-N, Greg Roark,

25 R-O-A-R-K, Justin Wagoner, W-A-G-O-N-E-R, Michael Jett, J-E-T-T,

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  Billy Denney, D-E-N-N-E-Y, Kevin Cornell, C-O-R-N-E-L-L, Robby

2  Todd, Carlos Garcia, Eric Ogaz, O-G-A-Z?  All right.  I see no

3  hands.

4       Based on my summary of the charges so far, has anybody heard

5  about this case?  If so, raise your hand.

6       (Negative response from members of the prospective jury

7       panel.)

8       I see no hands.  Has anybody served on a jury before?  If

9  so, raise your hand.

10      (Affirmative response from members of the prospective jury

11      panel.)

12           **THE COURT:**  All right.  Miss Pansib; is that right?

13           **JUROR NO. 2:**  Yes, sir.

14           **THE COURT:**  You will need to speak up, ma'am.

15           **JUROR NO. 2:**  Yes, sir.

16           **THE COURT:**  Was your jury service on a civil or

17  criminal case?

18           **JUROR NO. 2:**  I misunderstood.

19           **THE COURT:**  Have you ever served on a jury?

20           **JUROR NO. 2:**  No, sir.

21           **THE COURT:**  That's all I meant to ask.  Miss Wallace;

22  is that right?

23           **JUROR NO. 6:**  Yes.

24           **THE COURT:**  Was it a criminal or civil matter?

25           **JUROR NO. 6:**  It was civil, I think, in both cases.

 1          THE COURT:  All right.  Do you understand that this is
 2   a criminal case and, in a criminal case, the Government has a
 3   higher burden of proof than the plaintiff would in a civil case?
 4          JUROR NO. 6:  Yes, sir.
 5          THE COURT:  Do you understand that the Government has
 6   to bear a burden of proof of all elements beyond a reasonable
 7   doubt before a conviction could be found?
 8          JUROR NO. 6:  Yes.
 9          THE COURT:  All right.  Who else had their hand up on
10   the back row?  Miss Kolbeth?
11          JUROR NO. 7:  Kolbet.
12          THE COURT:  What kind of case was it?
13          JUROR NO. 7:  Civil.
14          THE COURT:  I am going to ask you the same question.
15   Do you understand that in this case the Government bears a higher
16   burden of proof and, that is, it must prove all the elements of
17   the offenses beyond a reasonable doubt before a conviction could
18   be found?
19          JUROR NO. 7:  Yes.
20          THE COURT:  All right.  And who was the last one?
21   Miss Holland; is that correct, ma'am?
22          JUROR NO. 11:  Yes.
23          THE COURT:  What type of case was it?
24          JUROR NO. 11:  I think it was civil.  It's been quite
25   some time.

1            **THE COURT:**  I am going to ask you, again, do you

2   understand in this case that the Government bears a burden of

3   proof of beyond a reasonable doubt, which is higher than the

4   plaintiff bears in a civil case that you may have sat on?  Do you

5   understand that?

6            **JUROR NO. 11:**  Yes.

7            **THE COURT:**  You will need to answer loudly.  Thank you.

8   I should tell you -- you probably hear it -- there is a fan above

9   you, and sometimes it is more difficult to hear.  So if everybody

10  could speak up a little bit.  While it may seem loud to you

11  there, by the time the voice carries to here, it loses a little

12  bit.

13       Was there everybody else I missed?

14       (Negative response from members of the prospective jury

15       panel.)

16       All right.  Has anybody on the jury ever been a victim of a

17  crime?  If so please, raise your hand.

18       (Affirmative response from members of the prospective jury

19       panel.)

20            **THE COURT:**  All right.  Miss Kolbet, what type of crime

21  was it?

22            **JUROR NO. 7:**  In June we had someone to break into our

23  house and steal a number of things, and they have not been caught

24  yet.

25            **THE COURT:**  Do you believe that that incident would in

1  any way affect your ability to be fair and impartial in this

2  case?

3          **JUROR NO. 7:** Yes.

4          **THE COURT:** You believe it would?

5          **JUROR NO. 7:** Uh-huh.

6          **THE COURT:** Why do you say that?

7          **JUROR NO. 7:** I still just have all of this -- I still

8  feel violated, and I know it is not fair to bring it into here

9  but...

10         **THE COURT:** All right. Do you believe that because of

11 that incident you would tend to favor one party or the other in

12 this case?

13         **JUROR NO. 7:** Yes.

14         **THE COURT:** All right. Do you think you could put that

15 aside in your analysis and be fair to both sides or not?

16         **JUROR NO. 7:** I could try.

17         **THE COURT:** Do you believe you can?

18         **JUROR NO. 7:** No.

19         **THE COURT:** All right. Thank you, ma'am. Anybody else

20 have their hand up? Yes, Miss Henry.

21         **JUROR NO. 1:** My computer was stolen out of my office

22 in May.

23         **THE COURT:** In May?

24         **JUROR NO. 1:** Uh-huh.

25         **THE COURT:** Did they resolve that to your satisfaction?

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1          **JUROR NO. 1:**  Uh-uh.

2          **THE COURT:**  I'm sorry.

3          **JUROR NO. 1:**  No.

4          **THE COURT:**  Do you believe you could put that aside and

5    render a verdict in this case that's fair and impartial to both

6    sides based solely on the evidence that's presented here in this

7    courtroom?

8          **JUROR NO. 1:**  I don't know.

9          **THE COURT:**  Do you believe that that incident would in

10   any way affect your ability to be fair and impartial to the

11   parties in this case?

12         **JUROR NO. 1:**  I can't say specifically this case, no.

13         **THE COURT:**  All right.  As you now come into this case,

14   do you believe that that incident would in any way affect your

15   thinking as to the guilt or innocence of the defendant in this

16   case?

17         **JUROR NO. 1:**  I can't really answer yes or no, but it

18   is possible.

19         **THE COURT:**  Do you believe you can set aside your

20   feelings about your incident and listen solely to the evidence in

21   this case and render a verdict based solely on the evidence

22   that's fair and impartial to both sides?

23         **JUROR NO. 1:**  Like the last person, I could try.

24         **THE COURT:**  And my question to you, while you try, do

25   you believe you can do that or not?

1          **JUROR NO. 1:**  I believe it is possible.

2          **THE COURT:**  Do you think it is probable?

3          **JUROR NO. 1:**  I don't know.

4          **THE COURT:**  All right.  Was there anybody else who had

5    been a victim of a crime?

6        (Negative response from members of the prospective jury

7        panel.)

8        All right.  Has anyone ever been involved in legal

9    proceedings either as a party or as a witness?  If so, raise your

10   hand.

11       (Affirmative response from members of the prospective jury

12       panel.)

13       Miss Holland, what was your involvement?  Was it a party or

14   a witness?

15         **JUROR NO. 11:**  Party.

16       **THE COURT:**  As a party?

17         **JUROR NO. 11:**  As a party.

18       **THE COURT:**  What type of case was it, ma'am?

19         **JUROR NO. 11:**  It is declaratory determination of a

20   will.

21       **THE COURT:**  Do you believe that your involvement in

22   that case would in any way affect your ability to be fair and

23   impartial in this case before the Court?

24         **JUROR NO. 11:**  No, sir.

25         **THE COURT:**  Did anybody else have their hand raised?

1      (Negative response from members of the prospective jury

2      panel.)

3      All right.  Does anybody here know any other person who's

4  been called here as a potential juror?  If so, raise your hand.

5      (Negative response from members of the prospective jury

6      panel.)

7      Now, the attorneys estimate that the case may take

8  approximately three days.  Would this present a special problem

9  for anyone?  If so, raise your hand.

10      (Negative response from members of the prospective jury

11      panel.)

12      Is there anything about the nature of the case itself --

13  that is, the fact that the defendant is charged with certain

14  offenses involving a controlled substance, in this case

15  methamphetamine -- that will prevent you from being able to

16  render a fair and impartial verdict?  If so, raise your hand.

17      (Negative response from members of the prospective jury

18      panel.)

19      I see no hands.  Based on what little you know about the

20  case, have any of you formed or expressed an opinion about the

21  case or about the parties themselves that you feel will adversely

22  affect your ability to sit on the case and render a fair and

23  impartial verdict?  If so, please raise your hand.

24      (Negative response from members of the prospective jury

25      panel.)

```
1        I see no hands.  Do any of you have any reason that I have
2   not asked you about that you believe would make it difficult for
3   you to be the fair and impartial juror that I described earlier?
4   If so, please raise your hand.
5        (Negative response from members of the prospective jury
6        panel.)
7        All right.  I see no hands.
8        At this point, ladies and gentlemen, I want to ask you some
9   very brief questions just about your background, and let me tell
10  you what I am going to ask and we'll start -- pardon me -- we'll
11  start with Juror Number 1, and we'll go down through the
12  prospective jury pool.
13       What I am going to ask you is your full legal name; your
14  basic educational background, in other words, how far did you
15  attend in school; whether you work and, if so, what you do
16  outside the home; if you're married, what your spouse does; and
17  whether you have any adult children who are employed and, if so,
18  what they do.  So that's what I'm interested in.
19       If we can start with you, Miss Henry; is that right, ma'am?
20            JUROR NO. 1:  Yes.
21            THE COURT:  What is your full name, please, ma'am?
22            JUROR NO. 1:  Jonita Andreas (phonetic) Henry.
23            THE COURT:  What is your educational background?
24            JUROR NO. 1:  Master's degree.
25            THE COURT:  In what subject?
```

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 94 of 172

1            **JUROR NO. 1:**  In English education.

2            **THE COURT:**  Where do you work, ma'am?

3            **JUROR NO. 1:**  Livingstone College.

4            **THE COURT:**  And what do you do there?

5            **JUROR NO. 1:**  I teach English.

6            **THE COURT:**  Are you married, ma'am?

7            **JUROR NO. 1:**  No.

8            **THE COURT:**  Do you have any adult children?

9            **JUROR NO. 1:**  No.

10            **THE COURT:**  All right.  If I can then, Juror Number 2,

11  your full legal name, please, ma'am?

12            **JUROR NO. 2:**  Rubilee Pansib.

13            **THE COURT:**  I am going to ask you to speak loudly so

14  that everybody in the courtroom can hear you, the lawyers.

15            **JUROR NO. 2:**  Rubilee Pansib.

16            **THE COURT:**  Miss Pansib, how far did you attend in

17  school?

18            **JUROR NO. 2:**  Three years.

19            **THE COURT:**  Three years of?

20            **JUROR NO. 2:**  College.

21            **THE COURT:**  College.  All right.  Do you work outside

22  the home?

23            **JUROR NO. 2:**  Yes.

24            **THE COURT:**  What do you do, ma'am?

25            **JUROR NO. 2:**  QA, quality assurance in Pilgrim's Pride

1  Poultry.

2          **THE COURT:**  Are you married, ma'am?

3          **JUROR NO. 2:**  Yes.

4          **THE COURT:**  What does your husband do?

5          **JUROR NO. 2:**  He works in the government.  They call

6  it -- I forgot.  He is in the audience right now.

7          **THE COURT:**  What does he do?

8          **JUROR NO. 2:**  Computer engineering.

9          **THE COURT:**  That's all I needed.  Thank you, ma'am.  Do

10  you have any adult children?

11          **JUROR NO. 2:**  Yes.  Nineteen years old.

12          **THE COURT:**  What does he do?

13          **JUROR NO. 2:**  She is in college.

14          **THE COURT:**  She is in college.  All right.  Thank you,

15  ma'am.  Mr. Mitchell, what is your full name?

16          **JUROR NO. 3:**  Jimmy Lee Mitchell.

17          **THE COURT:**  And how far did you attend in school?

18          **JUROR NO. 3:**  Vocational degree at Forsyth Tech.

19          **THE COURT:**  Do you work outside the home, sir?

20          **JUROR NO. 3:**  Yes.

21          **THE COURT:**  What do you?

22          **JUROR NO. 3:**  I work at Hedgecock Lumber Company.

23          **THE COURT:**  Are you married, sir?

24          **JUROR NO. 3:**  No, sir.

25          **THE COURT:**  Do you have any adult children?

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 96 of 172

 1              **JUROR NO. 3:**  No.

 2              **THE COURT:**  Thank you, sir.  Mr. Burnette?

 3         **JUROR NO. 4:**  Yes, sir.

 4              **THE COURT:**  What is your full name?

 5         **JUROR NO. 4:**  Dennis Edward Burnette.

 6              **THE COURT:**  How far did you attend in school?

 7         **JUROR NO. 4:**  I have a master's degree and hold a

 8  dissertation master's.

 9              **THE COURT:**  Do you work outside the home?

10         **JUROR NO. 4:**  I'm retired.

11              **THE COURT:**  What did you do before you retired?

12         **JUROR NO. 4:**  Was a professor of sociology.

13              **THE COURT:**  Where was that?

14         **JUROR NO. 4:**  Guilford Technical Community College.

15              **THE COURT:**  Are you married, sir?

16         **JUROR NO. 4:**  Yes.

17              **THE COURT:**  Does your wife work outside the home?

18         **JUROR NO. 4:**  Yes, she does.  She works as a

19  professional for Girl Scouts as an administrator.

20              **THE COURT:**  Do you have any adult children?

21         **JUROR NO. 4:**  Two girls.

22              **THE COURT:**  What do they do?

23         **JUROR NO. 4:**  My oldest daughter teaches English in

24  Korea.  My younger daughter is in Asheville, and she is an

25  artist.

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER   (336) 254-7464

1            **THE COURT:**  Thank you, sir.  Miss Stevens?

2            **JUROR NO. 5:**  I'm Melinda Marie Stevens.

