1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3  UNITED STATES OF AMERICA      )    DOCKET NO. 1:08CR233-1
                                 )
4          vs.                   )
                                 )    Winston-Salem, North Carolina
5  CLEVE ALEXANDER JOHNSON       )    December 17, 2008
                                      9:23 a.m.
6  _____    **VOLUME II OF III**

7

8          TRANSCRIPT OF THE TRIAL -- GOVERNMENT WITNESSES
           BEFORE THE HONORABLE THOMAS D. SCHROEDER
9              UNITED STATES DISTRICT COURT JUDGE

10 APPEARANCES:

11 For the Government:      RANDALL GALYON, AUSA
                           Office of the U.S. Attorney
12                         251 N. Main Street, Suite 726
                           Winston-Salem, North Carolina 27101

13

14 For the Defendant:      WAYNE HARRISON, ESQ.
                           101 S. Elm Street, Suite 230
15                         Greensboro, North Carolina 27401

16

17 Court Reporter:         BRIANA NESBIT, RPR
                           Official Court Reporter
18                         P.O. Box 20991
                           Winston-Salem, North Carolina 27120

19

20

21

22

23

24        Proceedings recorded by mechanical stenotype reporter.
          Transcript produced by computer-aided transcription.
25

```
1                           INDEX


2
                        Direct   Cross   Redirect   Recross
3
     GOVERNMENT'S WITNESSES:

4

5    ROBBY TODD            9       73       82        84

6    LORI WILSON          86      110      112        --

7    JONATHAN WATSON     114      130       --        --

8    JIM MENDEZ          134      151      154       155

9    TIM HODGES          155       --       --        --

10

11   MOTION IN LIMINE:     3, 180

12

13

14   EXHIBITS:                                Marked   Received

15   G-1     12/4/07 Recorded conversations     45       46
     G-1A    12/4/07 Transcript of conversations 45       46
16   G-2     12/7/07 Recorded conversations     57       --
     G-2A    12/7/07 Transcript of conversations 57       --
17   G-3     Photograph of Defendant            64       65
     G-4     Photograph of Melvin Johnson       64       65
18   G-5     Defendant cell phone records       66       68
     G-6     Phone records                     108      109
19   G-7     Defendant's vehicle registration plate 122   122
     G-8     12/11/07 Recording of vehicle stop 122      123
20   G-9     No insurance citation             129      130
     G-10    1/23/08 Recorded meeting w/UC      144      145
21   G-11    Piece of paper w/Dft phone number  144      145
     G-12    Home Depot surveillance photograph 148      149
22   G-13    Home Depot surveillance Photograph 148      150

23

24

25
```

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER     (336) 254-7464

```
 1                  P R O C E E D I N G S
 2       (The Court was called back to order at 9:23 a.m.)
 3       (The Defendant was present.)
 4       THE COURT:  Good morning.  I have the submissions -- I
 5  thank you for that -- by both parties.  I have read the cases.
 6  Does anybody wish to be heard further?  We are talking now about
 7  the issue of the November meeting.
 8       MR. HARRISON:  Your Honor, I think the statements
 9  contained in the case that I submitted are at least as eloquent
10  as I am.
11       THE COURT:  Thank you.  What is before the Court at
12  this point is a request by the defendant to preclude evidence
13  that the Government intends to offer of a meeting in November of
14  2007, involving the defendant and co-defendant Melvin Johnson and
15  two other individuals.
16       The proffer of the evidence is that this is part and parcel
17  to explain the nature of the conspiracy and the relationship of
18  the parties alleged in the indictment in that, during the
19  November 2007 meeting, the defendant distributed methamphetamine
20  in the amount of a quarter an ounce to co-defendant Melvin
21  Johnson; and the allegation is that this will be evidence of part
22  of the conspiracy involving the distribution.
23       Do I have that summarized correctly, Mr. Galyon?
24       MR. GALYON:  Yes, sir.
25       THE COURT:  And the defendant argues that the evidence
```

 1  should be precluded on two grounds:  One is that this information

 2  did not become known to the defendant until yesterday morning,

 3  although the Government reports that it was not aware of the

 4  information until the night before based on information from a

 5  witness in a case; and the defendant also argues that the

 6  evidence should be precluded principally as improper under Rule

 7  404(b); is that accurate, Mr. Harrison?

 8          **MR. HARRISON:**  Yes, sir.

 9          **THE COURT:**  I had initially ruled yesterday afternoon

10  that I was going to preclude the evidence; and I did that

11  principally on the ground that it was mid-afternoon, and it was

12  apparent that the first witness was going to discuss this topic.

13  I felt at that point that it was -- it may not have provided

14  adequate time for the defendant to prepare to cross-examine as to

15  that topic, but the witness was not reached yesterday; and I have

16  asked the parties to brief the issue, and the parties have

17  briefed it and/or submitted cases.

18          Given the passage of time and the fact that the defendant

19  has now had time to anticipate the evidence and also the fact

20  that the defendant himself was a participant in the meeting, the

21  first ground of late-blooming evidence and lack of preparation

22  has been ameliorated in the Court's view.

23          Secondarily, the evidence is, in the Court's view, relevant

24  to an issue other than the character of the defendant and the

25  evidence relates to -- bear with me.

```
 1          (Off-the-record discussion between the Court and Law clerk.)
 2          The evidence relates to several issues.  One is the intent
 3   of the defendant who has denied any agreement to distribute in
 4   this case.  It also goes to indicate the relationship of the
 5   parties relating to the conspiracy that's alleged as well as the
 6   defendant's knowledge of the drug distribution network or drug
 7   trafficking.
 8          So I think the evidence is intrinsic evidence and does not
 9   technically fall within Rule 404(b); but even if it did, I do
10   find it is relevant to an issue other than character, as I
11   described.  I think it is necessary.  It furnishes part of the
12   context of the crime, and I find that it is reliable under United
13   States v. VanMeter, 150 F.3d at 349, 351.
14          I also have balanced the Rule 401, Rule 403 considerations
15   and find that the probative value of the evidence is not
16   substantially outweighed by the danger of undue prejudice.  So
17   based on that, I am going to allow the evidence to be used in the
18   case.
19          Any questions as to that?
20          MR. GALYON:  No, Your Honor.
21          THE COURT:  I also -- for what it's worth,
22   Mr. Harrison, in terms of the Thomas case that you cited, the
23   Seventh Circuit case, unlike the fact scenario in that case, here
24   the allegation here, as I understand it, is that the co-defendant
25   Melvin Johnson acted as a distributor on consignment, if you
```

1  will, of the drugs in question and that the defendant got paid

2  after the drugs were sold since they were sold on consignment.

3      Do I understand that to be part of the Government's proffer,

4  Mr. Galyon?

5          **MR. GALYON:**  Yes, sir.

6          **THE COURT:**  And based on that, though, the defendant

7  clearly has a stake in the outcome of the subsequent sale of the

8  drugs, which is a distinguishing factor, among others, from the

9  Thomas case.

10     All right.  Anything further from the parties before we

11 bring the jury down?

12         **MR. GALYON:**  No, Your Honor.

13         **MR. HARRISON:**  No, Your Honor.

14         **THE COURT:**  Miss Solomon, if you would, please bring

15 the jury down.  As they are coming down, I want to tell you I

16 have a limiting instruction I will be happy to give at the time

17 this evidence comes in if the defendant would like it.

18         **MR. HARRISON:**  That really is important to the defense,

19 Your Honor.  I appreciate that.

20         **THE COURT:**  All right.

21         **MR. HARRISON:**  Actually, that was the purpose in

22 submitting the Thomas case.

23         **THE COURT:**  Okay.  Well, the instruction I am going to

24 give is a modified instruction from Judge Horn's model

25 instruction.  It will read as follows:  "You have heard evidence

1  that the defendant engaged in certain bad conduct in the past.

2  The law allows this kind of evidence for certain limited

3  purposes.  For example, this evidence may properly be considered

4  in determining intent, knowledge, such as knowledge of the drug

5  trade, how relationships between the parties developed, and the

6  mechanics of an alleged conspiracy.

7       "Please keep in mind the limited purposes for which this

8  evidence is admitted.  Most importantly, do not conclude from

9  this evidence that the defendant has bad character in general,

10 nor should you conclude that because the defendant may have

11 engaged in bad conduct in the past he is more likely to have done

12 so in this case.

13      "You are to consider the evidence only if you find that the

14 defendant committed the acts charged in the indictment and, if

15 so, to consider it only for the reasons I instruct you."

16      Is that acceptable?

17           **MR. HARRISON:**  Very satisfactory.

18           **THE COURT:**  Mr. Galyon, is that acceptable?

19           **MR. GALYON:**  Yes, Your Honor.

20           **THE COURT:**  Do you want that before the testimony comes

21 in, or do you want it after the testimony comes in?

22           **MR. HARRISON:**  I request it be given after the

23 testimony.

24           **THE COURT:**  All right.  I will -- after the witness is

25 completed?

1           **MR. HARRISON:**  After the witness' relation of the

2    events.

3           **THE COURT:**  All right.  If you will remind me to make

4    sure I do it at the right time that you request, and I will

5    certainly give the instruction.

6           **MR. HARRISON:**  Thank you, sir.

7           **MR. GALYON:**  Your Honor, if I may -- are they bringing

8    the jury down now?

9           **THE COURT:**  Yes.  Do you need to take a break?

10           **MR. GALYON:**  Just very quickly.  I will be right back.

11           **THE COURT:**  That would be fine.

12       (Assistant U.S. Attorney departed the courtroom and

13       returned.)

14           **MR. GALYON:**  Ready, Your Honor.

15       (The jury returned to the courtroom at 9:38 a.m.)

16           **THE COURT:**  Good morning, ladies and gentlemen.  I hope

17    you had a relaxing evening last night.  We are now ready to

18    proceed.

19       Mr. Galyon, you may call your first witness.

20           **MR. GALYON:**  Thank you, Your Honor.  The United States

21    calls Robby Todd.

22    **ROBBY TODD,** GOVERNMENT'S WITNESS, being first duly sworn,

23    testified as follows:

24                        DIRECT EXAMINATION

25

1   **BY MR. GALYON**

2   Q    If you would, state your name, sir.

3   A    My name is Robby Todd.

4   Q    How old are you, sir?

5   A    I am 37 years old.

6   Q    How far did you go in school?

7   A    I went through the 12th grade.

8   Q    Where are you from?

9   A    I'm from Lowgap, North Carolina.

10  Q    And what county is Lowgap in?

11  A    Surry County.

12  Q    About far is Lowgap from Mount Airy?

13  A    It's about 20 miles.

14  Q    During the fall of last year, did you do work as an

15  informant for the Mount Airy Police Department?

16  A    Yes, sir.

17  Q    And why was it that you were working for law enforcement?

18  A    I was working off -- trying to work off charges to where I

19  got caught with an ounce previous.

20  Q    Okay.  When you talk about "got caught with an ounce

21  previous," you are talking about an ounce of methamphetamine?

22  A    Yes, sir.

23  Q    And was that in July of last year?

24  A    Yes, sir.

25  Q    Was that with the Mount Airy Police Department?

1  A    Yes, sir.

2  Q    And as a result of getting caught with an ounce of

3  methamphetamine, did you agree to cooperate with law enforcement

4  and work for them?

5  A    I did.

6  Q    Were you charged when you caught in July?

7  A    No, sir.

8  Q    Why were you not charged?

9  A    Because I agreed to work for them.

10 Q    To cooperate and try to help get other drug dealers?

11 A    Yes, sir.

12 Q    And as part of that, did you give information about the

13 people that you had received methamphetamine from?

14 A    Yes, sir, I did.

15 Q    Did you also tell law enforcement information about who your

16 customers were?

17 A    Yes, sir, I did.

18 Q    And as part of your work as a confidential informant for the

19 Mount Airy Police Department, did you, in fact, make controlled

20 purchases of methamphetamine?

21 A    Yes, sir, I did.

22 Q    Do you know an individual who goes by the name Wizard?

23 A    Yes, sir.

24 Q    And do you know what that person's real name is?

25 A    Melvin Johnson.

1  Q    Had you on previous occasions supplied Melvin Johnson with

2  methamphetamine?

3  A    Yes, I have.

4  Q    As part of the investigation in this case, did you make

5  contact with Melvin Johnson?

6  A    Yes, sir.

7  Q    Do you have any idea when that was?

8  A    It was probably around -- around November, in the fall of

9  last year.

10 Q    And as part of that contact, did you ever wear a recording

11 device?

12 A    Yes, sir.

13 Q    The recording device that you had, who supplied that?

14 A    Mount Airy Police Department.

15 Q    And on those occasions when you wore a recording device, did

16 you ever have an opportunity to actually meet with Melvin

17 Johnson?

18 A    Yes, sir.

19 Q    Now, the first time that you met with Melvin Johnson for law

20 enforcement, do you recall specifically what the date was?

21 A    It was around December the 4th of '07.

22 Q    Prior to that time, had you also had contact with Melvin

23 Johnson?

24 A    Yes, sir, I had contact with him.

25 Q    All right.  In November of 2007, did you take Melvin Johnson

1  anywhere in your vehicle?

2  A    Yes, sir.  I took him to meet with Cleve at a cabin.  It was

3  in High Point.

4  Q    And when you say you took him, Melvin, to meet with Cleve --

5  A    Yes, sir.

6  Q    -- who is Cleve?

7  A    Cleve was his cousin that he was getting meth from.

8  Q    Do you recognize that person you knew as Cleve in the

9  courtroom?

10  A    Yes, sir.

11  Q    If you would, point him out for the ladies and gentlemen of

12  the jury.

13  A    (Indicating.)

14  Q    He is seated over there in the plaid shirt; is that correct?

15  A    Yes, sir.

16  Q    Now, how was it that you came about taking Melvin Johnson to

17  meet with Cleve Johnson in High Point?

18  A    Melvin was buying meth or had -- getting his meth from

19  Cleve.

20  Q    And did you do that meeting at the direction of law

21  enforcement?

22  A    No, sir, I did not.  I could not get in touch with the Mount

23  Airy Police Department on that weekend.  It was on a Sunday, and

24  I could not get in touch with anyone.  So I took it on my own to

25  take him.

1  Q    And when you took Melvin, did you take him from somewhere in

2  Surry County?

3  A    Yes, sir.  He was staying in a camper off of Saddlebrook

4  Road, which is right below Dobson, North Carolina.

5  Q    And did anyone else go with you when you took Melvin to this

6  defendant's house?

7  A    Yes, sir, my girlfriend Lori Wilson.

8  Q    So you and Miss Wilson and Mr. Johnson went in a vehicle

9  down to High Point; is that correct?

10 A    Yes, sir.

11 Q    What vehicle was it?

12 A    It was -- we had a 4Runner, a White Toyota 4Runner.

13 Q    When you went down there, was it day or night?

14 A    It was nighttime.

15 Q    When you got to this residence, what, if anything, happened?

16 A    We was told to stay in the vehicle and --

17 Q    Who told you to stay in the vehicle?

18 A    Wizard.  Wizard told us to stay in the vehicle until he made

19 sure it was okay for us to come in.  At that time, he got out of

20 the vehicle and went into the cabin.  Then he was in there for

21 just a little bit.  Then he come back out, and then we went in to

22 the cabin and that --

23 Q    I'm sorry.  What happened then?

24 A    We met Cleve.  We was introduced to Cleve, and then we come

25 in to the cabin; and he had couple of pit bulls or bulldogs, and

1  we sat down at the kitchen table of the cabin.

2  Q    What happened at the kitchen table?

3  A    Him and Melvin was discussing their deals on the meth.

4  There was actually a plate of meth in front of Cleve, a plate

5  that had methamphetamines in it; and they discussed their

6  business, and then Melvin weighed out a half an ounce of meth.

7  Q    You say Melvin weighed out a half ounce?

8  A    Yes, sir.

9  Q    Not this defendant?

10 A    No.  The meth was from him.  He give the meth, slid the

11 plate over to Melvin, and Melvin weighed it out.

12 Q    How did he weigh it out?

13 A    On a set of digital scales.

14 Q    Who had the digital scales?

15 A    I believe Melvin did.

16 Q    And after the amount was weighed out, what happened with it?

17 A    Then we took it back to his camper, Melvin's.  Melvin left

18 with it.

19 Q    Before we get there, when you say that it was weighed out on

20 the scales, did it get packaged in some way?

21 A    Yes, sir.  It was bagged up in a sandwich baggy, a

22 cellophane baggy.

23 Q    Who bagged it up?

24 A    Melvin.

25 Q    And how much was bagged up?

1 A    A half an ounce.

2 Q    And after that was done, did Melvin -- did you see Melvin

3 give this defendant any money?

4 A    The money -- I never did see no money switch hands.  The

5 dope was fronted to my understanding -- was fronted to Melvin to

6 sell.

7 Q    When you say it was "fronted," what does that mean?

8 A    That means that he gives him a half an ounce of dope.  Then

9 he goes and sells it, and then he brings him back the money.

10 Q    So the ladies and gentlemen of the jury can follow the "he"s

11 that you are talking about, when you say he gives him the dope to

12 sell, who are you talking about?

13 A    I am talking about Cleve.

14 Q    You are talking about this defendant giving the

15 methamphetamine to who?

16 A    To Melvin.

17 Q    So that Melvin can then sell it?

18 A    Yes, sir.

19 Q    And after Melvin sells it, what happens?

20 A    Then they make arrangements to meet, and Melvin gives Cleve

21 the money.

22        **MR. HARRISON:**  Object, unless this is something in his

23 knowledge.

24        **THE COURT:**  Sustained.

25

1  **BY MR. GALYON**

2  Q    And to your knowledge, based on other conversations that you

3  had with Melvin Johnson, were you aware that Melvin Johnson would

4  pay Cleve Johnson back for --

5            **MR. HARRISON:**  Object.

6            **THE COURT:**  Overruled.

7  **BY MR. GALYON**

8  Q    Were you aware of whether Melvin Johnson would pay Cleve

9  Johnson back for the methamphetamine he had been provided?

10 A    Yes, sir.

11 Q    So it is sort of like getting --

12           **MR. HARRISON:**  Objection.

13           **THE COURT:**  Sustained.

14 **BY MR. GALYON**

15 Q    Is it getting fronted dope consistent with sort of getting

16 it on consignment?

17 A    Yes, sir.

18 Q    And on this date in November when you went down to the

19 defendant's residence, what else happened there at the cabin?

20 A    We -- as we sat there talking and cutting out the meth, we

21 also smoked and he also smoked some meth.

22 Q    When you say "he" --

23 A    Me, Melvin, Cleve, and my girlfriend.

24 Q    And you said when "we" were cutting out the meth.  Did you

25 participate in --

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  A    No, sir.  As they was cutting out the meth, as in Melvin and

2  Cleve, which Melvin actually cut -- weighed it out and packaged

3  it up.

4  Q    All right.  And using meth on that occasion, was that the

5  first time you had used methamphetamine?

6  A    No, sir.

7  Q    How long had you been using methamphetamine?

8  A    I had been using methamphetamine for about three years at

9  that point.

10  Q    And after you got caught in July of 2007, did you continue

11  using methamphetamine?

12  A    No, sir.  I had quit at that point after I got caught and

13  started working for the Mount Airy Police Department.  I was an

14  informant.  I was informed that if I had, you know, smoked meth

15  or anything while I was working for them that --

16          **MR. HARRISON:**  Object.

17          **THE WITNESS:**  -- it wouldn't be good.

18          **THE COURT:**  Sustained.

19  **BY MR. GALYON**

20  Q    And after that incident in November, did you tell the Mount

21  Airy Police Department detectives that you were working with

22  about the meeting itself?

23  A    No, I did not tell them.

24  Q    Why not?

25  A    Because I had smoked meth on that occasion.

1  Q    After that occasion, did you have contact with Melvin

2  Johnson concerning methamphetamine?

3  A    Yes, sir.

4  Q    And on December the 4th of last year, did you meet with

5  detectives with the Mount Airy Police Department in order to get

6  a concealed recording device and then meet with Melvin Johnson?

7  A    Yes, sir, I did.

8  Q    What were the procedures used on that occasion on December 4

9  of last year as far as what law enforcement would do prior to you

10 going to meet with Melvin Johnson?

11 A    We would -- I would go into the police department.  I would

12 get the recording device.  We would make arrangements of how it

13 was going to happen and that I was going to Melvin's, and then

14 they would search me, my girlfriend, and the vehicle prior to us

15 leaving.

16 Q    If you had money on you, did they take the money that you

17 had?

18 A    No, sir, they would not take it.

19 Q    Did they count the money that you had?

20 A    Yes, sir.

21 Q    And on December 4 of 2007, what was the purpose of you going

22 to meet with Melvin Johnson?

23 A    I was going to meet with Melvin to talk about supplying him

24 with some pills and anhydrous to make meth with and to talk about

25 setting up the procedures for him to buy a pound of meth.

1  Q    When you say "for him," are you referring to Melvin Johnson?

2  A    No, to Cleve.

3  Q    Okay.  Now, how was it that you were aware that Cleve

4  Johnson was involved?

5  A    Through Melvin.

6  Q    Did you, in fact, wear a recording device on December 4 of

7  2007 and go over to Melvin Johnson's residence?

8  A    Yes, sir.

9  Q    Who was with you when you went?

10 A    Lori Wilson, my girlfriend.

11 Q    During the course of your conversation with Melvin Johnson,

12 what, if anything, did you talk about?

13 A    We had talked about --

14        **MR. HARRISON:**  Well, object to what did "we" talk

15 about.

16        **THE COURT:**  Can you -- well, sustained.

17 **BY MR. GALYON**

18 Q    Related to methamphetamine, what specifically did you talk

19 about?

20 A    Purchasing a pound of meth.

21        **MR. HARRISON:**  Object.

22        **THE COURT:**  Basis?

23        **MR. HARRISON:**  I'm sorry?

24        **THE COURT:**  Basis?

25        **MR. HARRISON:**  Well, Your Honor --

1              THE COURT:  Do you want to approach the bench?

2         (The following proceedings were had at the bench by the

3         Court and Counsel out of the hearing of the jury:)

4              MR. HARRISON:  First of all, the question and the

5    response is purchasing a pound of meth.  Well, that question

6    elicited a totally general response.  That could be purchasing

7    meth for any purpose from anybody.

8         Secondly, I am going to have to -- it is something that I am

9    not happy about having to do; but I think to prevent a waiver

10   possibility on my argument concerning the fact that this is not a

11   conspiracy, therefore, these statements are not admissible, I am

12   going to have to object to almost every question having to do

13   with anything Melvin said.  Do you see what I --

14             THE COURT:  Well, I can't tell how to raise your

15   objections.  That is up to you.  At this point, I understand the

16   question to be a followup to what he said earlier, and the

17   purpose of the meeting was to talk about selling a pound of meth

18   to the defendant, which is what he said was the purpose of going

19   to meet.  That's why I thought in the context it sounded like an

20   appropriate question.

21             MR. HARRISON:  Well, if I don't object and if he's

22   allowed to testify about what Melvin said about this alleged

23   conspiracy, then unless I can successfully present a line

24   objection, I don't know whether that would be effective on appeal

25   or not.

 1          **THE COURT:**  I can't advise you on that obviously.  You

 2   have your objection to the testimony earlier that you raised that

 3   I overruled.

 4          **MR. HARRISON:**  I think that might be sufficient

 5   actually.

 6          **THE COURT:**  Okay.  Well, so the record is clear, I

 7   leave that decision up to you.  Any other basis otherwise?

 8          **MR. HARRISON:**  No, sir.

 9          **THE COURT:**  Okay.

10       (Thereupon, the following proceedings continued within the

11       hearing of the jury:)

12          **THE COURT:**  Overruled.

13   **BY MR. GALYON**

14   Q    And who was to be supplying the pound of methamphetamine?

15   A    Undercover that was working through Mount Airy Police

16   Department.

17   Q    As part of your conversations with the detective from the

18   Mount Airy Police Department and the investigation, were you

19   given information about talking to Melvin Johnson and how much

20   the purchase price would be for the methamphetamine?

21   A    Yes, sir.

22   Q    What was the purchase price to be for the pound of

23   methamphetamine?

24   A    Sixteen thousand.

25   Q    And did you communicate that to Melvin Johnson?

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  A    Yes, sir, I did.

2  Q    And as part of the conversation that you had with Melvin

3  Johnson about methamphetamine, did he give you any information

4  about who would be supplying the money to pay for that

5  methamphetamine?

6  A    Yes, sir, he did.

7  Q    Who?

8  A    Cleve Johnson.

9  Q    After that conversation was had, did you meet again with

10 Melvin Johnson on December 7, just three days later, of 2007?

11 A    Yes, sir.

12 Q    And where did you meet with Melvin Johnson on that occasion?

13 A    We also went to his camper.

14 Q    And prior to that time, did you follow the same procedures

15 in terms of meeting with Mount Airy detectives to get the

16 recording device, get searched -- both you, your girlfriend, and

17 your vehicle -- prior to going over there?

18 A    Yes, sir.

19 Q    On each occasions, the 4th and 7th, did detectives meet with

20 you after you had left Melvin Johnson's residence?

21 A    Yes, sir, they did.

22 Q    What happened when you would leave the residence and meet

23 with the detectives?

24 A    We would leave the residence, come back to the Mount Airy

25 Police Department.  They would download the recordings over the

 1 | recorder and search the vehicle and us again.
 2 | Q    As to December 7th of 2007, when you went to Melvin
 3 | Johnson's residence, do you recall what time of day or night it
 4 | was?
 5 | A    It was around 3:00 in the afternoon.
 6 | Q    And during the time that you spoke with Melvin Johnson, did
 7 | you and he discuss the pound purchase of methamphetamine?
 8 | A    Yes, we did.
 9 | Q    Did Melvin Johnson say whether or not they wanted to
10 | purchase the pound of methamphetamine?
11 | A    Yes. They wanted to purchase it.
12 | Q    And did Melvin -- or to your knowledge did this defendant,
13 | Cleve Johnson, go by any nicknames?
14 | A    Cuz.  Melvin called him "Cuz."
15 | Q    To your knowledge, were Melvin Johnson and Cleve Johnson
16 | cousins?
17 | A    Yes, sir, to my knowledge.
18 | Q    And, in fact, did Melvin Johnson tell you that he and Cleve
19 | Johnson were cousins?
20 | A    Yes, sir.
21 | Q    During the time that you were at the cabin -- or I'm
22 | sorry -- at the camper there with Melvin Johnson, did Melvin
23 | Johnson make any phone calls?
24 | A    Yes, sir.  He called Cuz on the phone, on his cell phone.
25 | Q    When you say "he called Cuz," you are referring to this

1 | defendant?

2 | A    Yes, sir.

3 | Q    When you say he called this defendant, how do you know that

4 | he called this defendant?

5 | A    Because he told me he was going to.

6 | Q    And were you actually present when he made the phone call?

7 | A    Yes, sir.

8 | Q    Have you listened to the recording of that incident?

9 | A    Yes, sir.

10 | Q    Were you able to hear Melvin Johnson talking to someone on a

11 | telephone?

12 | A    Yes, sir.

13 | Q    During the course of that conversation, did you hear what

14 | Melvin Johnson was saying to Cleve Johnson?

15 | A    Yes, sir.

16 | Q    What was he talking about?

17 | A    He was talking about setting up a time for the pound to be

18 | picked up and talking about the money that he owed to Cleve for

19 | methamphetamines.

20 | Q    When you say you talked to him about money that he owed him,

21 | what in that conversation let you know that he owed money to

22 | Cleve Johnson?

23 | A    He was -- he asked him if he had all of the money and

24 | Wizard, Melvin, said that he had about half of it, and at that

25 | time they went on to discuss that Cleve was going to wait and

1    come up to get the -- pick up -- to purchase the pound and get

2    Melvin's money at one time.  He did not want to make two trips.

3         MR. HARRISON:  Your Honor, I'd like for the Court to

4    give the 404(b) limiting instruction.

5         THE COURT:  If you all would approach the bench

6    briefly.

7         (The following proceedings were had at the bench by the

8         Court and Counsel out of the hearing of the jury:)

9         THE COURT:  I would be glad to give this.  Now, the

10   404(b) instruction relates to the November incident.

11        MR. HARRISON:  Correct.  Or to any implication that

12   this is a different -- that the payment is for a different

13   transaction between Melvin and Cleve.

14        THE COURT:  Okay.  I guess my question is is whether in

15   giving the limiting instruction, I should make reference at all

16   to any portion of the testimony or just give the instruction

17   plainly?

18        MR. GALYON:  Your Honor, I think that it needs to be

19   made clear that the limiting instruction relates to incidents

20   prior to December 4th because that's --

21        THE COURT:  Does that satisfy you?

22        MR. HARRISON:  Yes, sir.

23        THE COURT:  So if I say you heard evidence that the

24   defendant engaged in certain bad conduct --

25        MR. GALYON:  I think just by saying in November.  It is

1  clear by his testimony that it was in November that they went to

2  the cabin.

3            THE COURT:  Is that okay with you?

4        MR. HARRISON:  Yes.

5            THE COURT:  So just say November of 2007?

6        MR. GALYON:  Just so there is not -- the jury isn't

7  confused.  Did the Court intend to give this instruction now?

8            THE COURT:  He has asked for it now, so I will give it

9  now.

10       MR. GALYON:  All right.  That's fine.

11           THE COURT:  Is that acceptable?

12       MR. GALYON:  Yes, sir.

13     (Thereupon, the following proceedings continued within the

14     hearing of the jury:)

15           THE COURT:  Ladies and gentlemen of the jury, you have

16  heard evidence that the defendant engaged in certain bad conduct

17  in November of 2007.  The law allows this kind of evidence for

18  certain limited purposes.  For example, this evidence may

19  properly be considered in determining intent, knowledge, such as

20  knowledge of the drug trade, how relationships between the

21  parties developed, and the mechanics of an alleged conspiracy.