3            **THE COURT:**  What is your educational background, ma'am?

4            **JUROR NO. 5:**  Tenth grade.

5            **THE COURT:**  And do you work outside the home?

6            **JUROR NO. 5:**  No, I'm a stay-at-home mom.

7            **THE COURT:**  Are you currently married?

8            **JUROR NO. 5:**  Yes.

9            **THE COURT:**  What does your husband do?

10           **JUROR NO. 5:**  He was a car salesman.  He lost his job

11   about three months ago.

12           **THE COURT:**  Do you have any adult children yet?

13           **JUROR NO. 5:**  They are not adult yet.

14           **THE COURT:**  Like I said, please don't be offended by

15   any of my questions.  Miss Wallace?

16           **JUROR NO. 6:**  My name is Nancy Records Wallace.

17           **THE COURT:**  How far did you attend in school?

18           **JUROR NO. 6:**  I have a master's, and I was in a Ph.D.

19   program, but didn't finish, in pathology.

20           **THE COURT:**  Do you work outside the home?

21           **JUROR NO. 6:**  Yes.  I work for Charles River

22   Laboratories, and we're doing contract research, testing

23   pharmaceuticals.

24           **THE COURT:**  Are you married, ma'am?

25           **JUROR NO. 6:**  Yes.

1          **THE COURT:**  What does your husband do?

2          **JUROR NO. 6:**  He is an attorney.

3          **THE COURT:**  All right.  What kind of practice does he

4    have?

5          **JUROR NO. 6:**  Well, right now he is working for another

6    firm also doing legal work for -- actually, contract work for a

7    pharmaceutical company.  I think it is sort of a separate --

8          **THE COURT:**  So it would be civil work?

9          **JUROR NO. 6:**  Yeah.

10         **THE COURT:**  Does he do any criminal work?

11         **JUROR NO. 6:**  No.

12         **THE COURT:**  All right.  Do you have any adult children?

13         **JUROR NO. 6:**  No.

14         **THE COURT:**  Thank you, ma'am.  Miss Kolbet, your full

15   name, please.

16         **JUROR NO. 7:**  Caroline Brown Kolbet.

17         **THE COURT:**  How far did you attend in school?

18         **JUROR NO. 7:**  One year of college.

19         **THE COURT:**  Do you work outside the home?

20         **JUROR NO. 7:**  Yes.

21         **THE COURT:**  What do you do?

22         **JUROR NO. 7:**  I'm a part-time travel agent.

23         **THE COURT:**  Are you married?

24         **JUROR NO. 7:**  Yes.

25         **THE COURT:**  What does your husband do?

1              **JUROR NO. 7:**  He is a mechanical engineer.

2              **THE COURT:**  Do you have any adult children?

3              **JUROR NO. 7:**  No.

4              **THE COURT:**  Miss Smith?

5              **JUROR NO. 8:**  Dora Regine Smith.

6              **THE COURT:**  What is your educational background, ma'am?

7              **JUROR NO. 8:**  BA in counseling, Christian counseling.

8              **THE COURT:**  Do you work outside the home?

9              **JUROR NO. 8:**  Yes, I do.

10             **THE COURT:**  What do you do?

11             **JUROR NO. 8:**  I work for Bank of America as a recovery

12 analyst.

13             **THE COURT:**  Are you married, ma'am?

14             **JUROR NO. 8:**  Yes, I am.

15             **THE COURT:**  What does your husband do?

16             **JUROR NO. 8:**  He is a pastor, full-time pastor.

17             **THE COURT:**  Do you have any adult children?

18             **JUROR NO. 8:**  Yes.

19             **THE COURT:**  What do they do?

20             **JUROR NO. 8:**  I have one.  He's in his last year at

21 A&T.  He also works for Target.

22             **THE COURT:**  Thank you.  Miss Bryson, your full name,

23 please.

24             **JUROR NO. 9:**  Kristi McClella (phonetic) Bryson.

25             **THE COURT:**  How far did you attend in school?

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1          **JUROR NO. 9:**  I have BS in chemistry.

2          **THE COURT:**  Do you work outside the home?

3          **JUROR NO. 9:**  Yes, I do.

4          **THE COURT:**  What do you do, ma'am?

5          **JUROR NO. 9:**  I'm a safety manager.

6          **THE COURT:**  Are you married?

7          **JUROR NO. 9:**  Yes, sir.

8          **THE COURT:**  What does your husband do?

9          **JUROR NO. 9:**  He's a residential appraiser.

10         **THE COURT:**  Do you have any adult children?

11         **JUROR NO. 9:**  No, sir.

12         **THE COURT:**  Thank you.  Miss Cochran; is that right,

13  ma'am?

14         **JUROR NO. 10:**  Yes.  Jennifer Lee Cochran.  I have a

15  four-year bachelor's degree plus two years of physical therapy

16  degree, which is what I do at Moses Cone.  I am married, and my

17  husband is a structural engineer.

18         **THE COURT:**  Do you have any adult children?

19         **JUROR NO. 10:**  No.

20         **THE COURT:**  Miss Holland, your full name, please,

21  ma'am.

22         **JUROR NO. 11:**  Judy Carol Holland.

23         **THE COURT:**  What is your educational background?

24         **JUROR NO. 11:**  I have a broker's license in real

25  estate.

1              THE COURT:  All right.  Do you do that for a living
2  now?
3              JUROR NO. 11:  No, sir.
4              THE COURT:  Are you working now?
5              JUROR NO. 11:  No, sir.
6              THE COURT:  When you did work, what did you do?
7              JUROR NO. 11:  Just -- well, I owned my own business.
8  It was retail.
9              THE COURT:  All right.  Are you married?
10             JUROR NO. 11:  Yes, sir.
11             THE COURT:  What does your husband do?
12             JUROR NO. 11:  He's retired.
13             THE COURT:  What did he do before he retired?
14             JUROR NO. 11:  He was a sales manager -- or parts
15  manager for a dealership.
16             THE COURT:  Do you have any adult children?
17             JUROR NO. 11:  Yes, sir.
18             THE COURT:  What do they do?
19             JUROR NO. 11:  One is a -- the oldest is a Spanish
20  teacher in high school; the other is a social worker.
21             THE COURT:  All right.  Thank you.  Mr. Wood?
22             JUROR NO. 12:  David Lee Wood.
23             THE COURT:  What is your educational background, sir?
24             JUROR NO. 12:  High school.
25             THE COURT:  Do you work outside the home?

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 102 of 172

 1           **JUROR NO. 12:**  Yes.

 2           **THE COURT:**  What do you do?

 3           **JUROR NO. 12:**  I work for Gregory Pulling Equipment

 4    Company.

 5           **THE COURT:**  Are you married, sir?

 6           **JUROR NO. 12:**  Yes, sir.

 7           **THE COURT:**  What does your wife do?

 8           **JUROR NO. 12:**  She works for a computer software

 9    company.

10           **THE COURT:**  Do you have any adult children?

11           **JUROR NO. 12:**  No, sir.

12           **THE COURT:**  All right.  If counsel would approach the

13    bench, please.

14        (The following proceedings were had at the bench by the

15        Court and Counsel out of the hearing of the jury:)

16           **THE COURT:**  Okay.  Let me ask you first, were there any

17    other questions that you wanted asked of any particular juror?

18           **MR. HARRISON:**  No, sir.

19           **MR. GALYON:**  No.

20           **THE COURT:**  Okay.  Any motions as to --

21           **MR. HARRISON:**  Motion for cause on Miss -- Juror Number

22    7.

23           **THE COURT:**  Okay.

24           **MR. HARRISON:**  And Juror Number 1.

25           **THE COURT:**  What is the Government's position?

1           **MR. GALYON:**  Your Honor, I agree with that.  I would

2    also move for cause related to Juror Number 2.

3           **THE COURT:**  On what grounds?

4           **MR. GALYON:**  Your Honor, I think she had some real

5    problems with understanding and communicating and certainly with

6    the ability to understand and communicate.

7           **MR. HARRISON:**  I would agree with that.

8           **THE COURT:**  Okay.  So we have cause for one, two and

9    seven agreed to by the parties?

10          **MR. HARRISON:**  Right.

11          **MR. GALYON:**  Yes, sir.

12          **THE COURT:**  All right.  Thank you.

13       (Thereupon, the following proceedings continued within the

14       hearing of the jury:)

15       (The proceedings were paused for counsel to exercise their

16       peremptory challenges.)

17          **THE CLERK:**  Your Honor, five jurors have been selected.

18       Ladies and gentlemen of the jury, as your name is called,

19   please exit the jury box and take a seat in the rear of the

20   courtroom:  Miss Henry, Miss Pansib, Mr. Burnette, Miss Wallace,

21   Miss Kolbet, Miss Smith, Mr. Wood.

22       Mr. Skinner, Seat Number 1 on the first row; Miss Campbell,

23   Seat Number 2 on the first row; Mr. Tuttle, Seat Number 4 on the

24   first row; Mr. Rawlinson, Seat Number 6 on the first row;

25   Mr. Carver, Seat Number 7 on the second row; Miss Owens, seat

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 104 of 172

 1  Number 8 on the second row; Miss Dalton, Seat Number 12 on the

 2  second row.

 3         **THE COURT:**  Ladies and gentlemen, my questions now will

 4  be directed to the newest members of the jury box; and my

 5  question, as predicted, is would any of you have answered yes to

 6  any of my prior questions?  If so, please raise your hand.

 7      (Affirmative response from members of the prospective jury

 8      panel.)

 9      All right.  Mr. Skinner, which ones would you have answered

10  yes to, sir?

11         **JUROR NO. 1:**  I would have answered yes to I have

12  participated in a trial.

13         **THE COURT:**  What kind of case, sir?

14         **JUROR NO. 1:**  Criminal trial.

15         **THE COURT:**  All right.  Any other questions you would

16  have answered yes to?

17         **JUROR NO. 1:**  There was a question about -- I think

18  that's it.

19         **THE COURT:**  All right.  Miss Campbell, did you raise

20  your hand?

21         **JUROR NO. 2:**  Yes.

22         **THE COURT:**  What would you have answered yes to, ma'am?

23         **JUROR NO. 2:**  I am employed by a contractor who works

24  for the federal government.  I don't know if that makes a

25  difference yet.

1           **THE COURT:**  You are employed by a whom, ma'am?

2           **JUROR NO. 2:**  A contractor who works for the federal

3  government.

4           **THE COURT:**  Which contractor is that?

5           **JUROR NO. 2:**  Carl Henry.

6           **THE COURT:**  Would the fact that you are employed by a

7  contractor that works for the federal government in any way

8  influence your ability to be fair and impartial in this case?

9           **JUROR NO. 2:**  No.

10          **THE COURT:**  All right.  Would you have answered yes to

11 any other questions?

12          **JUROR NO. 2:**  No.

13          **THE COURT:**  I'm sorry.  You will need to answer

14 verbally for the court reporter.

15          **JUROR NO. 2:**  No.

16          **THE COURT:**  Who else had their hand up?  Mr. Tuttle, is

17 that right, sir?

18          **JUROR NO. 4:**  Yes, sir.  I've been on two juries in the

19 last seven years.

20          **THE COURT:**  What kinds of cases were they?

21          **JUROR NO. 4:**  Actually, one of each.

22          **THE COURT:**  Well, you understand that this is a

23 criminal case and, in a criminal case, the Government has the

24 burden of proving all the elements of the offenses charged beyond

25 a reasonable doubt, which is a higher burden than a plaintiff has

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  in a civil case?

2          **JUROR NO. 4:**  Yes, sir.

3          **THE COURT:**  Any other questions?

4          **JUROR NO. 4:**  That was it.

5          **THE COURT:**  Then I think I had a hand from Miss Dalton;

6  is that right, ma'am?

7          **JUROR NO. 12:**  Yes.  My husband was murdered by a

8  guy -- by an employee who had been doing some drugs and drinking

9  in 1999.

10          **THE COURT:**  All right.  What kind of drugs; do you

11  know?

12          **JUROR NO. 12:**  I'm not sure exactly, but they said he

13  went into a blackout.  He said he didn't know what he was doing.

14  So he was stabbed to death.

15          **THE COURT:**  All right.  Do you believe that that

16  incident would affect your ability in this case?

17          **JUROR NO. 12:**  It might, yeah.

18          **THE COURT:**  All right.  I am going to ask the newest

19  members of the jury the basic background questions.  Before I do

20  that, are there any other questions you would have answered yes

21  to, including the following and, that is, do any of you have any

22  reason that I did not ask about that would make it difficult for

23  you to be fair and impartial in this case?  If so, among the

24  newest members, raise your hand.

25          (Negative response from members of the prospective jury

1        panel.)

2        I see no hands.  I am now going to ask the newest members to

3    give us their brief background history, starting with

4    Mr. Skinner.  Your full name, please, sir.

5            **JUROR NO. 1:**  Rahim Norwood Skinner.

6            **THE COURT:**  And, Mr. Skinner, what is your educational

7    background?

8            **JUROR NO. 1:**  I'm in my second year -- I am seeking my

9    associate's degree.

10           **THE COURT:**  Are you working?

11           **JUROR NO. 1:**  Yes, sir.  I'm working as a certified

12   nurse's assistant and as a professional counselor.

13           **THE COURT:**  Are you married?

14           **JUROR NO. 1:**  I am not married.  Don't have any

15   children.

16           **THE COURT:**  Thank you, sir.  Miss Campbell, your full

17   name.

18           **JUROR NO. 2:**  Candi Service Campbell.

19           **THE COURT:**  How far did you attend in school?

20           **JUROR NO. 2:**  Two years of college.

21           **THE COURT:**  Are you working?