22     Please keep in mind the limited purposes for which this

23  evidence is being admitted.  Most importantly, do not conclude

24  from this evidence that the defendant has bad character in

25  general, nor should you conclude that because the defendant may

1  have engaged in bad conduct in the past, he is more likely to

2  have done so in this case.

3      You are to consider the evidence only if you find that the

4  defendant committed the acts charged in the indictment and, if

5  so, to consider it only for the reasons I instruct you.

6      Mr. Galyon, you may continue.

7          **MR. GALYON:**  Thank you, Your Honor.

8  **BY MR. GALYON**

9  Q   As part of the discussions that you had with Melvin Johnson

10 related to the phone call, did Melvin Johnson actually recite to

11 you the discussion that he had with Cleve Johnson?

12 A   Yes, sir, he did.

13 Q   Okay.  And in addition -- as part of that conversation, you

14 had mentioned something about the defendant not wanting to make

15 two trips?

16 A   Yes, sir.

17 Q   What was that about?

18 A   He didn't want to make two trips as far as coming up and

19 receiving money from Melvin and picking up the pound that he was

20 supposed to purchase.

21 Q   He wanted to do all that at one time?

22 A   Yes, sir.

23 Q   And after the phone conversation between Melvin Johnson and

24 this defendant, was there -- shortly thereafter, was there a

25 place on the recording that alerted you as to what time it was

1  day or night?

2  A    As far as -- I do not understand.

3  Q    Okay.  You've had a chance to listen to the recording of

4  December 7, 2007; is that right?

5  A    Yes.

6  Q    Okay.  And you've heard that portion of the tape that deals

7  with the phone conversation --

8  A    Yes, sir.

9  Q    -- that Melvin Johnson and Cleve Johnson had?

10  A    Yes, sir.

11  Q    In addition to that, shortly after that conversation, is

12  there some discussion about what time it is day or night?

13  A    Yes, sir.  I asked what time it was.

14  Q    And what time was it at that point?

15  A    It was around 1:00.

16  Q    1:00 in the afternoon?

17  A    Yes, sir.

18  Q    Then after that time -- or after the conversations that you

19  had with Melvin Johnson on December 7, did you leave his camper

20  there?

21  A    Yes.

22  Q    And where did you go?

23  A    I went back to Lowgap -- or went back to the Mount Airy

24  Police Department.

25  Q    And did you turn over the recording device?

1  A    Yes, sir.

2  Q    Were you searched?

3  A    Yes, sir.

4  Q    Was your girlfriend searched?

5  A    Yes, sir.

6  Q    And the car itself also was searched?

7  A    Yes, sir.

8  Q    Now, was your purpose in going there on the 7th to actually

9  sell or buy methamphetamine on that occasion?

10  A    No, sir.

11  Q    Okay.  Did you sell or buy methamphetamine on that occasion?

12  A    No, sir.

13  Q    Did you see any methamphetamine on December 7th of 2007?

14  A    No, sir.

15  Q    And did you have any contact with Melvin Johnson after

16  December 7th, 2007?

17  A    Yes, sir, I did.

18  Q    What happened next?

19  A    The next time that I talked to Melvin, he had called me and

20  they was -- they had -- it was early in the morning.  They had

21  come up to purchase the pound of meth, and it was like 5:00,

22  6:00 in the morning when they first started contacting me.

23  Q    Now, that is on December 11, 2007; is that right?

24  A    Yes, sir.

25  Q    Did you have a conversation with Melvin Johnson between

1  December 7th and December 11th of 2007?

2  A    No, sir.

3  Q    And on December 11th of 2007, did you talk with Melvin

4  Johnson on the phone?

5  A    Yes, sir.

6  Q    And what did he tell you?

7  A    That they had been -- that he was up, and Cleve was ready to

8  purchase the pound of meth.

9  Q    And did he tell you where they were?

10 A    Yes, sir.  He said they was eating breakfast at Brintle's

11 Truck Stop.

12 Q    Where is Brintle's Truck Stop?

13 A    It is about probably seven to eight miles from my residence.

14 Q    Now, prior to December 11th of 2007, had Melvin Johnson ever

15 been to your residence?

16 A    No, sir.

17 Q    Had Cleve Johnson ever been to your residence?

18 A    No, sir.

19 Q    Had you told either one of them where you lived?

20 A    Well, I had discussed with Melvin, you know, that I lived in

21 Lowgap, North Carolina.  He was familiar with the area.

22 Q    Did you tell him where you lived in Lowgap?

23 A    I lived on Lumber Plant Road but not the exact -- he had

24 never been there.  I didn't give him my address or nothing, no.

25 Q    Now, why did you not tell him what your address was?

1  A    I didn't want him to know.

2  Q    And why was it that you didn't want Melvin to know?

3  A    Well --

4         **MR. HARRISON:**  Object, relevance.

5         **THE COURT:**  Sustained.

6  **BY MR. GALYON**

7  Q    After you received a telephone call from Melvin Johnson, did

8  you give directions on how to get to your house?

9  A    I did after the conversation with him that he said they was

10 up and he was ready to purchase the pound.

11 Q    So did Melvin and Cleve Johnson actually come to your

12 residence that morning?

13 A    Yes, sir, they did.

14 Q    And did you have contact with law enforcement that morning?

15 A    Yes, sir.  After I seen that they was trying to get in touch

16 with me -- actually, he texted on my phone, Melvin did, and I

17 contacted Mount Airy Police Department and told them that they

18 was at Brintle's Truck Stop ready to purchase a pound of meth.

19 Q    And what time, if you recall, was it roughly that you met

20 with Melvin and Cleve Johnson?

21 A    It was early that morning.  It was probably around 8:00,

22 9:00, somewhere in there.

23 Q    Okay.  And what, if anything, happened during the meeting

24 there at your residence?

25 A    Are you asking what -- they come into the house.  After they

 1  got there, they come into the house.  They sit down.  Melvin sit

 2  down.  Cleve sit down.  Me and Melvin went to discussing then how

 3  the deal was going to go down, where we was going to meet; and I

 4  got up, I went into the bathroom, and contacted Mount Airy Police

 5  Department again on my cell phone and told them that we was

 6  getting ready to leave.  And they told me where to meet at, which

 7  was Bottom Dollar, which is a grocery story there in Mount Airy,

 8  North Carolina.  They told me to make sure that I seen the money,

 9  the cash, to purchase the pound of meth with.

10      So I went back into the living room.  We went out on the

11  porch started -- and I told, you know -- we'll just ride in my

12  Toyota, the 4Runner.  At that time Cleve wanted to drive his own

13  car, a black Acura, and we walked up -- my girlfriend was

14  driving.  So I come around the passenger side.  Cleve had opened

15  up his door and him and Melvin -- Melvin was getting in the

16  passenger side, and I seen two rolls of money laying in between

17  the passenger and driver seat in the black Acura.

18      So then we left from my residence and on the way down 89 --

19  I had got the license plate number off the black Acura for Mount

20  Airy Police Department.  I contacted Mr. Hodges, the detective,

21  told him the license plate number, that I had seen the money, and

22  that we was on 89 coming into Mount Airy.

23  Q   Now, tell the ladies and gentlemen of the jury what

24  discussion was had about you getting in contact with your

25  supplier.

1  A    I had told them that the Mexican that was supplying the meth

2  was out of town, but he was going to have his little brother meet

3  us with a pound of meth in Mount Airy at Bottom Dollar, that we

4  would drive.  Since we were going to take two vehicles, we would

5  pull into Hardee's parking lot, which is across the street from

6  Bottom Dollar, and we get into my vehicle, then go meet the

7  Mexican to get the pound.

8  Q    And what, if anything, did Cleve Johnson say during the

9  course of your conversation there on December 11th?

10 A    Cleve wanted to be the one to hand the Mexican the money for

11 the pound and to try out the meth to make sure it was good before

12 any money was switched hands.

13 Q    And did the defendant, Cleve Johnson, follow you into Mount

14 Airy?

15 A    Yes, sir, he did.

16 Q    Did you all pull into the Hardee's?

17 A    Yes, sir.

18 Q    What happened next?

19 A    As we was coming to Mount Airy city limits, I received

20 another phone call from Detective Hodges telling me that a city

21 policeman would be sitting on the way in on the right, for me not

22 to worry, that he was trying to check traffic violations, for me

23 not to get nervous or whatever.

24     As we come into the city limits, come up to a stoplight, we

25 went through the stoplight.  Hardee's is on the right just as

1  soon as you go through the stoplight at the intersection.  I had

2  turned into the Hardee's parking lot and looked up in my side

3  view mirror and seen Cleve pulling in behind me and the Mount

4  Airy police right behind him.

5  Q    Now, you said "you turned in."  Were you driving or --

6  A    No, sir.  Lori was.  We turned in, excuse me.

7  Q    So when you turned in, you saw that there was -- was it a

8  marked patrol unit?

9  A    Yes, sir.

10  Q    Okay.  So what did you do?

11  A    I proceeded to park in a parking space on the right side of

12  the parking lot there at Hardee's.  At that time he put his blue

13  lights on Cleve.

14  Q    When you say "he," are talking about the officer in the

15  marked unit?

16  A    Yes, sir.

17  Q    Where did you and Lori Wilson go?

18  A    I sat there for just a few minutes and backed up, and I

19  crossed the street into the Bottom Dollar parking lot.

20  Q    And did you -- how long did you stay there?

21  A    Probably 15, 20 minutes.

22  Q    And what did you do after that?

23  A    I went back to Lowgap.

24  Q    Okay.  Did you have contact with law enforcement later that

25  day?

1  A    Later that day, I did.

2  Q    And did you have discussions about talking with Melvin

3  Johnson again?

4  A    Yes, sir.  I had contacted Melvin on his cell phone, asking

5  him what was going on and that I was on the way back to Lowgap

6  and then after I talked to -- after I talked to him, I talked to

7  Mount Airy Police Department and Mr. Hodges -- we discussed -- I

8  told him that I wanted to go back down to the camper at Melvin's

9  just to -- so they wouldn't think that I had anything to do -- or

10 blow my cover, you know, and he did not advise (sic) that that

11 would be a smart thing to do, but I thought you know -- I told

12 him that I needed to.

13 Q    And did you wear a recording device to go meet with Melvin

14 Johnson?

15 A    No, sir.

16 Q    You don't recall wearing a recording device on December 11

17 when you went and met with Melvin Johnson after?

18 A    No, sir.

19        **MR. GALYON:**  If I may approach, Your Honor?

20        **THE COURT:**  Yes, you may.

21 **BY MR. GALYON**

22 Q    (Hands Witness exhibit) I am going to show you a document

23 that's been prepared and ask, Mr. Todd, if that refreshes your

24 memory about whether or not you were wearing a recording device

25 on December 11th, 2007, when you went and met with Melvin Johnson

1  after the traffic stop?

2  A    Okay.  Yes, I had.

3  Q    Did it help refresh your memory?

4  A    Yes, sir.

5  Q    So, in fact, you were wearing a recording device when you

6  went and met with Melvin Johnson?

7  A    Yes, sir.

8  Q    Okay.  Why was it important to go and meet with Melvin

9  Johnson after this traffic stop had occurred?

10  A    Because I didn't want them to think that I was -- you know,

11  that I had anything to do with the law pulling them over.

12  Q    Okay.  And during the conversation that you had, did Melvin

13  Johnson indicate to you or confront you about being an informant?

14  A    No, sir.

15  Q    Was there discussion about money that had been seized --

16  A    Yes, sir.

17  Q    -- from Cleve Johnson?

18  A    Yes, sir, there was.

19  Q    Okay.  In your subsequent discussions with law enforcement,

20  were you aware that money had been seized --

21  A    Yes, sir.

22  Q    -- from Cleve Johnson?  Following December 11, 2007, did you

23  continue to have contact with Melvin Johnson?

24  A    Yes, sir.

25  Q    And January 7th of this year, did you have contact with

1 Melvin Johnson on that day?

2 A    Yes, sir.

3 Q    And what happened on January 7th of this year?

4 A    I contacted Melvin, and we was discussing money and stuff

5 that he had owed Cleve that I was supposed to take down -- take

6 him down to meet Cleve and pay the money that he owed.  He was

7 wanting to borrow money from me to pay Cleve for dope that he

8 owed.

9 Q    And how much money did Melvin Johnson need?

10 A    He needed $600.

11 Q    And did you get $600?

12 A    Yes, sir.

13 Q    Who did you get $600 from?

14 A    The Mount Airy Police Department.

15 Q    And did you meet with the detectives on January 7 --

16 A    Yes, sir.

17 Q    -- in order to get that money?

18 A    Yes, sir.

19 Q    Did you also get a recording device on that occasion?

20 A    Yes, sir.

21 Q    Was that the same recording -- kind of recording device that

22 you had on previous occasions?

23 A    Yes, sir.

24 Q    And did you -- after receiving the money from law

25 enforcement, did you go and meet with Melvin Johnson?

1  A    Yes, sir.

2  Q    Where did you go?

3  A    We went to High Point to meet with Cleve.

4  Q    So did you meet -- did you meet Melvin in Surry County and

5  pick him up?

6  A    Yes, sir.  We went to Melvin's residence and picked him up.

7  Q    Was that just you and Melvin Johnson or was anybody else

8  with you?

9  A    Lori was with me.

10 Q    So the three of you then went to High Point; is that

11 correct?

12 A    Yes, sir.

13 Q    And did you go to that same residence that you had been to

14 before?

15 A    No, sir.  We went to a residence -- I'm not sure where I was

16 at because I am not familiar with the place, but we went and

17 Cleve was at a residence; and we took Melvin to there, and we sit

18 in the vehicle.  Melvin got out and went into the place of

19 residence.

20 Q    And did you ever see Cleve Johnson that night?

21 A    Yes, sir.  He come out of the residence with Melvin.  They

22 both got into a Suburban SUV and sit there and talked for

23 probably 15, 20 minutes.

24 Q    And then what happened after Melvin Johnson and Cleve

25 Johnson were in the SUV?

1  A    Then Cleve pulled up beside of me and Lori and was talking

2  about the money that had been seized from him and another time

3  that they had seized money from him, and we left from there and

4  went right up the street to a Hess station.

5  Q    And during the time that you were at the Hess station, did

6  this defendant, Cleve Johnson, talk to you about wanting to

7  purchase the pound of methamphetamine?

8  A    No, sir, it was not discussed.

9  Q    Did he give you his phone number on that occasion?

10 A    Yes, sir, he did.

11 Q    Do you recall what that phone number is?

12 A    It is 442-7144.

13 Q    Did you tell law enforcement after that meeting about the

14 information that the defendant had given you regarding his

15 telephone number?

16 A    Yes, sir.

17 Q    Now, had you called Cleve Johnson any time prior to

18 January 7th?

19 A    No, sir.

20 Q    Your contact had been with Melvin Johnson; is that correct?

21 A    Yes, sir.  I strictly went through Melvin.

22 Q    Do you recall what Melvin Johnson's cell phone number was?

23 A    Yes, sir, it is 710-1989.

24 Q    And after -- well, first of all, on January 7th, after the

25 meeting between Melvin Johnson and Cleve Johnson, did you give

1  Melvin a ride back to Surry County?

2  A    Yes, sir.

3  Q    Did he discuss providing the money to Cleve Johnson?

4  A    Just -- yes, sir.  He said, you know, that he provided the

5  money to him.

6  Q    To your knowledge, did Melvin Johnson get any more

7  methamphetamine on that occasion from Cleve Johnson?

8  A    No, sir, not to my knowledge.

9  Q    And after January 7th of this year, did you have

10 conversations, recorded conversations, with this defendant to

11 have him meet with your Hispanic supplier?

12 A    Yes, sir.

13 Q    And as part of those conversations -- well, did some of

14 those conversations occur on January 23 of 2008?

15 A    Yes, sir.

16 Q    And what happened on January 23, 2008?

17 A    January 23 we -- me and Lori went with Detective Hodges and

18 Wagoner down to Greensboro and met with law enforcement there and

19 the Mexican, the undercover cop, to set up the meeting to

20 actually meet with Cleve.

21 Q    And --

22        **THE COURT:**  Counsel approach the bench, please.

23        (The following proceedings were had at the bench by the

24        Court and Counsel out of the hearing of the jury:)

25        **THE COURT:**  I just happen to notice Juror Number 11

 1   seems to have her eyes down, and I am tempted to make some

 2   comment about staying awake.  I don't know if we need to be

 3   concerned about that or not.

 4          MR. HARRISON:  Well, I noticed the same thing during my

 5   opening statement.

 6          THE COURT:  I'm sure she was awake.

 7          MR. HARRISON:  It nearly broke my heart.  She's nodding

 8   off from time to time.

 9          THE COURT:  I am just going to ask if anybody needs a

10   break right now.  If not, we are going to go to 11:00.  They need

11   to pay attention.  Any other discussions?

12          MR. HARRISON:  No, sir.

13          MR. GALYON:  I will try to be more exciting.

14          THE COURT:  Nobody take offense.

15      (Thereupon, the following proceedings continued within the

16      hearing of the jury:)

17          THE COURT:  Ladies and gentlemen of the jury, let me

18   ask, does anybody need to take a break right now?  If so, please

19   raids your hand.

20      (Negative response from members of the jury panel.)

21      Okay.  We are going to keep going.  I am going to ask you

22   all -- I know you are paying close attention, but please pay

23   close attention to the evidence.  If you are getting tired or

24   think you need a break, simply raise your hand and we'll take a

25   break.  Otherwise, we are going to go to 11:00.

1    Mr. Galyon, you may proceed.

2  **BY MR. GALYON**

3  Q    So January 23 of this year, you said that you and Lori

4  Wilson went down and met with law enforcement in Greensboro; is

5  that right?

6  A    Yes, sir.

7  Q    And did you actually make some recorded telephone calls to

8  this defendant to try to set up a meeting?

9  A    Yes, sir, we did.

10 Q    Did he -- did you see this defendant Cleve Johnson on

11 January 23?

12 A    Yes, sir, I did.

13 Q    Where was that?

14 A    I seen him at the Home Depot parking lot in Greensboro.

15 Q    And Home Depot is off Wendover Road; is that right?

16 A    Yes, sir.

17 Q    Who were you with?

18 A    I was with the undercover agent.

19 Q    And did you, in fact, talk to Cleve Johnson when you were at

20 the Home Depot parking lot?

21 A    Yes, sir.

22 Q    Did Cleve Johnson give you anything?

23 A    No, sir.

24 Q    Did you give him anything?

25 A    No, sir.

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  Q    Were you present when Cleve Johnson was in the -- talked to

2  the undercover officer?

3  A    No, sir, I was not.

4  Q    Where did the conversation between Cleve Johnson and the

5  undercover officer occur?

6  A    It occurred in the vehicle that me and the undercover drove

7  from the federal building to the Home Depot.

8  Q    Were you searched before you got into the vehicle with the

9  undercover officer?

10 A    Yes, sir.

11 Q    Were you searched after you got out of the vehicle with the

12 undercover officer?

13 A    Yes, sir.

14 Q    Did you have any methamphetamine on you on that occasion?

15 A    No, sir.

16 Q    And after that meeting, was there -- did you have

17 conversations with Cleve Johnson thereafter?

18 A    Yes, sir.

19 Q    First of all, was he -- was -- were there arrangements for

20 this defendant, Cleve Johnson, to actually purchase the pound of

21 methamphetamine on the 23rd, or was it just to discuss?

22 A    It was just to discuss future purchases -- or future --

23 Q    So after January 23 of 2008, did you have conversations with

24 Cleve Johnson?

25 A    Yes, sir.

1  Q    Telephone conversations or in person?

2  A    Telephone conversations.

3  Q    And during any of those telephone conversations, did the

4  defendant tell you whether or not he had money to purchase

5  methamphetamine?

6  A    Yes, sir, he did.

7  Q    What did he say?

8  A    I contacted him again from the Mount Airy Police Department

9  and talked to him, wanted to know -- told him that the

10  undercover, my Mexican, had contacted me and had a couple of

11  pounds he was wanting to get rid of and was wanting to know, you

12  know, what he had been up to; and at that time he told me that he

13  had contacted the undercover with $11,000, wanting to buy a pound

14  of meth.

15  Q    Did he indicate whether or not he had money on January 23rd

16  of 2008 when you met with the undercover?

17  A    I do not know.

18  Q    And did the defendant during that conversation also talk

19  with you about money that he had to pay out relating to the

20  trucking business?

21  A    Yes, sir, he did.

22  Q    What was that?

23            **MR. HARRISON:**  Object, relevance.

24            **THE COURT:**  Overruled.

25

 1  **BY MR. GALYON**

 2  Q    What did he say?

 3  A    He had discussed about the 30,000 that they had took from

 4  him, that the feds had took from him.  He had paid out -- I don't

 5  recall the amount that he had paid out on the trucking business

 6  for the trucks.

 7       (Assistant U.S. Attorney showed Defendant's Counsel

 8       exhibit.)

 9            **MR. GALYON:**  Your Honor, if I may approach?

10            **THE COURT:**  Yes, you may.

11       (Government's Exhibits Nos. 1 and 1A were marked for

12       identification.)

13  **BY MR. GALYON**

14  Q    (Hands Witness exhibit) Mr. Todd, I am showing you

15  Government's Exhibit 1 for identification.  I will ask if you

16  recognize what that is?

17  A    Yes, sir.

18  Q    What is that?

19  A    It is the recorded phone conversations.

20  Q    Okay.  I'll ask if you recognize Government's Exhibit 1A?

21  A    Yes, sir.

22  Q    And what is that?

23  A    It is the redacted version of what has been recorded.

24  Q    Okay.  What is the date related to Government's Exhibit 1A?

25  A    It is December 4th, 2007.

BRIANA NESBIT, RPR       OFFICIAL COURT REPORTER    (336) 254-7464

1  Q    And was December 4, 2007, one of the days that you actually

2  met in person with Melvin Johnson?

3  A    Yes, sir.

4  Q    Okay.  Government's Exhibit 1 -- have you listened to the

5  recording?

6  A    Yes, sir.

7  Q    And is it, in fact, an in-person recording between you and

8  Melvin Johnson and your girlfriend, Lori Wilson?

9  A    Yes, sir, it is.

10 Q    And as far as the redacted part, what is Government's 1A,

11 the audio recording, is that the entire meeting that you had with

12 Melvin Johnson?

13 A    No, sir.

14 Q    Okay.  It is a portion of that meeting; is that correct?

15 A    Yes, sir.

16 Q    And to your knowledge, is this transcript consistent with

17 what is on Government's 1?

18 A    Yes, sir, it is.

19        **MR. GALYON:**  Your Honor, I am going to ask what's been

20 marked as Government's 1 and 1A be admitted.

21        **MR. HARRISON:**  No objection.

22        **THE COURT:**  Admitted without objection.

23     (Government's Exhibits Nos. 1 and 1A were received into

24     evidence.)

25        **THE COURT:**  Which one is the disk, Mr. Galyon?

1          **MR. GALYON:**  The disk is 1 and the transcript is 1A.

2          **THE COURT:**  Are you going to play it now for the jury?

3          **MR. GALYON:**  Yes, sir.

4          **THE COURT:**  Ladies and gentlemen, if any of you have

5   any problem hearing, if you would just raise your hand when it

6   begins playing.

7          **MR. GALYON:**  If I could have the CSO distribute the

8   transcripts to the jury?

9          **THE COURT:**  All right.  What you are distributing now

10  is Government's Exhibit 1A; is that correct?

11         **MR. GALYON:**  That's correct, Your Honor.

12         **THE COURT:**  All right.

13      (Government's Exhibit No. 1A was published to the jury.)

14      (Government's Exhibit No. 1 was played.)

15  **BY MR. GALYON**

16  Q    Mr. Todd, did you recognize who was talking just then?

17  A    Yes, sir.

18  Q    Did you recognize Melvin Johnson's voice?

19  A    Yes, sir.

20      (Government's Exhibit No. 1 continued to be played.)

21         **MR. HARRISON:**  Your Honor, I need to object to the

22  section with regard to the pills.  There's no charge here of

23  possession or conspiracy to distribute or possess pills.

24         **THE COURT:**  Why don't you approach the bench, please.

25      (The following proceedings were had at the bench by the

BRIANA NESBIT, RPR       OFFICIAL COURT REPORTER    (336) 254-7464

 1          Court and Counsel out of the hearing of the jury:)

 2              **THE COURT:**  All right.  Anything further?

 3          **MR. HARRISON:**  No, sir.  I mean, this doesn't -- this

 4   is just a different -- completely different thing than -- it is

 5   like if they were going to sit there and talk about selling

 6   marijuana.  I mean, there is no charge of conspiracy to possess

 7   or distribute some amount of -- I don't know what kind of pills.

 8              **THE COURT:**  Okay.  Mr. Galyon?

 9          **MR. GALYON:**  Well, he actually talks about it in the

10   transcript and on the tape.  He talks about it because there had

11   been discussions and this informant has already testified about

12   the fact that there was discussion with Melvin Johnson regarding

13   getting anhydrous and pills.

14          **MR. HARRISON:**  I thought that was with Melvin.  I

15   didn't know that there was any involvement of my client with

16   regard to the pills and anhydrous.

17          **MR. GALYON:**  It was the -- it had been put to Melvin

18   about buying a large quantity of pills and anhydrous in order to

19   manufacture methamphetamine, or that he could buy a pound of meth

20   already made; and that was the discussion, and then they are

21   discussing that here on this transcript about, you know, whether

22   or not the defendant wanted to do that or if he just wanted to

23   buy the pound of methamphetamine.

24      It's part of the crime itself, whether he is going to get

25   pre-made meth or precursor chemicals, and he even says on the

 1  transcript that he doesn't want to get that, the price is too

 2  high simply for the precursor chemicals.

 3         MR. HARRISON:  I mean, it is just not what is charged.

 4  He is charged with -- you know what he is charged with, Your

 5  Honor.  He is not charged with transactions or anything involving

 6  whatever, ephedrine -- I don't know how to pronounce it.

 7         MR. GALYON:  Right.

 8         MR. HARRISON:  He is charged -- and I recall -- my

 9  recollection is his testimony was, well, on December 4th I told

10  Melvin -- talked to Melvin about the purchase of pills or

11  anhydrous and then we talked about whether or not Cleve wanted to

12  buy methamphetamine, which is what is the charged crime or the

13  drug involved in the charged crime.

14     This is a completely different object of either a conspiracy

15  or a purchase.  It is the same thing if they were talking about

16  buying marijuana or heroin.

17         THE COURT:  Have you seen this transcript before today?

18         MR. HARRISON:  Yes.

19         THE COURT:  Why didn't you raise this before?

20         MR. HARRISON:  Because -- I have no explanation except

21  to say that maybe I am not as sharp as I need to be.  I read a

22  lot of transcripts in this case, but I didn't connect it up.

23         THE COURT:  I am going to allow it.  Is there any more

24  discussion on this about pills or is this simply it?

25         MR. GALYON:  There is in the December 7th -- there is

1    in the phone conversation between Melvin Johnson and Cleve

2    Johnson.  He talks about whether or not he wants to get "tanks"

3    and that's referring to anhydrous.  So he is --

4            **THE COURT:**  It's already been mentioned in the opening,

5    as I recall, without objection.

6            **MR. GALYON:**  Right.

7            **THE COURT:**  But anything about pills?

8            **MR. GALYON:**  No, not at that point.

9            **THE COURT:**  Okay.  I am going to overrule the

10   objection.  One is that the pills started several lines earlier

11   than before it was raised, but not principally on that ground.

12   Principally, that's one ground.

13       I should also say that I am going to overrule the objection

14   because I believe it is part of the intrinsic discussion of the

15   nature of the transactional relationship between the parties in

16   the case, and this involves Melvin Johnson who is a

17   co-conspirator showing, among other things, the ability to

18   distribute drugs, which is the essence of the charge here,

19   conspiracy to distribute, at least in Count One.

20       So I'm going to find that it goes to an issue other than

21   character, and I think it is intrinsic.  So it is not necessarily

22   a 404(b) issue by definition.  In addition to that 404(b) -- it

23   goes to an issue other than character, as I described -- I think

24   it is necessary in that it demonstrates the relationship of the

25   parties and their knowledge about their distribution potential,

Case 1:08-cr-00233-TDS   Document 32   Filed 06/22/09   Page 50 of 205

 1  distribution of the methamphetamine at issue in the case; that

 2  is, that Melvin Johnson can't distribute and that the basic

 3  defense in the case, as I understand it, is that there is no

 4  agreement about distribution as to the methamphetamine at issue

 5  in the case.  This tends to show a course of dealing in that

 6  regard.

 7      And I also think it is reliable; and under Rule 401, 403, I

 8  could conclude that its probative value is not substantially

 9  outweighed by any substantial prejudicial effect.

10      If there are any more references, though, to pills, I think

11  you ought to advise Mr. Harrison before it comes up.

12          **MR. GALYON:**  He's got the transcripts.  I don't think

13  in the December 7th transcript that there is any discussion about

14  pills at that point.  I think that the only mention about any of

15  that is "tanks" in the conversation that Melvin Johnson is having

16  with Cleve Johnson, but all the conversation that I recall from

17  that transcript is about the purchase of the methamphetamine,

18  pre-made methamphetamine, and also about methamphetamine that

19  Melvin Johnson still has to sell so that he can pay Cleve Johnson

20  back.  So I don't think there is any reference at all to pills.

21  I think this was the only reference.

22          **MR. HARRISON:**  I'll be frank with you.  I can't recall

23  all of these transcripts.