22           **JUROR NO. 2:**  I'm a bus driver at the EPA.  I am not

23   married, no kids.

24           **THE COURT:**  Thank you, ma'am.  Mr. Tuttle?

25           **JUROR NO. 2:**  Monte Joe Tuttle, associate's degree, no

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  children, and a flight attendant.

2          **THE COURT:**  All right.  Mr. Rawlinson?

3          **JUROR NO. 6:**  Herman Rawlinson.

4          **THE COURT:**  What is your educational background?

5          **JUROR NO. 6:**  High school.

6          **THE COURT:**  Are you working?

7          **JUROR NO. 6:**  Unemployed.

8          **THE COURT:**  Before you were unemployed, what did you

9  do, sir?

10         **JUROR NO. 6:**  Commercial photographer.

11         **THE COURT:**  Are you married?

12         **JUROR NO. 6:**  Yeah.

13         **THE COURT:**  Does your wife work outside the home?

14         **JUROR NO. 6:**  She works at Sam's Club in inventory.

15         **THE COURT:**  Do you have any adult children?

16         **JUROR NO. 6:**  We have one son.  I don't know what he

17  does.

18         **THE COURT:**  All right.  Mr. Carver?

19         **JUROR NO. 7:**  Ricky Joe Carver.  I am married.  I work

20  for Tyco Electronics.  I have two daughters.  Both of them are

21  outside the house.  Both of them are dental assistants.

22         **THE COURT:**  What is your basic educational background?

23         **JUROR NO. 7:**  Twelfth grade.

24         **THE COURT:**  Thank you, sir.  And is there anything

25  about -- I see your arm is in sling.  Is there anything about

1  your current medical condition that would make it difficult for

2  you to sit as a juror, recognizing that we do take regular breaks

3  throughout the day?

4        **JUROR NO. 7:**  Well, hurts when I sit so, yes, for three

5  days, I think it would hurt, yes.

6        **THE COURT:**  All right.  Do you believe you can -- well,

7  let me ask you, if you don't mind telling me, what exactly

8  happened to your wrist?

9        **JUROR NO. 7:**  I broke my wrist.  I slipped on some ice

10  two weeks ago, and broke my wrist in two.

11        **THE COURT:**  Are you on any medication at all?

12        **JUROR NO. 7:**  Yes.

13        **THE COURT:**  Any pain medication?

14        **JUROR NO. 7:**  Yes.  That's what I am on, pain

15  medication.

16        **THE COURT:**  Do you know what it is?

17        **JUROR NO. 7:**  Oxycodone.

18        **THE COURT:**  Does that affect your ability to

19  concentrate at all?

20        **JUROR NO. 7:**  Yes.

21        **THE COURT:**  What does it do?

22        **JUROR NO. 7:**  It makes me real sleepy.

23        **THE COURT:**  All right.  Thank you.  Miss Owens?

24        **JUROR NO. 8:**  Debra J. Owens.  I have a degree in

25  nursing.  I'm married.  My husband is disabled.  I have three

 1  daughters, all outside the home.  One is a receptionist, one is a

 2  social worker with a degree in psychology, and the other one is

 3  in nursing school.

 4          **THE COURT:**  You are a nurse?

 5          **JUROR NO. 8:**  Yes, sir.

 6          **THE COURT:**  Thank you.  Miss Dalton?

 7          **JUROR NO. 12:**  Elizabeth Dalton.  Three years at A&T.

 8  Finished up at the University of Nebraska at Omaha.  I've been

 9  with the airlines 20-something years.  I have one daughter.  She

10  is at home, teenager.

11          **THE COURT:**  Thank you, ma'am.  If counsel would

12  approach the bench, please.

13      (The following proceedings were had at the bench by the

14      Court and Counsel out of the hearing of the jury:)

15          **THE COURT:**  All right.  Any other questions you want to

16  ask of this jury?

17          **MR. HARRISON:**  No.

18          **MR. GALYON:**  No.

19          **THE COURT:**  Any motions for cause?

20          **MR. HARRISON:**  Yes, Miss Dalton and, actually,

21  Mr. Carver.  I believe he said he is affected by the medicine,

22  pain medicine that he takes.

23          **THE COURT:**  Okay.

24          **MR. GALYON:**  I would agree with both of those.

25          **THE COURT:**  I will grant both of those.  Okay.

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 111 of 172

1    (Thereupon, the following proceedings continued within the

2    hearing of the jury:)

3    (The proceedings were paused for counsel to exercise their

4    peremptory challenges.)

5    **THE CLERK:**  Nine jurors have been selected.  Ladies and

6  gentlemen, as I call your name, please exit the jury box and take

7  a seat in the rear of the courtroom:  Mr. Skinner, Mr. Carver,

8  Miss Dalton.

9    Miss Jones, Seat Number 1 on the first row; Mr. Ousley, Seat

10  Number 7 on the second row; Miss Blackwelder, Seat Number 12 on

11  the second row.

12    **THE COURT:**  I am going to direct my questions now to

13  the three new members of the jury panel, and my first question

14  is, would have answered yes to any of my previous questions?  If

15  so, please raise your hand.

16    (Affirmative response from members of the prospective jury

17    panel.)

18    All right.  Mr. Ousley, which ones would have answered yes

19  to, sir?

20    **JUROR NO. 7:**  I'm employed by a federal contractor.

21    **THE COURT:**  Which contractor is that?

22    **JUROR NO. 7:**  It's Microtech.  It's a

23  communication-based company.

24    **THE COURT:**  Do you believe that your employment in any

25  way by a contractor of the federal government would in any way

1  affect your ability to be fair and impartial in this case?

2         **JUROR NO. 7:**  No, sir.

3         **THE COURT:**  Do you believe you can set aside that

4  knowledge of that relationship and render a verdict based solely

5  on the evidence presented in this courtroom?

6         **JUROR NO. 7:**  Yes, sir.

7         **THE COURT:**  All right.  Anybody else have any questions

8  they would have answered yes to?

9      (Negative response from members of the prospective jury

10     panel.)

11     If I can briefly, starting with Miss Jones, if you would,

12  your basic background questions; that is, your name, your

13  educational background, your work, whether you are married, what

14  your spouse does.

15        **JUROR NO. 1:**  My name is Deana Hall Jones, and I have a

16  bachelor's degree in elementary education.  I am a fourth grade

17  teacher.  I am married, and my husband is an electrical engineer.

18  I do not have any adult children.

19        **THE COURT:**  Mr. Ousley.

20        **JUROR NO. 7:**  My name is Jeremy Edward Ousley.  I'm a

21  chief programmer.  I have a Bachelor of Science degree in

22  electronics engineering and technology.  My wife is a registered

23  nurse, and we have no adult children.

24        **THE COURT:**  Thank you, sir.  And Miss Blackwelder?

25        **JUROR NO. 12:**  I'm Samantha Blackwelder, graduated from

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  high school, babysit, and do embroidery work.  I am married to a

2  heat and air guy.

3          **THE COURT:**  Do you have any adult children?

4          **JUROR NO. 12:**  No.

5          **THE COURT:**  All right.  And let me ask you all, as I

6  asked the others, any of you know, the three of you, any reason

7  that I have not asked about that would make it difficult for you

8  to be a fair and impartial juror that I described earlier?  If

9  so, please raise your hand.

10     (Negative response from members of the prospective jury

11     panel.)

12     All right.  I see no hands.  If counsel would approach the

13  bench, please.

14     (The following proceedings were had at the bench by the

15     Court and Counsel out of the hearing of the jury:)

16          **THE COURT:**  Okay.  Any other questions?

17          **MR. HARRISON:**  No, sir.

18          **MR. GALYON:**  No, sir.

19          **THE COURT:**  All right.  Any motions?

20          **MR. HARRISON:**  No.

21          **MR. GALYON:**  No, sir.

22          **THE COURT:**  Okay.  Thank you.

23     (Thereupon, the following proceedings continued within the

24     hearing of the jury:)

25     (The proceedings were paused for counsel to exercise their

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 114 of 172

 1    peremptory challenges.)

 2              **THE CLERK:**  Your Honor, the parties are content.

 3              **THE COURT:**  Ladies and gentlemen, at this time I am

 4   going to select two alternates to go with the jury.  So what I am

 5   going to do is take the twelve of you in the box and let you take

 6   a break and retire into the jury room, which is off to my left

 7   here.

 8       We have not started the case yet, but let me give you my

 9   preliminary admonition and, that is, you are not to discuss the

10   case at all, either among yourselves or with anybody else.  Do

11   not investigate the case, do not attempt to find anything out

12   about the case, and do not think about the case.

13       At this time I ask you simply to relax.  There is a restroom

14   in there, and there may be some things to drink; and we'll take a

15   15-minute break approximately, and then I'll send for you at that

16   time.  So, as I said, please do not think about it or discuss the

17   case in any way.

18       Yes?

19              **JUROR NO. 9:**  Judge, may I collect my belongings?

20              **THE COURT:**  Yes, absolutely.  If you need -- do any of

21   you have any belongings in the courtroom that you need to

22   collect?

23       (Negative response from members of the prospective jury

24       panel.)

25       I think that's -- where are they, and the court security

1 | officer can grab them for you?

2 |          **JUROR NO. 9:**  Behind the chairs on the far left.

3 |          **THE COURT:**  Again, at this point I am going to dismiss

4 | you to the jury room for approximately 15 minutes.  As I said, do

5 | not talk about the case at all among yourselves.  Do not research

6 | the case.  Just relax, and we'll start the trial after we take a

7 | break.  All right.

8 |     (Member of the jury panel departed the courtroom at 3:19

9 |     p.m.)

10 |          **THE COURT:**  All right.  Miss Solomon, if you would.

11 |          **THE CLERK:**  Miss Dow, Seat Number 1 on the first row;

12 | Miss Cooley, Seat Number 2 on the first row; Miss Comar, Seat

13 | Number 3 on the first row; Mr. Lindsey, Seat Number 4 on the

14 | first row; Miss Peeler, Seat Number 5 on the first row;

15 | Miss Davis, Seat Number 6 on the first row.

16 |          **THE COURT:**  All right.  I am going to direct my

17 | questions now to the six of you in the jury box as we select two

18 | alternates.

19 |     Would any of you have answered yes to any of my questions

20 | earlier?

21 |     (Affirmative response from members of the prospective jury

22 |     panel.)

23 |     Miss Dow?

24 |          **ALTERNATE JUROR NO. 1:**  I would have answered yes to

25 | three questions.  One, I worked for a subregional police in

1  Canada for a period of time as a radio dispatcher; I was a victim

2  of a crime -- our house was broken into and robbed -- and the

3  third one was I was a witness in a criminal case.

4         **THE COURT:**  All right.  When were you employed by the

5  police in Canada?  Do I have that right?

6         **ALTERNATE JUROR NO. 1:**  Yes, sir.  Thirty-three years

7  ago.

8         **THE COURT:**  Do you believe you would -- that that

9  experience, rather, would in any way affect your ability to be

10 fair and impartial in this case?

11        **ALTERNATE JUROR NO. 1:**  Not at all.

12        **THE COURT:**  You were a radio dispatcher; is that right?

13        **ALTERNATE JUROR NO. 1:**  Yes, sir.

14        **THE COURT:**  When was your house broken into?

15        **ALTERNATE JUROR NO. 1:**  That would have been five or

16 six years ago.

17        **THE COURT:**  And do you know whether drugs were in any

18 way involved in that?

19        **ALTERNATE JUROR NO. 1:**  I have no idea.  They were

20 never found.  They were never caught.

21        **THE COURT:**  Do you believe that that incident would in

22 any way affect your ability to be fair and impartial in this

23 case?

24        **ALTERNATE JUROR NO. 1:**  Not at all.

25        **THE COURT:**  And you were a witness in a case.  What

1  kind of case was that?

2        **ALTERNATE JUROR NO. 1:**  It was an indecent exposure and

3  I -- I didn't actually have to be a witness in court; but I sort

4  of checked in and the officer in charge let the judge know that I

5  was there, and I was a witness to the fact, and that's all I had

6  to do was sit in court.

7        **THE COURT:**  Was the case actually tried?

8        **ALTERNATE JUROR NO. 1:**  Yes, sir.

9        **THE COURT:**  When was this?

10       **ALTERNATE JUROR NO. 1:**  A long time ago.  Twenty-five

11 years ago.

12       **THE COURT:**  Do you believe that that would in any way

13 affect your ability to be fair and impartial in this case?

14       **ALTERNATE JUROR NO. 1:**  Not at all.

15       **THE COURT:**  Were you actually the victim in that case?

16       **ALTERNATE JUROR NO. 1:**  Yes, sir.

17       **THE COURT:**  Do you believe the fact that you were a

18 victim in that case would in any way affect your ability in this

19 case to listen to the evidence and the instructions as I give

20 them to you and to render a verdict that's fair and impartial to

21 both sides?

22       **ALTERNATE JUROR NO. 1:**  No, sir, I don't believe that

23 would affect me at all.

24       **THE COURT:**  Anything else, ma'am?

25       **ALTERNATE JUROR NO. 1:**  Nothing else.

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 118 of 172

1          **THE COURT:**  Who else had their hand up?  Mr. Lindsey,

2    is that right?

3          **ALTERNATE JUROR NO. 4:**  Yes.  I've been on two criminal

4    cases before probably five years ago, and the other question

5    about getting over here, I had an accident this morning.  So when

6    I leave here, I need to go check on my insurance and see about

7    getting some more transportation.

8          **THE COURT:**  You had an auto accident?

9          **ALTERNATE JUROR NO. 4:**  Yes.

10         **THE COURT:**  Were you injured at all, sir?

11         **ALTERNATE JUROR NO. 4:**  No, I don't think so.