24          **THE COURT:**  You take a look at it.  If you think you

25  need to raise it in further transcripts --

1        **MR. HARRISON:**  At this point I don't, but I will

2  respectfully request a 404(b) instruction identical to the one

3  that you gave earlier.

4        **THE COURT:**  Okay.  Any objection?

5        **MR. GALYON:**  Your Honor, I think that -- as the Court

6  has said, I think it is intrinsic.  I mean, I can see how -- it

7  is not like a -- I mean, it is not a prior bad act.  So right --

8        **THE COURT:**  Do you want me to reference --

9        **MR. HARRISON:**  I'm sorry.

10        **THE COURT:**  Do you want me to reference in the limiting

11  instruction the testimony about pills and there is no charge as

12  to pills in this case but that the evidence is admissible and

13  then explain?

14        **MR. HARRISON:**  Exactly.

15        **THE COURT:**  Is that acceptable?  When he finishes

16  playing the tape; is that correct?

17        **MR. HARRISON:**  Yes, thank you, sir.

18        (Thereupon, the following proceedings continued within the

19        hearing of the jury:)

20        **THE COURT:**  Overruled.

21  **BY MR. GALYON**

22  Q    And this discussion here on the second page about mini,

23  white cross mini, what are you referring to?

24  A    I'm referring to mini-thins, which they are just little

25  pills that they was going to get the ephedrine out of them to

1  make methamphetamine with.

2  Q    Ephedrine being the main ingredient to make methamphetamine?

3  A    Yes, what they needed out of that pill to make meth.

4       (Government's Exhibit No. 1 continued to be played.)

5  **BY MR. GALYON**

6  Q    This discussion about "you are going to make money on that,

7  ain't ya" on line 10 on the second page --

8            **MR. GALYON:**  If I may approach?

9            **THE COURT:**  Yes.

10 **BY MR. GALYON**

11 Q    (Indicating) About "you are going to make money on that,

12 ain't you," what is that in reference to?

13 A    On the anhydrous and the pills that we was talking about

14 previous, making the meth.

15 Q    And so the discussion is that you were going to receive some

16 money for setting up the deal?

17 A    Yes, sir.  That's what he was asking me.

18       (Government's Exhibit No. 1 continued to be played.)

19 Q    Now, when he says, "When worse comes to worse," on line 22,

20 "I will tell him that that was just tanks," who is Melvin Johnson

21 referring to, as far as "I will tell him"?

22 A    Cleve, I guess.

23           **MR. HARRISON:**  Well, object.

24           **THE COURT:**  Sustained.

25           **MR. HARRISON:**  Move to strike.

1           **THE COURT:**  Granted.

2    **BY MR. GALYON**

3    Q    Well, as part of the discussions that you had had, who was

4    supposed to be buying the methamphetamine, the anhydrous, or the

5    pills?

6    A    Cleve.

7           (Government's Exhibit No. 1 continued to be played.)

8           **THE COURT:**  Ladies and gentlemen of the jury, you've

9    heard evidence about mini pills during this December 4, 2007,

10   transcript and tape.  The defendant is not charged with regard to

11   the mini capsules or mini pills that have just been referenced.

12        The law allows this kind of evidence for certain limited

13   purposes.  For example, this evidence may properly be considered

14   in determining intent, knowledge, such as knowledge of the drug

15   trade, how relationships between the parties develop, and the

16   mechanics of an alleged conspiracy.

17        Please keep in mind the limited purposes for which this

18   evidence is admitted.  Most importantly, do not conclude from the

19   evidence that the defendant has bad character in general, nor

20   should you conclude that because the defendant may have engaged

21   in bad conduct in the past, he is more likely to have done so in

22   this case.

23        You are to consider the evidence only if you find that the

24   defendant committed the acts charged in the indictment and, if

25   so, to consider it only for the reasons that I instruct you.

1        (Assistant U.S. Attorney showed Defendant's Counsel

2        exhibit.)

3            **THE COURT:**  Mr. Galyon, it is five to 11:00.  Are we

4    getting ready to do another tape?

5            **MR. GALYON:**  Yes, sir.

6            **THE COURT:**  Do you think this would be a good time to

7    take a break?

8            **MR. GALYON:**  Certainly, Your Honor.

9            **THE COURT:**  We are going to take our morning recess at

10   this time, ladies and gentlemen.  If you would, please -- I am

11   going to ask, first of all, the court security officer to collect

12   all of the transcript copies that you have of what you just

13   heard.  If you will pass those back to the end of the jury.

14       If you would, put your notes back into your envelopes with

15   your pencils, and I am going to give you my standard admonition;

16   that is, do not discuss the case at all with anyone, with members

17   of the jury or anybody else.  Do not try to investigate the case.

18   Do not in any way deliberate on the case or consider it.

19       At this time simply keep an open mind, go back, and relax.

20   We are going to take a 15-minute break.  Then we'll call for you

21   in 15 minutes.  I am going to discharge you now to the jury room,

22   and you should have adequate facilities there to relax for about

23   15 minutes.  You may want to stand up and stretch your legs

24   because we'll go again from about 11:15 to 12:30 when you come

25   back.

1    As I said, if at any time you feel you need a break in
2  between the breaks, if something becomes necessary, just raise
3  your hand and that will be your signal to me that we need to do
4  that.

5    So remember my admonitions, including all the admonitions I
6  gave you in my standard admonition.  At this time I am going to
7  ask the court security officer to allow you to recess into the
8  jury room.

9    (The jury departed the courtroom at 10:57 a.m.)

10    **THE COURT:**  Mr. Todd, you may step down, sir.  Anything
11  from counsel at this time before we take our break?

12    **MR. HARRISON:**  No, Your Honor.

13    **MR. GALYON:**  No, Your Honor.

14    **THE COURT:**  I just want the record to reflect that
15  while I did bring you to the bench about Juror Number 11, so just
16  it is clear, I at no time ever saw her asleep.  I just simply saw
17  that it looked like she was getting tired.  I wanted to bring
18  that to your attention.  I thought also just by bringing you to
19  the bench it might wake up the jury a little bit.  It seems to
20  have made its point.

21    All right.  We'll take a break until 11:15.

22    (The Court recessed at 10:58 a.m.)

23    (The Court was called back to order at 11:13 a.m.)

24    (The Defendant was present.)

25    **THE COURT:**  You all ready to proceed?

1          **MR. HARRISON:**  Yes, Your Honor.

2          **THE COURT:**  If you would, please bring the jury back.

3     (The Witness returned to the witness stand.)

4     (The jury returned to the courtroom.)

5          **THE COURT:**  Mr. Galyon, you may proceed.

6          **MR. GALYON:**  Thank you, Your Honor.

7     (Assistant U.S. Attorney showed Defendant's Counsel

8     exhibit.)

9          **MR. GALYON:**  May I approach?

10         **THE COURT:**  Yes, you may.

11    (Government's Exhibits Nos. 2 and 2A were marked for

12    identification.)

13    **BY MR. GALYON**

14    Q    (Hands Witness exhibit) Mr. Todd, I'm showing you

15    Government's 2 for identification, and I'll ask if you recognize

16    what that is?

17    A    Yes, sir.

18    Q    What is that?

19    A    That is a recorded tape of conversations.

20    Q    And for what day is that a recorded conversation?

21    A    12/7/07.

22    Q    And Government's 2A for identification, do you recognize

23    what that is?

24    A    Yes, sir.

25    Q    What is that?

 1 A    It is a transcript of the recording.

 2 Q    And is this one, like Government's 1 and 1A, a shortened

 3 version, that is, it is not the entire conversation; it is just

 4 part of it?

 5 A    Yes, sir.

 6          MR. GALYON:  I'm going to ask what's been marked as

 7 Government's 2 and 2A be admitted in.

 8          THE COURT:  Any objection?

 9          MR. HARRISON:  Well, Your Honor, may we approach the

10 bench, please?

11          THE COURT:  Yes.

12      (The following proceedings were had at the bench by the

13      Court and Counsel out of the hearing of the jury:)

14          THE COURT:  I don't have a copy.

15      (Assistant U.S. Attorney handed Court document.)

16          MR. GALYON:  This is one.

17          THE COURT:  I would be glad to hear you.  I might add

18 that since we had a break and this was being shown right before

19 the break it would have been helpful to have known before the

20 break.

21          MR. HARRISON:  This is being shown to the jury.

22          THE COURT:  I think he showed it to you and was getting

23 ready to play it, and we took the break.  That's okay.  It is

24 just a timing issue.

25          MR. HARRISON:  And here I was attempting to be better

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

 1  about my timing.

 2      There is some language in this that I object to,

 3  specifically with regard to Melvin's statements about my client's

 4  mother and father and how much money they had.

 5          **THE COURT:**  Can you point me to the specifics?

 6          **MR. HARRISON:**  Yes.  Page 3, Your Honor.

 7          **THE COURT:**  All right.

 8          **MR. HARRISON:**  Starting around line 10 to the bottom of

 9  the page.  I don't believe that that's relevant, and I do believe

10  that it has -- I mean, it has no probative value in my opinion

11  whatsoever.  It could be that someone might think -- spoiled

12  child image comes to mind.

13          **THE COURT:**  Where does it start that you are concerned

14  about?

15          **MR. HARRISON:**  Starts on --

16          **THE COURT:**  Ten is actually the answer to the question.

17          **MR. HARRISON:**  Eleven.

18          **THE COURT:**  Is there something wrong with that?

19          **MR. HARRISON:**  It is just the entire --

20          **THE COURT:**  When it gets down to line 18 is when they

21  start describing the size of the company.  I see actually line 14

22  talking about the family-owned business.

23          **MR. HARRISON:**  Uh-huh.

24          **THE COURT:**  So we went from line 13 down to --

25          **MR. HARRISON:**  -- line 24.

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1          THE COURT:  Twenty-four.

2          MR. HARRISON:  Yes.

3          THE COURT:  Does that satisfy your concern?

4          MR. HARRISON:  Yes.

5          THE COURT:  Is there any way you can redact that or at

6   least not play that part for the jury?

7          MR. GALYON:  Yes, I certainly can.  It is going to be a

8   turn-the-volume-down kind of thing.

9          THE COURT:  Then the problem is going to be with having

10  a copy.

11         MR. GALYON:  I can have it redacted.

12         THE COURT:  Do you have a black marker you can redact

13  it with?

14         MR. GALYON:  Yes, sir.

15         THE COURT:  Or to have that in some way redacted so the

16  jury can have a copy of your transcript?

17         MR. GALYON:  Yes, sir.

18         THE COURT:  I think what you can actually do frankly is

19  you can cut -- I think you could just take the scissors and cut

20  it right there and give it to the jury in that form.  Is that

21  acceptable?

22         MR. HARRISON:  Fine.

23         THE COURT:  Do you have scissors?

24         MR. GALYON:  I don't.  But the other part -- if you do

25  that, then you miss 25 and 26.  We'd have to put that somewhere.

 1 | What may make the most sense, Your Honor, is I can -- I've got
 2 | this on my laptop.  I can just delete those lines.
 3 |         THE COURT:  How do you want to do it?  Do you want to
 4 | play this next?
 5 |         MR. GALYON:  I do.  But you know, as far as timing, I
 6 | don't know that that's going to work out because I need to be
 7 | able to change the document and make copies for the jury so that
 8 | they would have it.
 9 |         THE COURT:  Okay.  I will leave it to you as to how you
10 | want to do it.  If you -- one suggestion I have -- if you do it
11 | how you want, take the scissors, cut, and play it right now and
12 | you will lose the bottom of the page.  I don't know how critical
13 | that will be to your presentation of the evidence.  It's up to
14 | you how you want to do that.
15 |         MR. GALYON:  I'd rather not do that right in front of
16 | the jury.
17 |         THE COURT:  Do you want to take just a minute and have
18 | them cut in the conference room there and just bring them in?
19 |         MR. GALYON:  That's fine.  Then I'll just have to
20 | manually turn that as far as the playing.
21 |         THE COURT:  I would be glad to just wait until you do
22 | that.  I don't think it will take more than 30 seconds to do
23 | that.  Do you want to do that?
24 |         MR. HARRISON:  Yes, sir.  Could you tell me what the
25 | next thing you are going to admit or seek to admit, then I can be

1  reading it over.

2          **MR. GALYON:**  I am not going to do any other recordings

3  with him.  There aren't any other recordings that I am going to

4  do with him.

5          **MR. HARRISON:**  Any other transcripts?

6          **MR. GALYON:**  The only other transcripts are going to be

7  January 23 with the UC.

8          **MR. HARRISON:**  Okay.  I will take a look at that then

9  probably at the lunch break.

10         **MR. GALYON:**  And there is not a transcript for

11 December 11th, the car stop.

12         **THE COURT:**  Okay.  Let me just say for the record I

13 will grant the request to strike this part.  I think it is coming

14 late in the day, particularly given that it was shared before the

15 break.  So I do encourage you to make a timely objection to any

16 others ahead of time so we can deal with them.  I appreciate

17 that.

18     Okay.  All right.  We'll take just a minute, if you don't

19 mind doing that.

20         **MR. GALYON:**  What may make the most sense -- I'll do

21 that; and then when we get to that portion of the tape where you

22 know the transcript is redacted, I may ask to stop so that I can

23 have them go out and I can play it -- I don't want them to

24 hear -- so that I can get exactly where it is.

25         **THE COURT:**  It doesn't show up on your screen what is

1  happening on the tape; it is just showing what is playing?

2          MR. GALYON:  Right.  It is just showing that it is

3  playing.  It is not like I have to hit play again.  It is not

4  like a realtime transcription.

5          THE COURT:  However you want to do that is fine.

6          MR. GALYON:  I'll just ask for a break at that time.

7          THE COURT:  Do you want them to leave, or do you want

8  to just turn it down?

9          MR. HARRISON:  Whatever you want to do is fine.

10          MR. GALYON:  Okay.  All right.  I'll just listen.

11          THE COURT:  I'll leave it to you how you want to do it.

12      (Thereupon, the following proceedings continued within the

13         hearing of the jury:)

14          THE COURT:  Ladies and gentlemen, there is a matter

15  that is going to take just under a minute before we can get

16  started.  So I ask your indulgence to be patient for just a

17  minute.  Then we'll resume testimony.

18          MR. GALYON:  Your Honor, before I play that, what I'll

19  do is -- I have some other exhibits that I want to show, if I

20  may.

21  BY MR. GALYON

22  Q    You've mentioned that there was this meeting on December

23  7th; is that correct?

24  A    Yes, sir.

25  Q    And also on the 11th of December; is that correct?

```
 1  A     Yes, sir.

 2  Q     The one on December 11th at your house, when this defendant

 3  and Melvin Johnson showed up at your house, do you recall that?

 4  A     Yes, sir.

 5        (Government's Exhibit Nos. 3 and 4 were marked for

 6        identification.)

 7  Q     (Hands Witness exhibit) I am going to show you two

 8  photographs.  One is Government's 3 for identification, and I'll

 9  ask if you recognize who that is?

10  A     Yes, sir.

11  Q     And who is that?

12  A     That's Cleve Johnson.

13  Q     Is that how he was dressed and what he looked like on

14  December 11th of last year?

15  A     Yes, sir.

16  Q     (Hands Witness exhibit) I am going to show you Government's

17  4 for identification and ask if you recognize what that is?

18  A     It is Melvin Johnson.

19  Q     Is that a photograph of Melvin Johnson?

20  A     Yes, sir.

21  Q     Is that how he looked back on December 11th of last year?

22  A     Yes, sir.

23        MR. GALYON:  I am going to ask that Government's 3 and

24  4 be admitted.

25        MR. HARRISON:  No objection.
```

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

 1          THE COURT:  Admitted without objection.

 2      (Government's Exhibits Nos. 3 and 4 were received into

 3      evidence.)

 4          MR. GALYON:  Your Honor, I am going to ask to publish

 5  those to the jury.

 6          MR. HARRISON:  No objection.

 7          THE COURT:  You may.

 8      (Government's Exhibits Nos. 3 and 4 were published to the

 9      jury.

10  BY MR. GALYON

11  Q    And as part of the discussion that you all -- that you and

12  Melvin Johnson had on December 7th, was there a discussion of

13  what type of business this defendant was engaged in?

14  A    Yes, sir.

15  Q    What kind of business was that?

16  A    A trucking business.

17  Q    And who told you that this defendant was involved in the

18  trucking business?

19  A    Melvin.

20  Q    And as far as the discussions on December 11th, when this

21  defendant arrived at your house, was there any discussion about

22  the trucking business on that occasion?

23  A    No, sir.

24  Q    On January 23 of 2008, when you talked with this defendant

25  on the telephone and/or met with him there at the Home Depot, did

1  he discuss any trucking business with you on that occasion?

2  A    Yes, he said he was headed up to Philadelphia.

3  Q    Was that to do a delivery in the truck?

4  A    He was in the truck or going to be in a truck to deliver.

5  Q    To your knowledge, did this defendant actually own any of

6  the trucks?

7  A    Yes, sir, to my knowledge he did.

8  Q    On the December 7th recording on that occasion, was there --

9  did you actually talk to Melvin Johnson about whether or not this

10  defendant wanted a pound quantity of methamphetamine?

11  A    Yes, sir, I did.

12  Q    And what did Melvin Johnson say?

13  A    Melvin said that Cleve was wanting to purchase a pound of

14  meth.

15  Q    And is this the same conversation where there is actually a

16  phone call?

17  A    Yes, sir.

18      (Assistant U.S. Attorney showed Defendant's Counsel

19      exhibit.)

20      (Government's Exhibit No. 5 was marked for identification.)

21          **MR. GALYON:**  If I may approach?

22          **THE COURT:**  Yes.

23  **BY MR. GALYON**

24  Q    (Hands Witness exhibit) Mr. Todd, I am showing you

25  Government's 5 for identification, and ask if you recognize what

1  that is?

2  A    Yes, sir.

3  Q    What is that?

4  A    It is phone records.

5  Q    And based on this first sheet, can you tell what number the

6  phone records are for?

7  A    Yes, sir.  They are for Cleve's cell phone.

8  Q    What is that cell phone?

9  A    (336)442-7144.

10  Q    And you had mentioned before about the December 7th date,

11  that you had an opportunity to listen to the full recording of

12  your conversation with Melvin Johnson on that occasion; is that

13  correct?

14  A    Yes, sir.

15  Q    And you had mentioned about the time associated with the

16  conversation itself.  After the phone call that Melvin Johnson

17  makes on December 7th, calling Cleve Johnson, do you recall that

18  there was some discussion about what time it was?

19  A    Yes, sir.

20  Q    Do you recall what time that was?

21  A    After the phone call, it was around 3:00.

22  Q    Okay.

23            **MR. GALYON:**  I am going to ask what's been marked as

24  Government's 5 be admitted, Your Honor.

25            **MR. HARRISON:**  No objection.

1          **THE COURT:**  All right.  Admitted without objection.

2          (Government's Exhibit No. 5 was received into evidence.)

3   **BY MR. GALYON**

4   Q    (Hands Witness exhibit) I am going to show you page 139 of

5   161 of these phone records; and in looking at December 7th of

6   2007 for the 442-7144 number, is there a call at around

7   2:57 p.m.?

8   A    Yes, sir.

9   Q    And is that an inbound, or received, call from that number

10  from another number?

11  A    Yes, sir.

12  Q    So Cleve Johnson's phone received the call from somebody; is

13  that right?

14  A    Yes, sir.

15  Q    And according to the phone records, what was the phone

16  number that called Cleve Johnson's cell phone?

17  A    It was (336)710-1989.

18  Q    To your knowledge, that's Melvin Johnson's cell phone; is

19  that correct?

20  A    Yes, sir.

21  Q    Now, you just testified about Government's 2 and 2A and

22  that's the conversation, the redacted conversation, and the

23  transcript for December 7th, the one we've just been talking

24  about with these phone records; is that correct?

25  A    Yes, sir.

1          (Assistant U.S. Attorney showed Defendant's Counsel

2      exhibit.)

3          **MR. GALYON:**  Your Honor, I'll ask the copies of the

4   transcript be distributed out to the members of the jury.

5          **THE COURT:**  This is a copy of 2A?

6          **MR. GALYON:**  That's correct.

7          **THE COURT:**  Any objection?

8          **MR. HARRISON:**  No.

9          **THE COURT:**  You may.

10     (Government's Exhibit No. 2A was published to the jury.)

11     (Government's Exhibit No. 2 was played.)

12  **BY MR. GALYON**

13  Q    Now, when you are talking about "is he wanting to buy a

14  quantity" and you say "Cuz," is Cuz like a nickname that you

15  would use for Melvin?

16  A    If he was my cousin, I would.

17  Q    But are you related to Melvin Johnson?

18  A    No.

19  Q    Okay.  So when you asked that question, are you referring to

20  this defendant?

21  A    Yes, referring to Cleve.

22  Q    Okay.  Because Melvin had referred to this defendant as

23  "Cuz"; is that correct?

24  A    Yes, sir, that's what he calls him.

25  Q    Okay.

Case 1:08-cr-00233-TDS   Document 32   Filed 06/22/09   Page 69 of 205

1      (Government's Exhibit No. 2 continued to be played.)

2  Q    And when -- in this portion of the conversation, as far as

3  "I need to get rid of some more of that," what is Melvin Johnson

4  talking about?

5  A    He is talking about the meth that he had.

6  Q    And when he is talking about "that boy put me in a bind

7  because when I was up with him, he said I need that money by

8  Friday," who is Melvin talking about there?

9           **MR. HARRISON:**  Object.

10          **THE WITNESS:**  He is talking about --

11          **MR. HARRISON:**  Object.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  He is talking about Cuz.

14 **BY MR. GALYON**

15 Q    He is talking about this defendant?

16 A    Yes, sir.

17 Q    Okay.

18     (Government's Exhibit No. 2 continued to be played.)

19 Q    When you say "he ain't busy with his trucks this evening,"

20 who are you talking about?

21 A    I was talking about Cleve.

22 Q    Because you knew he was in the trucking business?

23 A    Yes, sir.

24     (Government's Exhibit No. 2 continued to be played.)

25 Q    Now, what is happening here during the conversation?  Where

1  are you and where is Melvin Johnson?

2  A    We are in his camper that he was staying in, and his phone

3  don't pick up real good except in certain places there.  At that

4  time, he had called Cuz and his phone wasn't picking up good; and

5  he had stepped out of his camper just right there on the outside

6  of the camper, which the camper was pretty small, trying to get

7  his phone to pick up.

8       (Government's Exhibit No. 2 continued to be played.)

9  Q    What are you talking about there?

10 A    I didn't hear.  I couldn't hear it.

11 Q    About scratching his belly, what is that about?

12 A    He's got a little dog named Paco that stays there with him.

13 Q    Okay.

14      (Government's Exhibit No. 2 continued to be played.)

15 Q    What was the "either or"?  "Set up a time on either or,"

16 what is that about?

17 A    He was referring to the pills and the anhydrous or the pound

18 is what he is talking about when he said "either or."

19      (Government's Exhibit No. 2 continued to be played."

20 Q    What is Melvin Johnson referring to there about "half of

21 it"?

22 A    He is talking about half of his money that he owed.

23 Q    Who did he owe money to?

24 A    To Cleve.

25      (Government's Exhibit No. 2 continued to be played.)

1  Q    The "LB" there, what is that reference to?

2  A    He is referring to what we call a pound, "LB" referring to a

3  pound.

4  Q    And then the "no less than"?

5  A    I had told him -- I had been informed by Officer Hodges

6  before it all that we wouldn't sell no less than a pound, that my

7  Mexican or my connection wouldn't sell no less than a pound.

8  Q    That was basically part of the cover story for you; is that

9  correct?

10 A    Yes, sir.

11      (Government's Exhibit No. 2 continued to be played.)

12          **MR. GALYON:**  Your Honor, if I may have moment?

13          **THE COURT:**  Yes.  Are those turned up as loud as they

14 can be, Mr. Galyon.

15          **MR. GALYON:**  They are.

16          **THE COURT:**  Thank you.

17      (Government's Exhibit No. 2 continued to be played.)

18 **BY MR. GALYON**

19 Q    Now, where this is a discussion about "he is wanting a

20 pound," who are you referring to?

21 A    I was referring to Cleve.

22 Q    And when Melvin Johnson says, "Right, 16,000," what is that

23 about?

24 A    He is talking about 16,000 for the pound of meth.

25 Q    And then there is a discussion about "one in your pocket and

 1  one in my pocket."  What is that about?

 2  A    He had -- Melvin -- I had told Melvin I could get it for

 3  14,000.  He was wanting to make $2,000 on a pound off of Cuz.  So

 4  I priced it at 16.

 5  Q    And you would make $1,000, and Melvin would make $1,000?

 6  A    Yes, sir.

 7       (Government's Exhibit No. 2 continued to be played.)

 8            **MR. GALYON:**  Your Honor, I tender him for cross.

 9            **THE COURT:**  All right.  Cross-examination?

10            **MR. HARRISON:**  Yes, sir.

11                     CROSS-EXAMINATION

12  **BY MR. HARRISON**

13  Q    Mr. Todd, so was there, in fact -- with regard to this

14  proposed transaction, was there in existence, so far as you know,

15  a pound of meth that was being discussed?

16  A    No, there was not actually a pound of actual meth.

17  Q    And when -- there at the end of that transcript -- or that

18  tape we just heard, you and Melvin are planning on making $1,000

19  each from the transaction; correct?

20  A    In Melvin's mind, yes, sir.

21  Q    And so Melvin was not being paid by this man?

22  A    No, sir, he was not being paid.

23  Q    And Melvin was not going to buy the methamphetamine himself,

24  was he?

25  A    No, sir.

```
 1  Q    He didn't have -- as far as you know, he didn't have enough
 2  money to invest in that kind of amount, did he?
 3  A    No, sir.
 4  Q    And he didn't tell you that he and Cleve were going to share
 5  in the profits or the losses from this imaginary pound, did he?
 6  A    No, sir.
 7  Q    In fact, he made no statement about what might happen to the
 8  pound once it was procured, did he?
 9  A    No, sir.
10  Q    So this was a situation where Melvin and you were kind of
11  arranging the sale to Cleve?
12  A    Yes, sir.  That Melvin was my go-between between Cleve and
13  the main buy.  I had to go through Melvin to talk to Cleve.
14  Q    You originally began to work for the Mount Airy Police
15  Department back in the summer; is that correct?
16  A    Yes, sir.
17  Q    And you had been busted, as you testified?
18  A    Yes, sir.
19  Q    Had your girlfriend also been charged -- or not charged, but
20  subjected to possible charges?
21  A    Yes, sir.
22  Q    She and you were dealing drugs together?
23  A    No, sir.  Just me.
24  Q    Just you.  But the police told you that she could be
25  charged?
```

1  A    Yes, sir.  It was her vehicle.

2  Q    I'm sorry?  I didn't hear that.

3  A    I said it was her vehicle that we was in.

4  Q    She was there at the scene?

5  A    Yes, sir.

6  Q    She was aware of what was going on?

7  A    Yes, sir.

8  Q    How long had you been selling drugs?

9  A    I had been selling drugs for about two and a half years at

10  that time.

11  Q    Okay.  And you sold to various people in the Mount Airy

12  area?

13  A    Yes, sir.

14  Q    What did you sell?

15  A    I sold methamphetamines.

16  Q    Did you ever sell it in pound quantities?

17  A    No, sir.

18  Q    What quantities would you sell it?

19  A    I would sell from an ounce to quarter pounds.

20  Q    Okay.  You rarely would sell, let's say, an 8-ball?

21  A    I would sell 8-balls, yes, sir.

22  Q    How much is an 8-ball?

23  A    It is 3.5 grams.

24  Q    Three-point-five grams?

25  A    Yes, sir.

1  Q    Okay.  And an ounce is how many grams?

2  A    An ounce is 28 grams.

3  Q    So when you met -- when you began your transactions with

4  Melvin, were you selling him quantities of that sort?

5  A    I had sold Melvin quantities, yes, sir.

6  Q    What quantities?

7  A    I had sold him up to two ounces.

8  Q    Okay.  Do you know what he did with that methamphetamine?

9  A    No, sir.

10 Q    You had no concern with what he did?

11 A    No, sir.

12 Q    You all were not partners together?

13 A    No, sir.

14 Q    You just had an agreement to buy or sell some limited amount

15 of methamphetamine; is that right?

16 A    Yes, sir.

17 Q    So you -- there came a time that you met my client, Cleve

18 Johnson; correct?

19 A    Yes, sir.

20 Q    And was that after you had discussed with Melvin the

21 possibility of Cleve buying methamphetamine?

22 A    Yes, sir.

23 Q    Okay.  And the discussion was limited to Cleve buying the

24 methamphetamine; right?

25 A    Yes, sir, to my understanding.

```
 1  Q    Okay.  When you went to Cleve's cabin, I think you called
 2  it, where was that now?
 3  A    I really -- I really don't know exactly the place we went
 4  to, I mean as far as the area.  It was somewhere in High Point.
 5  Q    Somewhere near High Point?
 6  A    Yeah, near High Point.
 7  Q    Why did you go?
 8  A    Because Melvin needed a ride.
 9  Q    He didn't have a car?
10  A    No, sir.
11  Q    His truck was broken down, I believe?
12  A    Yes, sir.
13  Q    The incident that you described where Melvin cut out some
14  methamphetamine for himself there in Cleve's presence, how much
15  --
16  A    It was a half ounce.
17  Q    How many grams is that?
18  A    Fourteen grams.
19  Q    And do you know what Melvin did with that 14 grams?
20  A    As far as -- he said that he was going to sell it.
21  Q    Well, so he said that.  Do you know whether he sold any --
22  A    No, sir, I did not see him sell it.
23  Q    So he may have sold it all, as far as you know?
24  A    Yes, sir.
25  Q    But he owed my client money for the purchase of that
```

1  methamphetamine; is that correct?