12         **THE COURT:**  All right.  I should ask you that you know

13   of?

14         **ALTERNATE JUROR NO. 4:**  Not that I know of.

15         **THE COURT:**  Is your car able to drive at all?

16         **ALTERNATE JUROR NO. 4:**  I got one headlight.  I hope I

17   can get back to Reidsville before it get dark.

18         **THE COURT:**  Do you have access to another automobile?

19         **ALTERNATE JUROR NO. 4:**  Yes.

20         **THE COURT:**  Your two criminal cases, what kinds of

21   cases were they, sir?

22         **ALTERNATE JUROR NO. 4:**  One was a rape case, and one

23   was an armed robbery.

24         **THE COURT:**  Do you believe that your experience as a

25   juror -- is that right, sir?

1          **ALTERNATE JUROR NO. 4:**  Yes, sir.

2          **THE COURT:**  Do you believe that your experience as a

3  juror in those cases would in any way affect your ability to be

4  fair and impartial in this case?

5          **ALTERNATE JUROR NO. 4:**  No.

6          **THE COURT:**  All right.  Was there anything else?

7          **ALTERNATE JUROR NO. 4:**  No.

8          **THE COURT:**  Thank you.  Who else had their hand up?

9  Just the two of you.  All right.  Nobody else.

10     All right.  Let me ask you, is there any reason that I have

11  not asked about that would make it difficult for you to be a fair

12  and impartial juror that I described already?  If so, please

13  raise your hand.

14     (Negative response from members of the prospective jury

15     panel.)

16     All right.  I see no hands.  Let me briefly ask you, if you

17  would, to tell us about your background, your name, educational

18  background, your work, whether you are married and et cetera.

19          **ALTERNATE JUROR NO. 1:**  I hold a master's degree.  I am

20  a freelance writer.  I'm widowed.  My husband was a contractor,

21  business owner.  I have two adult sons.  Both in engineering, one

22  electronics and one environmental.

23          **THE COURT:**  What was your educational background?

24          **ALTERNATE JUROR NO. 1:**  I hold a master's degree in

25  education.

Case 1:08-cr-00233-TDS   Document 31   Filed 06/22/09   Page 120 of 172

1          **THE COURT:**  Thank you.  Miss Cooley, what is your full

2    name, please?

3          **ALTERNATE JUROR NO. 2:**  Teresa Gadd Cooley.  I have a

4    high school education.  I'm a print manager for a printing

5    company.  My husband is the grounds maintenance supervisor for

6    Forsyth County, and I have a grown daughter who is a kindergarten

7    teacher.

8          **THE COURT:**  All right.  Thank you.  Miss Comar?

9          **ALTERNATE JUROR NO. 3:**  Tammy Hicks Comar.  I work as

10   an administrative assistant in local government.  My husband is a

11   deputy sheriff's investigator in the county we live in.  I have

12   an adult son that is a convenience store worker right now and a

13   waiter.

14         **THE COURT:**  Do you believe that the fact -- well, let

15   me back up for a minute.  How long has your husband been a deputy

16   sheriff investigator?

17         **ALTERNATE JUROR NO. 3:**  All his adult life.  He is 42.

18   That's 24 years.

19         **THE COURT:**  Do you believe that the fact that he is a

20   deputy sheriff's investigator would in any way affect your

21   ability to be fair and impartial in this case?

22         **ALTERNATE JUROR NO. 3:**  I've been thinking about that.

23   I know a lot of his coworkers, and I trust them; so I would say

24   yes.

25         **THE COURT:**  Mr. Lindsey?

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1           **ALTERNATE JUROR NO. 4:**  My name is Jimmy Robby Lindsey.

2   Twelfth grade education, work for Miller Brewing Company, wife

3   works for Lowes Building Supply.  I have two grown daughters.

4   One works for United Health Insurance Company, and the other one

5   is in human resource for Honeywell.

6           **THE COURT:**  Thank you, sir.  Miss Peeler?

7           **ALTERNATE JUROR NO. 5:**  My name is Deborah Ann Peeler.

8   I work -- I went through 12th grade.  I did nursing one year, did

9   not like it.  I quit.  I'm employed at Athena Marble.

10          **THE COURT:**  Are you married, ma'am?

11          **ALTERNATE JUROR NO. 5:**  No.  No children.

12          **THE COURT:**  All right.  Thank you.  Miss Davis?

13          **ALTERNATE JUROR NO. 6:**  My name is Beulah Ann Davis.  I

14   finished 12th grade.  I work at Moses Cone Hospital.  I'm a cook,

15   and I have one grown daughter.  She is a certified nursing tech.

16          **THE COURT:**  All right.  Are you married at this time?

17          **ALTERNATE JUROR NO. 6:**  I'm single.

18          **THE COURT:**  Counsel, if you would approach the bench,

19   please.

20       (The following proceedings were had at the bench by the

21       Court and Counsel out of the hearing of the jury:)

22          **THE COURT:**  Any further questions?

23       **MR. HARRISON:**  No, sir.

24       **MR. GALYON:**  No, sir.

25          **THE COURT:**  Any motions?

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1            MR. HARRISON:  Move to remove Miss Comar for cause.

2            THE COURT:  The Government's position?

3            MR. GALYON:  Did she say that she didn't think she

4    could be fair and impartial because of her husband's employment,

5    or that she knew those guys?

6            MR. HARRISON:  She said that she didn't think she

7    could.

8            MR. GALYON:  I don't have any problem with that.

9            THE COURT:  Okay.  Strike Number 3 for cause.

10           MR. HARRISON:  I'm sorry, sir?

11           THE COURT:  I am going to strike Number 3; is that

12   right?

13           MR. HARRISON:  Yes.

14           THE COURT:  For cause?

15           MR. GALYON:  Yes, sir.

16           THE COURT:  You each have one peremptory, and you can

17   exercise your peremptory; and whoever is left, the two lowest

18   numbers we'll take.

19       (Thereupon, the following proceedings continued within the

20       hearing of the jury:)

21       (The proceedings were paused for counsel to exercise their

22       peremptory challenges.)

23           THE CLERK:  Miss Dow and Miss Cooley will be our

24   alternates.

25           THE COURT:  All right.  I am going to ask at this time,

1   Miss Dow and Miss Cooley, to retire with the rest of the jury in

2   the jury room; and before you leave, I am going to give you my

3   admonition and, that is, you have not heard any evidence.  I need

4   to remind you at this time, of course, not to discuss the case

5   with anyone, of course, not in the jury room or even at home or

6   with a spouse or friend or coworker.  Do not discuss it with one

7   another until all the evidence is in and the attorneys have made

8   their closing arguments and I have given you the final

9   instructions on the law and directed you to do that.

10       Until then, make no investigation in the case.  Do not read

11  about it if it appears anywhere at this point, and do not speak

12  to or contact anybody connected with the case, including lawyers,

13  even if it's a courtesy hello.  They understand what the rules

14  are, and they will not be offended.

15       At this point, I am going to excuse Miss Dow and Miss Cooley

16  to the jury room.

17       (Members of the jury panel departed the courtroom at 3:32

18       p.m.)

19       **THE COURT:**  For the rest of you all, I want to thank

20  you all for your service.  As I said, we never know exactly how

21  many jurors we will need.  It is critical that we have a full

22  complement so that we have enough potential jurors, as you can

23  see, now that you've seen the process unfold, so that we can

24  select a complete jury in the case.

25       Your services will not be needed on this case.  For those of

1  you not selected, please call back on Thursday, December 18, this

2  Thursday -- is that after 5:00, Miss Solomon?

3          **THE CLERK:**  Yes, sir.

4          **THE COURT:**  -- after 5:00 on the number you previously

5  have for updating as to any further reporting instructions.  So

6  you all are now released.  If you would, as I said, just call

7  back again; and we release you with our thanks.  You all have a

8  good day.

9      (The prospective jury departed the courtroom at 3:35 p.m.)

10         **THE COURT:**  All right.  We are going to take just a

11  brief break here to give you all time to set up, and then we'll

12  bring the jury in, swear them; and I'll give the preliminary

13  instructions, and then you all can do your openings.  We'll start

14  the presentation of the evidence.

15     First of all, is there anything from counsel that you want

16  to bring to my attention?

17         **MR. HARRISON:**  Your Honor, Mr. Galyon gave me at the

18  lunch break some further discovery, the nature of which leads me

19  to object to its entry.

20         **THE COURT:**  All right.

21         **MR. HARRISON:**  The information comes from the

22  cooperating individuals and --

23         **THE COURT:**  Can I ask briefly is this something that

24  needs to be resolved before 5:00?  If so, I would be glad to.

25  Otherwise, we can resolve it at 5:00 when I let the jury go out.

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 125 of 172

1  Do you need to know about it before you do your openings?

2            **MR. HARRISON:**  I would not.

3            **THE COURT:**  Mr. Galyon, do you want -- I'll be glad to

4  resolve it now if you need me to.  Otherwise, I'm just trying to

5  focus on what we need to focus on.

6            **MR. GALYON:**  I don't intend on mentioning it in my

7  opening.  However, it will potentially come up during the

8  testimony of the first witness.

9            **THE COURT:**  Let's resolve it then.  What is it that's

10 been produced.

11           **MR. HARRISON:**  Would the Court want me to read it?

12           **THE COURT:**  Sure.

13           **MR. HARRISON:**  "During discussions with the CIs

14 tonight, they told the officers that they had taken Melvin to

15 Cleve's cabin in November of 2007 so that Melvin could pick up a

16 quarter ounce of meth from Cleve.  While at Cleve's cabin, Melvin

17 and Cleve smoked and initially the" -- now they call them "CSs

18 said, no, but then both smoked some meth.  They had taken Melvin

19 without letting law enforcement know, and they did not report the

20 incident until tonight," which I assume was last night.

21           **MR. GALYON:**  That's correct.

22           **MR. HARRISON:**  "In addition, they said in late November

23 of 2007 they took Melvin to meet with Cleve at a Waffle House

24 parking lot off of Germantown Road.  They did not see Melvin with

25 dope."

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER    (336) 254-7464

1          **THE COURT:**  All right.  The basis of your objection is

2    for the record?

3          **MR. HARRISON:**  It is prior to the time that the alleged

4    conspiracy began sometime in November.

5          **THE COURT:**  All right.  Has this information been

6    disclosed to you prior to today?

7          **MR. HARRISON:**  No, sir.  Today around lunch.

8          **THE COURT:**  Mr. Galyon, do you want to be heard?

9          **MR. GALYON:**  Your Honor, I did not get the information

10   as you can tell -- that is actually an e-mail that I sent to

11   Mr. Harrison yesterday -- or last night, late last night, and

12   then gave him a copy of it this morning.

13       Obviously, it is information that I didn't have until now.

14   So it is not an issue of didn't turn it over, just didn't have

15   it.  It was one of those -- I met with the confidential

16   informants before, and it was only last night that they informed

17   law enforcement that, in fact, there had been these two incidents

18   where, without notifying law enforcement at the time, they went

19   with Melvin Johnson and took him, as Mr. Harrison recounted, on

20   one occasion to this defendant's cabin where they actually

21   weighed methamphetamine out.  It was actually on a dish, and then

22   it was weighed out by this defendant and then given to Melvin

23   Johnson, and that all of the individuals -- that is, this

24   defendant, Melvin Johnson, and both of the CSs -- actually smoked

25   methamphetamine at the time.

1        And then the second incident was also in November, and that

2   also is an incident where they, the CSs, took Melvin Johnson to

3   meet with Cleve Johnson at a Waffle House, where Melvin Johnson

4   then got into a vehicle with Cleve Johnson and then got out

5   thereafter.  They didn't see any methamphetamine exchanged and,

6   Your Honor, I would argue that that's only relevant to the extent

7   that in January of this year there was a very similar incident as

8   part of the conspiracy wherein the defendant and Melvin Johnson

9   met together in High Point in a vehicle after the CSs had brought

10  Melvin to the scene for the purpose of Melvin paying drug money

11  that he owed to this defendant.  So that's largely the relevance

12  of that Waffle House incident.

13       The other, of course, is, I would argue, highly probative

14  with respect to the issue of the ongoing conspiracy and, as the

15  Court is well aware, the dates of the conspiracy, what is

16  actually charged -- it is an on or about.  That's a very loose

17  timeframe.  Essentially, the evidence from the -- presented at

18  trial can establish the conspiracy based on the on-or-about

19  language.

20       Even it's outside the timeframe of the conspiracy, it can

21  certainly be 404(b) to show the knowledge, intent, the

22  association between the parties, all of those things, modus

23  operandi.  Modus operandi in particular is important in this case

24  because, as I understood what the CSs had told the officers, when

25  they took Melvin to meet with Cleve down at Cleve's cabin, this

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 128 of 172

1  defendant's cabin, the methamphetamine that was provided by this

2  defendant to his cousin was fronted, and that's consistent with

3  how all of the drug transactions that these CSs are aware of --

4  and all the evidence that we will present is that this defendant

5  fronted methamphetamine to his cousin and would then get repaid

6  after his cousin had sold the methamphetamine to someone else.

7          **THE COURT:**  His cousin Melvin?

8          **MR. GALYON:**  His cousin Melvin, yes, sir, right.  So,

9  again, it is just consistent with the modus operandi within the

10  conspiracy itself, how the conspiracy is operating related to the

11  distribution, that this defendant is fronting methamphetamine to

12  his cousin Melvin.  Melvin then sells it.  Once he gets the money

13  back, then he pays his cousin back as part of the ongoing course.

14          **THE COURT:**  Tell me again exactly -- tell me what

15  happened at the cabin?

16          **MR. GALYON:**  Your Honor, they --

17          **THE COURT:**  I'm sorry.  Let me do the other one first.