2  A    When we left there, yes, sir, he owed him.

3  Q    Okay.  So the transactional relationship on this occasion

4  was just like you selling a half an ounce to Melvin; right?  You

5  sold him -- you sold Melvin on a few occasions some amount of

6  methamphetamine; correct?

7  A    Yes, sir.

8  Q    And on this occasion, you saw Cleve sell some amount of

9  methamphetamine, half an ounce, to Melvin; correct?

10  A    No, he did not.  He said he would front it to him.

11  Q    Well, he was expected to pay for it, wasn't he?

12  A    Yes, sir.

13  Q    Just like you expected Melvin to pay for the amount that he

14  got from you?

15  A    Yes, sir.  He paid me.

16  Q    So you told me and the jury that in your transaction with

17  Melvin when you just sold him some amount -- you didn't consider

18  that to be a partnership, did you?

19  A    No, sir.

20        **MR. GALYON:**  Well, objection as to what he thinks.

21        **MR. HARRISON:**  Well, it goes to the type of

22  transactions we are talking about here.

23        **THE COURT:**  Overruled.

24        **THE WITNESS:**  No, sir.

25

**BY MR. HARRISON**

1

2   Q    Okay.  And when they were sitting there in this incident

3   that you observed, was there any discussion between the two of

4   them about them joining in a common partnership purpose to sell

5   that methamphetamine that Melvin was getting?

6   A    He was supposed to sell the dope for Cleve to pay for it,

7   yeah.

8   Q    Well, was Cleve to -- how much did he sell it for?

9   A    I do not know.  I didn't see him sell it.

10  Q    Do you know how much Melvin was supposed to sell it for?

11  A    No, sir.

12  Q    So we don't know if Melvin was going to make a profit or

13  not, do we?

14  A    No, sir.

15  Q    And they didn't have any discussion about my client getting

16  a profit from Melvin's sales, was there?

17  A    No, sir.

18  Q    Well, let's -- let me direct your attention to

19  December 11th.  When you called the Mount Airy police, did you

20  tell them -- did you tell them that you needed to arrange this

21  sale because they were there to continue negotiations with the

22  unknown Mexican?

23  A    I called Officer Hodges and told him that Cleve was up ready

24  to purchase the pound of meth.

25  Q    Did he -- he told you where to go; right?

1  A     Yes, sir.

2  Q     But he didn't have -- there wasn't any meth; correct?

3  A     Not to my knowledge.

4  Q     So someone who was going to purchase the pound of meth -- if

5  they wanted to check out the quality of it, they wouldn't be able

6  to do that, would they?

7            **MR. GALYON:**  Objection.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  No, sir.

10 **BY MR. HARRISON**

11 Q     So what was going to happen was Cleve was going to -- as you

12 said, he wanted to put -- he wanted to put the -- he wanted to,

13 in essence, deal with this Mexican face to face because he wanted

14 to check out the quality of the methamphetamine; isn't that what

15 you told the jury?

16 A     It is.

17 Q     And so, obviously, he is not going to buy an empty bag

18 claiming somebody -- claiming it's methamphetamine; right?

19 A     No.

20 Q     So he had told you he was going to -- as a condition of

21 purchasing and possessing this methamphetamine, he wanted to see

22 it and check its quality; right?

23 A     Yes, sir.

24 Q     And more than that, he told you that he wanted to see if he

25 could get a lower price from the Mexican, didn't he?

```
 1  A     A lower price from the Mexican?

 2  Q     A lower price, pay less than 16,000?

 3  A     At that time?

 4  Q     Uh-huh.

 5  A     No, sir.

 6  Q     He told you that earlier, didn't he?

 7  A     He told me he wanted to put the money in the Mexican's hand

 8  and to try it out before any money switched hands.

 9  Q     Did they tell you that they were going to stop Cleve and --

10  A     No, sir.

11  Q     -- have some kind of confrontation with him prior to the

12  meeting with the imaginary Mexican?

13  A     No, sir.

14  Q     So you don't know what was going on when you saw the stop

15  take place?

16  A     To my knowledge, they was actually going to have a Mexican

17  waiting on me at Bottom Dollar when I left from my house.  That

18  was my understanding.

19  Q     Well, did you see a Mexican?

20  A     No, sir.

21  Q     Did you see my client get stopped?

22  A     Yes, sir.

23  Q     Did you see the police interacting with him?

24  A     Yes, sir.

25  Q     Did you have a conversation with the police afterwards about
```

1  that incident?

2  A    Yes, sir.

3  Q    Did they explain why they aborted this transaction?

4  A    No, sir.

5  Q    Did they plan on doing -- did either mister -- well, either

6  of your two connections, the detectives, did they -- were they

7  aware that this police officer was going to stop my client?

8  A    I guess.  I don't really know.  I was not informed that he

9  was going to be stopped.  Like I said, to my knowledge that we

10  was going to Bottom Dollar to meet a Mexican.

11  Q    So in all the negotiations and discussions of transferring

12  methamphetamine between you and my client from the time you first

13  met him until the time you last saw him in January, late January,

14  how much methamphetamine did he buy from you?

15  A    None.

16            **MR. HARRISON:**  That's all.

17            **THE COURT:**  Any redirect?

18            **MR. GALYON:**  Yes, sir.

19                    REDIRECT EXAMINATION

20  **BY MR. GALYON:**

21  Q    Mr. Harrison asked you questions about your relationship

22  with Melvin Johnson and providing him methamphetamine; is that

23  right?

24  A    Yes, sir.

25  Q    And he asked you about selling to Melvin Johnson?

1  A    Yes, sir.

2  Q    Selling methamphetamine.  When you sold methamphetamine to

3  Melvin Johnson, did he pay you when you gave him the

4  methamphetamine?

5  A    He did at that time, but it was months before -- it was like

6  a few months before I ever got in trouble myself.

7  Q    Let me make sure this is clear for the jury.  Before you

8  yourself were apprehended by law enforcement in July of 2007, you

9  had been selling methamphetamine to Melvin Johnson; is that

10  right?

11  A    I had on a couple of occasions, yes.

12  Q    On a couple of occasions.  On those couple occasions when

13  you sold methamphetamine to Melvin Johnson, did you get payment

14  at the time that you gave him the methamphetamine?

15  A    Yes, sir, he paid me then.

16  Q    You didn't front him?

17  A    No, sir.

18  Q    Okay.  Did you ever front people in the drug business?

19  A    No, sir.

20  Q    You always got paid when you delivered the drugs?

21  A    Yes, sir.

22  Q    How much were you selling an ounce of methamphetamine for in

23  July of 2007 before you got arrested?

24  A    I was selling it for around 16-, $1,800 an ounce.

25  Q    And did you ever "gram out" your meth?

```
 1  A    No, sir, I don't do that.

 2  Q    To your knowledge, did Melvin Johnson ever "gram out" his

 3  meth to sell it?

 4  A    Yes, sir.

 5  Q    Do you know what -- explain to the ladies and gentlemen of

 6  the jury what "gramming out" is.

 7  A    "Gramming out" is breaking it down from 28 grams, basically

 8  what an ounce is, to having single packs of 28 grams of

 9  methamphetamine in a single pack for one gram.  That's gramming

10  an ounce out.

11  Q    So that way you can make more money?

12  A    Yes, sir.  You make profit out of it.

13  Q    Because drugs are sold based on weight?

14  A    Yes, sir.

15          MR. GALYON:  I don't have anything else.

16          THE COURT:  All right.

17          MR. HARRISON:  Briefly, Your Honor.

18          THE COURT:  All right.  Briefly.

19                      RECROSS-EXAMINATION

20  BY MR. HARRISON

21  Q    Mr. Todd, if you had fronted drugs instead of gotten payment

22  immediately, what would that have changed?

23  A    That would have changed a whole lot because I sold my drugs.

24  I didn't have somebody else sell them for me.  That is the

25  difference.
```

1    Q    Well, would you have made any more or less?

2    A    I would have charged him more if I had fronted it to him,

3    yes, sir.

4    Q    Well, would you have demanded some kind of accounting from

5    that person?

6    A    Accounting?

7    Q    By that I mean, would you have to know how much he sold the

8    drugs for?

9    A    No, it was none of my business.

10   Q    Okay.  So it would just be you would get the money.  You

11   would you have to trust the guy to pay the money that you asked

12   him to give you?

13   A    Well, yes, sir.  I mean, it would be like him selling my

14   drugs for me.

15            **MR. HARRISON:**  That's all.

16            **THE COURT:**  All right.  You may step down.  You may

17   call your next witness.

18            **MR. GALYON:**  United States calls Lori Wilson.  Your

19   Honor, if we may approach?

20            **THE COURT:**  Yes.

21         (The following proceedings were had at the bench by the

22         Court and Counsel out of the hearing of the jury:)

23            **MR. GALYON:**  I just wanted it on the record now, not in

24   front of the jury, I am sequestering the witnesses so that there

25   is not any discussion between them and after.  So after each

1  witness, they will be put in a separate room so that there is not

2  any -- he can't -- Mr. Todd can't go back and --

3          THE COURT:  I know to my knowledge there has been no

4  formal invocation of the rule, but none of the witnesses have

5  been in the courtroom.

6          MR. HARRISON:  Because Randall and I, through previous

7  engagements, have had an understanding with regard to that.

8          THE COURT:  All right.

9      (Thereupon, the following proceedings continued within the

10      hearing of the jury:)

11  **LORI M. WILSON**, GOVERNMENT'S WITNESS, being first duly sworn,

12  testified as follows:

13                       DIRECT EXAMINATION

14  **BY MR. GALYON**

15  Q    If you would, state your name, please, ma'am.

16  A    Lori Michelle Wilson.

17  Q    And, Miss Wilson, is Robby Todd your boyfriend?

18  A    Yes, sir.

19  Q    Where are you from, ma'am?

20  A    Lowgap, North Carolina.

21  Q    What county is that in?

22  A    Surry County.

23  Q    How far did you go in school?

24  A    I have my bachelor's in accounting, and a year left to get

25  my master's.

```
1   Q    Where do you work?

2   A    I work for my father.

3   Q    And what kind of business is that?

4   A    It is junk recycling business.

5   Q    Where does your boyfriend, Robby Todd, work?

6   A    He works for Aspen Tree Company.

7   Q    What do they do?

8   A    They trim trees around the power lines.

9   Q    In the fall of last year, did you work as an informant for

10  the Mount Airy Police Department?

11  A    Yes, sir.

12  Q    In July of last year, tell the ladies and gentlemen of the

13  jury what happened regarding your contact with law enforcement.

14  A    An ounce of methamphetamine was found in my vehicle.

15  Q    And that ounce of methamphetamine was methamphetamine that

16  your boyfriend, Robby Todd, had gotten; is that correct?

17  A    Yes, sir.

18  Q    Were you using methamphetamine at that time?

19  A    Yes, sir.

20  Q    How long had you been using methamphetamine prior to that?

21  A    I would say about two years.

22  Q    And how were you using the methamphetamine?  Did you smoke

23  it?  Did you snort it?  How did you use it?

24  A    Smoked it.

25  Q    Was the methamphetamine in a powder form then?
```

Case 1:08-cr-00233-TDS   Document 32   Filed 06/22/09   Page 87 of 205

1  A    Yes, and sometimes in chunks.

2  Q    And were you being supplied the methamphetamine by your

3  boyfriend, Robby Todd?

4  A    Yes, sir.

5  Q    He was also selling methamphetamine?

6  A    Yes, sir.

7  Q    And after you and Mr. Todd were apprehended by law

8  enforcement in July, did you agree to work for law enforcement so

9  that you wouldn't be charged?

10  A    We agreed to cooperate with law enforcement and everything

11  that we done would be considered.

12  Q    Were you promised anything?

13  A    No, sir.

14  Q    And as part of the cooperation, did you ever go with your

15  boyfriend, Mr. Todd, to a camper and meet with a man named Melvin

16  Johnson?

17  A    Yes, sir.

18  Q    What did that person go by?  What did Melvin Johnson go by?

19  A    Wizard.

20  Q    And during the course of going and talking with Melvin

21  Johnson, did you become familiar with what his phone number was?

22  A    Yes, sir.

23  Q    What is his phone number?

24  A    (336)710-1989.

25  Q    And what was the phone number that you all were using to

1  contact Melvin Johnson?

2  A    (336)401-0537.

3  Q    At some point in November of 2007, did you and your

4  boyfriend, Robby Todd, pick up Melvin Johnson and take him down

5  to a residence near High Point, North Carolina?

6  A    Yes, sir.

7  Q    And tell the ladies and gentlemen of the jury about what

8  happened when you got to that cabin or residence.

9  A    We went in and Melvin's cousin Cleve brought out some

10  methamphetamines, and it was weighed; and Melvin then took it

11  with us, and we took him back home.

12  Q    You say that this defendant brought out some

13  methamphetamine?

14  A    Yes, sir.

15  Q    What was it in or on?

16  A    It was on a plate originally, and then was put in a Ziplock

17  bag.

18  Q    Do you know who put it in the Ziplock bag?

19  A    I can't be 100 percent sure, no.

20  Q    Where was all of that done within the residence?

21  A    It was done at the kitchen table.

22  Q    Do you know whether or not the methamphetamine was weighed?

23  A    Yes, sir.

24  Q    Do you know how much it was?  How much it weighed?

25  A    No, I never seen the reading on the scales.  That was across

1  the table from me.

2  Q     How was it packaged?

3  A     (Indicating) It was in a Ziplock baggy.

4  Q     And you've made -- you said like a -- sort of made a motion

5  with your hands.  Like a typical sandwich bag or something

6  smaller?

7  A     It was like a miniature sandwich bag.

8  Q     Like a miniature sandwich bag?

9  A     Uh-huh.

10 Q     And did you see any money exchanged between Melvin Johnson

11 and Cleve Johnson?

12 A     I did not see any, no.

13 Q     Did Melvin Johnson tell you that he had paid this defendant

14 for the methamphetamine?

15 A     The original reason for taking Melvin to High Point was in

16 order to pay Cleve money and, in return, get some dope.

17 Q     After that occasion, did you on December 4th of 2007 go with

18 your boyfriend, Robby Todd, to Melvin Johnson's camper?

19 A     Yes, sir.

20 Q     And what happened on that occasion?

21 A     We were at the camper, and the anhydrous tanks were

22 discussed, pills were discussed, and the dollar amount that would

23 be paid for the pound.

24 Q     When you say "the dollar amount that would be paid for the

25 pound," what are you referring to?

1  A     $16,000.

2  Q     And a pound of what?

3  A     Methamphetamines.

4  Q     And after that occasion, did you three days later, on the

5  7th of December, go back over to that camper and talk with Melvin

6  Johnson with your boyfriend?

7  A     Yes, sir.

8  Q     On each of these occasions -- December 4, December 7 -- did

9  you get searched by law enforcement before and after you went?

10 A     Yes, sir.

11 Q     To your knowledge, was Mr. Todd wearing a recording device

12 on those occasions?

13 A     Yes, sir.

14 Q     And as to the December 7th meeting with Melvin Johnson,

15 what, if anything, do you recall about that meeting?

16 A     My boyfriend, Robby Todd, went in and asked -- you know,

17 inquired about what Cuz wanted, and Melvin specifically said he

18 was wanting a damn pound, I think.  And after that, he went to,

19 you know, confirm what he had told Robby and called Cleve.

20 Q     And were you present when that call was made?

21 A     Yes, sir.

22 Q     And after the phone call was had between Melvin Johnson and

23 this defendant, did Melvin Johnson recite to you what had been

24 discussed?

25 A     Yes, sir.

```
 1  Q    And what did he say they had talked about?
 2  A    He asked him, you know, what did he want.  Actually, he
 3  said, you know, did he want the tanks or the methamphetamines.
 4  Then he -- evidently, Cleve had asked him, you know, about the
 5  money because he was telling him, you know, he had had about half
 6  of his money, but he didn't have all of it.  That wasn't
 7  something he could control, that when someone called that wanted
 8  the methamphetamines, he could get the rest of his money.
 9  Q    Did Melvin Johnson tell you about methamphetamines that he
10  had sold -- or methamphetamine that he had sold to that point,
11  that is, the night before he had actually sold --
12  A    Yes, sir.
13  Q    -- what he referred to as a large quantity?
14  A    Yes, sir.  And a small quantity to another person.
15  Q    But was there some discussion about this defendant, Cleve
16  Johnson, not coming up to Surry County until that money was paid,
17  that is --
18           MR. HARRISON:  Object to the leading, Your Honor.
19           THE COURT:  Sustained.
20  BY MR. GALYON
21  Q    Was there some discussion about the defendant not wanting to
22  make two trips?
23  A    Yes, sir.
24  Q    What was that about?
25  A    Cleve said that he did not want to come up until Melvin had
```

1  all of his money because he did not want to make more than one

2  trip to pick up the pound for 16,000 and then to pick up the rest

3  of his money.  He wanted to do it all at one time.

4  Q    Several days later, on December 11th, did this defendant and

5  Melvin Johnson come to your house?

6  A    Yes, sir.

7  Q    Were you expecting them on that occasion?

8  A    No, sir.

9  Q    Did Melvin Johnson get in contact with your boyfriend, Robby

10 Todd, on that morning?

11 A    Yes, sir.

12 Q    Tell the ladies and gentlemen of the jury what happened.

13 A    He talked to my boyfriend and said that they had been riding

14 around up where we lived looking for our house and couldn't find

15 it.  They had to leave Lowgap because they had no cell phone

16 service and were at Brintle's Truck Stop, going to eat breakfast,

17 and wanted to come back to our house.

18 Q    Where is Brintle's Truck Stop?

19 A    It is in Mount Airy, North Carolina.

20 Q    And how far is you live in Lowgap from Mount Airy?

21 A    I would say seven to ten miles.

22 Q    So after that phone conversation, did this defendant and

23 Melvin Johnson actually show up at your house?

24 A    Yes, sir.

25 Q    Were you concerned about that?

 1  A    I was very nervous, yes.

 2  Q    Why?

 3  A    Because they were unexpected.  They had -- you know, we had

 4  just heard just a few minutes that they were on their way coming

 5  to our house and wanting to get a pound of methamphetamines.

 6  Q    And did you have any contact with law enforcement that

 7  morning while they were -- while this defendant and Melvin

 8  Johnson were at your residence?

 9  A    Myself, no, I did not.

10  Q    To your knowledge, did Robby Todd call law enforcement?

11  A    Yes, sir.

12  Q    And tell the ladies and gentlemen of the jury what happened

13  once this defendant and his cousin arrived at your residence at

14  on December 11, 2007.

15  A    We were told by law enforcement to try to stall them, to,

16  you know -- so he would have more time to get his team together,

17  and we were supposed to arrange a meeting in Mount Airy, North

18  Carolina, in order for him to meet a Mexican to purchase the

19  pound of methamphetamine.

20  Q    Was there any discussion about the price for the

21  methamphetamine that morning?

22  A    I can't recall exactly if it was discussed or not.

23  Q    What, if anything, did the defendant say during the time

24  that he was at your residence?

25  A    I don't recall him saying very much of anything.

 1  Q    When you went outside to go to Mount Airy, who drove?

 2  A    Robby drove our vehicle, and Cleve drove his vehicle.

 3  Q    And who rode with who?

 4  A    Me and Robby rode together in our vehicle, and Melvin and

 5  Cleve rode together in his.

 6  Q    And did you at any point see any money?

 7  A    No, sir, I did not.

 8  Q    After that -- well, first of all, on the way to Mount Airy,

 9  where was it that you were supposed to meet?

10  A    We were supposed to meet Cleve and Melvin at Hardee's across

11  from the Bottom Dollar, get in one vehicle, and then go to the

12  Bottom Dollar to meet the Mexican.

13  Q    Where is the Bottom Dollar in relation to Hardee's?

14  A    Just across the street.

15  Q    And did they -- that is, this defendant and Melvin Johnson,

16  did they follow you into Mount Airy?

17  A    Yes, sir.

18  Q    What vehicle was this defendant driving?

19  A    A black Acura.

20  Q    And when you got into Mount Airy, what happened?

21  A    As we approached Hardee's -- we were less than a mile from

22  Hardee's.  There is a Mount Airy police car on the right-hand

23  side of the road; and as we went by, didn't think anything was

24  wrong.  Still continued to turn into the Hardee's.  When we

25  pulled in, as Cleve was driving to pull in, the officer flipped

1  the blue lights on Cleve.

2  Q    What did you do?

3  A    We sit in the Hardee's parking lot for a minute or two and

4  then pulled off and went ahead and pulled across the street to

5  the Bottom Dollar parking lot.

6  Q    Later that day, did you and Mr. Todd go and talk to Melvin

7  Johnson?

8  A    Yes, sir.

9  Q    And during that conversation, was Mr. Todd wearing a

10 recording device?

11 A    No, sir.

12     (Assistant U.S. Attorney showed Defendant's Counsel

13     exhibit.)

14         **MR. GALYON:**  If I may approach?

15         **THE COURT:**  Yes.

16 **BY MR. GALYON**

17 Q    (Hands Witness exhibit) I am going to show you a transcript

18 of a recording from December 11th of 2007 and ask if that

19 refreshes your memory about whether or not there was, in fact, a

20 recording device that Mr. Todd wore on that occasion when you met

21 with Melvin Johnson?  Does that refresh your memory?

22 A    Yes.

23 Q    So was there, in fact, a recording device being worn by

24 Mr. Todd?

25 A    Yes, sir, there was.

1  Q    Okay.  And on December 11th of 2007, was there any

2  discussion from Melvin about -- or did you get confronted or

3  Robby Todd get confronted by Melvin Johnson about you all being

4  informants in the case?

5  A    No, sir.  That was never a question at any time.

6  Q    And after that time, did you and Mr. Todd have contact with

7  Melvin Johnson on January 7th of this year?

8  A    Yes, sir.

9  Q    What happened on January 7th of this year?

10  A    January 7th the recorder was not actually working.  We

11  didn't know that at the time, but we was supposed to pick Melvin

12  up.  He was short on his debt on what he owed Cleve.  So it was

13  provided to us -- that money was provided to us in order to meet

14  Cleve.  We met at -- I am not exactly sure whose house it was.

15  Melvin got out of the vehicle and went into the house.  I would

16  say at least 30 minutes later Cleve and Melvin exited the house

17  and got into Cleve's vehicle where they sat for another few

18  minutes, pulled up beside of us, and told us to follow them to a

19  convenience store.

20  Q    And how much money was it that was provided to Mr. Todd to

21  pay Melvin Johnson?

22  A    $600.

23  Q    And on that occasion, did you actually see Mr. Todd give the

24  money to Melvin Johnson?

25  A    Yes, sir.

1  Q    And after that time, you and Mr. Todd and Mr. Johnson rode

2  down from Surry County to somewhere where outside of High Point

3  or in High Point.  Do you know where it was?

4  A    Kernersville.

5  Q    Okay.  And where did you go in Kernersville?

6  A    It was a friend of Melvin's.

7  Q    And after you went to Kernersville, did you then go and meet

8  with Cleve Johnson?

9  A    Yes, sir.

10 Q    Where was that?

11 A    That's -- I am not -- it was in High Point.  I am not sure

12 whose home it was.

13 Q    Somebody's residence in High Point?

14 A    Yes, sir.

15 Q    And during that time, that's where Melvin Johnson met with

16 Cleve Johnson; is that correct?

17 A    Yes, sir.

18 Q    And then thereafter, where did you and Robby Todd go in your

19 vehicle?

20 A    We followed Cleve and Melvin to a Hess station a couple of

21 miles down the road.

22 Q    And during the time that you were at the Hess station, did

23 you have any conversation with this defendant?

24 A    Yes, sir.

25 Q    Was there any discussion about the $16,000 that had been

1  seized?

2  A    Yes, sir.

3  Q    And did you hear at some point this defendant give his

4  telephone number to Robby Todd?

5  A    Yes, sir.

6  Q    After that time, did you have any other conversation -- or

7  any conversation with Cleve Johnson?

8  A    No, sir.

9  Q    Did you go with Mr. Todd on January 23rd down to Greensboro?

10 A    Yes, sir.

11 Q    And that was when Robby Todd and the undercover were to meet

12 with Cleve Johnson; is that right?

13 A    Yes, sir.

14 Q    Did you actually ride with them over to the Home Depot?

15 A    No, sir.  I rode with the two Mount Airy detectives to the

16 Home Depot.

17 Q    So you don't know what, if anything, was said by Cleve

18 Johnson on that occasion?

19 A    No, sir, I did not hear anything.

20         **THE COURT:**  Is this a good time to stop, Mr. Galyon?

21         **MR. GALYON:**  Certainly, Your Honor.

22         **THE COURT:**  We are going to take our lunch break at

23 this time.  If you would, please pass the copies of the redacted

24 transcript, Exhibit 2A, back to the end of the bar.  Please put

25 your notes and pencils back in your envelopes.  You may leave

 1  your envelopes in the chair closed, and Miss Solomon will ensure

 2  their safekeeping during lunch.

 3      I am going to now dismiss you for lunch.  I am going to give

 4  you my standard admonition; that is, don't talk about the case.

 5  Don't form any opinion about the case.  Do not make any effort to

 6  investigate the case, and also do not speak with anyone involved

 7  in the case in any manner.  Remember that and all my other

 8  cautionary instructions in my standard admonition.

 9      I am going to excuse you now and ask you to be back at 1:30

10  up on the fourth floor, and we'll call for you just as soon after

11  that that we are ready to proceed.  All right.  You are now

12  excused for lunch.

13      (The jury departed the courtroom at 12:31 p.m.)

14      **THE COURT:**  You may step down, ma'am.  Anything counsel

15  wants to bring to the Court's attention before lunch?

16      **MR. GALYON:**  No, Your Honor.

17      **MR. HARRISON:**  No, sir.

18      **THE COURT:**  All right.  Mr. Galyon, do you have any

19  idea -- any estimate of what the timing looks like in terms of

20  the Government's case?

21      **MR. GALYON:**  Your Honor, I have probably four or five

22  more witnesses.  I'm sure that it will take the rest of the

23  afternoon.  It may go into tomorrow morning.  I guess that's

24  going to depend, too, on the issue of the California information.

25  The four or five witnesses that I have are law enforcement

 1  related to the North Carolina portion.  That's why I say I think

 2  we are going to have a little bit longer because I'll have the

 3  officer -- there is the in-car video information from

 4  December 11th.  There is the undercover meeting from

 5  January 23rd, and both of those have videotapes with them.  It

 6  will take a little while.

 7          **THE COURT:**  Are they going to be shown on this screen?

 8          **MR. GALYON:**  They will be.  I can hook up, yes, sir.

 9          **THE COURT:**  As long as you know how to run it.

10          **MR. GALYON:**  Yes, sir.

11          **THE COURT:**  So there is no danger of having to instruct

12  the jury this afternoon?

13          **MR. GALYON:**  Your Honor, I don't believe so.

14          **THE COURT:**  You've got closing arguments -- even if we

15  were to do that and there were no evidence, we've got closing

16  arguments.  I am thinking in terms of the final instructions.

17          **MR. GALYON:**  Right, I understand.  I certainly

18  understand.  I guess the other issue -- and maybe it is still

19  somewhat premature for the Court to decide on that issue of the

20  question of the concealment and the statement because that may

21  help me.

22      I have one of the officers here from California already and

23  so I can certainly put him on.

24          **THE COURT:**  Okay.  If I can give you any guidance on

25  that before we start at 2:00, I'll try to do that.

1          MR. GALYON:  Certainly.  Your Honor, just so that the

2    Court is aware, Special Agent Denney informs me that Miss Wilson

3    just informed him that she knew one of the jurors.  They went to

4    high school together apparently.

5          So I just bring that to the Court's attention.  I don't know

6    if the Court wants to ask the juror about that or if she does, in

7    fact, remember her from high school or whatever.

8          THE COURT:  She claimed to know her well?

9          MR. GALYON:  Just that they went to high school

10   together.  That's the information.

11         THE COURT:  Okay.  I may inquire of the juror when we

12   come back -- not of juror, of the witness -- when we come back as

13   to the nature of the relationship.  I'm loathe to make any

14   inquiry of the jurors at this point without any evidence from

15   Miss Wilson, if she thinks for any reason that they are in any

16   way other than acquaintances.  I am not sure there is any issue.

17         MR. GALYON:  Your Honor, it was actually Juror Number

18   5.  She knew her by maiden name, Melinda Hawks.  It is Melinda

19   Stevens.

20         THE COURT:  Mr. Harrison, do you have any

21   recommendation in that regard?

22         MR. HARRISON:  No.  I think the matter is in the

23   Court's discretion.

24         THE COURT:  As I said, I would be loathe to make any

25   inquiry of the jurors.  I propose that I simply ask the witness

 1  before we start, out of the presence of the jury, what the

 2  relationship is.  We'll just take it from there.

 3      Can we come back in an hour?  Can we come back at quarter to

 4  2:00, or 1:45?  Is that a problem for anybody?

 5          **MR. HARRISON:**  No, sir.

 6          **THE COURT:**  If we are ready to go then and all the

 7  jurors are upstairs, we may start at 1:45.  My guess is I may

 8  have a few issues that I need to talk to you about at that point.

 9      (The Court recessed at 12:36 p.m.)

10      (The Court was called back to order at 1:52 p.m.)

11      (The Defendant was present.)

12          **THE COURT:**  All right.  One matter I do want to make

13  sure I take up is asking the witness about whether she knows the

14  juror.

15      The issue of the concealment, at what time did you think you

16  need to know about that, Mr. Galyon?  As I said, it is informed

17  in part on the evidence that's coming in.  Is this something that

18  we can resolve at the 3:30 break, or do you need to know before

19  then?