18  The Waffle House, it is the absence of activity that's consistent

19  with other absence of drug trafficking that it's relevant to; is

20  that kind of how it fits together?

21          **MR. GALYON:**  Well, Your Honor, it is consistent, too,

22  with how transactions were done or how these meetings were

23  conducted between Melvin Johnson and this defendant, that if they

24  didn't occur in a residence, then, of course, there would be

25  meetings in a vehicle in order to either transfer money or

 1  transfer --

 2          **THE COURT:**  What happened at the Waffle House meeting?

 3          **MR. GALYON:**  Your Honor, the informants were not clear

 4  as to what happened.  The purpose of, A, turning it over and, B,

 5  whether or not it is relevant is that it is consistent with what

 6  happened in January in terms of the meetings.

 7     Quite honestly, it is more impeachment information related

 8  to the CSs because they did it without informing law enforcement.

 9  That's why I felt it was important to turn it over to

10  Mr. Harrison.

11          **THE COURT:**  Do you have any interest in putting that

12  into evidence, Mr. Harrison?

13          **MR. HARRISON:**  No, I don't, and I can't conceive of how

14  it would be admissible.  I mean, how would we know what was said

15  or done?

16          **THE COURT:**  I understand the Waffle House one.  Go to

17  the other one, if you would, the November incident.  When in

18  November was this?  Do we have a date?

19          **MR. GALYON:**  Your Honor, we don't have a specific date.

20  It was within November.

21          **THE COURT:**  Will there be a date in the evidence or

22  not?

23          **MR. GALYON:**  Not that the CIs are 100 percent sure on.

24  They know that it was prior to December 11th, and they believe

25  that it was sometime in November; and, actually, the evidence is

1  that there were discussions with Melvin Johnson even during the

2  month of November.  Not all of those were recorded by law

3  enforcement; but they actually had the CSs in contact with Melvin

4  even during November, which led to this discussion about getting

5  anhydrous ammonia and/or pills and then later evolved into the

6  request for -- or willingness to supply a pound of meth.

7          **THE COURT:**  The November-proposed testimony that we are

8  now talking about, as I understand it, Melvin Johnson went over

9  to the cabin of the defendant; is that right?

10          **MR. GALYON:**  Yes, sir.

11          **THE COURT:**  And at the cabin -- he went there for what

12  purpose?

13          **MR. GALYON:**  To get methamphetamine.

14          **THE COURT:**  For purposes of consumption or to

15  distribute?

16          **MR. GALYON:**  To distribute.

17          **THE COURT:**  All right.  How much did he get?  A quarter

18  of an ounce?

19          **MR. GALYON:**  Yes, sir.

20          **THE COURT:**  Mr. Harrison?

21          **MR. HARRISON:**  Your Honor, once again, I mean, a

22  quarter of an ounce of methamphetamine is a usage amount for,

23  certainly demonstrably so -- by Melvin Johnson who is constantly

24  using methamphetamine.  A quarter of an ounce is a few grams, and

25  there is no evidence, again, except that it was transferred.

1  There is no evidence that they had agreed to do anything about

2  the distribution mutually of that quarter ounce.  There is just

3  no evidence.  There is no evidence.  There is a -- there is a

4  speculation that he could have sold it, but there is no testimony

5  that he -- that there was a plan, an organization, a goal, or

6  anything to do with -- he could just as easily have done it all

7  between the time that he got it and went home.

8       **THE COURT:**  When they had the meeting in November of

9  '07, Mr. Galyon, was the quarter of an ounce actually then

10  consumed -- you mentioned that they then all smoked -- I guess

11  this was meth that they were smoking, is that right, as opposed

12  to taken by pills?

13       **MR. GALYON:**  Yes, sir.

14       **THE COURT:**  They smoked meth.  Is that the quarter of

15  an ounce that they smoked at the time?

16       **MR. GALYON:**  No.  They smoked methamphetamine; and at

17  the same time, an amount was weighed out by this defendant and

18  packaged and given to Melvin in their presence.

19       **THE COURT:**  Will there be testimony by the Government

20  that a quarter of an ounce is -- as to how much that is on a user

21  basis versus a distribution basis?

22       **MR. GALYON:**  Yes.  And, actually, the transcript, I

23  think, of December 7 talks about -- well, if the transcript

24  doesn't, I know that the tape does, the full tape wherein Melvin

25  is actually talking about the fact that he has four or five grams

Case 1:08-cr-00233-TDS   Document 31   Filed 06/22/09   Page 132 of 172

1   that he has to get sold and that he is having trouble -- that he

2   had three people come by the previous evening and buy some

3   amounts -- or three people call and/or come by, and that one of

4   them got some amount of methamphetamine.  He doesn't describe how

5   much, and another got some --

6          **THE COURT:**  Is what you are talking about something

7   that was disclosed?

8          **MR. GALYON:**  Yes, sir.

9          **THE COURT:**  So the only part that wasn't disclosed is

10  this part you just told me about?

11         **MR. GALYON:**  Yes, sir.  What I am attempting to do is

12  explain in relation to the question of user amounts.

13         **THE COURT:**  I'm sorry.

14         **MR. GALYON:**  That, first of all, there will be law

15  enforcement testimony about user amounts based on their training

16  and experience and then, of course, we've got the two CSs who

17  used methamphetamine and then, beyond that, we've got -- specific

18  to this case, we've got Melvin Johnson who provided information

19  about how much methamphetamine he had and that he needed to get

20  rid of so that he could get more from this defendant.

21         **THE COURT:**  When does that occur?

22         **MR. GALYON:**  That occurs on December 7th.

23         **THE COURT:**  Okay.

24         **MR. GALYON:**  December 7th.

25         **THE COURT:**  All right.  So apart from this evidence we

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER   (336) 254-7464

1  are now talking about, the Government still has evidence of

2  distribution involving Melvin Johnson and Cleve Johnson?

3          **MR. GALYON:**  Yes, sir.

4          **THE COURT:**  I am going to preclude the evidence

5  primarily on the basis that, even though an email was sent out

6  last night, it was not known to the defendant until this morning

7  through perhaps no fault of the Government; but I think that

8  late-blooming information for purposes of the case is prejudicial

9  to the defendant and principally on that basis will preclude it.

10      The Waffle House incident, while potentially probative of

11  prior meetings, seems to be lacking in enough factual

12  information, in any event, to have the probative value outweigh

13  its potential prejudicial effect in this case, particularly since

14  it is information that the defendant said they did not know about

15  until today and here we are getting ready to start the trial.  I

16  will keep it out on that basis.

17      I'm also concerned that we don't have a date as to the

18  November information, and the further it gets from December 7th,

19  the more difficult I think it becomes as to relating it to the

20  on-or-about date of the specific date that's given in the

21  indictment.  So for those reasons, I think I will preclude the

22  evidence at this point.

23      Okay.  Anything further you all need to raise?  I have one

24  thing I need to raise with you; that is, as I went through the

25  preliminary instructions on page 4, I give a definition of

1  willfully, which is actually a holdover from a different

2  definition of conspiracy which uses the word "willfully"; and in

3  this set of instructions, I have not used willfully.

4       So I am asking whether it would be appropriate to just take

5  out the definition of willfully since it doesn't -- if the jury

6  is paying close enough attention, they are not -- they are going

7  to connect up the fact that I've defined a term that is not in

8  the definition of conspiracy as given here.

9       So I would think the thing to do would be to strike the last

10  three sentences on -- well, it is my last three on page 4 of this

11  draft, but it is the definition of willfully.  I would like to

12  hear from you all as to what you think the appropriate thing to

13  do is.

14          **MR. GALYON:**  I would agree with that, Your Honor.

15          **MR. HARRISON:**  I have no contention with that.

16          **THE COURT:**  I'm sorry?

17          **MR. HARRISON:**  I have no problem with that.

18          **THE COURT:**  No objection.  All right.  I believe that's

19  everything.  All right.  Let's take a break.  Is five minutes

20  okay for you all?  I know you all need a quick break.  Do you

21  need a little bit more than that?

22          **MR. GALYON:**  I just need to get the computer and set it

23  up.

24          **THE COURT:**  I'll come back at 4:00.  If you all are

25  ready, we'll start.  If you need to set up, you'll have the time

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  you need to set up.

2      (The Court recessed at 3:52 p.m.)

3      (The Court was called back to order at 4:08 p.m.)

4      **THE COURT:**  Mr. Galyon, let me ask you as to what we

5  were just talking about and, that is, the -- I'm sorry.  We've

6  got to wait for the defendant to get in.

7      (The Defendant entered the courtroom.)

8      It is ten after 4:00.  What I am wondering is is the

9  testimony going to come in as to the November incident that you

10 are interested in -- is that going to come up before 5:00 today

11 at this point?

12     **MR. GALYON:**  I don't think that it actually will.  It

13 will -- it could potentially come in through the first witness,

14 but I don't have to get into it.  I've got --

15     **THE COURT:**  If you can avoid getting it into until

16 then.  I want to talk about that just a little bit more, not the

17 Waffle House incident, but the November one.  I am always at a

18 disadvantage when I don't have any case law cited to me when I

19 have to decide an issue.  I have now looked at a few cases.  I am

20 getting a better understanding of the breadth of what's

21 admissible as evidence to prove a conspiracy, going outside of

22 the conspiracy timeframe; and I want to talk about that further.

23     So if there is a way to avoid that until we have to reach it

24 at 5:00, I would like to do that.

25     Anything further at this time?

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 136 of 172

1        **MR. GALYON:**  No, Your Honor.

2        **MR. HARRISON:**  No, sir.

3        **THE COURT:**  If you would, please bring the jury back.

4     (The jury returned to the courtroom at 4:09 p.m.)

5        **THE COURT:**  Miss Solomon, if you would, please impanel

6  the jury.

7     (Twelve jurors and two alternate jurors were duly

8     impaneled.)

9        **THE COURT:**  Ladies and gentlemen of the jury, let me

10 again express my appreciation for your service here as jurors in

11 this case.

12    Now that you have been sworn, I will give you some

13 preliminary instructions to guide you in your participation in

14 the trial.

15    It will be your duty to find from the evidence what the

16 facts are.  You and you alone will be the judges of the facts.

17 You will then have to apply to those facts the law as I will give

18 it to you.  You must follow that law whether you agree with it or

19 not.

20    Nothing the Court may say or do during the course of the

21 trial is intended to indicate or should be taken by you as

22 indicating what your verdict should be.

23    As you know, this is a criminal case.  There are three basic

24 rules about criminal cases that you must keep in mind.  First,

25 the defendant is presumed innocent until proven guilty.  The

 1  indictment brought by the Government against the defendant is

 2  only an accusation, nothing more.  It is not proof of guilt or

 3  anything else.  The defendant, therefore, starts out with a clean

 4  slate.  You are only here to determine guilt or innocence as to

 5  the charges in the indictment.

 6       Second, the burden of proof is on the Government until the

 7  very end of the case.  The defendant has no burden to prove his

 8  innocence or to present any evidence or to testify.  Since the

 9  defendant has the right to remain silent, the law prohibits you

10  from arriving at your verdict by considering that the defendant

11  may not have testified.

12       Third, the Government must prove the defendant's guilt

13  beyond a reasonable doubt.  The Government's burden is not beyond

14  all doubt but beyond a reasonable doubt.  I will give you further

15  instructions on this point later; but bear in mind that in this

16  respect, a criminal case is different from a civil case.

17       In this case the defendant is charged with conspiracy to

18  commit a drug offense and attempt to commit a drug offense, both

19  in violation of Title 21 of the United States Code, Section 846.

20  Section 846 of Title 21 of the U.S. Code makes it a separate

21  federal offense for any person to attempt or conspire to commit

22  any drug offense defined under Title 21 of the United States

23  Code.

24       I will give you detailed instructions on the law at the end

25  of the case, and those instructions will control your

1    deliberations and decisions; but in order to help you follow the

2    evidence, I will now give you a brief summary of the elements of

3    the offenses that the Government must prove to make its case.

4        In Count One, Mr. Johnson is charged with conspiracy to

5    distribute a mixture and substance containing a detectable amount

6    of methamphetamine in violation of Title 21, United States Code,

7    Section 846.

8        To prove this offense, the Government must prove the

9    following elements beyond a reasonable doubt:  First, from on or

10   about December 7, 2007, continuing up to and including July 1,

11   2008, two or more persons reached an agreement to engage in

12   conduct that violates a federal drug law as charged in Count One

13   of the indictment; that is, to knowingly or intentionally

14   distribute 50 grams or more of a mixture and substance containing

15   a detectable amount of methamphetamine, a Schedule II controlled

16   substance within the meaning of Title 21 of the United States

17   Code, Section 812, in violation of Title 21, U.S. Code, Section

18   841(a)(1).

19       Second, that the defendant knew of the conspiracy and its

20   objectives; and, third, the defendant knowingly and voluntarily

21   became a part of the conspiracy.  A conspiracy is an agreement or

22   kind of partnership in criminal purposes in which each member

23   becomes the agent or partner of every other member.

24       Before the defendant may be found guilty of the charge in

25   Count One, you must agree unanimously upon each legal element of

1  the offense.

2       In Count Two, Mr. Johnson is charged with attempt to possess

3  with intent to distribute 50 grams or more of a mixture and

4  substance containing a detectable amount of methamphetamine in

5  violation of Title 21, United States Code, Section 846.