20          **MR. GALYON:**  That's fine, Your Honor.

21          **THE COURT:**  If you will remind me at the 3:30 break,

22  we'll try to resolve it, if we can.

23      Anything from counsel before we bring the witness in?

24          **MR. HARRISON:**  No, Your Honor.

25          **THE COURT:**  Why don't we bring her back in.

1        (The Witness returned to the witness stand.)

2              **THE COURT:**  Miss Wilson --

3              **THE WITNESS:**  Yes, sir.

4              **THE COURT:**  -- I have just a couple of questions.  I

5    understand that you may know one of the jurors; is that right,

6    ma'am?

7              **THE WITNESS:**  Yes, sir.

8              **THE COURT:**  Which juror is that?

9              **THE WITNESS:**  Her name is Melinda.

10             **THE COURT:**  Do you know which juror she is?

11             **THE WITNESS:**  She was sitting on the first row.  She

12   was either the third or fourth.

13             **THE COURT:**  How many down from this first seat here in

14   front of you there?  That's Juror Number 1 in the first seat.

15             **THE WITNESS:**  Either the fifth or sixth.  I am thinking

16   it was the fifth.

17             **THE COURT:**  How do you know this person?

18             **THE WITNESS:**  I went to elementary school and grew up

19   with her.

20             **THE COURT:**  When is the last time you've seen her or

21   spoken to her?

22             **THE WITNESS:**  I hadn't seen her in years until just

23   probably a couple of weeks ago.  I just seen her at the store.

24             **THE COURT:**  Did you speak to her then?

25             **THE WITNESS:**  Just hi, how are you.

1          THE COURT:  All right.  Before that, how long had you

2    it been since you had known her -- or, I'm sorry, since you had

3    seen her?

4          THE WITNESS:  Years.

5          THE COURT:  Like what is your best estimate?

6          THE WITNESS:  I would say five or six.

7          THE COURT:  All right.  How would you describe your

8    relationship with her at this point in time?

9          THE WITNESS:  I know her when I see her.  Just no more

10   than, hi, how are you doing.

11         THE COURT:  Have you ever worked with her?

12         THE WITNESS:  No.

13         THE COURT:  Have you ever socialized with her in the

14   last ten years?

15         THE WITNESS:  No.

16         THE COURT:  Other than meeting her in the store the one

17   time you ran into her, have you talked with her at all the last

18   ten years that you recall?

19         THE WITNESS:  No.

20         THE COURT:  Any questions from counsel?

21         MR. GALYON:  No, Your Honor.

22         THE COURT:  Thank you very much.  I appreciate you

23   bringing that to my attention.  You may stay there because we are

24   at this point going to bring the jury back in.

25      (The jury returned to the courtroom at 1:58 p.m.)

 1          **THE COURT:**  Welcome back, ladies and gentlemen.

 2   Mr. Galyon, you may proceed.

 3          **MR. GALYON:**  Thank you, Your Honor.

 4   **BY MR. GALYON**

 5   Q    Miss Wilson, we were talking about January 23 of 2007 (sic)

 6   and how you were with the law enforcement officers from Mount

 7   Airy in Greensboro; is that right?

 8   A    Yes, sir.

 9   Q    Did you have any contact then with this defendant, Cleve

10   Johnson?

11   A    No.

12   Q    Was Melvin Johnson present on that occasion?

13   A    No.

14   Q    And after January 23 of 2007 (sic), did you have any contact

15   with Cleve Johnson?

16   A    I did not, no.

17   Q    Okay.  In any of -- did you accompany Robby Todd when he

18   would go to the Mount Airy Police Department to make telephone

19   calls, for instance?

20   A    Yes, sir.

21   Q    You all did that in the presence of law enforcement?

22   A    Yes, sir.

23   Q    And were phone calls made -- were phone calls made in

24   December of 2007?

25   A    Yes.

1   Q    Were phone calls made in January of 2008?

2   A    Yes.

3   Q    Were phone calls made, to your knowledge, in February or

4   March of 2008?

5   A    Yes.

6   Q    And would Robby Todd be the one that actually made the

7   telephone calls?

8   A    Yes, sir.

9   Q    Either to Melvin Johnson or this defendant?

10  A    Yes, sir.

11  Q    So you didn't actually talk on any of those phone

12  conversations?

13  A    No, sir.

14  Q    All right.  And as to January 23, were you actually present

15  in the parking lot and saw what was going on; or did you stay

16  with the Mount Airy police detectives somewhere else?

17  A    I was with the Mount Airy police detectives in the Home

18  Depot parking lot, but we could not see the UC or the defendant,

19  either one.

20  Q    Okay.  Do you recognize the person that you saw there at the

21  cabin back in November that had the methamphetamine that was

22  provided to Melvin Johnson in the courtroom?

23  A    Yes.

24  Q    Point that person out.

25  A    (Indicating.)

1   Q    And what does he have on?  What is he wearing?

2   A    A blue plaid, buttoned-up shirt.

3   Q    Was he also the same person that was at your residence there

4   on December 11th of last year?

5   A    Yes, sir.

6        (Assistant U.S. Attorney showed Defendant's Counsel

7        exhibit.)

8        (Government's Exhibit No. 6 was marked for identification.)

9   Q    (Hands Witness exhibit) Miss Wilson, I am going to show you

10  Government's 3 for identification and ask if you recognize what

11  that is?

12  A    Yes, sir, that's Cleve Johnson.

13  Q    That's a photograph from December of last year?

14  A    Yes, sir.

15  Q    (Hands Witness exhibit) Showing you Government's 4, ask if

16  you recognize what that is?

17  A    Yes, sir, that's Melvin Johnson.

18  Q    Was that from December of last year as well?

19  A    Yes, sir.

20  Q    (Hands Witness exhibit) Showing you Government's 6 for

21  identification, and you had mentioned the Number 442-7144.  Whose

22  number is that?

23  A    That's Cleve Johnson's number.

24  Q    And Government's 6, are those phone records for

25  December 13th of last year to January 30th of this year?

1  A    Yes, sir.

2         **MR. GALYON:**  I am going to ask that what's been marked

3  as Government's 6 be admitted, Your Honor.

4         **MR. HARRISON:**  No objection.

5         **THE COURT:**  Admitted without objection.

6     (Government's Exhibit No. 6 was received into evidence.)

7  **BY MR. GALYON**

8  Q    Back on December 7th of 2007 -- was there a discussion on

9  December 7 of 2007 where Melvin Johnson was relaying to you and

10  Robby Todd about the amounts that he had sold on prior

11  occasion -- he, Melvin Johnson, had sold previous?

12  A    He just said a large amount and then a small amount.

13  Q    And was that in relation to how -- that he needed to get

14  money in order to pay back Cleve Johnson?

15  A    Yes, sir.

16  Q    Did Melvin Johnson tell you what kind of business Cleve

17  Johnson was in?

18  A    Yes, sir.

19  Q    What kind of business?

20  A    He owned his own trucking company.

21  Q    And the type of vehicle that was there at your residence on

22  December 11th of 2007, what type of car was that?

23  A    He was in a black Acura.

24  Q    Okay.  Was he driving or was he a passenger in that vehicle?

25  A    He was driving when we left.  I am not sure who was driving

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER      (336) 254-7464

1  when they got there.

2              **MR. GALYON:**  I don't have anything else, Your Honor.

3              **THE COURT:**  Mr. Harrison, cross-examination?

4              **MR. HARRISON:**  Thank you, Your Honor.

5                           CROSS-EXAMINATION

6  **BY MR. HARRISON**

7  Q    Miss Wilson, how did you come to begin working undercover

8  with the Mount Airy Police Department?

9  A    An ounce of methamphetamines was found in my vehicle.

10 Q    When was that?

11 A    It was in July of 2007.

12 Q    And was it communicated to you by members of the Mount Airy

13 Police Department that it would be helpful to you to cooperate

14 with them in an effort to get information about drug deals?

15 A    It was communicated to us that any cooperation would be

16 explained.

17 Q    At what time?  Explained at what time?

18 A    When we were finished -- when we were finished cooperating,

19 when they said they didn't need us anymore.

20 Q    I mean, it would -- you said it "would be explained."  Do

21 you mean some person would -- they would tell some person that

22 you had been cooperating in the fashion that you had been doing?

23 A    They said it would be taken into consideration.  I'm sorry

24 if I misspoke and said "explained" but --

25 Q    Well, taken into consideration --

1  A    They never said it would be explained to this person or

2  anybody else that would be involved.  They said it would be taken

3  into consideration, any cooperation that we gave.

4  Q    So it could be -- did you understand it to be taken into

5  consideration by the police department?

6  A    Yes, sir.

7  Q    Okay.  So you were initially arrested, you and Robby;

8  correct?

9  A    Yes.

10  Q    But you weren't charged with anything?

11  A    Not at that time, no.

12  Q    Well, have you been charged with something?

13  A    No.

14  Q    And I believe that you both were told not to indulge in any

15  kind of smoking or use of methamphetamine or anything else for

16  that matter; is that correct?

17  A    Yes.

18  Q    Did you abide by that?

19  A    Not on occasion, no.

20  Q    So on some occasions you, in fact, did smoke?

21  A    One occasion.

22  Q    One occasion.  And you say you haven't been charged with any

23  crime to this point as we are sitting here in court?

24  A    To this point, no.

25  Q    And are you still cooperating with the state people?

1  A    Mount Airy Police Department?

2  Q    Uh-huh.

3  A    Yes.

4  Q    How long -- do you have any idea how long you are going to

5  be doing that?

6  A    No.

7  Q    So you are doing it indefinitely; correct?

8  A    Like I said before, until Mount Airy Police Department says

9  that we are finished.

10 Q    So it's now been, well, approximately a year and a half

11 since you began your cooperation; is that correct?

12 A    Yes.

13 Q    And you haven't been charged with anything else?

14 A    Not to this point, no.

15 Q    You don't really expect to be charged with anything, do you?

16 A    Honestly, I am not sure what to expect.

17          **MR. HARRISON:**  That's all.

18          **MR. GALYON:**  Just briefly.

19                  REDIRECT EXAMINATION

20 **BY MR. GALYON**

21 Q    The smoked on one occasion -- you mentioned that you smoked

22 methamphetamine on one occasion?

23 A    Yes, sir.

24 Q    Was that at this defendant's residence?

25 A    Yes, sir.

1  Q    On that occasion in November?

2  A    Yes, sir.

3  Q    In addition, to clarify something, January 7th of this year,

4  you all picked up Melvin Johnson --

5           **MR. HARRISON:**  Object to the leading.

6           **THE COURT:**  Sustained.

7  **BY MR. GALYON**

8  Q    January 7th of this year -- where did you go on January 7th?

9  A    After we left the police department?

10 Q    Yes.

11 A    Kernersville, North Carolina.

12 Q    And was Melvin Johnson with you at that time?

13 A    No.  That's where we picked him up.

14 Q    You picked Melvin up in Kernersville?

15 A    Yes, sir.

16 Q    And when was Melvin Johnson given the $600 to pay Cleve

17 Johnson?

18 A    When we got -- we all three got into the vehicle in

19 Kernersville to go to High Point.

20          **MR. GALYON:**  I don't have anything else.

21          **THE COURT:**  Any recross on that?

22          **MR. HARRISON:**  No, thank you, Your Honor.

23          **THE COURT:**  You may step down.  Call your next witness.

24          **MR. GALYON:**  The United States calls Jonathan Watson.

25 **JONATHAN WATSON,** GOVERNMENT'S WITNESS, being first duly sworn,

1  testified as follows:

2                    DIRECT EXAMINATION

3  **BY MR. GALYON**

4  Q    If you would, state your name, please.

5  A    Officer Jonathan Watson.

6  Q    And how are you employed?

7  A    I work for the Mount Airy -- City of Mount Airy Police

8  Department.

9  Q    How long have you been with the City of Mount Airy Police

10  Department?

11  A    Approximately three and a half years.

12  Q    And what are your duties as a police officer?

13  A    I work just on the patrol division.  I've also, for

14  approximately two years, been a K-9 handler for the police

15  department.

16  Q    And do you work in a marked patrol unit?

17  A    Yes, sir, I do.

18  Q    Do you wear a uniform like you have on today?

19  A    Yes, sir, I do.

20  Q    And as part of your responsibilities, do you conduct traffic

21  stops there in Mount Airy?

22  A    Yes, sir, I do.

23  Q    I am going to turn your attention to December 11th of last

24  year.  Did you have contact with detectives with the Mount Airy

25  Police Department on that occasion on that morning?

1   A    Yes, sir, I did.

2   Q    What shift were you working that day?

3   A    I had just come in on our day shift, which starts at 6:00 in

4   the morning.

5   Q    And when does that shift end?

6   A    It goes from 6:00 a.m. to 6:00 p.m. in the evening, 12-hour

7   shift.

8   Q    On that occasion did you have an opportunity to speak with

9   one of the detectives about a vehicle that was going to be coming

10  into Mount Airy?

11  A    Yes, sir, I did.

12  Q    What information did you receive regarding a vehicle that

13  was going to be coming in?

14  A    Initially, I was advised by Detective Hodges that a black

15  passenger car, possibly occupied by two to three white males,

16  would be traveling east on North Carolina Highway 89 into the

17  Mount Airy city limits.  They advised that the vehicle should be

18  coming into the city limits at approximately 9:00 to 9:15 in the

19  morning.

20  Q    And as a result of that information, did you also get

21  information about whether the vehicle had insurance on it?

22  A    Yes, sir.  From my understanding, they had gathered the tag

23  number, or the registration plate number, of the vehicle through

24  a confidential informant.  Detective Hodges ran that tag number

25  through our communications.  They advised the vehicle did have an

1  insurance stop, a pickup order on the tag, and also the tag had

2  been revoked.

3  Q    As a result of that, were you directed to make a stop of the

4  vehicle?

5  A    Yes, sir, I was.

6  Q    Were you told whether or not there was to be cash inside the

7  vehicle?

8  A    Yes.  Well, initially, they told me just to be looking for

9  the vehicle coming into the city limits.  They later advised just

10  prior to 9:00 that morning that there was -- should not be a

11  weapon in the vehicle, couldn't confirm that, and approximately

12  $20,000 in cash.

13  Q    As a result of that information, did you, in fact, set up on

14  one of the streets there in Mount Airy?

15  A    Yes, sir.  I set up in front of one our local businesses,

16  Mount Airy Tractor Company, off the right-hand shoulder of the

17  roadway running rear radar; observed the black passenger car

18  traveling in the right-hand lane of travel closest to me.  They

19  also advised me it would be followed by a white in color SUV.

20  Q    At some point after 9:00, did you, in fact, see a white in

21  color SUV and then the black passenger vehicle?

22  A    Yes, sir, I believe it was approximately 9:15 in the

23  morning.

24  Q    What did you do once you saw that?

25  A    At that point, I cleared -- made sure the traffic was

1  cleared for me to pull out into the roadway.  I pulled out into

2  the right-hand lane of travel.  There was one vehicle to the best

3  of my knowledge that was behind the black passenger car.  I

4  pulled over into the left-hand lane of travel to, you know,

5  approach and get over behind the suspect vehicle, or target

6  vehicle.

7  Q    And then what happened?

8  A    Prior to reaching the intersection of North Carolina Highway

9  89 and Franklin Road, the -- I was unaware really of the white

10  SUV.  I was keeping my eye on the target vehicle.  The target

11  vehicle put its right turn signal on to pull into the parking lot

12  of Hardee's restaurant.  It was under my understanding that the

13  vehicle was trying to evade me due to I was in the left-hand lane

14  of travel.

15  Q    Did you, in fact, pull into the Hardee's parking lot?

16  A    Yes, sir.  The vehicle that had been traveling behind the

17  suspect vehicle, the best I can remember, pulled off or turned on

18  to -- I'm sorry -- turned on to Franklin Road, South Franklin

19  Road, giving me an opening to pull into behind the target

20  vehicle.

21  Q    And once you were able to do so, what did you do?

22  A    Upon observing the fact that the target vehicle was going to

23  pull into the Hardee's parking lot, I went ahead and initiated

24  all of my emergency equipment.

25  Q    And after you initiated the blue lights, what did you do?

1  A    The target vehicle pulled into the rear portion of the

2  Hardee's parking lot.  It was occupied by two white males, one of

3  them appeared to have a ponytail with a hat on.

4  Q    Was that the passenger or the driver?

5  A    That was the passenger.  He pulled into the rear portion of

6  the parking lot.  I continued and radioed my dispatch, calling in

7  the traffic stop.

8  Q    And did you at some point approach the vehicle?

9  A    Yes, sir.  Upon finishing the radio traffic, I did exit my

10  patrol vehicle.  I walked up.  I approached the vehicle on the

11  driver's side, where the driver had previously already rolled the

12  window down.

13  Q    And what conversation, if any, did you have with the driver?

14  A    I immediately asked him for his license and registration.

15  Upon walking up to the vehicle, did notice both the passenger and

16  driver appeared to be moving around more than normal inside the

17  vehicle, which arose my suspicions.

18  Q    Did you notice whether or not the inspection sticker was on

19  the vehicle?

20  A    There was no inspection in place on the vehicle.

21  Q    And did -- who was, in fact, the driver of the vehicle?

22  A    Mr. Johnson, who is sitting before us today.

23  Q    When you say "who is sitting before us today," what does he

24  have on?

25  A    A blue plaid shirt.

1  Q     And what happened between you and Mr. Johnson concerning

2  that vehicle stop?

3  A     Initially, upon approaching Mr. Johnson, both subjects in

4  the vehicle, including Mr. Johnson, appeared to be very nervous,

5  chest was rising rapidly.  Mr. Johnson, I can remember, he was

6  rapidly breathing.  He was real fidgety.  He was very polite and

7  cooperative.

8      I advised him that the vehicle did have an insurance stop on

9  it.  Then he began a conversation, stating that his wife was

10  supposed to have taken care of that and the inspection.

11  Q     Did you at some point ask to search the vehicle?

12  A     Due to the movements upon my walking up to the vehicle, his

13  over-nervousness, I felt that there was an officer-safety issue,

14  that there was a possibility of some illegal activity in the

15  vehicle, whether it included narcotics, weapons, the money --

16  didn't know exactly why he was that nervous.

17  Q     And when you -- let me ask you this:  At some point did you

18  ask the defendant to step out of his vehicle?

19  A     Yes, sir, I did.

20  Q     How long into the stop was it?

21  A     I would estimate approximately three to five minutes into

22  the traffic stop.

23  Q     And when this defendant got out of his vehicle, did you see

24  any money in the car?

25  A     Yes, sir.  Upon him exiting the vehicle, I immediately

1  observed -- if he had still been sitting in the vehicle, would

2  have been between his right thigh and the middle console of the

3  vehicle, was two large rolls of money.

4  Q    And during the course of the stop, did you get information

5  about this defendant's cellular telephone number?

6  A    Yes, sir.  At one point during the traffic stop, he did

7  advise me of a cell phone number to put on the citation.

8  Q    Prior to that time, did you, in fact, search the passenger

9  compartment of the vehicle?

10 A    Yes, sir, I sure did.

11 Q    And during that time, did you seize the two rolls of cash?

12 A    Yes, I picked the two rolls of money up, walked back and

13 approached Mr. Johnson and began questioning him about the money.

14 Q    What did you say?

15 A    I asked him why did he have -- or why did he have the money

16 in the vehicle in such a large amount.

17 Q    What did he say?

18 A    He advised me that he was an owner of a trucking company,

19 that he was in town to -- I believe he quoted -- to look at a

20 truck to buy, purchase for his business.

21 Q    And during the course of the stop itself, did you issue a

22 citation to this defendant for the insurance violation?

23 A    Yes, sir, I did.

24 Q    Did detectives with narcotics also come out during the

25 course of the stop?

 1  A    Yes.  They were contacted.  We've always been advised by

 2  narcotics any time we encounter a sum of money over $10,000, if

 3  there are no receipts or other paperwork for it, for them to be

 4  contacted to come out and investigate it.

 5  Q    As a result of that, did Detective Hodges and Detective

 6  Wagoner come out?

 7  A    Yes, sir, they did.

 8  Q    Was there -- were you present when conversation was had

 9  between this defendant and Detective Hodges and Detective

10  Wagoner?

11  A    For the majority of the time, I was in my patrol unit

12  issuing the citation and completing my paperwork; and Detective

13  Hodges and Mr. Johnson, for the majority of the time, were beside

14  my driver's side door, which the window was rolled down so I

15  could overhear most of their conversation.

16  Q    To your knowledge was the $16,000 -- or the money, was it

17  seized by law enforcement on that occasion?

18  A    Yes, sir, it was.

19  Q    When you took the money out and asked him about it, did this

20  defendant tell you how much money there was?

21  A    Yes, he immediately advised me that there was $16,000 total.

22  He also advised that there was two $8,000 stacks, as he referred

23  to it.

24       (Assistant U.S. Attorney showed Defendant's Counsel

25       exhibit.)

 1  Q   (Hands Witness exhibit) Officer Watson, I'm showing you

 2  Government's 4 for identification.  I'll ask if you recognize who

 3  that is?

 4  A   Yes, sir.  This subject was identified, I believe, as

 5  Melbert -- I'm sorry -- Melvin Johnson.

 6  Q   Okay.  And he was the passenger in the vehicle?

 7  A   Yes, sir, he was.

 8  Q   (Hands Witness exhibit) Government's 3, do you recognize who

 9  that is?

10  A   Yes, sir, this is the defendant, Cleve Johnson.

11       (Government's Exhibit No. 7 was marked for identification.)

12  Q   Okay.  (Hands Witness exhibit) Showing you Government's 7,

13  do you recognize what that is?

14  A   Yes, sir.  This is the registration plate that was on the

15  rear of the passenger -- or the black Acura that he was driving.

16       **MR. GALYON:**  Ask that what's been marked as

17  Government's 7 be admitted.

18       **MR. HARRISON:**  No objection.

19       **THE COURT:**  Admitted.

20       (Government's Exhibit No. 7 was received into evidence.)

21       (Government's Exhibit No. 8 was marked for identification.)

22       (Assistant U.S. Attorney showed Defendant's Counsel

23       exhibit.)

24  **BY MR. GALYON**

25  Q   (Hands Witness exhibit) Officer Watson, I'm showing you

1  Government's 8 for identification.  Ask if you recognize what

2  that is?

3  A    Yes, sir.  This is a copy of the vehicle stop that was made

4  on that day.

5  Q    Have you had an opportunity to review this video recording?

6  A    Yes, sir, I have.

7  Q    It's got audio and video; is that correct?

8  A    Correct.

9        **MR. GALYON:**  Your Honor, I am going to ask that what's

10 been marked as Government's 8 be admitted.

11       **THE COURT:**  Any objection?

12       **MR. HARRISON:**  No.

13       **THE COURT:**  Admitted without objection.

14    (Government's Exhibit No. 8 was received into evidence.)

15 **BY MR. GALYON**

16 Q    Can you see that video screen from where you are?

17 A    Yes, sir, I can.

18 Q    I am going to pause it here for just a second.  On the

19 screen itself, as part of the video, can you tell what -- is

20 there a date and time stamp on it?

21 A    Yes, sir, right below the larger portion of the video.

22 Q    And are you referring to this area here (indicating)?

23 A    Yes, sir.

24 Q    Okay.  And that's 12/11/07; is that right?

25 A    Yes, sir.

1  Q    And then the time -- can you see the time from there?

2  A    Appears to be 9:13 in the morning.

3  Q    Okay.  Now, there is not sound here for several seconds --

4  there is not sound for a period of time during the video?

5  A    Yes, sir.  Our video system, the way it is set up, upon

6  initiating the blue lights or emergency equipment or just hitting

7  record manually on the video system, the first 30 seconds -- it

8  automatically backdates for the first 30 seconds and records it

9  also.

10     (Government's Exhibit No. 8 was played.)

11 Q    Did you just see two vehicles, a white vehicle and a black

12 vehicle, go by there?

13 A    Yes, sir.

14 Q    Were those the two vehicles that you were looking for?

15 A    Yes, sir.  The white SUV later find out was the CI vehicle,

16 and then the black passenger car was the one whom the defendant

17 was driving.

18 Q    Okay.

19     (Government's Exhibit No. 8 continued to be played.)

20 Q    And at that point, are you giving out dispatch information

21 about the vehicle that you are stopping?

22 A    Yes, sir.  Just completed the traffic stop to

23 communications.

24 Q    Are your emergency lights on at this point, the lights on

25 top of the vehicle?

1  A    Yes, sir.  The column where there are two -- the two red

2  boxes -- if you wanted to, you can rewind.  Upon him pulling into

3  the vehicle -- or into the parking lot, I'm sorry -- he had

4  already pulled in and put his turn signal on before I ever

5  activated the emergency lights.

6  Q    And the red block there at the top of that column indicates

7  emergency lights; is that correct?

8  A    That is correct.

9  Q    To show that you have turned on your emergency lights?

10  A    Yes, sir.

11  Q    Okay.

12       (Government's Exhibit No. 8 continued to be played.)

13  Q    You put your hand on the vehicle?

14  A    Yes, sir, at the rear of the vehicle.

15  Q    Why do you do that?

16  A    To leave the fingerprints on the car just in case he was --

17  I was to get injured and he left the scene.  They could identify

18  that that was the vehicle by my fingerprints on the rear.

19       (Government's Exhibit No. 8 continued to be played.)

20  Q    There are two different mics on as part of the audio and

21  video; is that correct?

22  A    Yes, sir, there is.

23  Q    This one up here, top left, VLP-1.  Do you actually have a

24  mic on your uniform; is that right?

25  A    Yes, sir.  I always carry it in my right, front shirt

1  pocket.

2  Q    There is also in-car audio?

3  A    Yes, sir, that's correct.

4  Q    That's for inside the vehicle even when you aren't in it; is

5  that right?

6  A    That's correct.

7       (Government's Exhibit No. 8 continued to be played.)

8  Q    And the information that just came back from dispatch, what

9  was that related to?

10 A    That was where I had called in the tag on the traffic stop.

11 They always advise us back whether the tag is valid or the

12 insurance is valid.

13 Q    Okay.  And what information did you receive back?

14 A    They advised me again and confirmed the CI's information --

15 or Detective Hodges' information, I'm sorry, that the insurance

16 was not in effect; the tag was revoked and had a pickup order on

17 it.

18      (Government's Exhibit No. 8 continued to be played.)

19 Q    When he gets out of the vehicle, did you say that's when you

20 saw the money in the vehicle?

21 A    Yes, sir.  As I said, if he were still sitting in the

22 vehicle, it would have been between his right thigh and the

23 middle console.  It was laying in plain view.

24      (Government's Exhibit No. 8 continued to be played.)

25 Q    Where did he say they were going?

 1   A     Initially there, he advised that he was up here to see a

 2   cousin.

 3         (Government's Exhibit No. 8 continued to be played.)

 4   Q     What did the defendant say about who was with him?

 5   A     He advised that it was his cousin Melvin Johnson.

 6         (Government's Exhibit No. 8 continued to be played.)

 7   Q     What did he say there?

 8   A     He said there was $16,000, two stacks of $8,000 each; and he

 9   said that he most of the time keeps that much money on him.

10         (Government's Exhibit No. 8 continued to be played.)

11   Q     Who is that talking there?

12   A     That is Officer Carlos Garcia, who was employed with the

13   Mount Airy Police Department.

14         (Government's Exhibit No. 8 continued to be played.)

15   Q     Now, there is someone else talking at this point.  Who is

16   that?

17   A     That is the voice of Detective Tim Hodges.

18   Q     And he is with Mount Airy; is that right?

19   A     Yes, sir, he is employed with Mount Airy Police Department.

20         (Government's Exhibit No. 8 continued to be played.)

21   Q     Now, is there another officer there as well?

22   A     Yes, sir.  He came into the video earlier, approached the

23   driver's side, walked around to the passenger's side.  That is

24   Officer Todd Bledsoe, who is also employed with the Mount Airy

25   Police Department.

1  Q    Did he ask about whether the defendant was up here to buy a

2  truck?

3  A    From my understanding, Officer Bledsoe was very interested

4  in trucking.  I believe some of his family is involved in

5  trucking.  Him and the defendant had been carrying on a

6  conversation in regard to that, and that was -- I couldn't quite

7  hear it on there, but I did think he did ask him if he was up

8  here to buy a truck.

9  Q    And what did the defendant say?

10  A    He said yes.  At one point on the video, I think it was

11  here, he advised us he was up to look at a truck just outside of

12  Danville, Virginia, to purchase it.

13       (Government's Exhibit No. 8 continued to be played.)

14  Q    Where is the defendant at this time?

15  A    He is standing.  Detective Hodges is walking back now at

16  this point to speak with Mr. Johnson beside my driver's side

17  window.

18  Q    So Mr. Johnson was just standing beside you?

19  A    Well, standing beside the driver's side of my car.

20       (Government's Exhibit No. 8 continued to be played.)

21  Q    What are you doing now?

22  A    I'm sitting in the patrol vehicle initiating the citation

23  through our North Carolina citation program.