6       To prove this offense, the Government must prove the

7  following elements beyond a reasonable doubt:  First, that the

8  defendant had the requisite intent to commit the crime; that is,

9  on or about December 11, 2007, to knowingly or intentionally

10  possess with intent to distribute 50 grams or more of a mixture

11  and substance containing a detectable amount of methamphetamine,

12  a Schedule II controlled substance within the meaning of Title

13  21, United States Code, Section 812, in violation of Title 21,

14  United States Code, Sections 841(a)(1) and (b)(1)(B).

15       Second, that the defendant undertook a direct act in

16  further -- I'm sorry -- a direct act in a course of conduct

17  planned to culminate in the commission of the crime.

18       Third, that the act was substantial in that it was strongly

19  corroborative of the defendant's criminal intent; and, fourth,

20  that the act fell short of the commission of the intended crime

21  because of intervening circumstances.

22       By definition, a conviction for attempt requires less

23  evidence than a conviction for the complete crime.  However, I

24  instruct you that in order to find the defendant guilty of

25  attempt, the evidence must establish at a minimum both culpable

Case 1:08-cr-00233-TDS   Document 31   Filed 06/22/09   Page 140 of 172

1  intent and a substantial step toward completion of the crime in

2  question.

3      Before the defendant may be found guilty of the charge in

4  Count Two, you must agree unanimously upon each legal element of

5  the offense.

6      The word "knowingly," as that term has been used in these

7  instructions, means that the act was done voluntarily and

8  intentionally and not because of mistake or accident.

9      As used in these instructions, the word "distribute" means

10 the transfer of a controlled substance to another person with or

11 without any financial interest in the transaction.  The phrase

12 "to distribute" includes the sale of something by one person to

13 another but it need not involve a sale.

14     I will now define possession as used in these instructions.

15 The law recognizes several kinds of possession.  A person may

16 have actual possession or constructive possession.  A person may

17 also have sole or joint possession.  A person who knowingly has

18 direct physical control over a thing at a given time is then in

19 actual possession of it.  A person who, although not in actual

20 possession, knowingly has both the power and the intention at a

21 given time to exercise dominion or control over a thing, either

22 directly or through another person or persons, is then in

23 constructive possession of it.

24     To prove constructive possession, the Government must prove

25 beyond a reasonable doubt that the defendant had knowledge of the

1  presence of the item or items in question and that he had both

2  the power and the intention to later take control over the item

3  or items.

4      Constructive possession may be inferred from the acts and

5  circumstances, including evidence that a person exercised control

6  over a home in which he knew the item in question was present.

7      The law recognizes also that possession may be sole or

8  joint.  If one person alone has actual or constructive possession

9  of the thing, possession is sole.  If two or more persons share

10  actual or constructive possession of a thing, possession is

11  joint.  When I use the word "possession," I am referring to

12  actual as well as constructive possession and sole as well as

13  joint possession.

14      You may find that element of possession, as that term has

15  been used in these instructions, is present if you find beyond a

16  reasonable doubt that the defendant had actual or constructive

17  possession either alone or jointly with others.

18      If you find that the defendant -- I'm sorry.  If you find

19  the defendant guilty of the charge in Count One or in Count Two,

20  you will also be asked to determine within certain ranges the

21  quantity of controlled substances involved in each count.

22      The evidence from which you will find the facts will consist

23  of the testimony of witnesses, documents, and other things

24  received into the record as exhibits and any facts that the

25  lawyers agree to or stipulate to or that the Court may instruct

1  you to find.

2      There are two kinds of evidence, direct or circumstantial.

3  Direct evidence is direct proof of a fact such as testimony of an

4  eyewitness.  Circumstantial evidence is proof of facts from which

5  you may infer or conclude that other facts exist.  I will give

6  you further instructions on these as well as other matters at the

7  end of the case, but keep in mind that you may consider both

8  kinds of evidence.

9      A stipulation is when the parties agree that something is

10  true.  When the parties agree that something is true, you should,

11  therefore, treat that fact as having been proved.  Otherwise, it

12  is up to you to determine whether you believe or do not believe

13  the evidence that is presented to you in this case.

14      Certain things are not evidence and must not be considered

15  by you.  I will list them for you now.  Statements, arguments,

16  and questions by lawyers are not evidence.  Objections to

17  questions are not evidence.  Lawyers have an obligation to their

18  clients to make objections when they believe evidence being

19  offered is improper under the rules of evidence.  You should not

20  be influenced by the objection or by the Court's ruling on it.

21  If the objection is sustained, ignore the question.  If the

22  objection is overruled, treat the answer like any other.  If you

23  are instructed that some item of evidence is received for a

24  limited purpose only, you must follow that instruction.

25      Testimony that the Court has excluded or told you to

1  disregard is not evidence and must not be considered.  Anything

2  you may have seen or heard outside the courtroom is not evidence

3  and must be disregarded.  You are to decide the case solely on

4  the evidence presented here in the courtroom.

5      As you listen to the witnesses, watch them carefully and ask

6  yourself, does it appear that they are being sincere in what they

7  are telling you?  Did the person have the opportunity to observe

8  carefully what they are telling you?  Does the person have a good

9  memory and the ability to remember accurately whatever it is they

10 are telling you?  Does the person have anything to gain by

11 testifying falsely in the case?

12     It will be up to you to decide which witnesses to believe,

13 which witnesses not to believe, and how much of any witnesses'

14 testimony to accept or to reject.

15     When one of the attorneys is asking questions, the other may

16 object, as I mentioned, to a question that is being asked.  When

17 that happens, what the lawyer is saying is, Judge, under the

18 rules of evidence, it is my position that the witness should not

19 be allowed to answer the question.  Do not hold it against either

20 party if their lawyer asserts an objection.  They have the right

21 to do so.

22     There will be times when I will be able to rule on

23 objections without talking with the lawyers, but there may be

24 times when I have to talk with the lawyers.  We try to anticipate

25 those times and avoid stopping the trial, but sometimes we cannot

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 144 of 172

1 anticipate them all. In those cases, if I think it can be

2 handled quickly, I may ask the lawyers to approach the bench.

3 When we discuss it here at the bench, do not try to figure

4 out what we are saying. You are not supposed to hear what we are

5 saying. If you can hear, please raise hand and let us know that

6 we are speaking too loudly. If you can read lips, do not do that

7 here. I will try to get everyone in a position that you do not

8 have the temptation either to listen or to try to read lips.

9 If we have need to have a more extensive discussion, I will

10 excuse you and send you back to the jury room. If I have to do

11 that, please understand that we are working on something that we

12 have to discuss out of your presence. In any event, I will try

13 to resolve the issues with the least inconvenience to you.

14 When I do rule on an objection, again, as I said, if I say

15 "overruled," it means that I will allow the question to be

16 answered; I am overruling the objection. You may then consider

17 the answer that you hear. If I say "sustained," it means that I

18 will not allow the question to be answered; and in that case, do

19 not consider the question and do not try to guess what you think

20 the answer will be. That would be speculation, and speculation

21 is not evidence.

22 It is not unusual that witnesses themselves are not familiar

23 with these rules and on occasion they may not understand that

24 when there is an objection they should wait until I rule before

25 they answer, or maybe the witness did not hear the objection and

1  they started to answer anyway.  If that happens and I have said

2  "sustained," meaning that the witness should not be allowed to

3  answer the question, you must erase what you have heard.  You

4  cannot consider the answer or partial answer at all for your

5  deliberations.

6        Now, a few words about your conduct as jurors in this case.

7        First, I instruct you that during the trial you are not to

8  discuss the case with anyone or permit anyone to discuss it with

9  you.  Until you retire to the jury room at the end of the case to

10 deliberate on your verdict, you simply are not to talk about the

11 case.  This prohibition includes any form of communication

12 whatsoever, whether over the Internet -- such as email, instant

13 messaging, websites, blogs, et cetera -- or the use of cell

14 phones for text messaging or audio, and the use of any other

15 recording or transmitting device.  Simply do not talk about the

16 case until you are instructed by me to deliberate, and then you

17 may only talk about the case among your other jurors when all are

18 present.

19       Second, do not read or listen to anything touching on this

20 case in any way.  If anyone tries to talk with you about the

21 case, bring it to my attention promptly.

22       Third, do not try to do any research or make any

23 investigation about the case on your own; and, finally, do not

24 form any opinion until all of the evidence is in.  Keep an open

25 mind until you start deliberations at the end of the case.

1      Now, a few notes about housekeeping.  We will start court

2  with the jury at 9:30 a.m. every morning.  You need to report to

3  the fourth floor, where you reported today, no later than

4  9:00 a.m. so that you can be checked in.

5      We will take a morning recess every morning at about

6  11:00 a.m.  We will try to break for lunch at about 12:30 p.m,

7  and you need to be back at 1:30 p.m., again reporting to the

8  fourth floor.  When everybody is ready, the court security

9  officers will bring you down here for court at 2:00 p.m.

10      We will take an afternoon break at 3:30, and we will recess

11  for the day at 5:00.  I will do my best to keep an eye on the

12  clock, and keep you in and out on time and not hold you over at

13  end of the day.  It will be a priority to proceed with the

14  testimony during these times.  I will try to avoid any delays as

15  much as possible.

16      You should know that the lawyers will be coming in early and

17  staying late to handle any matters that are necessary out of your

18  hearing so we that can be on time or as close to on time when you

19  are here.

20      Do not loiter in the corridors of the courthouse.

21  Embarrassing contacts may occur there with persons who are

22  interested in the case.  If anyone attempts to talk with you

23  about the case, tell them it is improper for a juror to discuss

24  the case or receive information except in the courtroom.  Do not

25  listen to the person, and it will be your duty to report the

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER  (336) 254-7464

1  incident at once to me.

2      If you want to take notes during the course of the trial,

3  you may do so.  Miss Solomon has legal pads and envelopes and

4  pencils for your use in taking notes if that helps you.  However,

5  it is difficult to take detailed notes and pay attention to what

6  the witnesses are saying at the same time.  If you do take notes,

7  be sure that your note-taking does not interfere with your

8  listening to and considering all of the evidence.  Your notes are

9  not evidence, and they should not take precedence over your

10  independent recollection of the evidence.

11      Also, if you do take notes, do not discuss them with anyone

12  before you begin your deliberations.  Do not take your notes with

13  you at the end of the day.  Be sure to leave them here in the

14  courtroom.  Also, do not loan your notes to anyone, not even to

15  another juror.  By the same token, do not borrow anyone else's

16  notes.

17      If you choose not to take notes, remember that it is your

18  own individual responsibility to listen carefully to the

19  evidence.  You cannot give this responsibility to someone who is

20  taking notes.  We depend on the judgment of all members of the

21  jury, and you must remember the evidence in this case.

22      If you wish to take notes, please write your name or juror

23  number on the outside of your envelopes so we can identify it and

24  match it up with you when you come back every day.  Every time we

25  take a recess, please place your legal pad in the envelope.  At

1  the end of the court day, please leave your envelopes in your

2  chairs; and Miss Solomon will place them in the jury room for the

3  evening.  We will place a note on the door to the jury room so

4  that nobody goes in there other than you, unless, of course, we

5  need to have it cleaned.  The jury room is set aside for your use

6  and for your use only.  You can leave your notes there in their

7  envelopes without fear that anyone will look at them.

8       I will now ask Miss Solomon to distribute your envelopes

9  with notepads and pencils.  As I said, please write your name or

10  juror number on the outside of your envelope.

11       (Deputy Clerk distributed envelopes.)

12       All right.  Ladies and gentlemen, the trial will now begin.

13  First, the Government will make an opening statement, which is

14  simply an outline to help you understand the evidence as it comes

15  in.  Next, the defendant's attorney may, but does not have to,

16  make an opening statement.  Opening statements are neither

17  evidence nor arguments.  They are merely forecasts of what the

18  lawyers think the evidence will be.

19       The Government will then present its witnesses and counsel

20  for the defendant may cross-examine them.  Following the

21  Government's case, the defendant may, if he wishes, present

22  witnesses whom the Government may cross-examine.

23       After all the evidence is in, the attorneys will present

24  their closing arguments to summarize and interpret the evidence

25  for you; and then the Court will instruct you on the law.  After

1  that, you will retire to deliberate on your verdict.

2      The jury is now with the Government.

3          MR. GALYON:  Thank you, Your Honor.  May it please the

4  Court, Mr. Johnson, Mr. Harrison, ladies and gentlemen, the

5  evidence is going to show in this case that in December of 2007,

6  the defendant, Cleve Alexander Johnson, and his cousin Melvin

7  Johnson conspired to distribute 50 grams or more of

8  methamphetamine in Surry County and elsewhere here in the Middle

9  District of North Carolina.

10      In addition, it is also going to show that they attempted to

11  possess more than 50 grams of methamphetamine with the intent of

12  possessing it with intent to distribute that methamphetamine.

13      Now, to further the conspiracy, the defendant, through his

14  cousin Melvin, actually made contact with an individual named

15  Robby Todd.  Through Robby Todd, they were to get in contact with

16  an Hispanic drug supplier; and that Hispanic drug supplier was

17  going to sell a pound of methamphetamine to this defendant and

18  his cousin Melvin Johnson.

19      On December 11, 2007, this defendant and his cousin came in

20  this defendant's car to Robby Todd's house in rural Surry County

21  with $16,000 in cash; and the purpose for that $16,000 in cash

22  was to pay for one pound of methamphetamine, which was the

23  agreed-upon price prior to December 11, 2007.

24      So once they arrived at the residence of Robby Todd, they

25  discussed the purchase, the contact was made with the Hispanic

Case 1:08-cr-00233-TDS   Document 31   Filed 06/22/09   Page 150 of 172

1  supplier, and the deal was to be done in Mount Airy, North

2  Carolina, which is in Surry County.  It is some distance away

3  from Robby Todd's residence there in Surry County.