24  Q    So you are typing stuff into the computer?

25  A    Yes, sir.

```
 1        (Government's Exhibit No. 8 continued to be played.)
 2   Q    I'm going to forward through part of this up to a portion
 3   where you ask about the cell phone in a few minutes.  That was
 4   the question about the cell phone for this defendant; is that
 5   right?
 6   A    Yes, sir.  Detective Tim Hodges had asked the defendant what
 7   his cell phone number was.
 8   Q    And then shortly thereafter, you give his license and
 9   registration back; is that right?
10   A    Yes, sir.
11   Q    And is the defendant given his money back?
12   A    Not at that point.
13   Q    Is he given it back at any point?
14   A    It is -- from my understanding, the money is still currently
15   seized.
16   Q    Did you actually issue a citation on December 11th for the
17   insurance violation as well?
18   A    Yes, sir, I did.  Due to the defendant being polite and
19   cooperative, I just issued him a verbal warning on the inspection
20   violation and then just issued a citation for the insurance.
21        (Government's Exhibit No. 9 was marked for identification.)
22        (Assistant U.S. Attorney showed Defendant's Counsel
23        exhibit.)
24   Q    (Hands Witness exhibit) Showing you Government's 9 for
25   identification, and ask if you recognize what that is?
```

1   A    Yes, sir.  This is a copy of the citation I issued to

2   Mr. Johnson for the insurance violation.

3           **MR. GALYON:**  I ask what's been marked as Government's 9

4   be admitted.

5           **THE COURT:**  Any objection?

6           **MR. HARRISON:**  No objection.

7           **THE COURT:**  Admitted without objection.

8       (Government's Exhibit No. 9 was received into evidence.)

9           **MR. GALYON:**  I have no further questions.

10          **THE COURT:**  Any cross-examination?

11                   CROSS-EXAMINATION

12  **BY MR. HARRISON**

13  Q    Officer Watson, I believe you commented that the reason that

14  you began getting the defendant out of the automobile and

15  frisking him had to do with his nervousness; is that correct?

16  A    Yes, sir, that's correct.

17  Q    Well, can you articulate -- can you describe what the

18  defendant's -- any of the defendant's conduct or activity in that

19  video that demonstrated extreme nervousness?

20  A    No, sir, not after the point that he exited his vehicle.

21  Prior to -- I'm sorry, upon approaching the vehicle, it is common

22  to see your everyday, ordinary person to be a little nervous just

23  for the encounter of being stopped by a police officer; but,

24  however, on this day, Mr. Johnson appeared to be overly nervous.

25  Q    You mean, you can discern degrees of nervousness between

1  someone who is normally nervous in terms of stopping them and

2  someone who is maybe twice as nervous?

3  A    Yes, sir.

4  Q    How do you do that?

5  A    Due to training and experience.

6  Q    Training and experience?

7  A    Yes, sir.

8  Q    What -- again, if you can, articulate what the difference is

9  between someone who is normally nervous and someone who is not

10 normally nervous?

11 A    Again, as I stated earlier, Mr. Johnson, upon approaching,

12 was rapidly breathing.  He was very fidgety and just in my

13 opinion appeared to be overly nervous.

14 Q    Well, the normally-nervous person, wouldn't that person be

15 breathing more rapidly than normal?

16 A    Yes, sir, typically; but, however, upon a few seconds of

17 speaking with them, typically they calm down.

18 Q    Well, when he got out of the car, did he appear to be -- I

19 mean, was he jumping around or did you see anything on that video

20 that indicated some kind of unusual physical conduct?

21 A    No, sir, not by the video; but in person, speaking with

22 Mr. Johnson, even after him getting out of the car, he still

23 appeared to be very nervous in my opinion and was very concerned

24 with the money being in the car.

25 Q    Well -- but as it turns out, the money was seized; is that

1   correct?

2   A    Yes, sir, from my understanding.

3   Q    Well, you saw -- I mean, first of all, you took the money?

4   A    No, sir, I did not take the money.

5   Q    You put your hands on the money?

6   A    Yes, sir.  I removed it from the vehicle.

7   Q    So you took the money from the vehicle?

8   A    Yes.

9   Q    Well, did you notice anything about him that he -- I mean,

10  did he become even more relaxed when he saw you taking the money

11  out of his car, or did he become more nervous or less nervous

12  than he was initially?

13  A    I don't believe his demeanor changed that much.

14  Q    Okay.  Did you hear one of the officers talking about some

15  of kind of criminal act that had taken place earlier, that is to

16  say, some type of robbery?

17  A    Yes, sir.  I believe that was the voice of Detective Tim

18  Hodges.

19  Q    Did you hear what Officer Hodges was saying when he was

20  saying it?

21  A    Just bits and pieces of it.  Like I said, I was in the

22  patrol vehicle filling out the citation.

23  Q    So he was speaking to my client; is that correct?

24  A    I assumed so.

25  Q    So did you hear or did you not hear any of the content of

1  his conversation with my client about some drugstore robbery or

2  something?

3  A    Initially, upon the traffic stop, no; but through reviewing

4  the videotape, I have.

5  Q    And what was he saying about that drugstore robbery?

6  A    I couldn't hear it clear enough on the video to say in

7  court.

8  Q    Okay.  Had you been told by anyone in the police department

9  to seize any money you found in the vehicle prior to the stop?

10 A    Can you reword that question for me?

11 Q    Sure.  Prior to the time that you stopped Mr. Johnson's

12 vehicle, had you been instructed by anyone in your police

13 department to search his vehicle and seize any large amounts of

14 cash you discovered?

15 A    I was instructed at all possible to search the vehicle and,

16 if any sum of money was located, to contact narcotics.

17 Q    Who told you to do that?

18 A    That would be Detective Tim Hodges.

19         **MR. HARRISON:**  That's all.  Thank you.

20         **THE COURT:**  Any redirect?

21         **MR. GALYON:**  No, Your Honor.

22         **THE COURT:**  Thank you.  You may step down.  Call your

23 next witness.

24         **MR. GALYON:**  Your Honor, the next witness is going to

25 be Jim Mendez for the United States.

 1  **JIM N. MENDEZ**, GOVERNMENT'S WITNESS, being first duly sworn,

 2  testified as follows:

 3                          DIRECT EXAMINATION

 4  **BY MR. GALYON**

 5  Q    If you would, state your name for the record, please.

 6  A    Jim Nicholas Mendez.

 7  Q    And how are you employed, sir?

 8  A    I'm employed with the Asheboro Police Department.

 9  Q    And how long have you been employed with the Asheboro Police

10  Department?

11  A    Approximately five years.

12  Q    And are you a patrol officer?

13  A    No, sir, I'm actually assigned with the vice and narcotics

14  unit.

15  Q    And how long have you been with vice and narcotics with

16  Asheboro?

17  A    Going over three years.

18  Q    Prior to the time that you worked vice and narcotics, did

19  you work patrol then?

20  A    Yes, I did.

21  Q    And are you fluent in Spanish?

22  A    Yes, I am.

23  Q    As part of your responsibilities as a vice and narcotics

24  detective, have you ever done any undercover work?

25  A    I have.

1  Q    And have you received training through the Asheboro Police

2  Department and other agencies with respect to narcotics deals?

3  A    I have.

4  Q    Do you also -- as part of your patrol duties, did you have

5  experience in seizing narcotics during traffic stops?

6  A    I did.

7  Q    And as part of your undercover work in vice and narcotics,

8  have you, in fact, purchased narcotics?

9  A    I have.

10  Q    And how many times have you purchased narcotics as an

11  Asheboro police officer working undercover?

12  A    Well, since I have been assigned to the vice and narcotics

13  unit, I would say numerous times.  The reason I say that is

14  because I don't have an exact number, but numerous times.

15  Q    Would you say more than ten?

16  A    Yes, sir.

17  Q    More than twenty?

18  A    Yes.

19  Q    And are you familiar with how methamphetamine is packaged as

20  a result of your training and experience?

21  A    I am.

22  Q    Are you familiar with how other drugs are packaged and sold?

23  A    Yes, sir.

24  Q    Have you purchased methamphetamine before --

25  A    I have.

1  Q    -- as a vice officer?

2  A    I have.

3  Q    And how is the -- let's say, for instance, an ounce quantity

4  of methamphetamine, how is that typically packaged?

5  A    Well, an ounce -- it all depends how the dealer is selling

6  it.  It might come in small baggies.  That's how it mainly comes.

7  Q    In your experience as a purchaser of narcotics for the

8  Asheboro Police Department, methamphetamine -- is it normally

9  sold in kilo quantities or pound quantities?

10  A    Pounds.

11  Q    And as far as cocaine, is it typically sold in kilos or

12  pounds?

13  A    Kilos.

14  Q    And as part of your work with the Asheboro Police

15  Department, have you on occasion worked as an undercover officer

16  for other agencies, essentially on loan to other agencies?

17  A    Yes, I have.

18  Q    In this case, did you have an opportunity to work with the

19  Drug Enforcement Administration and the Mount Airy Police

20  Department to serve in an undercover capacity?

21  A    Yes, sir.

22  Q    On January 23 of 2008, this year, did you have occasion to

23  serve in an undercover capacity?

24  A    I did.

25  Q    And what was it that you did in that undercover capacity on

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1   January 23?

2   A    I was going to be posing as a Mexican methamphetamine and

3   cocaine seller.

4   Q    And had you had occasion to meet the informant that Mount

5   Airy had?

6   A    I did.

7   Q    And did you know what his name was?

8   A    I only know his first name, Robby.

9   Q    And as part of the undercover work that you do, had you

10  previously had an opportunity to work with CIs?

11  A    Yes, I have.

12  Q    Confidential informants?

13  A    Yes.

14  Q    And as part of drug activity, that is, if you are buying or

15  selling drugs, is it common to have someone who is doing an

16  introduction for you?

17  A    Yes, sir.

18  Q    And so on January 23 of 2008, was Robby Todd supposed to be

19  introducing you to someone?

20  A    Yes, sir.

21  Q    And who was that person?

22  A    He gave me the name of Cleve, Cleve Johnson.

23  Q    And did you, in fact, on January 23 meet with a person named

24  Cleve Johnson?

25  A    I did.

1  Q    Do you recognize in the courtroom the person that you met

2  with on that occasion?

3  A    Yes, sir. (Indicating) It is the person there.

4  Q    Prior to -- on January 23, before you met with this

5  defendant, did you get equipped with any concealed audio or video

6  recording device?

7  A    I did.

8  Q    And what type of device was that?  Was it audio and video or

9  just audio?

10 A    It was audio and video device.

11 Q    And had you used that particular type of device before?

12 A    We had.

13 Q    After you were equipped with the audio and video recording

14 device, what did you do?

15 A    We proceeded actually to meet Mr. Cleve, myself and the CI,

16 Robby, to the parking lot of Home Depot.

17 Q    And that Home Depot -- in what city is it located?

18 A    Greensboro.

19 Q    Do you know what road it is on?

20 A    I believe it is on Wendover.

21 Q    And what vehicle did you use to go over to the Home Depot?

22 A    We were actually -- I was driving our assigned vehicle from

23 the Asheboro Police Department.

24 Q    When you say the "assigned vehicle for the Asheboro Police

25 Department," did you have a marked patrol unit or an undercover

1  vehicle?

2  A    It was like an undercover vehicle.

3  Q    So it looks just like any other vehicle?

4  A    Yes.

5  Q    So you drove, or did you ride in the passenger seat?

6  A    I drove.

7  Q    And Robby Todd rode with you?

8  A    Yes.

9  Q    After you got to the Home Depot, was there any conversation

10 between Robby Todd and this defendant?

11 A    From what I can remember, he did make a phone call, Robby

12 did, to Mr. Cleve telling him that -- where we were located at,

13 as far as in the parking lot.

14 Q    And then at some point did you see this defendant?

15 A    Yes.

16 Q    Did he park near your vehicle?

17 A    Yes.

18 Q    How close was he?

19 A    He was beside my vehicle.

20 Q    And after he got out, did you meet with him in your car or

21 his car?

22 A    My vehicle.

23 Q    Tell the ladies and gentlemen of the jury what happened once

24 he got into your car.

25 A    Once he got into the car, Mr. Johnson -- we introduced, how

1    you doing, man.  I said, How you doing.  He had said, I just got

2    out of federal prison for trafficking in marijuana, and he said

3    that the feds has taken $30,000 from him and the DA took the

4    money.

5         At that time I asked him, I said, Are you ready to do

6    business?  He said, Yes, I'm ready.  I then asked him what he

7    needed.  He told me that he might need a pound of meth.  I then

8    told -- he then told me that -- he asked me for a price of a

9    kilo.  I told him that I was going to give him a kilo of cocaine

10   for 20,000.  He then said he was probably going to get a pound of

11   meth.

12   Q    Was there some negotiation about the price for the pound of

13   methamphetamine if he got a kilo of cocaine?

14   A    Yes.  I told him that I was going -- I was actually going to

15   give it to him for $14,000.

16   Q    At any point was there money exchanged?

17   A    No, sir.

18   Q    During the course of the conversation, did this defendant

19   ask about the quality of the methamphetamine that you had?

20   A    Yes.  He actually -- well, when I was giving him the prices,

21   as far as the kilo and the pound for meth, he reached into his

22   pocket, took out a small bag containing -- which was consistent

23   with methamphetamine, and he asked me if my product was the same

24   quality as his.

25   Q    Did you give him some assurance as to whether or not the

1  methamphetamine that you had was as good?

2  A    I then told him that it was as exactly like that.

3  Q    Was there also some discussion about this -- did this

4  defendant tell you that he had previously, some days or so before

5  this occasion, had gotten a quantity of -- a half-pound quantity

6  of methamphetamine?

7  A    Yes.  That was almost at the end of our conversation.  He

8  then told me that -- prior to this, he did say that he went to

9  Robby's house with $16,000, but it was taken off by the feds, and

10  he had told me that he bought half a pound, which is he bought

11  nine ounces -- I'm sorry -- eight ounces and five of the ounces

12  were good and three were bad, and he had to return it because

13  they were bad.

14  Q    Was there some discussion about a cutting agent?

15  A    Yes, he had told me that some stuff they sold they cut it

16  with it, and he pretty much said that's what messed it up.

17  Q    And are you familiar with what a cut is?

18  A    Yes.

19  Q    What are cutting agents?  What do they do?

20  A    It all depends on how people cut it.  Some people use

21  like -- it is called MSM, what you say, like horse vitamin and do

22  the cut.  People will actually mix it up with it.  Like Cleve

23  said, lots of people actually mix it together, and he said that's

24  what makes it bad.

25  Q    Based on your training and experience, you are familiar with

 1 | drug dealers actually adding this filler, or cut, to provide more

 2 | volume for the drugs; is that right?

 3 | A    Yes.

 4 |        **THE COURT:**  Let me ask, Mr. Galyon, are you

 5 | anticipating -- how long does this run?

 6 |        **MR. GALYON:**  It is several minutes.  If you want to go

 7 | ahead and take the break, that's fine.

 8 |        **THE COURT:**  I am going to ask -- if it's seven or eight

 9 | minutes, we ought to play it.  If it's longer than that -- do you

10 | think it is within seven or eight minutes approximately?

11 |        **MR. GALYON:**  It is probably close to that.  It may be

12 | closer to ten.

13 |        **THE COURT:**  Let me ask you, ladies and gentlemen of the

14 | jury, if any of you would like to take a break now?

15 |      (Affirmative response from members of the jury panel.)

16 |      We'll take a break now then.  If you would, put your notes

17 | into your envelopes, ladies and gentlemen.  You may leave those

18 | in your chairs, if you would like.  We are going to take our

19 | afternoon recess at this point.  I give you my standard

20 | admonition; that is, do not discuss the case.  Do not think about

21 | the case.  Remember that and all the other cautionary

22 | instructions I have given you in my admonition.

23 |      At this time we will take an approximately 15-minute break.

24 | I will allow you to recess into the jury room.  I will call back

25 | for you in about 15 minutes.

 1        (The jury departed the courtroom at 3:22 p.m.)

 2          **THE COURT:**  Do you anticipate needing to call anybody

 3   on the concealment issue before 5:00?  Do you think it is going

 4   to come up before 5:00?  We'll start back here in 15 minutes, and

 5   you'll have your tape.  So you are looking at an hour and 15

 6   minutes probably.

 7          **MR. GALYON:**  Well, with -- I've got the narcotics

 8   detectives, and I don't know if they will take terribly long.

 9          **THE COURT:**  All right.  Let's do this, I am going to

10   wait to hear the rest of the evidence, if that's acceptable; and

11   if that comes up at or about 5:00, we'll deal with it at 5:00.

12   If it comes up before then, we'll deal with it before then.

13        Does that put a crimp in the Government's effort to present

14   evidence?

15          **MR. GALYON:**  No.

16          **THE COURT:**  Anything further at this time before we

17   take a break?

18          **MR. GALYON:**  No, Your Honor.

19          **MR. HARRISON:**  No, Your Honor.

20          **THE COURT:**  We'll take a break and we'll be back at

21   3:40.

22        (The Court recessed at 3:23 p.m.)

23        (The Court was called back to order at 3:43 p.m.)

24        (The Defendant was present.)

25          **THE COURT:**  You all ready to proceed?

1          **MR. HARRISON:**  Yes, sir.

2          **THE COURT:**  Bring the jury back in.

3      (The Witness returned to the witness stand.)

4      (The jury returned to the courtroom.)

5          **THE COURT:**  Mr. Galyon, you may proceed.

6          **MR. GALYON:**  Thank you, Your Honor.

7      (Assistant U.S. Attorney showed Defendant's Counsel

8      exhibit.)

9      (Government's Exhibits Nos. 10 and 10A were marked for

10     identification.)

11         **MR. GALYON:**  If I may approach?

12         **THE COURT:**  Yes.

13 **BY MR. GALYON**

14 Q   (Hands Witness exhibit) Detective Mendez, I'm showing you

15 Government's 10 for identification, and ask if you recognize what

16 that is?

17 A   It is a recording on January 23, 2008.

18 Q   And that recording -- that's both audio and video; is that

19 correct?

20 A   Correct.

21 Q   It is a redacted version?  That is, it is not the entire

22 recording; is that right?

23 A   Yes.

24 Q   The portion, both before the defendant gets in the vehicle

25 and after he gets out of the vehicle, is not part of the

 1 | recording; is that right?

 2 | A    Correct.

 3 | Q    And Government's 10A, I ask if you recognize what that is?

 4 | A    Yes, sir, I do.

 5 | Q    And what is that?

 6 | A    This is based on this recording.  That's basically what is

 7 | being recorded on this CD.

 8 | Q    So it is a transcript --

 9 | A    Transcript.

10 | Q    -- of what's on Government's 10; is that right?

11 | A    Correct.

12 | Q    And have you had a chance to review that --

13 | A    Yes, I have.

14 | Q    -- Government's 10A?

15 | A    Yes.

16 |           **MR. GALYON:**  Your Honor, I ask what's been marked as

17 | Government's 10 and 10A be admitted.

18 |           **MR. HARRISON:**  No objection.

19 |           **THE COURT:**  Admitted without objection.

20 |      (Government's Exhibits Nos. 10 and 10A were received into

21 |      evidence.)

22 |           **MR. GALYON:**  Your Honor, I ask that the transcripts be

23 | provided to the jurors.

24 |           **THE COURT:**  All right.  Any objection?

25 |           **MR. HARRISON:**  No, sir.

 1            **THE COURT:**  All right.

 2         (Government's Exhibit No. 10A was published to the jury.)

 3            **MR. GALYON:**  This may take just a second.  I have to

 4    restart.

 5         (Government's Exhibit No. 10 was played.)

 6    **BY MR. GALYON**

 7    Q    Now, what is going on at that point?

 8    A    That's when Mr. Cleve took out the bag out of his shirt and

 9    showed it to me, which is consistent with methamphetamine.

10    Q    Now, on the video it is actually -- it is not pointing

11    towards someone; is that right?  You are seeing basically the

12    roof of the vehicle at this point; is that right?

13    A    Yes, sir.

14         (Government's Exhibit No. 10 continued to be played.)

15    Q    Was that your cell phone going off?

16    A    That was my cell phone.  I actually had a call coming in,

17    yes, sir.

18         (Government's Exhibit No. 10 continued to be played.)

19    Q    The part here about "I didn't want to get a little something

20    and then come back and get something big and then scare you off,"

21    what is that in reference to?

22            **MR. HARRISON:**  I'll object.  It is what it is.

23    **BY MR. GALYON**

24    Q    Well --

25            **THE COURT:**  Hold on just a minute.  I'll sustain it as

1  phrased.  If you will rephrase the question.

2  **BY MR. GALYON**

3  Q    When you've worked in an undercover capacity and bought

4  narcotics, is there -- or have you had issues with buying a small

5  amount of narcotics, that is, for instance, one gram, and then

6  attempting to buy a much larger quantity, say an ounce or two

7  ounces?

8  A    Yes, there's been, yes, sir.

9  Q    And what is the issue with immediately moving up to that

10  amount?

11  A    Most of the time, it is basically trust.  Based on my

12  training and experience, also when I have a ball, for example --

13  if I may, for example, if I buy an ounce of Coke, I might order a

14  kilo and they might not bring it, you know what I'm saying?

15  Q    All right.  Because there is an issue about why are you --

16          **MR. HARRISON:**  Object to leading.

17          **THE COURT:**  Sustained.

18      (Government's Exhibit No. 10 continued to be played.)

19      (Assistant U.S. Attorney showed Defendant's Counsel

20      exhibit.)

21      (Government's Exhibit No. 11 was marked for identification.)

22          **MR. GALYON:**  If I may approach?

23          **THE COURT:**  Yes.

24  **BY MR. GALYON**

25  Q    (Hands Witness exhibit) Detective Mendez, I'm showing you

1  Government's 11 and ask if you recognize what that is?

2  A    It is Mr. Cleve's phone number.

3  Q    And this is a piece of paper -- is this the piece of paper

4  that the defendant gave you after he had written his phone number

5  down?

6  A    Yes.

7        **MR. GALYON:**  I ask what's been marked as 11 be

8  admitted.

9        **MR. HARRISON:**  No objection.

10       **THE COURT:**  Admitted without objection.

11     (Government's Exhibit No. 11 was received into evidence.)

12     (Assistant U.S. Attorney showed Defendant's Counsel

13     exhibit.)

14     (Government's Exhibits Nos. 12 and 13 were marked for

15     identification.)

16       **MR. GALYON:**  If I may approach?

17       **THE COURT:**  Yes, you may.

18  **BY MR. GALYON**

19  Q    (Hands Witness exhibit) Detective, I'm showing you

20  Government's 12 for identification, and ask if you recognize what

21  that is?

22  A    That's my vehicle -- my car I was driving and Mr. Cleve's

23  car.

24  Q    And is this photograph that is Government's 12 -- is that a

25  photograph taken on January 23 of 2008?

```
1   A    Yes, sir.

2   Q    And it is there in the Home Depot; is that correct?

3   A    That's correct.

4   Q    There is a black vehicle; is that right?

5   A    Yes.

6   Q    Is that the vehicle that the defendant came in?

7   A    Yes.

8   Q    And then there is a burgundy vehicle, a red vehicle?

9   A    That was the vehicle that I was driving.

10  Q    That's your vehicle?

11  A    Yes.

12            MR. GALYON:  I am going to ask what's been marked as

13  Government's 12 be admitted.

14            MR. HARRISON:  No objection.

15            THE COURT:  Admitted without objection.

16       (Government's Exhibit No. 12 was received into evidence.)

17  BY MR. GALYON

18  Q    (Hands Witness exhibit) Government's 13, is that the

19  surveillance photograph there at the Home Depot?

20  A    Yes, sir, it is.

21  Q    And the person in that photograph, do you recognize who that

22  is?

23  A    That's Cleve Johnson.

24            MR. GALYON:  I ask what's been marked as Government's

25  13 be admitted.
```

1          **MR. HARRISON:**  No objection.

2          **THE COURT:**  Admitted without objection.

3       (Government's Exhibit No. 13 was received into evidence.)

4          **MR. GALYON:**  I am going to ask that those be published

5    to the jury.

6          **THE COURT:**  All right.  Any objection?

7          **MR. HARRISON:**  No, sir.

8          **THE COURT:**  All right.

9       (Government's Exhibits Nos. 11, 12, and 13 were published to

10      the jury.)

11         **THE COURT:**  I am going to ask the ladies and gentlemen

12   of the jury if you are done as well as with the copy of the

13   transcript, just pass them back at the end of the jury.

14   **BY MR. GALYON**

15   Q    Detective Mendez, after that meeting on January 23, did you

16   have any subsequent phone contact with this defendant, Cleve

17   Johnson?

18   A    Yes, I did.

19   Q    And did you call him on that cell phone, the 442-7144?

20   A    Yes, sir, I did.

21   Q    And did you discuss the purchase of methamphetamine during

22   the course of those conversations?

23   A    Yes, I did.

24   Q    Did the defendant tell you about any money issues that would

25   make it impossible for him to buy?

1  A    Yes, sir.

2  Q    What was that?

3  A    On February 1, 2008, he actually called me, left me a

4  message on my phone.  I called him back, and he told me that the

5  reason he didn't get right with me is because he had -- he spent

6  $15,000 on his truck, and that was the reason he couldn't get it

7  right with me.

8         **MR. GALYON:**  I don't have anything else.

9         **THE COURT:**  All right.  Any cross-examination?

10        **MR. HARRISON:**  Yes, thank you, Your Honor.

11                    CROSS-EXAMINATION

12 **BY MR. HARRISON**

13 Q    Mr. Mendez, were you in Mount Airy on December 11th of 2007?

14 A    No, sir.

15 Q    So you only became involved in this entire investigation

16 early in January; is that accurate?

17 A    Correct.

18 Q    And you had never met Cleve Johnson before; correct?

19 A    No, sir.

20 Q    In your experience with transferring drug amounts and

21 receiving drug amounts and general investigative work, is it fair

22 to say that people who are interested in drug transactions are

23 concerned about the quality of the goods that they may or may not

24 purchase?

25 A    Can you repeat that question again?

1  Q    Okay.  Is the quality of the contraband something that

2  people who deal in drugs -- is that something they are concerned

3  about?

4  A    On some occasions, they are.

5  Q    And on this occasion, is it fair to say that Mr. Johnson

6  expressed concern to you about the quality of the product that

7  you proposed to sell to him?

8  A    He did.

9  Q    In fact, he spent most of the time talking about his concern

10 for running into bad stuff; is that fair to say?

11 A    Correct, he said that.

12 Q    And there was no transfer of money or drugs on this

13 occasion?

14 A    No, there was not.

15 Q    Now, when you talked to him, there came a point at which he

16 mentioned the fact that he wanted to -- he wanted to get Robby

17 out of the picture; is that right?

18 A    Correct.

19 Q    And he just -- he said, "I can just say, hey, just me and

20 you," is that -- do you recall him saying that?

21 A    I can recall, yes, sir.

22 Q    And you responded, "For now, it will be business between me

23 and you"?

24 A    Correct.

25 Q    So there was no discussion about Mr. Johnson having a

1  partner or having an associate who might be sharing in the

2  profits of this proposed transaction, was there?

3  A    Well, he did mention in one of his conversations that he was

4  going to talk to his buddies or somebody else.  Within 24 hours,

5  he was going to get something together.

6  Q    It was not on this occasion?

7  A    No, it was not.

8  Q    And when you talk about the fact that you talked to him

9  later and he tried to explain that he hadn't gotten back up with

10 you because of the cost in doing his legitimate business of

11 trucking -- is that what you told Mr. Galyon?

12 A    I was told that -- well, he actually -- Mr. Cleve told me on

13 the phone that the reason he didn't get with me is because he

14 spent $15,000 on his truck.

15 Q    And when was that that you had that conversation?

16 A    That was on February 1, 2008.

17 Q    That was a week later?

18 A    Yes.

19 Q    That was February 1, 2008.  Did you hear from him again

20 about any kind of transaction?

21 A    Yes.  On February 10, he called me again.  I called him back

22 again.  He told me that he only had 11,000.  I asked him first --

23 on this phone conversation, I said -- I asked him if he was going

24 to need the stuff, and I asked him how much portion -- by me,

25 portion is the drugs.  He said he only had 11,000 with him and

1 that he wanted to meet me.  Then I told him that I was not going

2 to be able to meet him that day because I was in Atlanta,

3 Georgia.

4 Q    Is that the last you heard of Mr. Johnson?

5 A    Yes, I believe it was.

6 Q    So Mr. Johnson never met with you with money and an arranged

7 amount of methamphetamine or any other kind of drug?

8 A    No, sir, he never met with me and talked about that.

9           **MR. HARRISON:**  That's all.

10           **THE COURT:**  Any redirect?

11                    REDIRECT EXAMINATION

12 **BY MR. GALYON**

13 Q    Just briefly.  As part of this January 23 meeting, I direct

14 your attention -- do you have a copy of the transcript up there

15 still?

16 A    Yes, sir.

17 Q    There on the first page at line 20, the sentence that starts

18 "and I need about 24," if you would read that?

19 A    Read this part?

20 Q    Yes, his part, Mr. Johnson's?

21 A    "Look here, when I get -- when I get this right here from

22 you, I am going to actually give it away, and I need about 24

23 hours and I'll get an answer from them.  And I probably -- you

24 know, I will probably get a pound."

25           **MR. GALYON:**  I don't have anything else.

```
 1            THE COURT:  Any recross?

 2            MR. HARRISON:  Yes, quickly, briefly.

 3                         RECROSS-EXAMINATION

 4   BY MR. HARRISON

 5   Q    He didn't mention anybody's name, did he?

 6   A    No, sir.

 7            MR. HARRISON:  That's all.

 8            THE COURT:  All right.  You may step down.  Thank you.

 9   You may call your next witness.

10            MR. GALYON:  The United States calls Tim Hodges.

11   DETECTIVE TIM HODGES, being first duly sworn, testified as

12   follows:

13                         DIRECT EXAMINATION

14   BY MR. GALYON

15   Q    If you would, state your name, please.

16   A    My name is Tim Hodges.

17   Q    And how are you employed, sir?

18   A    With the Mount Airy Police Department, Mount Airy, North

19   Carolina.

20   Q    How long have you been with the Mount Airy Police

21   Department?

22   A    Approximately ten years.

23   Q    And did you have any prior law enforcement experience?

24   A    Almost three years with the North Carolina State Highway

25   Patrol.
```

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER      (336) 254-7464

1    Q    What training have you had with Mount Airy?

2    A    We do in-service every year.  I was a K-9 officer; K-9

3    training for approximately three to four years.  Narcotics

4    conferences, OCDEF conferences, PLI.