4       And so this defendant got in his vehicle with $16,000 in

5  cash by his side and his cousin in the passenger seat, and they

6  followed Robby Todd and his girlfriend into Mount Airy to

7  complete the drug deal; but before the deal was completed, law

8  enforcement stopped this defendant and seized the money.

9       What the defendant did not know that day is that Robby Todd

10  was an informant working for law enforcement and that he had, in

11  fact, contacted law enforcement to tell them that, consistent

12  with plans that had been made during the previous several days,

13  this defendant and his cousin Melvin Johnson arrived with $16,000

14  to complete the drug deal, the purchase of one pound of

15  methamphetamine.

16       In addition to the evidence related to that stop, you will

17  also hear that in January 23 of this year, so six weeks later,

18  seven weeks later, this defendant met with an undercover officer

19  posing as an Hispanic drug supplier.  The person who introduced

20  this defendant to the undercover officer posing as an Hispanic

21  drug supply was Robby Todd because -- since the money got taken

22  off on December 11, this defendant still wanted the pound of

23  methamphetamine, and so he met with the Hispanic drug supplier

24  for the purpose of discussing that one-pound purchase.

25       And what you will hear, ladies and gentlemen, during the

1  course of the evidence and see this defendant via audio recording

2  and a videotape that was made of the meeting between the

3  undercover and this defendant in the undercover's car is this

4  defendant telling the undercover that he, in fact, wanted to

5  purchase the pound of methamphetamine back in December but that

6  law enforcement had taken his $16,000.

7       Ladies and gentlemen, as His Honor said, this is merely a

8  road map.  Opening statements are merely an opportunity for me to

9  provide a forecast of what the evidence is going to be; and I, on

10 behalf of the United States of America, will provide just a

11 little bit more detail than I already have related to what

12 happened in this case and what the evidence will show.

13      Now, you know that the defendant is charged with two things.

14 He is charged with conspiring with his cousin to distribute

15 50 grams or more of methamphetamine.  He is also charged with

16 attempting to possess more than 50 grams of methamphetamine for

17 the purpose of distribution -- those two things.  And in each of

18 those counts he is charged with his cousin.

19      Now, during November of 2007, Robby Todd, the informant in

20 the case, got in contact with Melvin Johnson.  He had known

21 Melvin from previous association between the two, and he talked

22 to Melvin Johnson about methamphetamine; and as a result of those

23 conversations and to further the investigation, Robby Todd wore a

24 concealed recording device so that the conversations that he had

25 with Melvin Johnson could be recorded.

1      And during the course of those conversations, Robby Todd

2   told Melvin Johnson about an Hispanic drug supplier that he knew

3   that could provide a pound or more of methamphetamine and would

4   Melvin Johnson be interested.  As a result of that conversation,

5   Melvin Johnson got in touch with his cousin Cleve Alexander

6   Johnson.

7      And you will hear evidence, ladies and gentlemen, that Cleve

8   Alexander Johnson was supplying his cousin Melvin with

9   methamphetamine.  He would supply methamphetamine to his cousin

10   Melvin.  Melvin would then sell the methamphetamine.  After he

11   had sold it, he would pay back the money that he owed for getting

12   fronted, or provided the dope on consignment.

13      And so you will hear that Melvin Johnson indicated that he

14   had to check with the person who had the money, this defendant,

15   to determine whether or not he would be interested in purchasing

16   a pound quantity of methamphetamine.

17      Now, on December 4, there was a discussion that you will

18   hear and there is an audio recording of that discussion related

19   to how much that pound of methamphetamine would cost.  There was

20   also a discussion related to getting in touch with this

21   defendant.

22      On December 7, just three days later, Robby Todd, again

23   wearing a concealed recording device, met with Melvin Johnson to

24   discuss the purchase of a pound quantity of meth; and Melvin

25   Johnson said that the defendant wanted to buy a pound of

1  methamphetamine.

2       And during that conversation, you will hear evidence, ladies

3  and gentlemen, through the audio recording of a phone

4  conversation while Robby Todd is present with Melvin Johnson.  He

5  makes a phone call to this defendant to discuss whether or not he

6  actually wants to get that pound of methamphetamine, and they

7  discuss how much it is going to cost; and then, thereafter, you

8  will hear Melvin Johnson talk about what he had just talked about

9  with this defendant on the phone in furtherance of the

10 conspiracy.

11      You will also hear Melvin Johnson talk about the fact that

12 he owes this defendant money because he has methamphetamine that

13 he received from this defendant and that he needs to pay him back

14 for.  So he needs to basically pay -- or sell the methamphetamine

15 that he has so that he can pay the rest of the money that he

16 would owe to this defendant to help make the drug deal happen.

17      Now, after December 7, there are several phone conversations

18 had between Robby Todd and Melvin Johnson and at the

19 conclusion -- or during the course of those several

20 conversations, there is a discussion -- there are discussions

21 about having the deal actually happen.

22      Well, December 11, 2007, this defendant and his cousin

23 Melvin show up at the residence of Robby Todd for the purpose of

24 buying one pound of methamphetamine; and consistent with that

25 goal, they had $16,000 in cash, the agreed-upon price.

1      Now, Robby Todd told law enforcement -- got in contact with

2  law enforcement.  Actually had to go into a bathroom of his house

3  to call law enforcement to let them know that this defendant and

4  Melvin Johnson were present at the residence.

5      You will hear from Robby Todd during the course of the

6  evidence in this case.  He tell you that he saw in the

7  defendant's car, a black Acura -- when they came to his residence

8  that morning, he saw in the car two big rolls of cash money

9  rubber-banded on each roll, and you will hear during the

10  subsequent car stop -- when this defendant is stopped in Mount

11  Airy, you will hear the defendant say, when the officers ask him

12  about the money, that it is exactly $16,000 in cash, 8,000 a

13  bundle.  Listen to what his explanation for why he has that much

14  cash is.

15      In addition, ladies and gentlemen, during the course of that

16  stop, this defendant also gave his cell phone number; and you

17  will hear testimony about cell phone numbers for this defendant,

18  for Melvin Johnson, for Robby Todd, the CS.  There are phone

19  records related to this defendant's cell phone records, and you

20  will see those during the course of the Government's evidence and

21  how they relate to the evidence of the conspiracy and the attempt

22  to possess with intent to distribute.

23      As I said earlier, on January 23, there is a conversation

24  between this defendant and an undercover officer posing as an

25  Hispanic drug dealer and during the course of that conversation,

1   the defendant, once he gets in the vehicle with the undercover

2   officer, says that he had just gotten out of federal prison for

3   trafficking in marijuana and that he can move -- he says -- he

4   doesn't say drugs.  He uses another word; that, in addition, he

5   admits that law enforcement had seized his money related to the

6   December incident and that he had intended to buy a pound of

7   methamphetamine.

8        He also indicates and asks at one point whether or not the

9   undercover officer knows his cousin Melvin, and that Robby, the

10  CI, wanted to be cut out of the drug deal itself.

11       In addition, the defendant tells the undercover officer that

12  he had recently, within the past several days, gotten a half

13  pound of methamphetamine but had returned several ounces of it

14  because it wasn't of good quality; and he wanted a steady supply

15  of good methamphetamine.  In addition, when the undercover

16  officer says it is good methamphetamine, it is good ice, it is

17  pure ice -- "ice" is a term related to methamphetamine -- this

18  defendant actually shows a quantity of methamphetamine that he

19  has to the undercover officer and says, "Is it as good as this,"

20  to which the undercover officer says, "It is exactly like that."

21       Now, ladies and gentlemen, after all the evidence is in in

22  this case, the Government will ask that you render a just verdict

23  related to the two charges against this defendant.  Thank you for

24  your time.

25            **THE COURT:**  Thank you, Mr. Galyon.  Mr. Harrison, do

1  you wish to be heard?

2       **MR. HARRISON:**  Yes.  Your Honor, Mr. Galyon, ladies and

3  gentlemen, one of the functions of an opening statement is to

4  provide the defendant with an opportunity to state to you the

5  theory of our defense, the theory of our case.

6       I am not attempting in my remarks to you at this time to

7  make arguments based on what this fact might mean and what this

8  fact might not mean or is it true or is it not true.  This is not

9  a time for argument.  It is a time at which I am afforded the

10  opportunity to talk to you about our theory of the defense in

11  this case.

12       Now, with that in mind, that will require maybe more than --

13  in most, if not all the cases that I've tried, it will require

14  that you become students of the law of conspiracy and students of

15  the law of attempt because as my colleague, Mr. Galyon, eagerly

16  points out, there are going to be -- you are going to hear

17  evidence of negotiations, evidence of discussions, talking about

18  dope, methamphetamine between several people.  You are going to

19  hear, in fact, that my client had $16,000, that he had it in the

20  car, and that he was on his way to negotiate -- it was still up

21  in the air as to whether or not the transaction would take place,

22  and you will hear evidence about that; but he was on his way to

23  negotiate the possible transfer of imaginary methamphetamine, as

24  it turns out.

25       Didn't quite work out because the police -- why?  I don't

1  know.  Maybe we'll find out in the evidence -- decide to stop him

2  and take the $16,000 before my client even gets to the point of

3  entering into the last stage of negotiations about the purchase

4  of the drugs.

5      Be that as it may, my client is charged in two counts.

6  First count is a conspiracy charge, and it sets out the specific

7  purpose of the conspiracy; and, that is, in combination with and

8  in agreement with his cousin Melvin Herbert Johnson, among others

9  unknown, to knowingly, intentionally, and unlawfully distribute

10 50 grams or more of a mixture of methamphetamine.

11     Now, there is no other conspiracy charged here.  That is the

12 conspiracy charge.  Not some conspiracy in California.  Not some

13 conspiracy in Mexico.  It is a conspiracy between Melvin Johnson

14 and Cleve Johnson to agree together and with each other to

15 distribute, those two people, to distribute more than 50 grams of

16 methamphetamine.

17     You cannot convict him of some other conspiracy unless you

18 are convinced beyond a reasonable doubt that the evidence that

19 the Government is going to present to you makes out a conspiracy

20 as charged.  You cannot convict him.

21     You are going to hear a lot of talk between the young folks

22 that were trying to help themselves out and Melvin Johnson who

23 isn't going to appear here.  He is not going to be here.  I am

24 not going to be able to cross-examine Melvin Johnson because if

25 that evidence is allowed in, his statements, then the rules of

BRIANA NESBIT, RPR       OFFICIAL COURT REPORTER   (336) 254-7464

1  evidence provide that the Government can get that statement in

2  and I can't cross-examine him because he is a co-conspirator.

3  Well, that's for you to decide, who is a co-conspirator with whom

4  and if, in fact, there is a conspiracy as charged in the

5  indictment.

6      Remember, remember, through every moment of this case,

7  remember that that evidence that comes from that chair right

8  there (indicating) has got to be measured by that standard.  Is

9  it evidence of the conspiracy charged in the indictment?

10     My client is not charged with being a bad guy.  He is not

11 charged with generally being a drug dealer.  He is not charged

12 nor can he be convicted of some other wrongdoing at some other

13 time that was not in connection with the conspiracy that appears

14 in this indictment.

15     The evidence based on my prediction of what I've seen in

16 discovery -- the evidence that will be shown to you, displayed

17 here, will simply fall short of demonstrating an agreement to

18 distribute more than 50 grams of methamphetamine between my

19 client and his cousin between December 7 and July of 2007 (sic).

20     You heard my colleague talk about this negotiation that took

21 place sometime in January of 2008, I believe.  Nothing ever came

22 of that.  Absolutely no transfer of any methamphetamine took

23 place as a result of those discussions.  So what is -- what is

24 that proof of?  That my client is bad guy?  That my client has

25 dealt in some kind of fashion or was trying to get some drugs?

1    That's not proof of a conspiracy as charged in the indictment.

2         In fact, you will hear, among other things, in that January

3    tape that both my client and the imaginary Mexican drug dealer,

4    who had no drugs to sell anyway -- you will find them agreeing

5    that they are the only ones to be involved in this transaction.

6    Melvin Johnson is not a part of it.

7         As a matter of fact, the evidence will show to you that

8    Melvin Johnson, throughout this affair, played two parts.  First

9    of all, he was a broker, someone who put together a willing buyer

10   with a willing seller, imaginary seller.  There was no drugs to

11   sell, but that's what his function was.  That's what his

12   relationship, the evidence will show, was with his cousin; and

13   that, the law is, is not sufficient evidence to make out a

14   conspiracy, an agreement.  That's a different thing.  It is a

15   different legal animal, and the Court will charge you about that.

16        Remember this, when I'm talking to you about what the law

17   is, if what I say about the law differs from what the judge tells

18   you what the law is, forget what I say.  That man is the final

19   arbiter of what the law is, but you must listen.  You must listen

20   and you must fit these facts that you are going to hear from the

21   Government -- you must see if they fit the legal description of

22   conspiracy that's contained in the indictment against my client.

23        You are going to go to law school.  You are going to go to

24   law school in order to do your duty in this case.  It is not

25   going to be fun, but your duty requires it.

1      There will be no evidence of Melvin Johnson sharing any

2  unity of purpose, sharing a common goal with Cleve Johnson.

3  Those things are necessary for a conspiracy, an agreement.  He

4  didn't have any concern with that, with what happened after Cleve

5  Johnson bought -- if he had bought it.  He didn't put any of the

6  money up for it.  They didn't have an agreement to get together,

7  put their funds together, put their efforts together, purchase

8  the cocaine, and then distribute it as partners in crime.