5    Q    What is PLI?

6    A    Police Law Enforcement Institute.

7    Q    As part of that training, have you become familiar with what

8    methamphetamine looks like?

9    A    That's correct.

10   Q    And in addition to the training regarding what different

11   types of drugs look like, have you also had interdiction training

12   and narcotic investigation training?

13   A    I've been to at least one interdiction school, worked with

14   some interdiction guys before, yes, sir.

15   Q    What is your current assignment with the Mount Airy Police

16   Department?

17   A    I'm now in the criminal investigation division.

18   Q    And back last year, what was your assignment?

19   A    I was a narcotics officer.

20   Q    How long had you been working in narcotics as of 2007?

21   A    Five years.  Right at five years.  Our policy is after five

22   years we are transferred out.

23   Q    And during the times that you were working narcotics, did

24   you also get cross-sworn with the Bureau of Alcohol, Tobacco, and

25   Firearms?

```
 1  A    That's correct.
 2  Q    And how long were you cross-sworn as a task force officer?
 3  A    I think this December will be three years.
 4  Q    As far as your experience in narcotics investigations,
 5  during the time that you've been with narcotics, roughly, how
 6  many investigations have you been involved in?
 7  A    Sir, I don't know how to state that.  It's been numerous
 8  cases.
 9  Q    More than ten?
10  A    Yes, sir.
11  Q    And as part of those investigations, have you been involved
12  in methamphetamine investigations?
13  A    Yes, sir.
14  Q    Were the methamphetamine investigations involving more than
15  ten cases?
16  A    Yes, sir.
17  Q    More than twenty?
18  A    Yes, sir.
19  Q    More than forty?
20  A    Yes, sir, I would say so.
21  Q    As part of the investigations that you've done, have you had
22  an opportunity to use confidential informants?
23  A    A number of them, yes, sir.
24  Q    And are you familiar with Robby Todd?
25  A    Yes, sir, I am.
```

1  Q    Did he work as an informant for the Mount Airy Police

2  Department?

3  A    Yes, sir.

4  Q    When did that begin?

5  A    We actually conducted a search warrant at another residence

6  on 6/20 of '07.  That's the first time I had met Mr. Todd, and he

7  agreed to work at that time.

8  Q    And as part of the search warrant that was done at this

9  third party's residence, was Lori Wilson also present?

10  A    She was.

11  Q    Did she also cooperate and agree to work with Mount Airy?

12  A    Yes.

13  Q    And as part of the use of confidential informants, do you

14  give them instructions about what they are supposed to do?

15  A    Yes, we have certain guidelines they have to follow.

16  Q    As far as using the informants, have you ever had occasion

17  to use a recording device, an audio or video recording device,

18  with an informant?

19  A    Yes.

20  Q    Why is that you try to use audio or video with an informant?

21  A    We want to corroborate exactly what's been told to us.

22  Q    And as part of the use of a confidential informant, do you

23  conduct what's called a "debrief"?

24  A    Yes.

25  Q    What is a debrief?

1  A    Generally, when we try to -- after we go out and do an

2  investigation or run an informant, as we call it, we bring them

3  back to the station or a secure site and try to sit them down,

4  talk to them, ask them exactly what happened, and take notes on

5  what they told us occurred in their presence.

6  Q    In addition to doing those debriefs, do you also conduct

7  interviews of individuals who have been involved in narcotics to

8  determine who they've been dealing with?

9  A    Yes.

10 Q    Do you interview individuals in order to determine what the

11 going rate is for methamphetamine?

12 A    Yes, sir.

13 Q    Why is that important?

14 A    Because we need to know what we have to pay or what is the

15 going rate or the price, the profit to be made on the drugs, et

16 cetera.

17 Q    And in the case of Mr. Todd, did you -- you mentioned having

18 to pay certain amounts.  Did you actually use him to make

19 purchases of methamphetamine?

20 A    Yes.

21 Q    Did Mr. Todd give you information about individuals that he

22 had been either supplying or getting methamphetamine from?

23 A    Yes.  The first night we dealt with him, we done an

24 interview and he give us a list of names and people that he had

25 been associated with.

1   Q    And was one of those individuals identified as Wizard?

2   A    Yes, sir.

3   Q    Did you have an opportunity to, as part of the

4   investigation, gather information on who Wizard might be?

5   A    Yes, sir.

6   Q    When Mr. Todd talked to you initially, did he even know what

7   Wizard's real name was?

8   A    No, sir.

9   Q    And did he tell you how much he had dealt with that person?

10  A    Yes, sir.

11  Q    What information did he give you about how often he dealt

12  with that person?

13  A    The best I remember, Mr. Todd said that he had sold

14  methamphetamine to Wizard; and I think he said he sold

15  approximately two ounces on three different occasions to a guy

16  named Wizard.

17  Q    And as part of the investigation that led to this case, did

18  you attempt to have Mr. Todd get in contact with Wizard?

19  A    Yes, we did.

20  Q    At some point did Mr. Todd indicate to you that he had, in

21  fact, got in touch with the person he knew as Wizard?

22  A    Yes.

23  Q    And as part of the investigation, did you then have Mr. Todd

24  wear a concealed recording device and meet with Wizard?

25  A    Yes, we did.

1  Q    What was the cover story, if you will, on what Mr. Todd was

2  supposed to be discussing with Mr. Wizard?

3  A    On the first interview I done with Mr. Todd, knowing him as

4  Wizard, according to Mr. Todd, Wizard was wanting Mr. Todd to

5  find him some anhydrous gas in order to make methamphetamine.  So

6  in order to for us to get back in with Wizard, we told Mr. Todd

7  to approach Wizard and tell him if he was still interested in it,

8  we may get our hands on some anhydrous.

9  Q    And as part of the investigation, did Mr. Todd, in fact,

10 talk to Wizard about the cost for methamphetamine -- or anhydrous

11 tanks?

12 A    Yes.

13 Q    Based on your training and experience, you are familiar with

14 anhydrous ammonia; is that right?

15 A    That's correct.

16 Q    Is it one of the precursor chemicals that's used to make

17 methamphetamine?

18 A    Yes, sir.

19 Q    And during the course of the investigation, was there

20 additional information given to Mr. Todd about a fictitious

21 Hispanic drug supplier?

22 A    Yes.

23 Q    Tell the ladies and gentlemen of the jury about that.

24 A    As far as what I told him?  I'm sorry.

25 Q    Yes.

1  A     As far as what I told Robby, Mr. Todd?

2  Q     That's correct.

3  A     We contacted the DEA and the SBI and determined it was too

4  dangerous to try to do this anhydrous deal.  Another thing is

5  Wizard and whoever his money man was could not afford what we

6  priced anhydrous for.  So we told Mr. Todd to tell Wizard that we

7  also knew an Hispanic male that would supply a pound of

8  methamphetamine or kilos of cocaine.

9  Q     Was that information regarding prices for a pound of

10 methamphetamine or cocaine -- to your knowledge, was that relayed

11 by Mr. Todd to Wizard?

12 A     Yes.

13 Q     And as part of the investigation, did Mr. Todd -- was he

14 going to be able to actually get money from Wizard?

15 A     As part of the investigation, my understanding was Wizard

16 had to go to someone to get the money to purchase the pound of

17 methamphetamine we had priced.

18 Q     And as the investigation developed, did you get a name for

19 who that person was that would provide the money?

20 A     At first we knew him as Cuz.  Mr. Todd and them had told us

21 that they felt like he called him Cuz because he was his cousin,

22 but that's all they had heard him referred to as, Cuz.  I had

23 gotten Melvin Johnson's name through probation, and I called

24 Special Agent Denney and asked him if he knew of anybody -- both

25 those names, Cuz or any Johnsons down in some agencies he worked

1  with near High Point.

2  Q    And as part of the investigation, did you have Robby Todd go

3  to the location where Wizard lived on December 4, 2007?

4  A    I believe that is correct.  We did.

5  Q    As part of what you did in the investigation, were you able

6  to actually conduct surveillance there at the location that

7  Mr. Todd went to?

8  A    At Wizard's camper?

9  Q    Yes.

10 A    There was a small camper off behind a house.  I think it was

11 on Badgett Road.  We got as close as we could to view the house.

12 Q    When you say you got "as close as we could to view the

13 house," were you actually able to see whether or not anyone went

14 into or out of the camper?

15 A    On drive-bys we done, as often as possible, we watched

16 Mr. Todd and his girlfriend, Lori, enter the residence; and I

17 think that night we also had a transmitter device on where we

18 could listen to it.  I'm not sure, but I think we did.

19 Q    Let's talk about the use of transmitter devices and also the

20 actual recording device.  Are there actually two separate things

21 that you use, one to transmit audio to you and other officers and

22 another that's actually recording what's going on there with

23 Mr. Todd; is that right?

24 A    That's correct.

25 Q    Okay.  So is it fair to say -- well, let's use January 7 as

1  an example.  Was a recording device given to Robby Todd on that

2  occasion?

3  A    That's correct.

4  Q    Was there a transmitter also?

5  A    Yes, sir, I believe there was.

6  Q    And after January 7th, that meeting, did you determine that

7  the recorder had malfunctioned?

8  A    Yes, sir.

9  Q    But were you able to hear -- during the course of any

10  conversation that Robby Todd had, were you able to hear who he

11  was talking to?

12  A    On the recorder.

13  Q    I'm sorry.  On the transmitter or on the recorder?

14  A    The recorder.

15  Q    So it was actually recording on that occasion?

16  A    No, I'm sorry.  On the 7th, that's when the transmitter -- I

17  mean, the recorder failed, but we listened to the realtime, what

18  was going on, through the transmitter.

19  Q    All right.  And so on December 4th of 2007, what procedures

20  did you use before Robby Todd and Lori Wilson went over to Melvin

21  Johnson's residence?

22  A    The same procedure we've always been using and I was trained

23  to use.  We search their vehicle.  We count their money.  We

24  search pocketbooks, if they have any, and search their persons;

25  and that's prior to any dealings and after they get back to meet

1  us.

2  Q    And on each and every occasion where you had Robby Todd and

3  Lori Wilson go to meet with -- whether it was with Melvin Johnson

4  or with this defendant, you would have those procedures in place

5  and do the same thing, the searches, et cetera?

6  A    Yes, sir.

7  Q    Okay.  And after -- or on December 4 of 2007, were you able

8  to hear the transmitter on that occasion?

9  A    I believe that's correct.

10 Q    Do you recall that there was a conversation about a price

11 for the pound of methamphetamine?

12 A    If I remember correctly, Mr. Prosecutor, they -- Wizard

13 actually called someone and was talking on the phone and talking

14 about -- I'm sorry.  Robby actually told him that his Hispanic

15 male wanted 16,000 for a pound.

16 Q    Now, how did Robby Todd come up with 16,000 for a pound?

17 A    That's the going rate we have been paying for it, and so

18 that's what we priced it as.

19 Q    So that's what you told Mr. Todd to tell Melvin Johnson?

20 A    That's correct.

21 Q    And then on December 7th, was there another meeting between

22 Robby Todd and Lori Wilson and Melvin Johnson?

23 A    Yes.

24 Q    Now, as part of the investigation, were you attempting to

25 get to whoever was supplying the money for the potential deal?

1   A    Yes.  We contacted Special Agent Denney and told him what

2   was going on, and he was advising us, helping us out with the

3   case; and we were trying to cut Mr. Johnson out to get to Cuz --

4   or cut Wizard out to get to Cuz.

5   Q    And during the course of the meeting on December 7th of

6   2007, were you able to actually hear that conversation on that

7   occasion?

8   A    Yes, sir.

9   Q    And to your knowledge, was there actually phone

10  conversations between Melvin Johnson and someone else regarding

11  buying the methamphetamine?

12  A    Yes.

13  Q    After that time when you spoke with Robby Todd, were you --

14  as part of the debrief that you did, did he explain to you what

15  had occurred on December 7th?

16  A    Yes.

17  Q    And as a result of that, did you anticipate that there was

18  going to be a drug purchase using Cuz and/or Melvin Johnson to

19  buy a pound of methamphetamine?

20  A    Yes, sir.

21  Q    As part of furthering that investigation, did you have Robby

22  Todd make recorded phone calls on December 8th and the 10th --

23  A    Yes, sir.

24  Q    -- to set up the deal?

25  A    Yes, sir.

1  Q    And on December 11th of 2007, did you work on that occasion?

2  A    Yes, sir.

3  Q    Tell the ladies and gentlemen of the jury what happened on

4  December 11th of 2007.

5  A    I hope I don't have this messed up, but if I remember this

6  correctly, I received a phone call from my partner early that

7  morning telling me that Mr. Todd --

8       **MR. HARRISON:**  Your Honor, I object to what his partner

9  said.

10      **THE COURT:**  Sustained.

11 **BY MR. GALYON**

12 Q    Based on the information that you received, what did you do?

13 A    Went to work early that morning, contacted Special Agent

14 Denney, got up with my patrol officers, advised them that there

15 was going to be a car, a vehicle, coming into Mount Airy that

16 would have $16,000 cash in it; and we wanted to make a vehicle

17 stop on that vehicle.

18 Q    Had you received information from Mr. Todd related to what

19 the license plate number was for that vehicle?

20 A    Yes.  He either texted me -- actually, he told me -- he had

21 went into the bathroom of his residence.  I told him to get the

22 tag number, if he could; and Mr. Todd called me back from his

23 bathroom and told me what the tag was.

24 Q    Did you have the tag run through the Division of Motor

25 Vehicles?

 1  A    Yes, sir, we did.

 2  Q    What did you determine, based on running the tag, for that

 3  vehicle?

 4  A    The vehicle had an insurance stop on it and an order to pick

 5  up the license plate of the vehicle.

 6  Q    Who was the vehicle actually registered to?

 7  A    Melvin Johnson -- I'm sorry.  It was registered to Cuz,

 8  Cleve Johnson.

 9  Q    And do you recall what type of vehicle it was?

10  A    It was a black Acura.

11  Q    As part of the investigation on December 11th, did you have

12  an opportunity to speak on the telephone with Robby Todd?

13  A    Yes.

14  Q    And did you say you texted as well?

15  A    We did some text messages early.  We talked on the phone

16  some, both.

17  Q    And was there any discussion about wanting to verify that

18  there was, in fact, money to do the deal?

19  A    Yes.  I told Mr. Todd that we weren't going to come out

20  unless he actually seen the money.

21  Q    And what, if anything, did Mr. Todd tell you about seeing

22  money?

23  A    He called me back just a few minutes later and said that he

24  had actually seen the money in the car.

25  Q    Was Mr. Todd concerned when he talked to you?

1  A    Very concerned.

2  Q    Why was he concerned?

3  A    This happened on a spur of the moment.  Like I said, I was

4  called out from my residence.  There was no way that we could get

5  everybody in place to do this exactly the way we wanted to.

6  Mr. Todd wanted to make sure that we actually had a pound of

7  methamphetamine to sell, that we weren't going to do something

8  that would get him or his girlfriend hurt.

9  Q    As part of what was happening that morning, was -- did

10 Mr. Todd indicate to you that he was concerned because this

11 defendant and Melvin Johnson were actually at his residence?

12 A    Yes, they were at his residence.  They had actually went to

13 a restaurant, called him and told him they had rode around all

14 night and were coming to his residence.  They showed up at his

15 residence.  When Robby called me, he was in his bathroom, telling

16 me that both Johnson subjects were in his residence.

17 Q    And so what did you do related to the investigation

18 thereafter?

19 A    At that point we -- like I say, we got up with patrol and me

20 and my partner arranged for -- we told Mr. Todd to tell them that

21 we had made contact with an Hispanic male, that he had a pound of

22 methamphetamine to sell; and set up a location for Mr. Todd to

23 bring Melvin and Cuz, and just told Mr. Todd to tell them it was

24 good to go, that we had the Hispanic undercover and a pound of

25 meth.

1  Q    And what happened after you told Mr. Todd that?

2  A    Just shortly, Mr. Todd called me back and said they were

3  heading into the city.  We had an officer sitting on Highway 89.

4  I called Mr. Todd back and told him not to be scared, that there

5  was an officer sitting on Highway 89.

6         **MR. HARRISON:**  Object.  That makes an implication that

7  is not based on facts.  There is no indication that there was any

8  danger.

9         **THE COURT:**  Sustained.

10 **BY MR. GALYON**

11 Q    Let me ask you this, how far -- where was Mr. Todd living

12 during that period of time?  What community was he living?

13 A    It is an area called Lowgap.

14 Q    How far is that from Mount Airy?

15 A    Approximately 12 miles.

16 Q    Did you then know that they would be coming in on a

17 particular highway from Lowgap to Mount Airy?

18 A    Yes, sir.  I asked Mr. Todd what way they were coming, and I

19 directed him which way to come.

20 Q    And that was Highway 89; is that right?

21 A    That's correct.

22 Q    And so that's why you had the officer set up on Highway 89?

23 A    That's correct.

24 Q    And what happened thereafter?

25 A    We had already told the officer there was an insurance stop

1  on the vehicle, give a description of our witnesses' vehicle,

2  give a description of the black Acura, told him there was an

3  insurance stop, and told him to stop that vehicle as soon as it

4  entered the city.

5  Q    Did you, in fact, have an Hispanic male, or Detective

6  Mendez, or someone present in order to conduct a deal?

7  A    No, sir.

8  Q    And were you concerned at all about essentially blowing the

9  confidential informant's cover?

10  A    Yes, sir.

11  Q    So what happened with the vehicle stop?

12  A    The officer stopped the vehicle.  At that point, Mr. Todd

13  called me and wanted to know what was going on.  I told him that

14  we had it, just to stay in the parking lot of Food Lion and not

15  go anywhere until I called him.  Me and my partner were sitting

16  at a Texaco across the street.  We advised our patrol officers,

17  as soon as they found the money in the vehicle, to call narcotics

18  out over the radio; and that's what happened.

19  Q    And so did you then receive a call shortly after the stop

20  occurred?

21  A    Yes.  Just a few minutes after the vehicle stop occurred, I

22  received a call from one of the officers on the scene; and me and

23  my partner went to the scene where Wizard and Cuz were stopped.

24  Q    Do you recall who was actually driving the vehicle and who

25  was the passenger in that vehicle?

1  A    Cleve Johnson was driving, and Melvin Johnson was the

2  passenger.

3  Q    And when you came into contact with this defendant on

4  December 11, what did you and he talk about?

5  A    We talked about a number of things.  We talked about -- he

6  told me he was going to look at a truck, I think, in Danville,

7  Virginia, is the reason he had the money.  We talked about

8  trucking, how much money was to be made in trucking.  He asked

9  why -- if I remember correctly, he wanted to know why we had

10 stopped him.  I told him there was a breaking and entering, and

11 the vehicle that had done the breaking or entering matched the

12 description of his vehicle; and we wanted to investigate.

13 Q    And was that, in fact, a rouse?

14 A    Yes, sir, it wasn't true.

15 Q    Why did you tell him this information about the breaking and

16 entering?

17 A    I told him for two reasons:  One, and the biggest, reason

18 was to further the investigation, and the other reason was to

19 protect my witnesses.

20 Q    When you say "to further the investigation" --

21      **MR. HARRISON:**  Again, I object, Your Honor, to this

22 protection concept.  It has no basis with regard to any other

23 evidence.

24      **THE COURT:**  Approach the bench, please.

25      (The following proceedings were had at the bench by the

1    Court and Counsel out of the hearing of the jury:)

2         **THE COURT:**  You are referring to physical protection?

3         **MR. HARRISON:**  I'm concerned that the jury is being

4    given an inference of potential physical danger from my client,

5    and there's been absolutely no indication of that.

6         **THE COURT:**  Okay.  I understood his answer to be to

7    protect the confidentiality of the witnesses.  Is that what -- do

8    you know what it is he intends to say?

9         **MR. GALYON:**  Well, I think it would be both because,

10   obviously, if the confidential informant is no longer an

11   informant and is known to be working for law enforcement, then

12   there is that concern about danger and, obviously, a concern

13   about jeopardizing the investigation itself.

14       I'll be happy to put on evidence related to conversations

15   about what would happen if -- that Robby Todd had with Melvin

16   Johnson about if he -- I think also with Cleve Johnson -- about

17   what would happen if they found someone working with law

18   enforcement, that they would be dealt with.

19        **THE COURT:**  I guess my concern at this point is I don't

20   know if that is really going to be a relevant issue in the case.

21   There is no firearms charge.  There is no danger.

22        **MR. HARRISON:**  To the contrary.  The testimony from the

23   last witness was that my client said he didn't --

24        **THE COURT:**  I do -- the case law recognizes and law

25   enforcement officers testify that guns and drugs tend to run hand

1   in hand.  So I think there is a basis for him to state what his
2   concern might be, not knowing more about the defendant; but since
3   it's not really an issue in the case, I prefer we just not get
4   into that.

5        As I said, I had thought -- I had interpreted, I should say,
6   his comment to refer to protecting the confidentiality of the
7   witnesses.  That's why he tried to divert attention to some other
8   activity; and if that's the case, then I think it's an
9   appropriate response.

10       At this point, I guess I'll sustain the objection; but to
11  the extent you get into questions about protecting the
12  confidentiality -- that's why we stopped -- I think that's
13  appropriate because I think the defendant has put that in issue,
14  just wanting to know why this investigation stopped when it did,
15  and that's the answer or at least partially; but in terms of
16  physical fear, if we can avoid that, I think that's really not
17  part of the case.

18       So however you want to proceed.  I'll sustain it, but you
19  are free to go into areas about protecting confidentiality.

20            **MR. HARRISON:**  I'm fine with that.

21            **THE COURT:**  Okay.

22       (Thereupon, the following proceedings continued within the

23       hearing of the jury:)

24            **THE COURT:**  Sustained.

25

BY MR. GALYON

Q    Detective Hodges, you mentioned protecting the

confidentiality of the informant?

A    Yes, sir.

Q    And that that was one of the reasons why you approached and

did what you did?

A    Yes, sir.

Q    And as far as protecting the confidentiality of an

informant, if an informant is known -- that is, if the

informant's identity is out as a person working for law

enforcement, are they able to work for you and buy drugs?

A    No, sir.

Q    Because people in the drug business --

        **MR. HARRISON:**  Objection to leading.

        **THE COURT:**  Sustained.

BY MR. GALYON

Q    Well, have you had any success with people who are known to

be informants --

A    No, sir.

Q    -- buying?

A    No, sir.  We tell all our informants not to tell anybody.

It doesn't matter if it's their wife, girlfriend, or family

members.  They never know who may be talking.  Once the word gets

out they are cooperating with an investigation, they are no

longer able to help them -- us or themselves.

1  Q    And you mentioned also furthering the investigation was part

2  of the reason why you approached on that occasion, December 11th.

3  What do you mean by that?

4  A    Simply, if you take off $16,000 on someone who is coming to

5  buy a pound of methamphetamines, they are going to talk about it.

6  By talking, you gain more information, find out more about what's

7  going on and who the money belongs to and et cetera.

8  Q    Did you on December 11th know the true name of Cuz?

9  A    On December 11th, yes, sir.

10 Q    Did you know the true name of Wizard on that occasion?

11 A    I'm sorry.  On December 11th, I knew -- I had gotten

12 Wizard's name and knew him to be Melvin through probation, and I

13 had gotten Cleve Johnson's name Cuz through Special Agent Denney;

14 but part of the reason for the vehicle stop, we wanted a picture

15 of these guys, and we also wanted to get their driver's license

16 information, telephone numbers, and what information we could to

17 further this investigation.

18 Q    When you say "further," is that to corroborate the

19 information or verify the information that you had gotten from

20 Robby Todd?

21 A    That's correct.

22 Q    And on December 11th, did you, in fact, seize the $16,000

23 that had been taken out of the vehicle?

24 A    Yes, sir.

25 Q    And after December 11th, did you have any further contact

1  with Robby Todd?

2  A    Yes, sir.

3  Q    And what did you have him do next?

4  A    Well, actually, on December 11, we advised Robby and Lori

5  not to go back to the camper, and they stressed to us that they

6  wanted to go back to meet with Melvin because they were scared it

7  would not look good if they didn't and that Melvin and

8  Mr. Johnson may know something if they didn't go back.

9       So we advised them that we were tied up dealing with this

10 money, and we could not go with them and that they should know if

11 they went we should give them a recorder, but they would be on

12 their own.  We could not do surveillance on them, listen to a

13 transmitter, and also deal with this money we just seized.  So

14 they went back to the camper on that same day.

15 Q    And after December 11 of 2007, what did you have Robby Todd

16 and Lori Wilson do?

17 A    We had them to try to get up with Cleve Johnson and deal

18 with him.

19 Q    And did that come about as a result of a meeting that they

20 had on January 7, 2008?

21 A    That's correct.

22 Q    As part of what happened on January 7, 2008, was money from

23 the Mount Airy Police Department given to Robby Todd?

24 A    Yes.

25 Q    What was the purpose of the money that was given to Robby

1  Todd?

2  A    We gave Robby $600 from our budget because he had to pay off

3  a debt Melvin owed to Cleve Johnson for a previous purchase of

4  methamphetamines.

5  Q    And were you able to monitor any contact that Robby Todd and

6  Lori Wilson had with Melvin Johnson and/or Cleve Johnson on

7  January 7th?

8  A    Yes.  I think we listened to it on the transmitter.

9  Q    After they -- did you use the same procedures as far as

10  searching them there at the police department and having --

11  A    Yes, sir, always.

12  Q    Did they actually pick up Melvin Johnson at some point?

13  A    Yes.

14  Q    Where did they pick him up, if you recall?

15  A    My understanding is they -- on this date, they picked him up

16  at Penny Pope's house, I believe.

17  Q    And where is that residence?

18  A    I want to say down near High Point where you cross a couple

19  of county lines.  I am not real familiar with that area.

20  Q    Is that where they came into contact with Melvin Johnson?

21  A    The best I remember, it is.

22  Q    After that, where did they go?

23  A    We ended up, the best I can remember, in a Hess parking lot.

24  Q    And where was that?

25  A    I want to say in Alamance.  Like I said, I am not at all

1  familiar with that area.  We actually followed them, the best we

2  could, without losing sight, and then we got up with Special

3  Agent Denney.

4  Q    All right.  And during the course of that --

5           **MR. GALYON:**  Your Honor, given that it's 5:00 --

6           **THE COURT:**  Is this an appropriate time to stop?

7           **MR. GALYON:**  Yes.

8           **THE COURT:**  Okay.  Ladies and gentlemen, we are going

9  to take our recess for the day.  If you would, please put your

10 notes and pencils back in your envelopes.  You may leave your

11 envelopes in your chairs, and Miss Solomon will collect them and

12 keep them for safekeeping for the evening, and I assure you that

13 she will keep them.  Nobody will investigate or look at your

14 notes.  They are solely for your own use.

15     I am going to give you, again, my standard admonition; that

16 is, do not discuss the case with anyone, whether members of your

17 family or anybody else.  Do not discuss it among yourselves.  Do

18 not read or listen to any report of the trial and make no attempt

19 to investigate.  Remember that and all the other instructions I

20 gave you in my standard admonition.

21     We'll see you back tomorrow then at 9:00 on the fourth

22 floor.  You are excused for the evening.  I hope you have a

23 restful evening, and we'll see you in the morning.  Everyone else

24 remain in the courtroom please.

25     (The jury departed the courtroom at 5:00 p.m.)

1          **THE COURT:**  You all may be seated.  I want to discuss a
2    few matters with you all.  Do you want to take a five-minute
3    break?  Does anybody need a comfort break?

4          **MR. HARRISON:**  Personally, I don't, Your Honor.

5          **MR. GALYON:**  I'm fine, Your Honor.

6          **THE COURT:**  Okay.  Where are we in the Government's
7    case then, Mr. Galyon?  How many more witnesses do we have before
8    you would get to your concealment witnesses?

9          **MR. GALYON:**  Probably two.

10         **THE COURT:**  All right.  Do we know anything more about
11   what it is the -- I'll call them the concealment witnesses.  It
12   is also the DEA agent who had some kind of statement that the
13   defendant allegedly made upon his arrest.  Do we know anything
14   more about the substance of that?

15         **MR. GALYON:**  Your Honor, I do know that, in speaking
16   with the agent, that the conversation -- the interview that was
17   had with Mr. Johnson, wherein he talks about that in 2001 he was
18   busted with approximately 30 pounds of marijuana he was
19   transporting in his vehicle, and the subjects in El Paso would
20   supply him with methamphetamine and marijuana because he did not
21   reveal his source after his arrest, that was a going-forward.
22   That was not that he was being supplied at the time, and so it is
23   not a situation where they were supplying him up until July when
24   he was arrested.

25        He talks about how two weeks before he had been contact with

1  them and that they wanted to find out whether or not he would

2  transport, but he indicated to the officers that they would

3  supply him but that is not a had been supplying him since he had

4  been released from prison.

5          **THE COURT:** And tell me how you think that comes into

6  the case.

7          **MR. GALYON:** Well, given that -- given the fact that it

8  is a would-be-able-to-going-forward, it certainly is not evidence

9  related to his current involvement in a conspiracy with those

10 individuals, which is part of the reason why I thought it was

11 relevant at the time; but I still believe it is relevant.