9      The Court has already told you that's what a conspiracy

10 fundamentally is, a partnership in crime.  They didn't have any

11 partnership.  There might be some other evidence of Cleve

12 transferring small amounts, relatively small amounts, of

13 methamphetamine to his cousin Melvin but not for purposes of

14 conspiring and agreeing together to distribute the

15 methamphetamine as a shared goal.  It was either Melvin wanted to

16 do some methamphetamine, or Melvin wanted to sell some on his

17 own; and a buyer-seller relationship and nothing else, without an

18 agreement beyond the actual act of buying and selling, is not

19 sufficient to make out a conspiracy.

20     It is going to be difficult.  It is going to be difficult

21 intellectually.  It is going to be difficult emotionally.  There

22 is going to be evidence of wrongdoing by my client, but you can't

23 convict him because you think he is a bad guy.  It's got to be on

24 the basis of the conspiracy charged in this indictment.  That is

25 your sworn duty.  That is your sworn duty to require from the

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 161 of 172

1  Government proof beyond a reasonable doubt that the crime

2  committed is the crime charged in the indictment and no other

3  crime.

4      The second count is an attempt count.  My prediction is the

5  evidence will not demonstrate to you beyond a reasonable doubt

6  that Cleve Johnson attempted to purchase any amount of

7  methamphetamine on or about December 11, 2007.  Instead, the

8  Government's evidence will show that the defendant was

9  participating in a series of preliminary negotiations wherein the

10 actual price had not been settled on yet.  He says to the

11 cooperating individual, I want to see this guy.  I want to talk

12 to him.  I may be able to negotiate a lower price.  He is not set

13 on the amount.  He wants to get a better deal.  He never gets the

14 opportunity to have a better deal.  There never would have been a

15 deal.  There was no methamphetamine.

16     If he had driven up to the house where the methamphetamine

17 was supposed to be, gone inside and said, okay, let me see the

18 methamphetamine, there wouldn't have been any there.  I suggest

19 to you that the evidence is going to show that nobody dealing in

20 drugs or, for that matter, mostly any kind of goods will buy a

21 "pig in a poke."

22     This transaction was nowhere near completion.  The price, as

23 the evidence will show, was unsettled; and as he told the

24 imaginary Mexican drug dealer in January, he would have used that

25 money if the stuff was right.

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER   (336) 254-7464

1      The Government's agents, I predict to you, will have to

2  admit that when people are involved in purchasing drugs, they are

3  not going to just go, oh, here is your money; I don't need to

4  check out the drugs.

5      The evidence will show that there is an intense detailed

6  effort prior to any transfer in the normal course of a business

7  operation, whether it is drugs or apples or peanuts, and he was

8  not going to buy poor, bad methamphetamine.  There was, in short,

9  no evidence of an attempt.  There was evidence of a hope, but

10 there was no evidence of an attempt.

11     As the law says, there was -- "the fact that there was a

12 showing of an intent alone is not enough to make out a charge of

13 attempt.  Conduct that is mere preparation is not enough to

14 support a conviction for attempt.  It is essential that the

15 defendant with the intent of committing a particular crime

16 perform some overt act" -- listen, please -- "which in the

17 ordinary and likely course of things will result in the

18 commission of the actual crime."

19     They went off too soon.  Why?  I don't know.  We'll never

20 know whether my client was actually going to attempt to purchase

21 that methamphetamine or not.  We'll never know because he was

22 never given the opportunity to take that substantial step to

23 determine the actual final price or the quality of the goods in

24 question.

25     Now, it is no fun sitting here talking about that because

1 that's very close to a crime, but you can't convict him except on

2 the basis of what he's charged with in this indictment.  I don't

3 say that as a challenge to you.  I say that because that is the

4 law, and it is your sworn duty to uphold the law.

5      If a man is not shown to be guilty of the crime that he's

6 charged with in an indictment, then it is the jury's verdict --

7 the jury's duty to return a verdict of acquittal.  I ask you to

8 remember, during the course of considering this evidence, those

9 fundamental legal duties.  Thank you.

10      **THE COURT:**  Thank you, Mr. Harrison.  Ladies and

11 gentlemen, it is just after 5:00.  Since I knew we were going to

12 come to a completion, I went ahead and finished with the opening

13 statements at this time.

14      We are going to break for the day.  So I am going ask, if

15 you would, put your notes and your pencils into your envelopes.

16 I want to remind you of what I am going to call my standard

17 admonition to you.  If I ever use the phrase "my standard

18 admonition," that will be shorthand for what I am about to tell

19 you and, that is, I am going to remind you that you are not to

20 discuss this case with anyone until I instruct you to do so at

21 the end of the case.  Do not discuss it with members of your

22 family, people involved in the trial, or anyone else.  That

23 includes your fellow jurors.

24      As I said, if anybody approaches you and tries to discuss

25 the trial with you, please let me know about it immediately.  You

1  must not read or listen to any news reports of the trial, and

2  remember that you must not talk about anything with any person

3  involved in the trial even if it's something that has nothing to

4  do with the trial.  We all understand and the lawyers understand

5  that they can't even say hello to you in the elevator if you

6  happen to see each other.  Do not comment to anybody involved in

7  the trial.

8       If you need to speak with me about anything, simply give me

9  a note -- indicate to the court security officer that you have a

10 note, and Miss Solomon will arrange to collect it.  I am not

11 encouraging that.  I am simply telling you if you need to that's

12 the process by which it will be done.  I don't anticipate it.

13      As I said, I may not repeat these admonitions to you, as I

14 have now, throughout trial.  That is what I mean when I give you

15 my standard admonition.

16      So at this time I am going to dismiss you for the day.  You

17 need to be back tomorrow at 9:00.  At the beginning of every day

18 and after lunch very day, you will collect up on the fourth

19 floor; and then we'll come send for you when we are ready.

20 During the middle of day, when we take our breaks, you will take

21 a break back in the jury room since you're already here.  I do

22 that because it is just a little bit hard to collect you through

23 the courtroom at the beginning of the day and after lunch.  It is

24 easier to bring you all down as a group.

25      So at this time, you are going to be excused.  Leave your

1  envelopes in your chairs, and Miss Solomon will collect them for

2  safekeeping for the evening and relax.  We'll see you in the

3  morning at 9:00 up on the fourth floor.  You all may be excused.

4  Everyone else remain in the courtroom, please.  You may go out in

5  the front of the courtroom.

6      (The jury departed the courtroom at 5:07 p.m.)

7          **THE COURT:**  All right.  Let me ask first, are there any

8  objections to the preliminary instructions as I read them?

9          **MR. HARRISON:**  I have none, Your Honor.

10          **MR. GALYON:**  No, Your Honor.

11          **THE COURT:**  All right.  For future reference, I did not

12  interrupt you in your opening.  You were very close to an

13  argument, at least from my perspective.  I understand you need to

14  explain the context of the charges.

15          **MR. HARRISON:**  Thank you, Your Honor.  There is no

16  other way for us to deal with it.

17          **THE COURT:**  I don't have any objection to explaining

18  the context of the charges.  It is always a question of degree in

19  any case.  There was no objection by the Government.  For that

20  reason, I did not jump in, but as I said, it was -- parts of it

21  were very close.

22      I don't want to stay late today, but I do want to

23  potentially revisit one matter, and that is this issue about the

24  testimony of the November 2007 incident where -- that we talked

25  about before we had our last break where the co-defendant Melvin

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 166 of 172

1  came to pick up a quarter of an ounce of methamphetamine from the

2  defendant.

3      Who all was present at that meeting?

4          **MR. GALYON:**  To my knowledge, it was this defendant,

5  Melvin Johnson, Robby Todd, and Robby Todd's girlfriend Lori

6  Wilson.

7          **THE COURT:**  Okay.  And who is going to testify about

8  that?

9          **MR. GALYON:**  Both Robby Todd and Lori Wilson.

10         **THE COURT:**  And summarize for me again how that fits

11  into the case from your perspective.

12         **MR. GALYON:**  Well, certainly, the fact that the

13  conspiracy charged is a conspiracy to distribute 50 grams or more

14  of methamphetamine, showing the relationship between the

15  defendant and Melvin Johnson; and, certainly, when you talk about

16  the fact that there is the November incident and then there is

17  discussion in December about owing money for methamphetamine, how

18  much is owed, things of that sort, I think that it is relevant to

19  show the ongoing relationship.

20      Even beyond that, as opposed to just a one-time buyer-seller

21  or a normal buyer-seller relationship -- a normal buyer-seller is

22  not on the front.  You have to have -- typically, you are going

23  to have to have had prior dealings with that person in order to

24  be able to get any type of narcotics on the front to get it on

25  consignment because otherwise you can just run off with the

1   narcotics and never come back.

2        This is not an arm's length negotiation or situation between

3   this defendant and his cousin, not only because of the familial

4   relationship, but also because they had done this before.  I

5   would argue that that's what the evidence is useful to show, that

6   it is part of their conspiratorial activity to distribute; that

7   is, supply the market with methamphetamine for their mutual

8   advantage.

9        The whole idea is that, yes, they are people who have an

10  agreement to commit some crime; and it doesn't have to be

11  anything super-involved beyond that.  The reality is that Burgos

12  and the other cases talk about essentially a loose conspiracy,

13  you know, and the object of that conspiracy is to supply and/or

14  distribute methamphetamine to willing buyers.

15       So that's how -- I mean, as part of the argument or the

16  primary thrust of the argument with why that November incident

17  would be relevant.

18            **THE COURT:**  All right.  Thank you.  Mr. Harrison,

19  briefly, can you -- do you want to respond at all?

20            **MR. HARRISON:**  Your Honor, I did not -- unfortunately,

21  I appreciate my colleague's effort to get that information to me

22  last night.  I wasn't out having a fine time.  For some reason, I

23  just didn't check -- I didn't check my email mainly because I was

24  trying to write an opening statement, but the truth is I would

25  like to have an opportunity to check a little bit of the law with

1  the Court's permission.

2       **THE COURT:**  Why don't we that.  I would like to take it

3  up in the morning.  I am rethinking it because it seems to be

4  relevant to the conspiracy charge and also, although it came late

5  notice, since we are not even getting into the witness today,

6  there is additional time to think about it and prepare for it

7  and, unlike some other late-blooming pieces of evidence, is

8  evidence that directly involves a meeting that your client was

9  present at.  So he, obviously, would either know or not know and

10  could defend, or at least help you defend, based on his presence

11  at the meeting.  Perhaps I might think differently if it were

12  some meeting that he was not there, and, therefore, you would

13  have to go and investigate further.

14      But for those reasons, I am rethinking whether I ought to

15  let that in.  I am inclined to consider letting it in.  I would

16  be glad to hear from you in the morning.  I will tell you what I

17  would like to do, if it's not an inconvenience, is start at

18  9:00 with you all on this matter so we can start with the jury at

19  9:30.  I would like to keep the case moving with testimony

20  whenever they are here.  I am finding that more difficult to do

21  as I do this.  If we can start at 9:00 -- is that an

22  inconvenience to the Marshal service?

23      **MARSHAL:**  No, Your Honor.

24      **THE COURT:**  All right.  Thank you.  We'll start at

25  9:00.  I will be glad to hear from you on any law that you have

1  at that time.  If you have anything before then you want to bring

2  to Miss Solomon's attention of any case citation you want me to

3  know about that I may not have read, either side, just let her

4  know.

5          **MR. HARRISON:**  Email?

6          **THE COURT:**  Well, I think the easiest way is for you to

7  just bring it in the morning.  Just bring it in the morning.  We

8  are all here usually pretty early, and I am trying to think what

9  the best way is to get that.  Can we have the courtroom open at

10  8:45?  Is that a problem?

11          **THE CLERK:**  It can be.

12          **THE COURT:**  We'll open the courtroom at 8:45.  At 8:45,

13  if you have anything, Miss Solomon will be here before 9:00.

14  Just let me know and I will try to look at it.

15          **MR. HARRISON:**  May I inquire if the Court has come upon

16  a particular case that you believe is persuasive?

17          **THE COURT:**  I can't at this point point to any

18  particular case.  I would be glad to tell what I am looking at.

19  I think in part I was informed in my decision-making simply

20  because it was late-blooming evidence.  We are not going to get

21  into any witness today.  With the additional time of tomorrow,

22  there doesn't seem to have been any purposefully withholding of

23  any evidence by either side.

24          **MR. HARRISON:**  No.

25          **THE COURT:**  So it is just a question --

Case 1:08-cr-00233-TDS  Document 31  Filed 06/22/09  Page 170 of 172

1          **MR. HARRISON:**  None by Mr. Galyon.  I don't know about

2   the good faith of anything else, but I know that it wasn't

3   anything on his part.

4          **THE COURT:**  It is just a question of ultimate fairness

5   on that point; and now that there is additional time and as I

6   thought about the fact that your client is allegedly part of

7   whatever happened, it does appear to me to be very probative

8   evidence; and so I would like to reconsider whether I ought to

9   let it in now that there's been some additional time.

10          **MR. HARRISON:**  If I can just prolong this about another

11   30 seconds, my initial response is it may be probative of

12   something; but I don't know that it's probative of the conspiracy

13   charge.

14          **THE COURT:**  Right.  I understand.  All right.  Anything

15   else from counsel at this time?

16          **MR. GALYON:**  No, Your Honor.

17          **THE COURT:**  We'll be in recess until 9:00 tomorrow

18   morning.

19      (The Court recessed at 5:17 p.m.)

20

21                      **END OF VOLUME I**

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Nesbit, Official Court Reporter, certify

7  that the foregoing transcript, Volume I of III, is a true and

8  correct transcript from the record of the proceedings in the

9  above-entitled matter.

10

11         Dated this 18th day of June 2009.

12

13

14                    //s//Briana L. Nesbit
                       Briana L. Nesbit, RPR
15                     Official Court Reporter

16

17

18

19

20

21

22

23

24

25