12      Certainly, those statements can be used, particularly the

13 statement about how he was -- you know, he gives them the

14 information about these folks in El Paso and then says that he

15 didn't want to provide any additional specific details because he

16 wanted to use the knowledge in order to possibly gain or receive

17 consideration for his current charges. I think that that's

18 certainly relevant to his state of mind, again, on the same

19 theory that an individual who has nothing to do narcotics in the

20 charge that they are currently facing wouldn't have to give any

21 information.

22      You know, they are not -- what would be the reason why you

23 would talk with law enforcement and tell them about all this drug

24 dealing that you could do when faced with the prospect of a

25 federal drug charge?

1          **THE COURT:**  Are you familiar with any case law that

2     indicates that a defendant's indication of willingness to share

3     information is somehow probative of consciousness of guilty?

4          **MR. GALYON:**  Your Honor, I am not familiar with any

5     case law.  I think that the statement -- because it is an

6     inculpatory statement -- that is, he is saying I've been involved

7     in drug dealing, I know that I have a drug charge now, and in an

8     effort to help myself with the current charge, I'll do what I

9     can, you know, I'll provide you this information -- I think that

10    that's certainly the primary reason that it's relevant.

11          Additionally, of course, Your Honor, the fact that -- there

12    are several cases and we've sort of touched on them because of

13    the 404(b) issue.  The issue of the fact that he says,

14    specifically, that those individuals supply both methamphetamine

15    and marijuana I think is relevant to the issue here because it

16    goes to his knowledge again of drug dealing, that he had been

17    caught with marijuana, but he was aware that they also provided

18    methamphetamine.

19          Now, we can't tell from the statement whether or not he had

20    transported methamphetamine in addition or not, but, again, I

21    think that that certainly is relevant to his knowledge of the

22    drug business.

23          **THE COURT:**  The statement about the methamphetamine, as

24    I understand it, is a statement that the defendant allegedly made

25    that he indicated that someone in El Paso, Texas, that he knew is

Case 1:08-cr-00233-TDS   Document 32   Filed 06/22/09   Page 182 of 205

1  somebody who would be able to supply him with methamphetamine he

2  thought if he wanted; is that right?

3          MR. GALYON:  Well, Your Honor, it is actually all part

4  and parcel of the same thing.  The individuals that he had been

5  transporting marijuana for in 2001 when he got busted were the

6  people in El Paso, and those people in El Paso were capable of

7  150 pounds of methamphetamine and 4- to 500 pounds of marijuana,

8  according to the statement that he gave to the DEA.

9      So it is not -- we are not talking about two separate groups

10  or something like that where the people that had been supplying

11  him in 2001 when he got busted are somehow different from this

12  group that he is talking about when he gets arrested in 2008.  It

13  is the same people, and what he's describing is that perhaps

14  based on his conversation two weeks prior where they asked him

15  would he -- they asked him -- specifically, according to his

16  statement, the individuals in El Paso asked him whether or not he

17  would be available to transport marijuana and/or methamphetamine.

18          THE COURT:  Okay.  And so articulate for me the grounds

19  that you think, again, that that ought to come in.

20          MR. GALYON:  Well, based on the Fourth Circuit cases

21  regarding 404(b) -- obviously, when this defendant pleads not

22  guilty, he puts his intent at issue; and part of showing intent

23  to enter a conspiracy is showing knowledge, showing the fact that

24  the individual is familiar with the drug trade.  It is not

25  character.  I mean -- that evidence would not come on to show

1  that he has bad character.  In fact, the evidence is already in,

2  and the Court will give a limiting instruction related to his own

3  admission during the course of the January 23 meeting with the

4  undercover that he actually had gone to prison for that same

5  incident from 2001.  So there is certainly not any danger that

6  somehow that's going to inflame the jury.

7          **THE COURT:**  I was just interested in your -- what you

8  would intend to argue that it's relevant to.  You said knowledge

9  of the drug trade.  Any other ground?  You said intent.

10          **MR. GALYON:**  Right.  And I certainly think it is

11  related to consciousness of guilt at that point.

12          **THE COURT:**  At the time he allegedly made that

13  statement, had he been informed of the charge against him in this

14  case?

15          **MR. GALYON:**  He had been because it was several hours

16  later.

17          **THE COURT:**  All right.  Anything further before I hear

18  from Mr. Harrison?  Mr. Harrison, would you like to be heard

19  further on this?

20          **MR. HARRISON:**  Well, sir, I am going to be candid and

21  state that I've never run into an effort on the part of the

22  Government to get this kind of evidence in, and I am puzzled as

23  to why my colleague would want to even try to do it.  I mean, it

24  is just not --

25          **THE COURT:**  Which --

Case 1:08-cr-00233-TDS  Document 32  Filed 06/22/09  Page 184 of 205

 1          **MR. HARRISON:**  -- it is not a prior or post bad act.

 2    It is just -- it is kind of like getting into evidence an

 3    attorney's plea negotiation; and if it fails, then, well, as a

 4    matter of fact, didn't your lawyer say he would be glad to have

 5    you testify against other people?  I mean --

 6          **THE COURT:**  As I understand it -- let me tell you what

 7    I understand the argument to be, and I would like to hear from

 8    you on that part.  I don't mean to interrupt you.  I want to make

 9    sure you understand what I am thinking.

10          The claim is that after the defendant is arrested and he is

11    informed of this charge in this case that he agrees to talk --

12    waives his Miranda rights and agrees to talk and, in the process,

13    indicates that he has knowledge about drug sources dealing with

14    the drug involved in this case, and that is methamphetamine.

15          And the concern is that that could be probative of the

16    defendant's knowledge about conspiring to distribute

17    methamphetamine, which is the first count in this case, because

18    it indicates, one could argue, that the defendant, by giving this

19    statement, reveals that he's not an innocent player in this, that

20    there is no mistake that --

21          **MR. HARRISON:**  You see, Your Honor -- I'm sorry.  Gosh.

22          **THE COURT:**  That's all right.  And I was going to say

23    that he has knowledge of the drug trade that's fairly extensive

24    where he would know about suppliers even as far as El Paso,

25    Texas, which could be probative of the defendant's intent in this

1  case to purchase quantities of methamphetamine and then to

2  distribute what he purchases.  So speak to that, if you would.

3          **MR. HARRISON:**  Well, sir, first of all, one of the

4  unique almost characteristics of this case and our defense is

5  that we are not claiming we didn't have an intent to do certain

6  criminal activities.  We are not even trying to deny that he has

7  sold drugs.

8          **THE COURT:**  But I do think --

9          **MR. HARRISON:**  It is not an issue.

10         **THE COURT:**  I thought I understood, though, the

11  defendant's defense to the first count on the conspiracy count is

12  that there is no agreement to distribute.

13         **MR. HARRISON:**  With the specific -- with the persons

14  charged, yes, sir.

15         **THE COURT:**  Which would involve the defendant,

16  obviously?

17      In other words, the Government's case is that, among other

18  things, that your client was fronting the money and that his

19  cousin Melvin was doing the retail.  That's not exclusive because

20  I think there is some evidence to suggest that it could be

21  interpreted that your client also was selling himself to

22  truckers, according to his own statement; but as to the first

23  point, that the defendant was fronting the money, that Melvin

24  would take the drugs, distribute them, and then come back and pay

25  your client.

1          MR. HARRISON:  That is the evidence.

2          THE COURT:  Yes.

3          MR. HARRISON:  Well --

4          THE COURT:  Which is suggestive of an agreement to

5    distribute through Melvin.

6          MR. HARRISON:  Well, it is not suggestive of an

7    agreement that is conspiratorial.  It is a suggestion that -- the

8    Joyce case, for instance, that I cited in my -- in some of the

9    documents that I filed and in some other cases that I'll be

10   talking about when I talk about suggested instructions to the

11   jury -- this is a situation where the only -- we got one -- as I

12   recall, there is evidence of one fronted sale by my client to his

13   cousin of gram amounts.

14         THE COURT:  Was that the November?

15         MR. HARRISON:  Yes, I believe so.

16         THE COURT:  That was, as I recall, a half ounce.

17         MR. HARRISON:  Yes, sir.  Well, that's eight ounces --

18   I mean, that's eight ounces and --

19         THE COURT:  That would be 14 grams; right?

20         MR. HARRISON:  It would be.

21         THE COURT:  Twenty-eight grams is an ounce and half an

22   ounce would be fourteen.  That's what I thought the testimony

23   was.

24         MR. HARRISON:  Well, sir, it is not a pound.

25         THE COURT:  I understand that.

Case 1:08-cr-00233-TDS  Document 32  Filed 06/22/09  Page 187 of 205

1            MR. HARRISON:  And the only evidence we have is that

2   they dealt on this one occasion, and it is my position that

3   that's not evidence of a conspiratorial agreement.  That's

4   evidence of a buyer and a seller having a transaction that's

5   limited to the act of buying from a seller, and the cases are

6   numerous from various circuits that indicate that that's not

7   conspiratorial.  That's a commercial action.  That's not the same

8   thing as -- and there is no evidence that he sold it to him for

9   purposes of having him return profit to him.  There is no

10  evidence of that at all.

11            THE COURT:  Well --

12            MR. HARRISON:  I mean, it is just one event involving a

13  relatively small transfer of methamphetamine without any

14  accompanying evidence of a shared purpose to have a

15  methamphetamine business, but that's not really what concerns me

16  so much about this particular evidence.

17       The thing that concerns me about this evidence is it's a

18  non-event.  I mean, it is not criminal in terms of 404(b).  It is

19  not -- he didn't do anything yet is what I'm getting at.  It is

20  like the Government wants to use evidence of a potential future

21  criminal event.  How speculative can that get?

22            THE COURT:  If it's not 404(b), then what are the

23  grounds for objection as to -- speculation, I hear you saying.

24            MR. HARRISON:  Yes, sir.  I mean, okay, I know a guy --

25  I know a lot of people.  I've represented hundreds, thousands of

1  people who I could -- I guess I could get drugs from.  Okay.

2  What does that -- I mean, that's not a crime, and it is not

3  evidence of a crime.

4          THE COURT:  But I think the question is is it probative

5  of an element in the case, and the question would be would the

6  knowledge -- alleged knowledge by the defendant of suppliers of

7  methamphetamine be probative of the defendant's knowledge about

8  the drug trafficking trade, which is certainly something

9  probative of whether they -- whether the defendant and Melvin

10  Johnson conspired to distribute methamphetamine.

11          MR. HARRISON:  How is Melvin Johnson even remotely

12  hooked up to the discussion of a potential source of supply in

13  the future when we don't have any indication that Melvin Johnson

14  even knows that this possibility exists?  And beyond that, Melvin

15  Johnson is already out of the conspiracy if it existed.  He's

16  been arrested.  He couldn't be -- Melvin Johnson can't be acting

17  as a co-conspirator.

18          THE COURT:  I don't think there is any argument that he

19  would be.  I think the concern that I would have -- I mean, if it

20  comes in, it comes in as an admission because it is made by your

21  client; and then the question is is it probative of an element in

22  the case, and the question in my mind is is it probative of his

23  knowledge of the drug trade.

24      There seems to be scores of cases that allow all sorts of

25  evidence in of other events and all sorts of activity that

1   relates to knowledge of the drug trade.  It clearly does not, I

2   don't think, go to character.  It goes to whether or not he's

3   knowledgeable enough about how drugs are distributed and having a

4   source of supplier --

5           MR. HARRISON:  Well, Your Honor, everybody knows that.

6   I mean, everybody knows how drugs are distributed.  I just think

7   it gets -- it puts the jury in the mind of, okay, he dealt drugs;

8   he was going to be dealing drugs at the time or near that time or

9   within the last two weeks somewhere in the Southwest with a crowd

10  of Mexicans.

11          THE COURT:  There might be -- even though everybody

12  might know how drugs are distributed generally -- I am not sure

13  that's the case.  I suspect there may be some jurors on this jury

14  that have no idea until this case how drugs are distributed; but

15  be that as it may, it is one thing to know generally how drugs

16  are distributed; it is another thing to be able to come up with a

17  name in a heartbeat as to where they can get some right away.

18  One could argue that that's a sign of someone who is the

19  business.  I think that's the essence of the Government's

20  argument in the case.

21          MR. HARRISON:  Well, sir, I feel like I argued myself

22  into a corner.  I feel like the more I argue, the more the Court

23  begins to decide that I am wrong.

24          THE COURT:  No, I want to hear you out.  I want to know

25  what your arguments are.  It is helpful for me to hear that.

Case 1:08-cr-00233-TDS  Document 32  Filed 06/22/09  Page 190 of 205

1          **MR. HARRISON:**  It is -- I just simply say this to you,

2   I am not prepared to come up with anything more than I have

3   given.  I just -- lord knows, this man knows how to prosecute a

4   case far better than I do.  I would be darned if I would want to

5   add this little crumb of information about some crime that

6   hadn't -- that hadn't taken place and risk an error.  I don't

7   understand.

8          **THE COURT:**  Okay.  All right.  Thank you.  Do you want

9   to add anything more, Mr. Galyon, to that?

10         **MR. GALYON:**  No, Your Honor.

11         **THE COURT:**  Okay.  Let me hear you just briefly on the

12  concealment issue.  I have looked at the cases, and most of the

13  cases I have found dealt with flight.  I may have asked you, but

14  has anybody found any cases that deal specifically with the issue

15  of concealment?

16      There is no doubt that they reference concealment.  In fact,

17  there is a unpublished case from the Fourth Circuit that

18  specifically lists concealment as one of the events along with

19  flight, resistance to arrest, and, quote, related conduct, closed

20  quote, that are admissible as evidence of consciousness of guilt

21  and, thus, of guilt itself; but I have not found any cases where

22  they were concealment.  They typically tend to be flight cases,

23  which I guess is more common in terms of the fact pattern you

24  would see.

25      What is the prejudicial effect of that testimony,

1  Mr. Harrison?

2          **MR. HARRISON:**  Well, it would allow Mr. Galyon to stand

3  in front of that jury and say, well, he is guilty of what he's

4  charged with in the indictment because he was hiding.

5          **THE COURT:**  All right.

6          **MR. HARRISON:**  And I mean --

7          **THE COURT:**  Now, there will be a jury instruction, if I

8  were to let it in, that will say that you can't reach that

9  conclusion.  The jury instruction will say something to the

10  effect of you can't presume guilt because of flight; it doesn't

11  create any presumption of guilt.

12      I haven't crafted an instruction for this yet subject to

13  actually making a decision on it; but if it were to come in, it

14  would essentially say, Lots of innocence people may feel guilty

15  and may want to hide if they are ever stopped, but whether or not

16  in this case this is evidence of guilt is for the jury alone to

17  decide.

18          **MR. HARRISON:**  Of course, if the Court's decision is to

19  let this in, then I would want that but what again -- I mean, we

20  are going on just this broadest of concepts of admissibility

21  because we don't know what my client knew of -- the Obi -- is

22  that how I pronounce the case from the Fourth Circuit that held

23  it was harmless error in a particular case to admit evidence

24  because it wasn't of the same case charged?  There was no

25  indication it was the same case charged that had motivated the

1  flight.

2      I just don't see that there is any -- I don't see how the

3  Government can argue, well -- or maybe they are not.  I don't

4  want to put words in his mouth, but my position is -- but the

5  argument is is, well, there isn't any evidence that he did, in

6  fact, know specifically what he was charged with, but that

7  indicates that he might have because a lawyer was told and maybe

8  he did tell him.  Maybe he didn't.  We don't know.  There is no

9  evidence of it.

10     So since there is no evidence of it, then we get this

11 tie-goes-to-the-government kind of thing.  Well, we don't have

12 any evidence --

13         **THE COURT:**  I will make sure the record is clear on

14 that.  There is no tie going to the Government in this case.

15         **MR. HARRISON:**  I understand that.  There is no evidence

16 that he knew that he -- the cases that I am now standing here

17 involved in a trial with was the reason why the people in

18 California are stopping the truck.

19         **THE COURT:**  Well, a lot of things tend to be proved by

20 circumstantial evidence and, at least at this point, there is

21 evidence that he and his cousin were close.  There is evidence

22 that he and his cousin dealt with drugs together, did drugs and

23 dealt drugs together; and I presume if this evidence were to come

24 in, there would be evidence that at this point in time, based on

25 the Government's proffer, that his cousin Melvin had been

1  arrested six weeks earlier, somebody with whom he, according to

2  the testimony in this case, traveled around with in the same car.

3  They got stopped together, were buying drugs together, at least

4  attempted to, according to the Government's case; and then Melvin

5  gets arrested and, six weeks later, the defendant won't come out

6  of the truck with a bullhorn.

7       There is certainly some evidence from which you could

8  conclude that it is a reasonable inference for the jury to make

9  that with his close cousin who he knew being arrested six weeks

10  earlier as a co-defendant named in the same counts of the

11  indictment that the jury could infer that the defendant was aware

12  of the charge.

13       I don't think the jury can infer from the lawyer -- the

14  comment to the lawyer.  I think -- I should clarify that.  It is

15  possible they could infer it from that.  I think that's less

16  strong of an inference.  I think the stronger inference is as to

17  his cousin's arrest, but I am also not aware that there are any

18  other charges pending against the defendant where he would have

19  been aware of any other charges.  Is there any other --

20       **MR. HARRISON:**  Well, there has certainly been evidence

21  of other crimes.

22       **THE COURT:**  All right.  What I am struggling with is,

23  one, the absence of any case law on the concealment issue and,

24  two, the notion that if somebody is engaged in activity --

25  extensive drug activity -- I am not saying that the defendant

 1 | necessarily is, but there is certainly testimony by the defendant

 2 | that he's buying on a weekly basis or would.

 3 |     I would be surprised if the law were that the defendant had

 4 | to have in mind this very charge as opposed to a charge related

 5 | to drug activity.  Otherwise, the more nefarious the defendant,

 6 | the more likely this evidence would ever come in at trial.  I am

 7 | not sure that's what the law would hold.

 8 |     So, I'm sorry, you wanted to say something else?

 9 |         **MR. HARRISON:**  Well, sir, I wanted to make -- really, I

10 | want to be as candid as I can with the Court.  I don't think

11 | there is really any conceptual difference between flight and

12 | concealment.  I think in both instances the same goal is

13 | accomplished; that is to say, you are either running or you are

14 | hiding and the effect, conceptually, I can't distinguish.  That

15 | would not be -- it would frankly not be part of my argument that,

16 | since we don't have any case law on concealment, you have to rule

17 | in my favor.

18 |         **THE COURT:**  Okay.  I appreciate that.  I would -- if I

19 | were you, Mr. Galyon, I would be prepared, if you want to put on

20 | any of the concealment evidence, to do that tomorrow.  I'll give

21 | you a firm ruling in the morning.  I apologize I haven't give you

22 | any more concrete than that at this point.

23 |     As I said, I wanted to see how the evidence was coming in as

24 | I evaluated this issue.  At this point, I would be leaning toward

25 | allowing it in.

 1        As to the other statements, I am less inclined to allow

 2   those in.  That's not a final ruling.  I am less inclined to do

 3   that simply because I think they do go to the state of mind of

 4   the defendant; but they do it in a more tangential way, and they

 5   are less probative than some of the evidence that's already in

 6   the case.

 7        So at this point I would be less inclined, particularly as

 8   to being busted in 2001 for the marijuana.  The one that I still

 9   think has some potential is he is aware of a methamphetamine

10   supplier and that does go to intent.  I'll let you know in the

11   morning as to that one if that's okay.

12           **MR. GALYON:**  Yes, sir.

13           **THE COURT:**  Anything further?  I kept you all late.  I

14   apologize for that, but I appreciate you all staying.  I would

15   like to get this resolved so that we can move with the evidence

16   in the morning.

17        From a timing point of view, you anticipate resting before

18   lunch tomorrow?

19           **MR. GALYON:**  Yes.

20           **THE COURT:**  All right.  What that means then is we need

21   to talk about the jury instructions probably.  I don't anticipate

22   what the defendant is going to do.  In the event that you have

23   made the decision not to put on any evidence or not much, then

24   we'll be in a position to charge the jury.

25        Do you know about what time you think that you would be

Case 1:08-cr-00233-TDS  Document 32  Filed 06/22/09  Page 196 of 205

1  finishing up tomorrow?

2          **MR. GALYON:**  I would anticipate 11:00 probably.  I say

3  that because I don't have any more videos or audio or anything

4  else to get in.  So I think that the evidence will be just

5  strictly more testimony and recounting.

6          **THE COURT:**  All right.  Is there anything -- let me --

7  let me stop just a minute.  I kept my staff.  Do any of you all

8  need to take a quick break?  I don't want to tax anybody's system

9  right now.

10     Jury instructions -- I have the Government's proposed

11 instructions.  Then I have proposed instructions from the

12 defendant.  Are there going to be any others?

13         **MR. HARRISON:**  Yes, sir.  As the evidence has developed

14 in the case, I will probably have another one or two.

15         **THE COURT:**  All right.  Can you give me some sense of

16 what they relate to?

17         **MR. HARRISON:**  Yes, sir.  If I haven't already -- I

18 can't recall right this minute whether they are in my request,

19 but the instruction on buy-sell.

20         **THE COURT:**  You've got that in here already.

21         **MR. HARRISON:**  And then there is an instruction on --

22         **THE COURT:**  Well, I would say -- you've got in here,

23 "If the evidence offered by the Government merely shows that the

24 defendant Melvin Johnson simply helped a willing buyer locate a

25 willing seller, such evidence, standing alone, is insufficient to

1  establish an agreement between the facilitator and either the

2  buyer or the seller."  Is that what you intended?

3       **MR. HARRISON:**  No, Your Honor.  Thank you for clearing

4  that up for me.  That's a different concept in my view and a

5  different jury instruction from the buy-sell agreement

6  instruction.

7     I have, as a matter of fact, a copy of a case that I can

8  give the Court right now.

9       **THE COURT:**  All right.  That would be helpful.  And let

10 me just say so it is clear, I am discussing instructions simply

11 because I have to be prepared as to where the case goes.  I don't

12 mean to, in any way, indicate any view on a Rule 29 motion.  I am

13 just getting prepared to deal with the Rule 29 when it comes up.

14    Do you have a case to hand up or a citation?

15       **MR. HARRISON:**  Pardon me?

16       **THE COURT:**  Is there a citation to it?

17       **MR. HARRISON:**  Well, I've got the case.  I don't know

18 if I've made notes.

19       **THE COURT:**  That's fine.  If you will just hand it up.

20 Does Mr. Galyon have a copy?

21       **MR. HARRISON:**  Now that I look at it, it is not a very

22 good -- I don't know whether -- my printer was skipping space.  I

23 can give it to the Court and --

24       **THE COURT:**  If you have --

25       **MR. HARRISON:**  -- with the hope that you can get a

1  better --

2          **THE COURT:**  We can find it probably.  Which circuit is

3  it from?

4          **MR. HARRISON:**  It is from the Seventh Circuit, which I

5  found to be one of the most active conspiracy law circuits in the

6  nation for some reason.

7          **THE COURT:**  I won't comment on that.

8          **MR. HARRISON:**  Chicago may have something to do with

9  it.

10          **THE COURT:**  If you would hand that up, I would be glad

11  to take a look at it.  And tell Mr. Galyon what the name of it

12  is.

13      (Defendant's Counsel handed Deputy Clerk document.)

14          **MR. HARRISON:**  There is also a noted case at the top

15  right that I don't have a copy of it right now, but it is one

16  that I will be asking the Court to consider.

17          **THE COURT:**  All right.  Mr. Galyon, are you aware of

18  the case names?  Or I can tell you what these are.  What he has

19  handed up is United States v. Rivera.  It is 273 F.3d 751, and

20  the noted case on the right is 284 F.3d 746.  There is no case

21  name.

22      There is also another -- well, let me see.  No, actually

23  this is all one case.  It just looks like it printed out funny;

24  is that right?

25          **MR. HARRISON:**  Yes, sir.

1          **THE COURT:**  So I will look at that.  Is there a

2   particular instruction this goes to, or what do you want me to do

3   with this other than be aware of it?

4          **MR. HARRISON:**  Well, the instruction -- that there is

5   language in those cases sufficient to -- in essence, the holding

6   in the cases contains language that I would want instructed.

7          **THE COURT:**  Okay.  You are going to need to be a little

8   more particular for me for purposes of the record.

9          **MR. HARRISON:**  All right, sir.

10         **THE COURT:**  Either now or in the morning.

11         **MR. HARRISON:**  I can do it in the morning.

12         **THE COURT:**  That would be better.  I can't instruct on

13  a case.  I can give or not give a requested instruction.  That

14  will be easier for me, if you don't mind.

15      Anything else from the defendant on requested instructions

16  at this time?

17         **MR. HARRISON:**  Your Honor, look what I found underneath

18  my -- and with the Court's permission, I would like to -- these

19  are my copies.  If you can just cite back to me what the copies

20  are, then I can print them out.

21         **THE COURT:**  Just tell me the citation numbers.  That's

22  all I need.

23         **MR. HARRISON:**  Two-eighty-four F.3d.

24         **THE COURT:**  That's the one you gave me.

25         **MR. HARRISON:**  This is a copy of it.

1          **THE COURT:**  You can keep that.  I can pull it off

2   Westlaw.  Anything else on that?

3      I am going to work on the instructions tonight.  That's why

4   I was hoping to have all the information I can have.

5      Now, let me give you a head's up and, that is, there is a

6   request that there is an instruction on unity of purpose.  I have

7   not seen that language in the Fourth Circuit.  The instruction on

8   the elements for a conspiracy seem to be pretty straightforward

9   in Fourth Circuit cases, and they don't include to my knowledge

10  any discussion of unity of purpose.  That seems to be a Third

11  Circuit and other circuit expression of a conspiracy.

12         **MR. HARRISON:**  I believe, Your Honor, a reading of

13  Guinta would give the sense of that.

14         **THE COURT:**  All right.  Well, if there is a part of

15  Guinta you can point me to for that, that would be helpful

16  because my inclination now is not to instruct as to that simply

17  because the Fourth Circuit law seems to be pretty clear on what

18  an appropriate elemental instruction is, and that did not appear

19  to be in it.  If there is language in Guinta that supports that,

20  if you can cite me to that --

21         **MR. HARRISON:**  I will.

22         **THE COURT:**  -- I will certainly consider that.

23  Presently -- well, let me just leave it at that for now.  I will

24  have a draft, I hope, in the morning to share with you.  I would

25  like to get all the kinks worked out on the proposed instructions

1  so that we can keep moving forward, if necessary; but we'll deal

2  with it as we need to.  I certainly, obviously, want them all

3  worked out before you do your closings.

4          **MR. HARRISON:**  Just, finally, if we are going to be --

5  if my colleague's prediction is somewhere accurate, then it would

6  seem to me we are going to be in a situation where we may have

7  some dialogue with regard to instructions.  Then at some point I

8  am hoping that I can get a feel of when we are going to have

9  closing.

10         **THE COURT:**  All right.  Well, I think if he's done by

11  11:00 and assuming you do not put on any evidence, then what I

12  would do at that point is hear the Rule 29 and as the -- after

13  the Rule 29, particularly, if there is -- if it's unlikely you

14  are going to present any evidence, then I would consider doing

15  the charge conference at that point.

16      I may do the Rule 29 argument -- depending on the timing of

17  it, I could bring the jury back in.  If you decide not to put on

18  any evidence, you could rest before the jury and then send them

19  out for lunch; and then we can do the charge conference over

20  lunch, and then you all can close when they come back, and we'll

21  just arrange their lunch hour around whatever our schedule is.

22      Does that provide enough guidance?

23         **MR. HARRISON:**  Yes, sir.

24         **THE COURT:**  Do you have any idea how long you all will

25  need to close?

Case 1:08-cr-00233-TDS   Document 32   Filed 06/22/09   Page 202 of 205

 1          **MR. HARRISON:**  I hope I am not going to talk this long,

 2  but possibly 45 minutes.

 3          **THE COURT:**  All right.

 4          **MR. GALYON:**  I would say somewhere in that

 5  neighborhood.

 6          **THE COURT:**  So it's still possible that the jury could

 7  get the case tomorrow if you decide not to put on any evidence;

 8  it is a possibility.

 9          **MR. HARRISON:**  I am not surprising anyone by making an

10  observation that, if it helps the Court plan, there is very

11  little likelihood of my putting on any evidence.  Of course, if I

12  win, we all go home.

13          **THE COURT:**  You don't have to commit to that.

14  Obviously, if you decide to put anything on, just build that into

15  that schedule; but that sounds about like where things are

16  headed.

17          **MR. HARRISON:**  Yes, sir.

18          **THE COURT:**  Well, let's stop there for the evening.  It

19  is late enough as it is.

20      Should we try to get together at 9:00 among our group; and

21  then if we are ready, soon after that, we'll bring the jury in

22  whenever they come in?  How does that sound?

23          **MR. GALYON:**  Yes, sir.

24          **MR. HARRISON:**  Yes, sir.

25          **THE COURT:**  We'll recess then until 9:00.

Case 1:08-cr-00233-TDS  Document 32  Filed 06/22/09  Page 203 of 205

1    (The Court recessed at 5:46 p.m.)

2

3                    **END OF VOLUME II**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  <u>CERTIFICATE OF REPORTER</u>

4

5

6          I,  Briana L. Nesbit, Official Court Reporter, certify

7  that the foregoing transcript, Volume II of III, is a true and

8  correct transcript from the record of the proceedings in the

9  above-entitled matter.

10

11          Dated this 18th day of June 2009.

12

13

14                          <u>//s//Briana L. Nesbit</u>
                            Briana L. Nesbit, RPR
15                          Official Court Reporter

16

17

18

19

20

21

22

23

24

25

BRIANA NESBIT, RPR        OFFICIAL COURT REPORTER    (336) 254-7464