IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3    UNITED STATES OF AMERICA        )      DOCKET NO. 1:08CR233-1
                                    )
4            vs.                    )
                                    )      Winston-Salem, North Carolina
5    CLEVE ALEXANDER JOHNSON        )      December 19, 2008
                                           9:33 a.m.
6    _____      **VOLUME III OF III**

7

8        TRANSCRIPT OF THE TRIAL -- CLOSINGS/INSTRUCTIONS/VERDICT
                 BEFORE THE HONORABLE THOMAS D. SCHROEDER
9                  UNITED STATES DISTRICT COURT JUDGE

10   APPEARANCES:

11   For the Government:       RANDALL GALYON, AUSA
                               Office of the U.S. Attorney
12                             251 N. Main Street, Suite 726
                               Winston-Salem, North Carolina 27101

13

14   For the Defendant:       WAYNE HARRISON, ESQ.
                               101 S. Elm Street, Suite 230
15                             Greensboro, North Carolina 27401

16

17   Court Reporter:          BRIANA NESBIT, RPR
                               Official Court Reporter
18                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120

19

20

21

22

23

24        Proceedings recorded by mechanical stenotype reporter.
           Transcript produced by computer-aided transcription.

25

```
                              INDEX

                    Direct   Cross   Redirect   Recross

GOVERNMENT'S WITNESSES:

TIM HODGES (Cont.)      12      18       20         --

HENRY VALENCIA          21      --       --         --


RULE 29 MOTION:                 34, 145

OPENING ARGUMENT BY MR. GALYON:    91

CLOSING ARGUMENT BY MR. HARRISON: 98

CLOSING ARGUMENT BY MR. GALYON:    110

JURY INSTRUCTIONS:                 117

VERDICT:                           140

JURY POLLING:                      142


EXHIBITS:                          Marked   Received

G-14    Photograph of Tractor-Trailer       30       32
G-15    Photograph of Tractor-Trailer       30       32
G-16    Copy of Defendant's driver's license 30      32
```

P R O C E E D I N G S

(The Court was called back to order at 9:33 a.m.)

(The Defendant was present.)

**THE COURT:** I apologize for not being out here a little bit earlier. I am trying to work through the instructions. I didn't make the progress on that that I thought we could. I still have a couple more things to do with that. So I don't have a draft yet, and I just received from Mr. Harrison some proposed instructions that I will try to incorporate; and we can have a draft to work off of that. I don't think it will be long. As soon as we have another break, I should be able to get to that.

Give me just a minute here to get organized. We also, I think, had a juror who was a little late getting in this morning. I understand, I think, they are now all here.

I have considered the potential testimony as to the post-arrest conduct, both as to the alleged statements by the defendant and as to the circumstances of his arrest. As I said, I am inclined to let in the circumstances of arrest testimony. So I am going to rule that that's admissible. I think it is -- ordinarily, as the cases say, circumstances of arrest is admissible conduct.

I think, in addition to just the circumstances of his arrest, there is evidence of potential concealment. I will give an instruction on concealment that will indicate that the mere fact that somebody concealed themselves or -- and we can work on

 1  the language, but the essence will be the mere fact of the

 2  circumstances of arrest, including concealment, does not create

 3  any kind of presumption of guilt, et cetera, but it is simply a

 4  factor that they can take into account.

 5      I read, as I said, the case law in the Fourth Circuit

 6  including United States v. Gardner 1 F.App. 108, a 2001 case,

 7  unreported; but the court says that, "We find that the testimony

 8  regarding the defendant's behavior at arrest is relevant to

 9  consciousness of guilt."  In citing an Eighth Circuit case, it

10  says that they recognize that it is, in the words of the court,

11  "universally conceded that the fact of an accused's flight,

12  escape from custody, resistance to arrest, concealment" -- and it

13  lists a bunch of other factors -- "are admissible as evidence of

14  consciousness of guilt and, thus, of guilt itself."

15      In that Fourth Circuit case, there is no further analysis

16  other than it is committed to the discretion of the trial judge

17  under Rules 401 or 403.

18      So I have considered the potential prejudicial effect of

19  such evidence but find that the probative value as to intent in

20  this case, which is a critical element of both counts, is not

21  substantially outweighed by its prejudicial effect; and, also, I

22  will give an instruction that advises the jury as to the basis

23  that they should and should not consider such evidence.  I think

24  that the instruction will also ameliorate any concern in that

25  regard.

1       As to the statements after arrest, at this point, I think I
2   would like to hear more on what the statements are.  So if the
3   witnesses are going to be available, what I would like to do is
4   have a proffer of evidence of what the statements exactly are
5   going to be before I make a final ruling on that.

6       Is that something that the Government would be interested in
7   doing?  I leave it up to the Government whether you want to do
8   that in order to put it on.

9       One of the concerns I have is that the statement about
10  knowledge of the drug trade and suppliers is clearly relevant --
11  or could be relevant to knowledge of the drug industry by the
12  defendant.  The statement, though, also was made, as I understand
13  the evidence, several weeks after co-defendant Melvin Johnson was
14  already arrested.  So it is, thus, obviously, after the
15  conspiracy had ended, at least as to the two defendants; and the
16  statement also refers to allegedly activity that the defendant
17  had within the two weeks prior to his arrest, which would have
18  been post-arrest of Melvin Johnson.

19      So one of the concerns I have is to what extent the witness
20  would, through the testimony, tie up knowledge of the drug
21  industry extending well into the conspiracy period and if that --
22  if there is evidence of that, then that would be more probative.

23      If the evidence is limited to knowledge post the conspiracy
24  period, then I would exclude the evidence because I don't believe
25  it would necessarily bear on the intent during the conspiracy

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 5 of 147

1  period in question.

2       So that is a concern I have; and if the Government wants to

3  proffer the testimony, then I would be glad to make a ruling as

4  to that.

5       As to the volunteered statement to help, as I understand it,

6  the defendant had waived his Miranda rights; and in the absence

7  of any expressed retraction of that waiver, then those statements

8  are admissible.  They are also statements of admissions as

9  opposed to statements of the co-conspirator.  So the fact that

10 they come after the conspiracy does not in itself bar their

11 admission.  They would be inadmissible against Melvin Johnson on

12 that basis, but they are not inadmissible as against the

13 defendant himself, at least as I understand it.

14      You all can correct me if you think the law is otherwise;

15 but the issue is to what extent he can give that testimony

16 without referring to the issue I just raised, and that was the

17 nature of his knowledge about the drug industry and what period

18 of time that relates to, whether it is during the conspiracy

19 period or not.  So to me, they are tied together.  For that

20 reason, I can't rule on the volunteered statements and the fact

21 that he was going to volunteer help and then withdrew that offer

22 until I know more about the underlying statement, which I think

23 is necessarily likely to come up.

24      So if it turns out that the underlying statement is well

25 within the conspiracy period, I think it goes to intent and then

 1  I would allow the witness to testify as to what the defendant

 2  allegedly said about his knowledge of the drug trade and his

 3  offer to help because, as I understand the testimony, one of the

 4  reasons he continued to -- the defendant continued to have as

 5  sources for distribution the people he allegedly mentioned is

 6  because he did not rat them out, if you will; and there is an

 7  inference the jury can draw that he is now, in his own mind, in

 8  enough difficulty because of what he knows about the crime that

 9  he allegedly committed that he's now willing to rat them out.

10       In other words, the evidence could go to his consciousness

11  of guilt about the charges that are pending against him.  As I

12  understand the evidence, he had been informed of the charges

13  against him at the time that he made these statements allegedly.

14       So that's my ruling on that.  Anything further you need from

15  me on that before you know what you might want to intend to do,

16  Mr. Galyon?

17            **MR. GALYON:**  No, I don't.  Just to tell the Court, in

18  speaking with the agent, there is not anything additional.  For

19  instance, there is not some additional information within the

20  statement that would indicate that this defendant was being

21  supplied by those individuals during the timeframe of the

22  conspiracy.  It was a proactive -- or a going-forward type of

23  offer essentially; that is, that he had had contact with them two

24  weeks prior to his arrest and that they -- he felt that they

25  would be willing to supply him such that he could then use that

1  as part of the cooperation effort.

2      So I don't have evidence that the conspiracy indicates that

3  he was being supplied during the timeframe of the conspiracy and

4  I won't attempt -- I mean, based on that and based on the Court's

5  ruling, I don't have any intent of trying to get any of that

6  statement in.

7          **THE COURT:**  Okay.  So do you believe that you'll be

8  calling any of the people with respect to the concealment?

9          **MR. GALYON:**  The concealment, yes.

10         **THE COURT:**  Which is a separate incident?

11         **MR. GALYON:**  Yes, sir.

12         **THE COURT:**  But not as the other -- not as to the

13 post-arrest statements?

14         **MR. GALYON:**  Not as to the post-arrest statement at

15 all.

16     And just to let the Court know, in conversation with the

17 agent related to that issue, the concealment issue, one of the

18 things that I was unaware at the time but, in speaking with him,

19 have learned and want to address is that when they used the PA to

20 say Cleve Johnson come out, they specifically said, "You have a

21 federal fugitive warrant for your arrest from North Carolina."

22     I think that the fugitive issue may be one that perhaps may

23 cause some problem but I'll -- I want to raise that with the

24 Court because I certainly don't want that to come up the first

25 time when I call the witness to testify and he says that.  I've

 1  alerted Mr. Harrison to that fact.  I just wanted the Court to

 2  know that as well.

 3          THE COURT:  What is the basis of claiming that he was a

 4  fugitive at that time?

 5          MR. GALYON:  The way that that had occurred was because

 6  of contact that Special Agent Denney had with the attorney in the

 7  case and then, because the defendant did not subsequently have

 8  contact with law enforcement after they had attempted to locate

 9  him for a week or so, he was put in the Marshal system as a

10  fugitive.

11      So that's the basis for why they in California said that he

12  was a fugitive.  So it was simply based on information that they

13  had received through another federal agency that he was a

14  fugitive.  They had the federal arrest warrant in hand and, you

15  know, the fugitive status was simply based on the fact that --

16  the lapse in time and based on the fact that he hadn't turned

17  himself in.

18          THE COURT:  Okay.  Is there any legal infirmity in

19  referring to the defendant as a fugitive at that time?  I mean,

20  was it an appropriate classification of his status?

21          MR. GALYON:  Yes.

22          THE COURT:  What does it require to be a fugitive under

23  federal law?

24          MR. GALYON:  Well, I am not sure specifically what

25  would be required, and that may be something that I would perhaps

1  need to raise with the agent but I think -- because of the

2  circumstances and the fact that the defendant was to turn himself

3  in and didn't, I think that was the basis, but I will tell the

4  Court that I don't intend to put on evidence related to any

5  conversation -- because of the attorney-client privilege issues,

6  I don't intend to go into any of that, and that's why I

7  questioned whether or not I would be able to put on evidence that

8  he was, in fact, a fugitive.

9        **THE COURT:**  You said just a minute ago that he didn't

10 turn himself in.  What is that based on?

11       **MR. GALYON:**  That's based on conversations that the

12 special agent had with his civil attorney, the attorney that

13 represented him in the forfeiture, and a voice mail message that

14 the civil attorney left saying, you know, that he thought that

15 the defendant was going to turn himself in and that the agent

16 would need to do what he needed to do as far as declaring him a

17 fugitive.

18       **THE COURT:**  Okay.  All right.  Mr. Harrison, do you

19 want to be heard at all?

20       **MR. HARRISON:**  Well, sir, as I just understood what

21 Mr. Galyon was saying, it is actually a non-issue.  He is not --

22 he is not planning on putting the foundation in to support the

23 conclusion -- the statement that someone is a fugitive.  So I

24 don't think he is going to try to put that in; or if he is, then

25 I would object.  One of the grounds being --

1          THE COURT:  Before you -- let me just stop.  If it's a

2   moot issue, it is a moot issue.

3        Do you intend to put in the statement that he was a fugitive

4   as part of that, or do you intend to ask it in such a way that

5   the law enforcement officer does not say the word "fugitive"?

6   Because I'm sure, from what Mr. Harrison is saying, if it doesn't

7   come out on direct, I doubt that there is going to be cross on

8   that issue.  Is that right, Mr. Harrison?

9          MR. HARRISON:  I do some stupid things, but that will

10  not be one of them.

11         THE COURT:  Are you proffering that fugitive phrase?

12  Are you indicating that you believe that you would offer the

13  evidence without getting into that?

14         MR. GALYON:  Well, I wanted to alert the Court and have

15  the Court decide.  I have some question in my own mind about if

16  that would essentially create more problems than it would solve

17  by saying that he was a fugitive without having other testimony

18  that would explain why he was classified as a fugitive.

19         THE COURT:  I think, if he were a fugitive, it would be

20  probative on the concealment issue.  There has to be foundation

21  for it, but I don't hear any foundation for it.  If there is no

22  foundation laid for the fact that he was a fugitive, then I think

23  the witness should not mention it; and it would be a potential

24  issue.

25        Can you advise the witness to that effect?

```
 1          MR. GALYON:  Certainly, Your Honor.

 2          THE COURT:  Okay.  Well, I'll order that he be

 3   precluded from mentioning the term "fugitive" or to refer to the

 4   defendant in any way as a fugitive.

 5      All right.  Anything else on that issue?

 6          MR. GALYON:  No, Your Honor.

 7          THE COURT:  Okay.  All right.  We still had on the

 8   stand the -- you were still on your direct, I believe, is that

 9   correct, with patrolman -- or officer, rather, Tim Hodges?  At

10   this point, I think what we ought to do is continue with the

11   direct.

12      All right.  If you would, Miss Solomon, let's bring the jury

13   in.

14      (The Witness returned to the witness stand.)

15      (The jury returned to the courtroom at 9:57 a.m.)

16          THE COURT:  Good morning, ladies and gentlemen.

17   Welcome back.  Officer, I remind you are still under oath.

18   Mr. Galyon, you may proceed.

19          MR. GALYON:  Thank you, Your Honor.

20   BY MR. GALYON

21   Q   Detective Hodges, we had gotten into January of 2008

22   yesterday related to the investigation.  On January 7th, what

23   happened related to the investigation?

24   A   January 7th, we followed the witnesses down to, I guess,

25   Greensboro -- I'm sorry -- Guilford County to an area and picked
```

1    up -- on January 7th, we picked up Wizard, or Melvin Johnson, at

2    Penny Pope's house, and on that day is when we gave our witness

3    Robby Todd $600 so that he could give that money to Melvin

4    because Melvin was short on what money he owed Cuz, or Cleve

5    Johnson, for previously purchased meth.

6          So when we picked up Melvin Johnson at Penny Pope's, they,

7    Melvin and Cleve, got in their vehicle and our witnesses followed

8    them to a parking lot, gas station parking lot.  That's where we

9    all met up at.

10   Q    When you say "previously purchased meth," was that

11   previously provided meth?  He didn't pay for it at the time as

12   far as you knew?

13   A    That's my understanding, that it was --

14          **MR. HARRISON:**  Well, Your Honor, I object.  He was not

15   there.  It is clearly information based on statements of other

16   people.

17          **THE COURT:**  Sustained.

18   **BY MR. GALYON**

19   Q    And as far as the investigation on January 7th and what

20   happened at the Hess station, were you able to hear any

21   conversation between Robby Todd and anyone else?  Were you able

22   to hear the audio transmission?

23   A    I think that is the actual day that it was going in and out.

24   We couldn't get but so close.  If we could hear anything, it was

25   very little.

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 13 of 147

1  Q    All right.  And after that incident on the 7th, did you have

2  an opportunity to debrief, or talk, to Robby Todd and Lori

3  Wilson?

4  A    Yes, sir.  It was early in the morning.  We had been up all

5  day, pretty much all night, and it was early in the morning when

6  we actually made it back to Mount Airy.  Myself -- I done a short

7  debrief that night, and the witnesses had to get back to work

8  early that morning.  We released them after a short debrief, and

9  then brought them in, I think, on January 10th; and my partner,

10 Detective Wagoner, done an in-depth interview on that day.

11 Q    And were they searched that night when they came back in on

12 the early morning hours of the 8th?

13 A    Yes, sir.

14 Q    Did they have any of the money with them?

15 A    No, sir.

16 Q    Did they have any methamphetamine with them?

17 A    No, sir.  We were actually concerned.  Since we had paid

18 this money back, there was talk between the witnesses and us that

19 Melvin may get some more methamphetamine from Cleve since he had

20 paid what he owed, but he didn't know if any more would be

21 fronted or not.  We had discussed and told the CIs --

22            **MR. HARRISON:**  Object.

23            **THE COURT:**  Sustained.

24 **BY MR. GALYON**

25 Q    After that occasion on January 7th going into the 8th, were

1  there phone calls between Robby Todd and Cleve Johnson?

2  A    To the best of my knowledge, there were some phone calls.

3  Q    Do you know how it was that Robby Todd got the phone number

4  for Cleve Johnson?

5  A    Yes.  On the 7th, at the meeting while they were parked

6  vehicle to vehicle, there was some discussion going on and Cleve

7  Johnson -- well, Robby Todd said he didn't know -- he yelled to

8  Cleve and said he didn't know how to get in touch with him, and

9  Cleve Johnson yelled his phone number out to our CIs.

10 Q    And then, thereafter, was a meeting set up between Cleve

11 Johnson and the undercover officer posing as the Hispanic

12 supplier of methamphetamine?

13 A    Yes, there was.

14 Q    Did you transport Robby Todd and Lori Wilson down to

15 Greensboro to help make that meeting happen?

16 A    Yes, sir.  We picked them up at the police department,

17 transported them to Special Agent Denney's office.

18 Q    And, thereafter, did you and the other officers participate

19 in surveillance there at the Home Depot?

20 A    Yes, sir.

21 Q    Were you actually able to see the meeting occur between the

22 undercover and this defendant?

23 A    I seen Robby exit Cleve's vehicle.

24 Q    You say Cleve's vehicle or the UC vehicle?

25 A    I'm sorry.  The UC vehicle.  I seen Robby exit the UC

 1  vehicle.  Robby went into the store, and I seen Cleve walking to

 2  the undercover vehicle; and we kind of dropped back and let

 3  Special Agent Denney's people get a little closer.  So we were

 4  kind of afraid that they might see us.

 5  Q    And then, thereafter, did you have -- was there any further

 6  contact between the CI and this defendant, Cleve Johnson?

 7  A    After the 23rd?

 8  Q    Yes, sir.

 9  A    Yes, sir.  I think we done some more phone calls trying to

10  purchase a gun and some more methamphetamine.

11  Q    And as to -- did there come a time in June when a federal

12  arrest warrant was issued for this defendant and Melvin Johnson?

13  A    June 16th is what I recall.  We had a federal indictment --

14  I know Melvin was arrested on June 16th with a federal

15  indictment.

16  Q    Did you participate in that arrest?

17  A    Yes, sir, I did.

18  Q    And that was June 16th of this year?

19  A    That's correct.

20  Q    And, thereafter, were there attempts to locate Cleve Johnson

21  up in Surry County?

22  A    Yes.

23  Q    Were there attempts to locate him elsewhere?

24  A    Not by me or my partner.  We couldn't locate him in Surry

25  County, and we called Special Agent Denney and told him we didn't

1  know where to look for him here.  We had tried where we knew he

2  might associate at.  Special Agent Denney said that he had him

3  and his people on it.

4            **MR. HARRISON:**  Object.

5            **THE COURT:**  Sustained.

6  **BY MR. GALYON**

7  Q    Now, Detective Hodges, as far as dosage units of

8  methamphetamine, have you had individuals working for law

9  enforcement purchase essentially dosage units of methamphetamine

10 from individuals?

11 A    Yes, sir.

12 Q    What is the sort of personal use or dosage unit that a

13 person would buy in order to smoke methamphetamine?

14 A    From my understanding, and this comes strictly from viewing

15 people, most of the time just personal use is a gram to maybe a

16 sixteenth.  From what I've been told from numerous informants, a

17 gram -- they may get two or three or four hits off of a gram,

18 which a gram is the size of a Sweet'n Low pack.  On a gram, they

19 may get high two or three times on it.

20 Q    Have you -- in directing informants or undercovers to make

21 purchases of methamphetamine, have you in Mount Airy determined

22 the typical going rate for a gram of methamphetamine?

23 A    Depending on the quality of meth, a gram can go from $60 to

24 a $100.

25            **MR. GALYON:**  I don't have anything else.

BRIANA NESBIT, RPR        OFFICIAL COURT REPORTER    (336) 254-7464

1          **THE COURT:**  Cross-examination?

2          **MR. HARRISON:**  Yes, thank you, sir.

3                          CROSS-EXAMINATION

4    BY MR. HARRISON

5    Q    Officer Hodges, were you able -- after your contacts you

6    just testified about after January of 2008, did anyone that you

7    were connected with, in terms of cooperative individuals -- were

8    they successful in selling to or buying from Cleve Johnson?

9    A    No, sir.

10   Q    Neither drugs nor gun?

11   A    No, sir.

12   Q    Well, let me redirect your attention to the events of

13   December 11th.  I believe you testified on direct that you were

14   contacted sometime fairly early in the morning with news that

15   there might be a transaction proposed involving a pound of

16   methamphetamine; is that accurate?

17   A    No, sir.

18   Q    You weren't notified?

19   A    Yes, sir, but it wasn't that it might go.  I was contacted,

20   stating that there was a drug transaction going to occur.

21   Q    That my client and Melvin were in town and had contacted the

22   undercover people?

23   A    That is correct.

24   Q    Or not undercover, but cooperating individuals?

25   A    That is correct.

1  Q    Now, you didn't then -- you didn't set up a place or a

2  person to make out this pretend transfer of methamphetamine, did

3  you?

4  A    I told my witnesses where to meet.

5  Q    Well, let me rephrase the question.

6  A    Please.

7  Q    Did you have -- did you have some Mexican available to play

8  the part of a methamphetamine seller?

9  A    Not at that time, no, sir.

10 Q    Okay.  Did you have a pound of methamphetamine available?

11 A    No, sir.  We cannot put meth on the streets.

12 Q    Well, you just didn't have a pound of methamphetamines, is

13 that --

14 A    That's correct.

15 Q    -- is that the answer to my question?

16 A    Yes, sir, we did not have a pound that morning.

17 Q    So what actually happened was you, or some other person in

18 the Mount Airy Police Department, or a combination of people made

19 a decision to abort any meeting between an imaginary seller of

20 methamphetamine and my client?

21 A    Yes, sir.  We let them get just as close to buying the meth

22 as we could, and then we stopped the transaction.

23 Q    You did that motivated primarily by your concern not to blow

24 the cover on your cooperating individuals; is that correct?

25 A    Yes, sir.  We wanted to further the investigation and keep

1  them from getting hurt, yes, sir.

2  Q    Okay.  Well, nobody made any threats to them physically, did

3  they?

4  A    At the beginning of the case, both CIs informed us that they

5  were very scared of these two subjects, and that they had been

6  informed by Melvin that, if they had contacted law enforcement,

7  they would be dealt with accordingly.

8  Q    So in the face of that, they then later that day on their

9  own, without any police protection, voluntarily went to meet

10 Melvin at his -- where he lived?

11 A    Yes, sir, because Cleve was going back to where he lived to

12 get paperwork and come back.

13 Q    Okay.  But your two cooperating individuals were not so

14 frightened that they didn't -- that they didn't go on their own

15 unarmed and unprotected to the man's house?

16 A    That is correct.

17          **MR. HARRISON:**  That's all.  Thank you.

18          **THE COURT:**  All right.  Any redirect?

19          **MR. GALYON:**  Just briefly, Your Honor.

20                    REDIRECT EXAMINATION

21 **BY MR. GALYON**

22 Q    Mr. Harrison asked you about aborting the meeting that was

23 going to occur on December 11th?

24 A    Yes, sir.

25 Q    There wasn't going to be a meeting; is that right?

1  A    No, sir.  Not at that time, no, sir.

2  Q    And in doing these drug transactions or drug work, do you

3  ever, on behalf of law enforcement, have individuals sell drugs

4  to individuals?

5  A    No, sir.  We cannot sell any type of drugs.

6          MR. GALYON:  That's all.  Thank you.

7          THE COURT:  All right.  You may step down.  You may

8  call your next witness.

9          MR. GALYON:  Thank you.  The United States calls Hank

10 Valencia.

11 HENRY P. VALENCIA, GOVERNMENT'S WITNESS, being first duly sworn,

12 testified as follows:

13                    DIRECT EXAMINATION

14 BY MR. GALYON

15 Q    If you would, state your name, please, sir.

16 A    Henry Phillip Valencia.

17 Q    How are you employed, sir?

18 A    I'm employed by the County of San Bernardino as a deputy

19 sheriff.  I'm an investigator for the narcotics division and a

20 task force officer with the DEA.

21 Q    And how long have you been employed with the sheriff's

22 office there in San Bernardino County, California?

23 A    Thirty-seven years.

24 Q    How long have you been a task force officer with the DEA?

25 A    Two years.

1  Q    How many narcotics investigations have you done during the

2  course of your 37 years?

3  A    I'm just going to low ball it and say over 1,000.

4  Q    July 24 of this year, did you have an opportunity to come in

5  contact with this defendant, Cleve Alexander Johnson?

6  A    Yes, I did.

7  Q    If you would, explain the circumstances relating to your

8  contact with Mr. Johnson on that day.

9  A    I had been contacted by group supervisor -- acting group

10  supervisor, Kevin Hatchett of the Riverside District Office of

11  the DEA where I am assigned to.  That was about 9:30 in the

12  morning, July 24, 2008.  He had advised me that --

13          **MR. HARRISON:**  Object.

14          **THE COURT:**  Sustained.

15  **BY MR. GALYON**

16  Q    As a result of the information that you received from the

17  group supervisor, what did you do?

18  A    I responded to the Needles area in San Bernardino County,

19  which is near the Arizona border, where a vehicle stop had taken

20  place on a truck Cleve Johnson was in.

21  Q    And this area there in Needles, California, is that

22  essentially out in the desert part of California?

23  A    It is.

24  Q    And do you recall what the temperature was like that day?

25  A    It was hot.  Probably in the hundreds.

1  Q    Were you in the company of other officers during the course

2  of the vehicle stop?

3  A    I was.

4  Q    And what other officers were there?  What other agencies?

5  A    San Bernardino County Sheriff's Department, High Desert

6  Impact Team, U.S. Marshals, highway patrol I believe was there

7  also, and myself representing DEA.

8  Q    What type of vehicle was stopped on that occasion?

9  A    It was a white freightliner tractor-trailer pulling -- I

10 think it was a 53-foot reefer trailer.

11 Q    And had you received information, prior to even getting to

12 the location, that the marshals were -- or had information about

13 locating Mr. Johnson?

14          **MR. HARRISON:**  Object.

15          **THE COURT:**  Sustained.

16 **BY MR. GALYON**

17 Q    When you got to the site of the vehicle shop -- well, first

18 of all, how far outside Needles was the vehicle stopped?

19 A    It was about 17 miles south of Needles on Highway I-95.

20 Q    And when you got to the site of the vehicle stop, what did

21 you do or see?

22 A    I noticed that the sheriff's units that were there were the

23 sheriff's crime impact team, and the U.S. Marshal that was with

24 them had positioned their units and already initiated the vehicle

25 stop on the tractor-trailer and had removed two subjects from the

1   tractor-trailer.

2   Q    And was there information -- or were they asked about

3   whether Cleve Johnson was in the vehicle?

4               **MR. HARRISON:**  Object.

5               **THE COURT:**  Overruled as to what the officers asked.

6               **THE WITNESS:**  Yes.

7   **BY MR. GALYON**

8   Q    And do you know what those individuals said?

9               **MR. HARRISON:**  Object.

10              **MR. GALYON:**  Your Honor, if we may approach?

11              **THE COURT:**  Yes.

12         (The following proceedings were had at the bench by the

13         Court and Counsel out of the hearing of the jury:)

14              **MR. GALYON:**  Your Honor, it is my contention that what

15  they say is not hearsay because I am offering it -- I will tell

16  the Court that the information they give is he is not in the

17  vehicle, and that information is not hearsay because I am not

18  offering it for the truth of what they say.  As a matter of fact,

19  I know it is not the truth; and the officer will testify about

20  that because he is present when Cleve Johnson is taken out of the

21  vehicle.  So I am offering it simply for that purpose.

22         I think that it also goes to show that they were aware that

23  he was in the vehicle and that they were either directed to or

24  help support his rouse that he wasn't present in the vehicle.

25              **MR. HARRISON:**  Well, either this or either that -- we

 1  don't know what why they said what they said, and there is

 2  absolutely no probative value in them saying that he's not --

 3  what does that prove?  It doesn't do anything except potentially

 4  inflame the jury.

 5          THE COURT:  How does it inflame the jury?

 6          MR. HARRISON:  Well, it simply makes a mountain out of

 7  this plot to conceal him or something.  What does it prove?

 8          THE COURT:  Well, I think it could be relevant just to

 9  show that motivation of why the officers continued to act.

10      Can you ask the questions in a way that you don't have to

11  have that answer?

12          MR. GALYON:  Sure, I can continue to go forward.  I

13  think if that's the case I certainly -- I want to make sure that

14  there is some information out there to indicate to these -- to

15  the jury that these officers had a federal arrest warrant in

16  hand.

17          THE COURT:  At some point -- let me ask you this, will

18  he testify that they told the people that they had a federal

19  arrest warrant?

20          MR. GALYON:  I'm sorry?

21          THE COURT:  He is going to testify that somebody told

22  the two occupants that got out of the truck that they had a

23  federal arrest warrant for Cleve Johnson?

24          MR. GALYON:  Yes.

25          THE COURT:  And then --

1          MR. GALYON:  And about five minutes into it, they

2     recanted their earlier denial; and I didn't anticipate getting

3     that in because then it would be offered for the truth to show

4     that, yes, they admitted that he was in the vehicle --

5          THE COURT:  Right.

6          MR. GALYON:  -- which we already knew.

7          THE COURT:  I guess what I'm asking is can you fashion

8     your questions in a way where you don't have to have their denial

9     as part of the questioning?

10          MR. GALYON:  Sure, I can skip that, certainly.

11          THE COURT:  I am going to sustain the objection because

12     I think that while you may be -- I think there is an argument as

13     to why it can come in for reasons other than the truth of the

14     matter.  I think you can ask the questions and get the same

15     result.  There is a potential prejudicial effect because we don't

16     know about any conversation with the defendant.

17          The jury can draw the inference that the defendant continued

18     to try to conceal, but I think, given the passage of time and

19     what I anticipate the testimony to be, that it took an hour to

20     get him out of the truck, I think there is sufficient evidence to

21     draw the same inference without having to elicit this testimony.

22          So if there is a way you can fashion your questions to avoid

23     eliciting this response and simply asking the officer what did he

24     tell them and what happened next, see if you can get it that way.

25     I think that would be preferable.

 1      (Thereupon, the following proceedings continued within the

 2      hearing of the jury:)

 3  **BY MR. GALYON**

 4  Q    Detective Valencia, were the two people that were taken out

 5  of the truck -- were they identified?

 6  A    They were.

 7  Q    And what were their names?

 8  A    Tony Hall was driving it.  He was a male friend of Cleve

 9  Johnson's, and a female by the name of -- I think her name was

10  Susan Graham.

11  Q    And were those two individuals told whether or not this

12  defendant was wanted on an arrest warrant out of North Carolina?

13  A    At some point, yes.

14  Q    Well, shortly after you arrived, did law enforcement

15  officers use a public address system?

16  A    Yes.

17  Q    And what was the public address system used for?

18  A    To ask Cleve Johnson to exit the vehicle, that there was a

19  federal warrant out for his arrest out of North Carolina.

20  Q    Okay.  And tell the ladies and gentlemen of the jury how

21  that public address system was used and where the PA was in

22  relation to the truck that Mr. Johnson was in.

23  A    When I arrived there, the units already set up in a

24  felony -- in their vehicle stop, they set up their units for a

25  felony stop.  What we consider a felony stop on the vehicle is

1  when we position our units behind the car that we are stopping or

2  the truck that we are stopping.  We usually offset it to the

3  right of the driver's side so they can see out the mirror, and

4  the officer can see any movement through those mirrors inside the

5  cab or inside the vehicle and we were approximately -- the first

6  unit was approximately two car lengths behind the trailer, offset

7  to the right, or the driver's side, of the back of the trailer.

8  The PA system was located on the front of that unit, and the

9  officer was making the announcements from that PA system, which

10  was very loud.

11      I had positioned myself in the desert area about 100 yards

12  away from the vehicle stop on the passenger side so that I could

13  look into the cab of the trailer to see if I seen any movement

14  through the passenger window, and I could hear plainly the

15  announcements being rebroadcast and rebroadcast and rebroadcast

16  for, I think, maybe about 20 minutes to half an hour.

17  Q    After that 20 minutes or half hour of continuously asking

18  Cleve Johnson to come out of the cab of the vehicle, what

19  happened?

20  A    I noticed a high impact group, the S.W.A.T. officers, making

21  their tactical plan toward the back of the trailer; and after a

22  short time, I noticed them approach the tractor portion of the

23  big rig on the passenger's side; and I do believe they tried to

24  open the passenger door and were unsuccessful, and there was no

25  movement inside the cab of the truck that I could see at that

1   point and several -- well, I think tear gas grenades were thrown

2   into the cab of the truck, and it filled it with smoke.

3        There was still no movement inside it.  I heard a couple of

4   flash bangs go off inside the truck; and, again, there was still

5   no movement, almost like there was no nobody in there.  That's

6   what I was thinking, or I was thinking that whoever was in there

7   was in the sleeper portion of it.

8            **MR. HARRISON:**  Object.

9            **THE COURT:**  Sustained.

10  **BY MR. GALYON**

11  Q    So after the approach by the tactical officers, how long was

12  it before they approached again?

13  A    They went back -- after they did that and there was no

14  response, they went back to the back of the truck again; and

15  within about another five- or ten-minute period, they

16  reapproached the cab of the tractor portion of the big rig on the

17  driver's side and were out of my sight; and that's when Cleve

18  Johnson was extricated from the cab of the truck.

19  Q    Did you actually see some movement in the cab of the truck

20  before he was taken out?

21  A    Yes, I did.  I could see a figure of a man inside the cab of

22  the truck near the driver's door as they were making their

23  approach near the driver's side of the tractor-trailer rig.

24  Q    And was Mr. Johnson actually taken out of the vehicle at

25  that point?

1  A    Yes.  When they arrived at the driver's door -- well, I

2  could hear banging, you know, and them ordering him out of the

3  truck; and then at some point thereafter, probably about a

4  five-minute period, they were extricating Mr. Johnson out of the

5  truck, and I could hear them yelling for him to stop resisting,

6  stop resisting.

7  Q    From the time that the stop occurred to the time that

8  Mr. Johnson was taken out of the vehicle, how long was it?  How

9  long did that all take?

10 A    Probably an hour or little more than an hour.

11 Q    Do you recall whether or not the tractor-trailer was still

12 on at that point?  Had it been turned off when the driver got

13 out?

14 A    That I don't recall.  I think it had been turned off.  I

15 don't recall the engine being on at that point.

16 Q    And then after that point, was Mr. Johnson taken into

17 arrest?

18 A    He was.

19      (Government's Exhibits Nos. 14, 15, and 16 were marked for

20      identification.)

21      (Assistant U.S. Attorney showed Defendant's Counsel

22      exhibits.)

23          **MR. GALYON:**  If I may approach?

24          **THE COURT:**  Yes, you may.

25

 1  BY MR. GALYON

 2  Q    (Hands Witness exhibit) Detective Valencia, I'm showing you

 3  Government's 14 for identification, and ask if you recognize

 4  that?

 5  A    I do.

 6  Q    What is that?

 7  A    That's the tractor portion of the big rig where Cleve

 8  Johnson was taken out of.

 9  Q    And was that taken on July 24th of this year?

10  A    It was.

11  Q    (Hands Witness exhibit) Showing you Government's 15 for

12  identification, and ask if you recognize that?

13  A    That depicts the tractor portion of the big rig and part of

14  the trailer portion of the big rig, the same tractor which Cleve

15  Johnson was taken out of.

16  Q    Is that also from July 24th of this year?

17  A    Correct.

18  Q    (Hands Witness exhibit) And then finally Government's 16 for

19  identification, do you recognize that?

20  A    Yes, that's Cleve Johnson's State of North Carolina driver's

21  license with his picture on it and date of birth.

22  Q    Was that taken during the course of the stop and arrest in

23  this case?

24  A    Yes, it was.

25          MR. GALYON:   I am going to ask what's been marked as

BRIANA NESBIT, RPR       OFFICIAL COURT REPORTER     (336) 254-7464

1  Government's 14, 15 and 16 be admitted.

2          **MR. HARRISON:** I have no objection either to entrance

3  into evidence or the publishing to the jury.

4          **THE COURT:** Thank you. They are admitted.

5      (Government's Exhibits Nos. 14, 15, and 16 were received

6      into evidence.)

7      (Government's Exhibits Nos. 14, 15, and 16 were published to

8      the jury.)

9  **BY MR. GALYON**

10 Q   Do you recognize in the courtroom the person that was

11 arrested on the federal arrest warrant out in California on

12 July 24, 2008?

13 A   I do.

14 Q   If you would point him out for the ladies and gentlemen of

15 the jury.

16 A   That's Cleve Johnson sitting by his counsel to the left of

17 the counsel (indicating), wearing a green shirt with stripes on

18 it.

19         **MR. GALYON:** I don't have anything else, Your Honor.

20         **THE COURT:** Cross-examination, Mr. Harrison?

21         **MR. HARRISON:** No, Your Honor.

22         **THE COURT:** All right. You may step down. You may

23 call your next witness.

24         **MR. GALYON:** Your Honor, the United States would rest.

25         **THE COURT:** All right. Ladies and gentlemen, we are

1  going to take our morning break just a little bit early this

2  morning.  So I am going to at this point let you recess.  If you

3  would take your notes and put them back into the envelopes with

4  your pencils.

5      Remember my standard admonition to you and, that is, do not

6  discuss this case with anyone, not among yourselves, your fellow

7  jurors.  Do not read or listen to anything about the case.  Do

8  not think about the case.  Continue to keep an open mind.

9  Remember that and all my other admonitions to you.

10      At this time, I am going to allow you to recess into the

11  jury room to relax for a few minutes, and we'll call for you

12  after the break.  Everybody else please remain in the courtroom.

13      (The jury departed the courtroom at 10:35 a.m.)

14          **MR. GALYON:**  Your Honor, I want to make sure that for

15  the record that I admitted all those items that I introduced.  I

16  think that I have.  I would like to check with Miss Solomon and

17  make sure.

18          **THE COURT:**  While she is checking on that, I did not

19  realize that the jury was still looking at those last three

20  exhibits.  One of the jurors asked whether they were all supposed

21  to see them.  It did not make it on the back row.  I propose,

22  when we come back, I continue to let them look at that.

23          **THE CLERK:**  All exhibits are admitted.

24          **THE COURT:**  Miss Solomon advises that all exhibits are

25  admitted.  Bear with me for just a moment.  Let me make some

 1 │ findings on the record and then I want to hear from --
 2 │ Mr. Harrison, do you want to make a Rule 29?

 3 │          **MR. HARRISON:**  Yes, sir.

 4 │          **THE COURT:**  -- argument at this time?  I tell you what,
 5 │ Mr. Harrison, let me hear from you first.

 6 │          **MR. HARRISON:**  Well, sir, let me start with the attempt
 7 │ count.  A reading of Pratt would certainly indicate that there is
 8 │ a need for the Government to show more than the defendant's
 9 │ intent to commit the offense charged.  In this case, that would
10 │ be possession of the drug with the intent to distribute it.
11 │ They've got to show more than mere preparation.  They've got to
12 │ show that a substantial step has been taken, and that that act is
13 │ in the nature of a series of acts that in the normal course of
14 │ the dealing involved -- or the activity or conduct involved would
15 │ result in the actual commission of the crime.

16 │     What we have here falls short of that by a considerable
17 │ distance.  I cite the Court, in terms of the factual similarity,
18 │ those facts which appear in the United States v. Joyce case that
19 │ I cited in one of our earlier filings with the Court.  It is 693
20 │ F.2d at 838.

21 │          **THE COURT:**  Bear with me just a minute.

22 │          **MR. HARRISON:**  In that case -- if I can summarize the
23 │ facts?

24 │          **THE COURT:**  Sure.

25 │          **MR. HARRISON:**  The Defendant Joyce had taken place in

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1    negotiations with regard to the purchase of -- I believe this was

2    cocaine.  It was, again, a sting operation just as this was.  He

3    agreed with the undercover folks that he would purchase a pound

4    of cocaine for $22,000.  That was decided upon.  There is no

5    doubt that that decision was made.  That was a satisfactory

6    arrangement with the defendant.  In fact, he then flew to St.

7    Louis, Missouri, with the purpose of -- for the purpose of

8    purchasing the cocaine.  However, when he got there, he went to a

9    hotel and met two undercover folks posing as cocaine sellers, and

10   at that point Joyce immediately asked to see the cocaine.

11       Well, as here, there was no cocaine -- or there was no real

12   cocaine.  He was handed a duct-tape-wrapped plastic package said

13   to contain a kilogram of cocaine, and Joyce then tried to examine

14   the cocaine, just as we know, sure as night follows the day, that

15   is what this man would have done if he had met with some

16   imaginary Mexican drug dealer; and they wouldn't have had

17   anything to show.  They wouldn't have had anything to let him

18   judge the quality of it.  The officer testified that they were

19   simply not going to have any methamphetamine.

20       And Mr. Joyce got upset about that, that he couldn't -- that

21   he couldn't -- he couldn't take a look and examine the goods in

22   question and refused to give up any money.  He was -- he got up

23   and started to leave the hotel and was arrested, and the Eighth

24   Circuit.  I might say, parenthetically, that is not exactly a

25   citadel of liberal jurisprudence.  The Eighth Circuit said that's

1  just simply not enough.

2      Two things, they point out that he is charged with

3  possession -- attempted possession with the intent to distribute

4  and, under the facts that I recited to the Court, the Eighth

5  Circuit said he never -- he never was in either actual or

6  constructive possession.  There was never any control of the

7  drugs in question.

8      Well, it is plainly clear that our case is even further from

9  a situation where the normal course of dealings would have

10 resulted in completion of the crime.  It just wasn't going to

11 happen, and it is not an impossibility -- I am not raising the

12 impossibility defense.  I am just saying that nothing was done by

13 my client or by the other end of this proposed transaction to

14 comprise a substantial step toward the realization of the

15 possession of anything.

16     They were stopped while driving, and my client had money on

17 him.  How much he was going to pay is unsure, whether he would

18 even buy methamphetamine that didn't meet his standards.  The

19 record at this point is chock-a-block full of his concern that

20 the quality of the product is a vital step in the purchase of the

21 product.

22     It is clear that he did not have an opportunity to exercise

23 either actual or constructive possession.  It is clear that he

24 did not take a substantial step.  No doubt the Government has put

25 on evidence of his intent; but as Pratt and other cases

 1  demonstrate, that's not sufficient.

 2      Would the Court like -- that's my statement with regard

 3  to --

 4          **THE COURT:**  Hold on just a minute because I do have a

 5  couple of questions for you.

 6          **MR. HARRISON:**  I'm sorry, Your Honor, may I make one

 7  further --

 8          **THE COURT:**  Absolutely.

 9          **MR. HARRISON:**  In this <u>Joyce</u> case, the Court also

10  observes that it is not effective argument on the part of the

11  Government that -- they point out that the undercover people were

12  just acting in compliance with DEA guidelines which prohibit

13  illegal drugs from going under the physical possession of persons

14  under investigation.

15          **THE COURT:**  In <u>Joyce</u>, as I was looking through the

16  facts, how far along did he get in his preparation, if you will?

17          **MR. HARRISON:**  Well, he possessed sufficient money to

18  purchase the cocaine at the agreed-upon price.  That's on page 4

19  of my copy.

20          **THE COURT:**  He had the money.  He flew to Oklahoma

21  City.

22          **MR. HARRISON:**  That's right.  He met physically in the

23  presence of the people that he believed were selling cocaine.  In

24  fact, he had the cocaine in his hand at one point.

25          **THE COURT:**  Okay.

1      **MR. HARRISON:**  And the Court again at the same page --

2   it is almost like reading from <u>Pratt</u>.

3      **THE COURT:**  Are you essentially saying, though, that

4   whenever the DEA is involved, because they don't ever want to be

5   in the policy of putting drugs out as a seller as opposed to

6   being a buyer, that the DEA could never prosecute an attempt

7   claim?

8      **MR. HARRISON:**  Well, I don't know.  I really don't know

9   the answer to that.  I know that under these facts the Eighth

10   Circuit kind of de facto put it that way.  I mean, they said the

11   fact that the DEA has this policy does not then do away with the

12   law -- with the law of attempt.

13      **THE COURT:**  So I guess one of the things that concerns

14   me about the implication of it is that any sophisticated drug

15   trafficker will always insist on seeing the drugs and ensuring

16   that there are drugs in the box.

17      **MR. HARRISON:**  Well, that's what the law of attempt --

18   I mean, that's part -- if they want to do a sting operation, I

19   mean, they still have to comply with the law of attempt.  Even

20   though it is a drug case and their own rules preclude them

21   from -- I guess they are just going to have to count on the drug

22   dealer not being sufficiently learned or sophisticated or

23   cautious, but there is going to have to be some proof beyond the

24   fact that he agrees on a price and has some money.

25      I mean, my client never got anywhere -- he didn't get

1  anywhere near a meeting like you have here in Joyce, nowhere near

2  it.  I mean, there is no evidence of constructive -- obviously,

3  there is no actual possession, but there is no evidence of

4  constructive possession here, and that's what the problem --

5          THE COURT:  Well, I am not sure necessarily you would

6  have to have constructive possession, would you?  I mean, under

7  one scenario, you could have a defendant who offers to pay first

8  and doesn't have the purchase requirements that your client had.

9          MR. HARRISON:  I think you are right about that, Judge,

10  but that didn't happen.

11          THE COURT:  So your argument is, as I understand it, in

12  part that because your client had a specific subjective

13  requirement, and that was he wanted to see the drugs and make

14  sure they were of the quality that he wanted, that because of

15  that, that was a condition preceding any sale?

16          MR. HARRISON:  There can be no doubt about that from

17  the evidence or any -- well, as a matter of fact, the evidence

18  has shown -- we've seen my client dance through two or three

19  different -- several efforts at negotiation and completion of

20  sales.  He's never gotten close.

21          THE COURT:  Okay.  All right.  I understand.

22  Mr. Galyon?

23          MR. GALYON:  Your Honor, several things.  First of all,

24  out of the Pratt case -- you know, one thing that's interesting

25  as a distinction between what's going on in Pratt and what's

1  happening in Joyce is in Pratt they have a cooperator who is

2  discussing with Pratt these drug sales, and there it is that they

3  find that there this insufficient proof of the crime of intent

4  because there is no evidence that Pratt possessed the specified

5  drugs or money necessary to effect the transactions discussed on

6  those dates.

7       I think that is important because, you know, that goes to

8  this issue of it doesn't have to be -- you know, it has to be

9  more than mere preparation, but it doesn't have to be the last

10 possible act before the crime would be committed.

11      And so the fact that this defendant has requirements, let's

12 say -- you know, he wants to be able to test the dope -- doesn't

13 change the fact that he committed a substantial step; that is, he

14 did something more than mere preparation on the way to completing

15 the offense such that the offense was probable, probable to

16 occur.  Doesn't even have to -- you know, the fact that -- it is

17 like if he wanted to buy a car and when he got to the car

18 dealership, the car didn't start that he wanted.  Well, it

19 doesn't change the fact that under the law of attempt he

20 attempted to buy a car.

21      You know, the reality is it doesn't have to be the last

22 thing.  There are some cases -- one that was cited out of the --

23 the Cea case out of the Seventh Circuit, 914 F.2d 881, I can't

24 recall whether or not I submitted anything to the Court related

25 to that portion; but it is a 1990 case out of the Seventh Circuit

1  that actually distinguishes the Tyler case that Mr. Harrison had

2  previously cited, and in it it cites two other cases that are

3  practically identical to the facts in our current scenario.  One

4  is Williams, it is 704 F.2d at 321, where the defendant had

5  solicited a narcotic sale and then, within a short time, appeared

6  at the designated residence with the money to consummate the

7  sale; and that's when the officers intervened, and that was

8  sufficient.

9      Likewise, the Cea case also cites United States v. Cafaro,

10 which is a Southern District of New York case; and that's

11 C-A-F-A-R-O.  In there, the defendant had telephoned --

12         **THE COURT:**  What is the citation number?

13         **MR. GALYON:**  It is 480 F.Supp. 511, and the pinpoint is

14 515, 1979 out of the Southern District of New York, where the

15 defendant had telephone conversations with a narcotics seller who

16 was cooperating with the Government.  It was agreed that the

17 defendant would bring money to the seller's apartment that

18 evening to complete the sale.  The defendant brought the money

19 and was arrested in the lobby of the seller's apartment.

20      So, again, there are -- just as there is a case like Joyce,

21 there are cases, I would argue, consistent with Pratt where the

22 officers did do something more, that the -- or that the defendant

23 did something more than simply talk.

24      Here this defendant is not just talking.  He has got -- he

25 knows exactly what the price is going to be.  He knows what he

1  wants to get.  He actively solicits or agrees to go with Melvin

2  Johnson to the CIs' residence to make the deal happen; and from

3  there, they have contact or ask the CI to contact the supplier so

4  that the deal can be done.  We want a pound of methamphetamine,

5  and then the deal is to occur there in Mount Airy.  So they have

6  to take additional steps to try to effect the deal itself.

7       All of that goes into the attempt calculus, I would argue,

8  because you are talking about an individual who is on a sure

9  course toward buying a pound of methamphetamine; and the fact

10 that the officers don't have the methamphetamine, the fact that

11 he wants to be able to test it, that has -- that has no bearing

12 because, again, it doesn't have to be the last act.  The question

13 is would it be probable.

14           **THE COURT:**  But in Pratt, the Court says that:

15           "To determine whether conduct is preparation or an

16           attempt, the Court must assess how probable it

17           would have been that the crime would have been

18           committed at least as perceived by the defendant

19           had intervening circumstances not occurred."

20      Mr. Harrison's argument is that the defendant wanted to see

21 and, I guess, taste, whatever you do with drugs, before he was

22 going to hand the money to, as he put it, the Mexican.

23      So tell me why from the defendant's point of view -- let me

24 ask it this way, tell me why a reasonable jury could infer from

25 the evidence so far that the defendant would have perceived that

1  it was probable that he would have made the purchase under these

2  facts?

3          MR. GALYON:  Well, again, because it doesn't have to be

4  the last step.  He's doing everything he can in order to purchase

5  the narcotics and presumably believes that, as he says in the

6  later conversation that he has, if it was right, that he was

7  going to buy it.  I mean, there are all these steps that he is

8  taking.

9          THE COURT:  But does the activity have to be beyond

10 preparation and so near the crime that these steps all were in

11 place so that, but for the intervening fact of law enforcement,

12 it is probable that the defendant would have made the purchase?

13 I mean, it seems to me that's the law.

14     Again, I guess my question is is there evidence from which a

15 reasonable jury could conclude that the defendant more likely

16 than not would still have bought on December 11th under these

17 facts, even though the defendant says, well, I want to make sure

18 I can taste it and see it?

19     And I say, parenthetically, it is a little troublesome that

20 may now become the route of criminal defendants is to put in

21 preconditions to every sale so that they can avoid attempt

22 charges; but putting that issue aside, if that's his

23 precondition, does the jury have to either believe that that

24 would have occurred or believed that the defendant would have

25 bought anyway without seeing and tasting the drugs?  Do you

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  follow that?

2          MR. GALYON:  I do.  And I think, based on the law as it

3  is, it doesn't require that even if the defendant has some

4  potential conditions -- it can't be a conditional attempt and so

5  the fact -- it essentially goes, I think, to the impossibility

6  argument that Mr. Harrison was not making but may be sort of part

7  of the issue.

8          THE COURT:  That may be a little different.

9  Impossibility can occur and still not be a defense to attempt if,

10 for example, a defendant says, I want a pound of meth and he

11 shows up with his $16,000, he hands over the 16,000, and the

12 officers hand over a package with a cement brick in it.

13     At that point, it strikes me, that's an attempt because he's

14 made the sale.  It is just impossible to put the drugs in the

15 package.  So he's made the attempt at the sale.

16     The argument here, as I understand it, is that that never

17 would have occurred, that the end transaction, which is the

18 subject of the attempt, never would have occurred; that, in fact,

19 it is a possession charge, right, attempt to possess with intent

20 to distribute?

21          MR. GALYON:  Yes, sir.

22          THE COURT:  So the sale, the defendant argues, never

23 would have occurred.  I guess it is arguable whether the

24 defendant still might have possessed the drugs at some point

25 without this condition having been met.  That's a possibility, I

1  suppose.

2          **MR. HARRISON:**  I think it would be.  It is not the

3  facts of this case but I do -- that's the point.  The point is an

4  attempt -- I am just taking what's in these two cases.  I mean,

5  it is -- as the Court recognizes, it is not from the police's

6  point of view.  It is not even from an objective observer's point

7  of view.  It is the state of mind of the defendant.

8      That may make it more difficult to prove an attempted drug

9  transaction because of the nature of the beast then, let's say,

10  an attempted bank robbery or an attempted sex offense, but it

11  doesn't change the law.  The fact that it is more difficult to

12  get a conviction doesn't mean then that the law must become less

13  demanding on its own terms.

14          **THE COURT:**  Okay.  Anything further?

15          **MR. GALYON:**  No, Your Honor.

16          **THE COURT:**  Okay.  Let me hear from you on the

17  conspiracy count.  Before you do that, give me just a second.

18      Okay, Mr. Harrison, let me hear from you on the conspiracy

19  count.

20          **MR. HARRISON:**  Your Honor, I'm wondering if anyone

21  shares with me the need for a break.

22          **THE COURT:**  All right.  Let's take a break then.  Let

23  me ask you -- I am wondering at this point -- if the defendant

24  does not intend to put on any evidence, then we have to have the

25  charge conference.  I'm wondering if I should dismiss the jury

1  for an early lunch.

2          **MR. HARRISON:**  It would be easier on them certainly.

3          **THE COURT:**  How about if I ask them to come back at

4  1:00 and that gives us time to hopefully finish, for you all to

5  take a quick lunch, and then start at 1:00?  Does that work with

6  you all?

7          **MR. GALYON:**  Sure.

8          **MR. HARRISON:**  Yes, sir.

9          **THE COURT:**  All right.  I'm going to bring them back

10  in.  I am going to have them continue finish looking at the

11  photos and dismiss them for an early lunch, and then do you want

12  to take a break real quick?

13          **MR. HARRISON:**  I'd like that.

14          **THE COURT:**  Why don't you take about a five-minute

15  break.  We'll come back and bring the jury in and then dismiss

16  them for lunch.  We'll take a brief recess.

17      (The Court recessed at 11:10 a.m.)

18      (The Court was called back to order at 11:25 a.m.)

19      (The Defendant was present.)

20          **THE COURT:**  Why don't I bring the jury in, and then I

21  can send them out.  Otherwise, they would be sitting back there

22  in that small jury room.  If you can bring them back.

23      (The jury returned to the courtroom.)

24          **THE COURT:**  Ladies and gentlemen, before we took our

25  break, there were three exhibits, Government's Exhibits 14, 15

 1  and 16, that had not made their way around the jury.  I would ask

 2  the court security officer, if he would, to pass them down to the

 3  end of the first row, and you all continue to pass them among the

 4  jury.

 5       (Government's Exhibits Nos. 14, 15, and 16 were again

 6       published to the jury.)

 7       **THE COURT:**  All right.  Ladies and gentlemen of the

 8  jury, if you would pass those to the court security officer

 9  again.

10       The Government has rested its case.  I am going to dismiss

11  you early for lunch and ask you to come back at 1:00.  Will that

12  present any problem for any juror if I alter the schedule in that

13  respect?  If so, raise your hand.

14       (Negative response from members of the jury panel.)

15       I'm just simply going to move the time period.  It will be a

16  little more appropriate to go ahead and do that at this point.

17       As I said, I'll dismiss you now.  Please report back on the

18  fourth floor at 1:00.  Remember my standard admonition to you:

19  Do not discuss the case with anyone; do not investigate the case;

20  do not think about the case; keep an open mind.  Remember that

21  and all my other admonitions, and we will see you back on the

22  fourth floor at 1:00.  Enjoy your lunch.

23       Everybody please remain in the courtroom.

24       (The jury departed the courtroom at 11:30 a.m.)

25       **THE COURT:**  All right.  Let me hear from you,

1  Mr. Harrison, now on the conspiracy count, Count One.

2          MR. HARRISON:  Thank you, sir.  Well, we are given a

3  good example, in my opinion, of the same sort of situation we

4  have on these facts by the Guinta case.

5      I want to immediately say to the Court that, as usual, the

6  Court is right; there was no language in Guinta with regard to a

7  buy-sell agreement.  The language, though, that is in here does

8  apply to our situation.

9      As Judge Phillips says in Guinta, the first step in the

10  analysis is to identify the exact conspiracy charged.  In my

11  view, that simple statement goes a long way towards eliminating a

12  lot of the murky, very sometimes obtuse arguments that get

13  started and never end with regard to whether or not a particular

14  instance or number of instances make out the conspiracy.  The

15  first thing to do is identify the exact nature of the conspiracy

16  charged.

17      Now, our court in Burgos, where the Guinta suggestion that a

18  heightened analysis should be required was overruled, while none

19  of the rest Guinta -- just that specific portion was overruled by

20  Burgos; but in Burgos, in Footnote Number 2, there is the

21  statement that makes clear that the Fourth Circuit still requires

22  a violation of a specific law to simply charge.

23          THE COURT:  There has to be an underlying offense.

24          MR. HARRISON:  That's correct.  And it has to be

25  identified and it has to -- the proof has got to be probative of

1  that specific offense not some other criminal activity that

2  actually is of a 404(b) nature.

3      It is awfully easy for people, certainly jurors -- that's

4  one of the dangers, in my view as a defense lawyer, of the

5  admissibility of 404(b) material in a conspiracy case because

6  they start -- it is awfully easy for them to start saying, well,

7  this guy is a drug dealer.  He was dealing drugs to somebody in

8  Chicago, or he was dealing drugs to somebody in New Mexico or

9  wherever; but he is not charged with that.

10     He is charged specifically in this case with a conspiracy

11 with one other named person.  He couldn't conspire with Robby,

12 couldn't conspire with Miss Wilson, couldn't conspire with

13 imaginary Mexicans.  He is charged with conspiring with Melvin

14 Johnson to possess -- conspiring to -- not to possess but to

15 distribute, which is an important factor in this case.

16     He, Melvin, provides, as I've pointed out in my -- in some

17 of my filings and as the evidence inextricably leads us to

18 understand, Melvin was not going to be a partner in the

19 subsequent distribution of the imaginary pound of

20 methamphetamine.  It is clear.

21         **THE COURT:**  Why do you say it is clear he wasn't going

22 to be involved in the distribution?

23         **MR. HARRISON:**  Well, because, A, there is an absence of

24 evidence that he was going to be.

25         **THE COURT:**  There was evidence that he was -- that

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  Melvin was selling or distributing methamphetamine on

2  consignment, if you will, for the defendant; that is, that drugs

3  went from the defendant to Melvin without payment and that Melvin

4  then collected money and later paid back the defendant.  Isn't

5  there evidence of that?

6          **MR. HARRISON:**  Yes, there is, Your Honor, but that's

7  actually -- it is -- I was initially going to address -- the only

8  activity -- the only conduct related -- that the two are, from

9  the evidence, engaged in are the negotiations regarding the pound

10 and then the distribution from my client to Melvin of the

11 14 grams.

12         **THE COURT:**  Right.

13         **MR. HARRISON:**  So I was --

14         **THE COURT:**  But to -- are you saying there is

15 insufficient evidence or are you saying -- I mean, there is some

16 evidence?

17         **MR. HARRISON:**  There is some evidence, yes, indeed

18 there is; but if my view of the law is agreed with, then that

19 evidence is not sufficient to make out a conspiracy.  It is

20 sufficient to make out crimes, but they aren't charged.

21     If, for instance, on that buy-sell arrangement in November

22 sometime, if the Government had charged -- if we were faced here

23 today with a situation where my client is charged with possession

24 with intent to distribute 14 grams of methamphetamine and

25 distribution thereof to Melvin Johnson, then if a jury believes

1  what the two witnesses said, then that's -- he is guilty of that

2  criminal act, but he is not charged with that.  He is charged

3  with conspiring with Melvin to distribute the drugs.

4          **THE COURT:**  Tell me why the November evidence, which

5  came in, as I recall, initially through the testimony of an

6  observation by Robby Todd of the defendant handing the drugs to

7  Melvin --

8          **MR. HARRISON:**  Correct.

9          **THE COURT:**  -- before any of Melvin's statements came

10 in?

11         **MR. HARRISON:**  Correct.

12         **THE COURT:**  Why isn't that evidence of -- it is not the

13 sole evidence, obviously; but why is that not evidence of a

14 conspiracy to distribute 50 grams or more where the indictment

15 alleges on or about in December, which is to be read reasonably

16 but not expressly just on that date?  So why isn't the November

17 conduct part of the evidence of the conspiracy?

18         **MR. HARRISON:**  Well, because every sale is not evidence

19 of a conspiracy.  As a matter of fact, a single sale -- I have

20 given to the Court over a period of days case law that indicates

21 a buy-sell relationship.

22         **THE COURT:**  And I understand that.

23         **MR. HARRISON:**  That's what -- what I'm saying to the

24 Court is that incident in November is exactly that.

25         **THE COURT:**  Okay.  So your argument -- I don't want to

1   put words in your mouth.  So you correct me, please, but I want

2   to make sure I understand.

3       Your argument is not that the November evidence could not be

4   evidence of a conspiracy; your argument is that it is not

5   sufficient evidence of a conspiracy because it shows merely a

6   buyer and seller?  Did I say that correctly?

7            **MR. HARRISON:**  That is it precisely.

8       Let me make this observation, Your Honor, about that -- the

9   Government is, I'm quite sure, going to raise this consignment or

10  fronting concept.  It is not like a talisman.  I mean, the fact

11  that payment was not made prior to a transfer doesn't make every

12  sale that takes place like that part of a conspiracy or

13  sufficient evidence alone, standing alone, make out a conspiracy

14  because it is clear that my client expected payment without

15  regard, without regard to whether or not Melvin resold

16  successfully the methamphetamine and that's what the important --

17  the only significance of a fronting situation to a conspiracy

18  determination is, that it tends to indicate some arrangement on a

19  permanent basis that is dependent upon the initial seller

20  reselling to complete the circle, but what my client did was

21  really an accommodation sale to his cousin.

22      There is no evidence of -- I mean, we can speculate all day

23  long about whether or not he ever sold to his cousin before or

24  whether or not he was going to do it in the future, but we don't

25  have evidence of it.

1    You got to go on what's in the evidence, not some

2 speculation about other sales that may have taken place.  If

3 those other sales took place, maybe they were cash sales.  Who

4 knows.  It is just all speculative.

5    What happened on that day in November, in my view, is that

6 it was a simple sale of a relatively small amount of drugs.

7 Nothing more, nothing less.  Then when you take the fact that --

8 again, I'll hazard a statement that it is clear in regard to the

9 pound negotiations --

10       **THE COURT:**  The December 11th?

11       **MR. HARRISON:**  Yes -- that the only observer we had --

12 we didn't have Melvin, but Melvin didn't say anything through any

13 co-conspirator statement I recall that indicated that he was

14 going to share in the profits or get -- or have a duty to aid in

15 the distribution of part of the pound or anything like that.

16 Melvin is strictly a broker.

17    And, as a matter of fact, I think it is a reasonable

18 inference that Melvin wouldn't have been involved in it weren't

19 for the fact that he called his cousin and he remained there in

20 the immediate area where the potential seller was, and it was

21 easy to communicate.  He was right there; but the nature of what

22 his agreement was did not include, from the evidence we've seen,

23 him becoming a partner, him acting in concert in the distribution

24 not in the acquisition of.

25    He is not charged with a conspiracy to acquire cocaine -- I

 1  mean, methamphetamine.  He is charged with a conspiracy with

 2  Melvin to distribute that cocaine (sic), and there is not one bit

 3  of evidence about the -- what was going to happen with regard to

 4  the distribution of the imaginary pound.  There is just not --

 5  there is not an iota of evidence about that.

 6          THE COURT:  Can the jury not infer from the testimony

 7  about Melvin selling for the defendant on other occasions that

 8  this would be handled in the same course of dealing?

 9          MR. HARRISON:  Your Honor, I don't believe that the

10  evidence was he was selling for -- he was selling, but not in

11  order to get -- to return some profit to my client.  The one

12  transaction that we know about --

13          THE COURT:  Let me stop you there.  I am sorry to

14  interrupt you.

15          MR. HARRISON:  That's all right.

16          THE COURT:  I never liked that when I was a lawyer.  I

17  apologize for it in advance.

18      Isn't there evidence that -- I'll take it step by step --

19  that the defendant provided drugs to Melvin?

20          MR. HARRISON:  Yes, sir.

21          THE COURT:  And there is evidence that Melvin didn't

22  take those drugs for consumption but distributed them?  In other

23  words, they were amounts that were more than consumption amounts

24  by Melvin; they were distribution amounts?

25          MR. HARRISON:  Yes.  I have case law that indicates --

 1  Seventh Circuit case law that indicates that, in fact, more than

 2  personal use amounts does not change a buy-sell into a

 3  conspiracy.

 4        **THE COURT:**  As I read those cases, the quantity alone

 5  would be insufficient for making that inference but that it is a

 6  factor that could be considered if you have sufficient other

 7  evidence.

 8        **MR. HARRISON:**  No question about that.

 9        **THE COURT:**  So there is evidence that Melvin was

10  getting from the defendant or had gotten from the defendant a

11  distribution amount?

12        **MR. HARRISON:**  Yes, Your Honor.

13        **THE COURT:**  All right.  And there is evidence that

14  Melvin paid the defendant back or was in a debt situation with

15  the defendant for drug sales?

16        **MR. HARRISON:**  No question about it.

17        **THE COURT:**  Is your point that there is no evidence

18  that the defendant was profiting from that relationship?

19        **MR. HARRISON:**  Well, not only profiting, that he didn't

20  have any interest in it.  He wanted his money whether Melvin sold

21  the drugs or not.  In fact, he started making demands on him I

22  believe in December, I think it was December 4th or 7th,

23  somewhere in there, you know, where is the money for the drugs I

24  sold you.

25       That had nothing to do -- it had no connection at all with

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1    whether or not Melvin had sold the drugs.  That's why it is not

2    like a classic front situation.

3              THE COURT:  Okay.  I understand your point.

4              MR. HARRISON:  Thank you.

5              THE COURT:  Anything else?  I didn't mean to --

6              MR. HARRISON:  No.  Thank you.

7              THE COURT:  Mr. Galyon, do you wish to be heard on this

8    point?

9              MR. GALYON:  Your Honor, I do.  Certainly, the evidence

10   that's been presented does allow for the jury to believe that

11   there is, in fact, a conspiracy based on an agreement by two or

12   more people to engage in some unlawful conduct.  In this case it

13   is the distribution of methamphetamine, and that evidence is not

14   separate and apart; that is, there is not simply the evidence

15   about being fronted and then there is, separately and only

16   related to the attempt to possess, the December 11th incident.

17        Those are all part and parcel of the fact that they were in

18   a conspiracy to distribute, and the argument that Melvin is, you

19   know, someone who is simply being accommodated is simply

20   inconsistent with the facts; and the reality is that he was an

21   individual who was selling, that this defendant was providing the

22   methamphetamine to him for sale, and that he was getting paid

23   back.  This defendant was getting paid back, but it was not an

24   arm's length transaction.

25        And there is very good case law in the Fourth Circuit --

1    actually, there is a 2007 unpublished case that talks about

2    fronting and about how fronting is essentially the heart of any

3    conspiratorial conduct.

4              **THE COURT:**  What case is that?

5              **MR. GALYON:**  United States of America v. Barber, 226

6    F.App. 255.

7              **THE COURT:**  That's 2006, you said?

8              **MR. GALYON:**  Two-thousand-seven, Your Honor.  That's

9    going to be at page 258 about -- I mean, there is just incredibly

10   good language about fronting and about how fronting necessarily

11   shows that when you give someone drugs on credit that you are

12   going to be paid back once the drugs are sold.  That constitutes

13   the heart of the conspiratorial conduct because the parties

14   necessarily agreed to distribute the drugs.  Here, there is not

15   any question about that.

16       The defendant -- during the course of the conversation that

17   he has with Melvin on December 7th, Melvin indicates through the

18   conversation that he's sold about half.  He talks about selling

19   half of the drugs that he has; and then he describes to the

20   informants about how he had sold quantities, but he still had

21   some left to sell, and that was what was holding up this

22   defendant coming up to Surry County.  He didn't want to make two

23   trips.

24       So, certainly, that fronting evidence is very important in

25   the context of the conspiracy, and then it is not like he can

1  only have one job in the conspiracy.

2       You know, the reality is we want to be able to get

3  methamphetamine for as cheaply as we can so that we can make as

4  much profit as we can.  While that may be not specifically set

5  out within the evidence itself -- you know, it is rare, even in

6  these recorded conversations, that you find someone who says I

7  want to make it -- our plan is we are going to make as much money

8  as we can selling these drugs, but, obviously, the reason that it

9  is being done is so that money can be made.

10      And in the context of this case, the fact that Melvin serves

11 essentially as a broker for this pound quantity of

12 methamphetamine doesn't -- that is not separate and apart from

13 their conspiracy to distribute, and while Mr. Harrison argues

14 that he wasn't going to -- you know, there was no specific

15 agreement that he was going to share in the pound quantity that

16 was to be purchased, what is the prior evidence?  I mean, the

17 prior evidence is this guy is supplying it.

18      And so based on that, Your Honor, I think that that all goes

19 to the issue of their conspiratorial agreement, not simply the

20 fronting, not simply the fact that Melvin is trying to help this

21 defendant acquire drugs for a good price in order for them to

22 distribute it and we even have later conduct, both where this

23 defendant -- well, this defendant and Melvin meet for the purpose

24 of additional repayments but also what the defendant says in that

25 January 23 meeting with the undercover officer, the fact that he

 1  has additional quantities separate and apart from what he

 2  actually got or what he hoped to get from the Hispanic supplier.

 3       There is certainly no evidence that communication had been

 4  cut off between he and Melvin.  In fact, he actually talks about

 5  Melvin in the January 23 meeting and not to say, you know, Melvin

 6  and I are no longer in this or anything.

 7            THE COURT:  It was Robby who he wanted to cut out the

 8  deal?

 9            MR. GALYON:  That's correct.  And, again, it was the

10  undercover who says, "it is just going to be me and you," which

11  is -- you know, that's essentially a throw-away statement.

12       It is not surprising that the undercover is going to say I

13  want to deal with you because, as we've learned during the course

14  of the evidence, the point was to get to Mr. Johnson because he

15  was the one who was the major player in the organization; and the

16  fact that a conspiracy is a partnership doesn't mean that

17  everybody has got to be equal.  I mean, there can be chiefs and

18  Indians, and Melvin was just an Indian.

19       That's the essence of the argument as to why there is

20  sufficient evidence on the conspiracy.

21            THE COURT:  All right.  Let me say this first and that

22  is, as I said earlier, while I didn't make an expressed finding

23  on the record, the evidence came in first through the first

24  witness Robby Todd that there was a meeting in November of 2007;

25  and the evidence came in, as I recall and as we just discussed,

1  that, at first, evidence was that Robby Todd observed the

2  defendant distribute methamphetamine to Melvin Johnson for the

3  purpose of Melvin Johnson later doing something with it.  An

4  inference can be drawn from that that it was in an amount which

5  was a distribution amount.  It was, as I recall, 14 grams, half

6  an ounce.

7       Based on that, the Court does find that there is evidence

8  sufficient from which a jury could conclude that there was a

9  conspiracy and that the conspiracy was between the defendant and

10 Melvin Johnson to purchase -- strike that -- between the

11 defendant and Melvin Johnson to distribute 50 grams or more of

12 methamphetamine.

13      There was independent evidence of the conspiracy, absent the

14 statements of the co-conspirator, which include but are not

15 limited to the following:  In November of 2007, Robby Todd did

16 testify that he observed methamphetamine, as I said, transferred

17 from the defendant to Melvin Johnson, his cousin, without any

18 cash payment.  Lori Wilson was also present at that meeting and

19 observed the same transfer and testified that she saw no cash

20 transfer at the time nor did she understand that any had, in

21 fact, been transferred.

22      There is also evidence on December 11th, 2007, that the

23 defendant and Melvin Johnson arrived together essentially

24 unannounced at 6:00 in the morning to buy one pound of

25 methamphetamine, that the defendant had on his person $16,000 in

1  cash that Robby Todd observed in the car with him.  Officer

2  Watson also testified he observed the $16,000.  The $16,000 in

3  cash was in the car with the defendant and he was driving and

4  Melvin Johnson was riding in the passenger seat, according to

5  Officer Watson's testimony and the videotape.

6      Also, on January 7th, 2007 (sic), both Robby Todd and Lori

7  Wilson testified that as to that date that they gave $600 to

8  Melvin Johnson and drove to the defendant's house and on

9  January 23, 2007 (sic), according to the testimony, the defendant

10 himself on tape indicates that his $16,000 was seized and that he

11 intended to have used that money to buy drugs from what was the

12 undercover agent in that January 23 incident, Mendez.

13     He said a statement to the effect of, quote, I guess I was

14 going to see you, closed quote, referring back to December 11th,

15 believing that -- or the jury can draw an inference that the

16 defendant was indicating that the fellow he was meeting with on

17 January 23rd was, in the defendant's mind, the person he was

18 going to have met with on December 11th.

19     There is also testimony by the defendant through that audio

20 tape -- or statements, I should say, by the defendant that he

21 does not like to buy his product, if you will, his drugs until

22 they are essentially presold; and he, during that conversation,

23 asks whether the undercover agent knows Melvin Johnson, his

24 cousin.

25     So the Court finds and has concluded that there was

1  sufficient evidence from which a jury could find that there was a

2  conspiracy to distribute 50 grams or more of methamphetamine.

3  The Court also finds that the testimony as to the statements of

4  the co-defendant, alleged co-conspirator, Melvin Johnson were

5  made during the course of and in furtherance of that alleged

6  conspiracy.

7       The Court also notes in U.S. v. Neal, 78 F.3d 901, 1996

8  Fourth Circuit case, that the co-conspirator statements may be

9  considered in determining the existence of a conspiracy.

10      As to the buy-sell issue, I have read the cases the

11  defendant has submitted, United States v. Thomas, and United

12  States v. Rivera, both Seventh Circuit cases, as well as the

13  other cases that have been submitted, but I will focus on those

14  two for just a moment.

15      Thomas sets out five factors for a court to consider whether

16  something is merely a buy-sell relationship; and the proposition

17  is that a buy-sell relationship standing alone, without any other

18  evidence, is insufficient to show a conspiracy, which appears to

19  be a reasonable statement of the law.

20      In United States v. Thomas, the Court looks at five factors.

21  I wanted to apply those to this case only for a moment to

22  indicate why I think at this point that I am going to allow this

23  claim to continue to go forward.  I am going to reserve final

24  ruling on the motions, but I wanted to indicate the application

25  of this case as to a reason why I am allowing the case to go

1  forward at this point.

2      Among the factors -- the first is a period of time over

3  which the transactions have occurred.  Testimony in this case

4  extended from November 2007 through February 10, 2008, as I

5  recall, when the last call was placed by the defendant to the

6  Undercover Agent Mendez to attempt to purchase more

7  methamphetamine, and Mendez was in Atlanta and said he couldn't

8  make the arrangement.  So it is anywhere from a three- to

9  four-month period.

10      The next factor is the method by which the buyer pays for

11  the narcotics.  There is evidence in this case that Melvin

12  Johnson would not pay up front.  He would return money later to

13  the defendant.  It is true that whether the drugs were sold or

14  not the defendant may have expected payment, but clearly it is a

15  lot easier to pay -- a lot easier for Melvin Johnson to pay if he

16  sold the drugs.  So because of that, there is a stake in the

17  outcome of the subsequent sell by Melvin Johnson that the

18  defendant has in the relationship in this case, which

19  distinguishes a normal buyer-seller relationship where cash is

20  transferred at the time.

21      The quantities of the drugs involved are a factor.  I agree

22  with Mr. Harrison; it is not just a controlling factor, but it is

23  a factor.  And in this case, on November 7th, there was a

24  distribution amount of 14 grams.  December 11, the purchase

25  amount was one pound, clearly a distribution amount.  January 23,

1   there was a discussion of one pound, which is a distribution

2   amount; and there is evidence that the defendant himself sold

3   through others.  There is certainly evidence from which a jury

4   could reasonably conclude that the defendant did that.

5        In this case also -- let me say -- strike that.  Another

6   factor is whether the transactions are standardized in some way,

7   and in this case there is evidence that Melvin Johnson would not

8   pay at the time.  He generally got drugs fronted to him, if you

9   will.

10       And then the fifth factor that Thomas looks at is whether

11  there was mutual trust between buyer and seller.  In this case,

12  unlike Thomas, you have a familial relationship.  You have two

13  cousins here that are working together.  There is evidence that

14  Melvin set up sales for the defendant.  Melvin accompanied the

15  defendant on December 11th on a potential purchase that was

16  aborted.  Robby Todd testified that as a drug dealer he would

17  never sell -- I'm sorry -- he would never give, rather, drugs to

18  anybody that he didn't trust without getting cash in return

19  immediately.  Here, there is evidence that the defendant, of

20  course, trusted his cousin to take the drugs without paying; and

21  there is evidence, in fact, that the cousin Melvin Johnson would

22  pay debts back to the defendant.

23       So based on that, I think it is sufficient at this time to

24  allow this part of the case to go forward because I don't think

25  that the case is simply a buyer-seller as a matter of law.  It

 1  will be up to the jury to decide whether they find otherwise, but

 2  I think there is sufficient evidence from which a jury can find

 3  this is beyond a buyer-seller relationship.

 4      As in -- I should say also Thomas goes on to distinguish

 5  itself from other cases; and if you follow the discussion at page

 6  753, it distinguishes itself on facts that appear to be facts

 7  that are presented in our case; and the Court concludes that,

 8  quote, in short, there was nothing in the way the transactions

 9  were arranged that revealed any degree of commitment between

10  Jones and Thomas, closed quote.

11      In this case there is evidence from which a jury could find

12  that there is a commitment between the two as to their

13  relationship in terms of distribution.  So there is evidence from

14  which a jury could find -- a reasonable jury could find that

15  these are not just spot dealings at arm's length between the

16  defendant and Melvin Johnson but are something more than that,

17  which would support a reasonable inference that there was an

18  understanding, mutual understanding, and agreement as to

19  distributing the methamphetamine in question.  There was also a

20  high level of trust evidenced in the evidence presented so far,

21  or at least from which a jury could find, between the defendant

22  and his cousin.

23      So for those reasons, at this time I am going to reserve

24  ruling officially on the motions, but I am -- for that reason, I

25  wanted to let you know why I am going to let the case go forward.

 1  I wanted to make sure that it was clear to you the evidence of

 2  what I believe the conspiracy could be found is on these facts.

 3      That wasn't very artfully stated.  Let me say what I believe

 4  a reasonable jury could find what the nature of the conspiracy

 5  was based on the evidence presented in this case.

 6      Any questions from counsel or any followup on any of that?

 7          **MR. HARRISON:**  No, Your Honor.

 8          **MR. GALYON:**  No.

 9          **THE COURT:**  The next step is we need to talk -- well, I

10  think we should go ahead and talk about the jury instructions.

11  Do you intend to put on any evidence at this time?

12          **MR. HARRISON:**  No, Your Honor.

13          **THE COURT:**  All right.  I'll let you -- do you want to

14  make that statement before the jury?  In other words, when I

15  bring them back, I would typically ask does the defendant wish to

16  present any evidence, and you would say no.

17          **MR. HARRISON:**  Correct.

18          **THE COURT:**  Unless you don't want to do it that way,

19  that's the way I usually do that.

20          **MR. HARRISON:**  That's fine.

21          **THE COURT:**  And then we go right into the argument.

22  I'll hear you again -- at that point I guess there won't be

23  anything else to hear in terms of another motion.  You don't have

24  to renew, as I understand the law, unless you technically want

25  to.

1        **MR. HARRISON:**  I would probably ask that the Court -- I

2   don't want to have the jury to have to leave or something like

3   that and come back.  If there is some method that the Court would

4   approve for me to get it in the record.

5        **THE COURT:**  Do you wish to be heard at all at that

6   point --

7        **MR. HARRISON:**  No, I do not.

8        **THE COURT:**  -- since no evidence is being presented?

9   All right.  Well, I will deem you to have renewed it at that

10  point.  As I understand the law, you don't waive it by not

11  renewing it.

12       **MR. HARRISON:**  I don't think so, but who knows.  Judge

13  Russell could come out of the grave to get me.

14       **THE COURT:**  I don't want to do anything that suggests

15  that you may have waived it.  So it will be very clear on this

16  record that you will not have waived it.

17       Let's talk for a moment about instructions then.  I'm going

18  to need a take a break and get you a copy so we can look at it

19  together, but I had a couple of questions that might help me

20  before I do that.

21       One of them is the standard instruction used on conspiracy

22  seems to differ, depending on the court, on the element of the

23  defendant knowingly and willfully becoming a part of the

24  conspiracy.  The instruction in some cases and in some pattern

25  instructions, including Magistrate Judge Horn's, uses the phrase

1  "knowingly and voluntarily."  So the issue is voluntarily versus

2  willfully.

3      The only reason I think it is -- it is going to be a

4  potential issue is we go on to define willfully; and if we don't

5  use willfully in that part of the instruction, should we be using

6  it elsewhere is my question?  I would be glad to hear from you.

7      It shows up in the discussion of the jury's obligation to

8  first determine the existence of the conspiracy before they

9  consider the co-conspirator's statements, and the phrase that is

10  used is "knowingly and willfully" as opposed to knowingly and

11  voluntarily; and then willfully goes on to be defined as the

12  following:  Quote, means that the act was committed voluntarily

13  and purposefully with the specific intent to do something the law

14  forbids, that is to say, with bad purpose either to disobey or

15  disregard the law, closed quote.

16      So I guess I'll hear from you all.  Let me hear from you,

17  Mr. Galyon.  It appears in your draft to some extent you have a

18  recommendation or a request as to how to treat that.

19          **MR. GALYON:**  Your Honor --

20          **THE COURT:**  Is the issue clear?

21          **MR. GALYON:**  Yes, sir.  As to whether or not with that

22  second element to say the defendant knowingly and voluntarily

23  became a member of the conspiracy?

24          **THE COURT:**  Right.  Which I believe is the way I read

25  it to them in the preliminary charge.  If we say that, should we

 1  use the word "voluntarily" as opposed to willfully throughout the

 2  rest of the instructions and just drop the definition of

 3  willfully?

 4          MR. GALYON:  I will tell the Court, as much as I'm sure

 5  they paid attention, they may not recall specifically that it was

 6  knowingly and voluntarily versus what you will tell them in the

 7  final instructions.

 8          THE COURT:  I think that's a safe assumption.

 9          MR. GALYON:  So if the Court says "knowingly and

10  willfully" and that willful instruction includes voluntarily, I

11  really don't think that that's going to make a difference at all.

12  I'm happy to -- if the Court wants to use knowingly and

13  voluntarily because of the previous instruction --

14          THE COURT:  Is there a case that uses the phrase

15  "willfully"?

16          MR. GALYON:  Not that I'm aware of.  Well, I take that

17  back.  There probably are.

18          THE COURT:  Most -- I shouldn't say most.  When I

19  looked it up, and one of the ones we were looking at was United

20  States v. Wilson 135 F.3d at 306, I believe they used the phrase

21  "voluntarily."  It may be much ado about nothing because they

22  define each other to mean the other.

23          MR. GALYON:  Right.

24          THE COURT:  I'm trying to make these understandable to

25  the jury, and I think by not introducing more phrases than we

1  have it might be helpful.

2          MR. GALYON:  I understand.  That makes sense.  I don't

3  have any objection to that.  As the Court points out, I think it

4  is consistent with what the law is.

5          THE COURT:  Mr. Harrison, do you have any strongly-held

6  view on that?

7          MR. HARRISON:  No, I don't really have much of a dog in

8  this fight, Your Honor.  I just have grown up hearing willfully

9  like I hear it rain on a tin roof; but other than that, I have no

10  objection to either term.

11          THE COURT:  Well, the definition using voluntarily

12  actually comes from Burgos 94 F.3d at page 857.  Well, I can

13  change voluntarily to willfully and go with that, but I am not

14  going to do it if the defendant objects to it.  If it doesn't

15  matter, then you tell me.

16          MR. HARRISON:  It doesn't matter to me.

17          THE COURT:  I am going to change so that it reads "the

18  defendant knowingly and willfully become a part of the

19  conspiracy."  Then I will leave all the other willfullys in the

20  draft because we tell them later that willfully means

21  voluntarily.  So I think it may come full circle.

22      Okay.  You are going to see and hear that I've added a

23  suggestion that we indicate to the jury that a defendant cannot

24  conspire with the Government based on the evidence in this case;

25  and the reason I think that's important is the only other persons

 1  I think, if I recall right, who the jury may conclude were part

 2  of the conspiracy were all Government agents, at least the

 3  principal players were that were mentioned by name.  They need to

 4  be clear that that can't be part of the conspiracy, as I have no

 5  doubt Mr. Harrison may want to tell them about in closing

 6  argument.

 7       There is also the issue of factual impossibility.

 8  Eight-forty-six does not allow factual impossibility, I should

 9  say.  Eight-forty-six does not allow factual impossibility as a

10  defense to a charge.

11       Is that -- does anybody want to be heard on that?  Does

12  anybody disagree with that proposition?

13            **MR. HARRISON:**  I do not, Your Honor.

14            **MR. GALYON:**  No, Your Honor.

15            **THE COURT:**  I think, given the defense in the case and,

16  that is, that the drugs were imaginary and there were no drugs,

17  the jury may conclude that unless there were drugs there couldn't

18  have been a sale on that fact alone as a matter of law.

19       Now, I understand you are going to make a legal -- factual

20  argument, rather, as to what the defendant required for a sale,

21  but I think there ought to be some statement in there about

22  factual impossibility.  So I am going to put that in there.

23       Let me -- give me until 12:30 and I will -- I can get a

24  draft back to you I hope by then.  The other alternative is if

25  you want to take a brief break for lunch.  Would you prefer to do

 1  that and come back -- would 30 minutes be enough for lunch?

 2          **MR. GALYON:**  Yes, sir.

 3          **THE COURT:**  Would that work, Mr. Harrison?

 4          **MR. HARRISON:**  I reckon so, yes, sir.

 5          **THE COURT:**  Let's take a brief lunch break so you all

 6  have some nourishment as well.  Let's come back at about ten to

 7  1:00.  I hope to have the draft for you to go through.

 8          I have tried to incorporate all the suggested instructions.

 9  The buyer-seller instruction I've incorporated.  There is an

10  issue that's raised by that and, that is, by incorporating the

11  buyer-seller instruction, as it appeared prior to today's

12  requested instruction, that is, buyer-seller relationship alone

13  is not sufficient, it raised in my mind whether that by putting

14  that in there because it is an additional statement to the jury

15  beyond the normal statement of what the elements are for the

16  claim -- whether that tends to suggest to the jury that they will

17  not be able to find a conviction here based on other factors in

18  the case which they may find relevant.

19          In other words, it raises the question of whether the Thomas

20  factors are factors that the jury should be informed are things

21  they could consider as factors to determine whether a conspiracy

22  existed in a case where the defense is it is just a buyer-seller

23  relationship.

24          So think about that if you would, Mr. Harrison and

25  Mr. Galyon, because I may have some of that language in a draft

1  and would like your reaction to it.  Let me restate that and say,

2  in other words, that by adding the requested instruction of the

3  defendant, it raises in my mind an issue of whether it needs to

4  have an instruction as to what kind of factors they could

5  consider.  The only guidance I have on that that I know of is the

6  case law that the defendant has cited from the Seventh Circuit.

7      All right.  So let's take a quick break, and we'll see you

8  in about 30 minutes.

9      (The Court recessed at 12:20 p.m.)

10      (The Court was called back to order at 1:10 p.m.)

11      (The Defendant was present.)

12      **THE COURT:**  Let me hand out proposed jury instructions.

13  Miss Solomon, if you would.

14      (Deputy Clerk handed out document to counsel.)

15      **THE COURT:**  I am going to assume then that you are

16  still reading.  If you are at the point where you want to be

17  heard on anything, just let me know.

18      Mr. Harrison, do you need some more time?

19      **MR. HARRISON:**  No, Your Honor.

20      **THE COURT:**  Let me ask you all if you would like to be

21  heard on any objections and any other suggestions?  I had your

22  more recent suggested jury instructions on a separate page.  They

23  came after I had a draft which tried to incorporate the essence

24  of those.

25      I guess -- let me hear from you first, Mr. Harrison.  Is

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  there anything that you want to be heard on with respect to the

2  instructions?

3      By asking you that, I want to make sure that the essence of

4  your requests are addressed in this charge conference.  So I have

5  what appear to be two or three different versions of requests

6  relating to similar types of topics.  I want to make sure that I

7  at least address in fairness the essence of your request.

8          **MR. HARRISON:**  Judge, the latest submitted material

9  contains the essence of what I would ask the Court to incorporate

10  in the charge to the jury.  What I'm looking for is the

11  opportunity -- whether the jury accepts it or not, I would like

12  to have the opportunity, since I believe it arises from the

13  evidence and since -- if there is -- I can't remember the term

14  the Fourth Circuit used.  It was in an entrapment case.  What was

15  it?  A tiny little bit.  I forget now what it is called.

16          **THE COURT:**  Scintilla.

17          **MR. HARRISON:**  Thank you.  If there is a scintilla of

18  evidence of a certain theory of defense, then the defendant is

19  entitled to a charge in response to that.  So I believe there is

20  some evidence of a buy-sell agreement.

21          **THE COURT:**  Take a look at page 7 because I

22  incorporated your earlier instruction.  It appears in the last

23  full paragraph on page 7, starting on the fourth line,

24  "similarly."  Are you with me on that?

25          **MR. HARRISON:**  Yes, Your Honor.  Senility is fast

1  approaching.  I have it marked here.

2          THE COURT:  I guess my question is -- I want to address

3  your concerns about your request.  I included the phrase, quote,

4  similarly, simply helping a willing buyer locate a willing seller

5  does not standing alone --

6          MR. HARRISON:  Well, now that -- what I am looking for

7  and maybe why I marked that and still got up to talk is I want to

8  be able to discuss the nature of that transaction in November and

9  be able to argue what you saw or what the picture painted by the

10 evidence is not an agreement to distribute between the two but

11 simply a sale from one to the other.  I think that's a rational

12 possibility.

13         THE COURT:  All right.

14         MR. HARRISON:  That's all --

15         THE COURT:  Does that give you -- does that instruction

16 as written there give you what you --

17         MR. HARRISON:  Well, that's --

18         THE COURT:  -- believe you need?

19         MR. HARRISON:  That's kind of different.  That's an

20 instruction about brokering that comes from Guinta and other

21 cases.

22         THE COURT:  What if I add from your proposed

23 instruction the second sentence in your first paragraph of your

24 proposed instructions?  If you have a copy handy -- but I will

25 read it to you.  What if I add right after the sentence, quote,

```
 1  the Government must show an agreement to commit a further crime
 2  in concert with the party to the sale"?
 3            MR. HARRISON:  That's -- yes.
 4            THE COURT:  Is that the essence of what you would like?
 5            MR. HARRISON:  Yes.
 6            THE COURT:  I'll consider adding that then right after
 7  that sentence.
 8       Now, the other parts of your most recent requested
 9  instructions, which are the three paragraphs on the one page with
10  your signature, indicate which things standing alone may not be
11  enough.  One of them is a reference to quantity alone.  The other
12  is knowledge of resale activities or objectives.  Knowledge is
13  not enough; in other words, you want to say any of those standing
14  alone is not enough.
15       My only concern is at some point the jury may be misled as
16  to what factors they can consider in determining whether or not
17  there was a conspiracy.  If we start telling them everything
18  that's not enough but it turns out that each of those together
19  could be enough, it may mislead the jury.
20       So my question is -- I raised this before the break.  Is it
21  appropriate to reference --
22            MR. HARRISON:  I'm sorry.  Of course, these matters
23  of -- these evidentiary matters may be considered by you.
24            THE COURT:  Well, let me ask you this, because one
25  option is to say something like factors you may consider in this
```

1  regard include but not are limited to the period of time

2  involved, the method by which the buyer pays for the controlled

3  substance -- in other words, the five Thomas factors.

4          **MR. HARRISON:**  I think that's the law.

5          **THE COURT:**  Would -- if we -- I'll read you the

6  proposal, but would that satisfy your concerns about your

7  requested instruction as to quantity alone is not enough or mere

8  knowledge is not enough?

9          **MR. HARRISON:**  Yes, sir.

10         **THE COURT:**  All right.  Let me hand out to you a

11 proposal.

12         **MR. HARRISON:**  May I approach?

13         **THE COURT:**  Yes.

14    (Defendant's Counsel retrieved document from Deputy Clerk.)

15         **THE COURT:**  If you would hand one to Mr. Galyon.  Take

16 a look at that, and then I'll hear from both sides as to whether

17 those factors are in agreement by the parties or not.

18         **MR. HARRISON:**  That's satisfactory for me, Your Honor.

19         **THE COURT:**  Anything else from you, Mr. Harrison, on

20 objections to the proposed charge?

21         **MR. HARRISON:**  No, sir.

22         **THE COURT:**  All right.  It is otherwise agreeable to

23 the defendant?

24         **MR. HARRISON:**  Yes, Your Honor.

25         **THE COURT:**  All right.  Now, there is a charge in here

 1  on the concealment evidence.  As I interpreted it, that's largely

 2  for the defendant's protection the way it is intended to be

 3  drafted.  It's been offered by the Government.

 4      Does the defendant wish to have that charge included?

 5          **MR. HARRISON:**  The charge --

 6          **THE COURT:**  It is on page 5.  It is the first full

 7  paragraph on page 5, starts "that evidence."

 8          **MR. HARRISON:**  Yes, uh-huh, I have no problem with

 9  that.

10          **THE COURT:**  All right.  The other -- I tried to

11  incorporate your other suggested charge on Count Two on page 10

12  and that deals with the attempt, and I tried to parallel the

13  language directly from Pratt.

14          **MR. HARRISON:**  That's what I had hoped the Court would

15  do.

16          **THE COURT:**  You had broken it down as mere attempt and

17  you discuss that in mere preparation.  I went ahead and just

18  combined the two and said mere intent or preparation to commit a

19  crime, however, does not constitute an attempt to commit a crime.

20  Is that acceptable to the defendant?

21          **MR. HARRISON:**  Yes, sir.

22          **THE COURT:**  I am not sure in the last sentence of that

23  paragraph I have good grammatical agreement.  So let me ask

24  you -- it reads "in other words" -- if you follow me?

25          **MR. HARRISON:**  Yes, sir.

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER    (336) 254-7464

 1          THE COURT:  In other words, preparation must come so

 2    near to the accomplishment of the crime that it becomes probable

 3    that the crime -- I have "will be committed."  I am wondering

 4    whether we should say would have been committed, at least as

 5    perceived by the defendant, had an intervening occurrence not

 6    occurred.

 7          MR. HARRISON:  That would be sufficient for me.

 8          THE COURT:  All right.  Let me tell both of you on page

 9    11, the very last sentence refers simply to Count Two, indicating

10    that the defendant may not be found guilty of Count Two unless

11    they agree unanimously as to each offense.  I am going to

12    reference both Counts One and Two in that sentence since that's

13    the end of the discussion in the legal elements.

14        All right.  Anything else?

15          MR. HARRISON:  There is one thing that occurred to me.

16    I do not recall having the Court put on the record the denial of

17    my motion to dismiss Count Two.

18          THE COURT:  I did not.  I took it under advisement.  I

19    reserved ruling.

20          MR. HARRISON:  Then forget I said anything.

21          THE COURT:  Okay.  Mr. Galyon, I would be glad to hear

22    from the Government.

23          MR. GALYON:  Your Honor, as to the issue in the

24    defendant's requested jury instruction regarding the buy-sell and

25    the Court, looking at, in that first paragraph, the last part of

1  that sentence, "the Government must show an agreement to commit a

2  further crime in concert with the other party to the sale" -- is

3  that --

4          **THE COURT:**  Yes.  It would read after the sentence

5  that's there, which -- let me just read them both together.  It

6  would read, "Similarly, simply helping a willing buyer locate a

7  willing seller does not, standing alone, establish an agreement

8  between the facilitator and either the buyer or seller," period.

9  "The Government must show an agreement to commit a further crime

10  in concert with the party to the sale," period.

11      And then right after that, I would put in the insert that

12  you have and that would read, "Factors you may consider in that

13  regard include, but are not limited to, the period of time

14  involved, the method by which the buyer pays for the controlled

15  substance, whether the seller had a stake in the outcome of the

16  buyer's sales, the quantities involved, whether the transactions

17  were standardized in any way, and whether there was mutual trust

18  between the buyer and seller."

19      Then it would pick up with the sentence that starts "a

20  person who has no knowledge," and the last sentence probably

21  ought to be phrased to read "the proof must show beyond a

22  reasonable doubt that the defendant was a willful participant,"

23  and add then the words "in the agreement alleged and not merely a

24  knowing spectator."

25          **MR. GALYON:**  And my only question is the -- as to that

1    sentence, "the Government must show an agreement to commit a

2    further crime in concert with the other party to the sale," and

3    then discussing those factors, I think may be more -- potentially

4    more confusing to the jury.  I understand that the buy-sell issue

5    in and of itself is not very simple, but I think that the Court,

6    as the charge is currently set out, addresses that because it

7    does talk about buy-sell relationships.

8         Or if the Court -- I think I've seen -- I could not find the

9    Horn instructions on it, and this may be patterned primarily

10   after that; but I know that I have seen and in instructions

11   before evidence of a single buy-sell transaction is not enough.

12        **THE COURT:**  Okay.  What is the nature of the --

13   crystallize the Government's objection for me, if you will.

14        **MR. GALYON:**  I guess it is just that the sentence "the

15   Government must show an agreement to commit a further crime in

16   concert with the other party to the sale" --

17        **THE COURT:**  Well, is locating a willing seller and

18   buyer facilitating that -- is that a crime?  Because if it's not

19   a crime, then maybe the sentence is not accurate because it is

20   not a further crime; it is just a crime.  In other words, the

21   Government must show an agreement to commit the crime alleged.

22        What I may do, and I'll hear from Mr. Harrison, is if I --

23   look at the last sentence of that paragraph -- by the way, I just

24   modified it.  It reads, "The proof must show beyond a reasonable

25   doubt that the defendant was a willful participant in the

1  agreement alleged and not merely a knowing spectator."  That's

2  the essence of what we are trying to say here, I think.

3      If we add that phrase "in the agreement alleged," as I just

4  suggested, on that last sentence, it seems to satisfy the

5  interest sought by having the additional sentence that the

6  defendant asked for and, that is, quote, the Government must show

7  an agreement to commit a further crime in concert with the party

8  to the sale."

9      Mr. Harrison, do you follow?

10          MR. HARRISON:  Your Honor, I got so many pages here.

11  What page?

12          THE COURT:  We are on page 7.  It is the sentence that

13  starts "similarly."  We had talked about your suggestion that we

14  add after that the sentence that's from your proposal in your

15  first paragraph -- it would be paraphrased -- "The Government

16  must show an agreement to commit a further crime in concert with

17  the party to the sale."

18          MR. HARRISON:  Well, here is, I think, our difficulty.

19  Your language beginning with "similarly" and ending with "seller"

20  satisfies completely my desire to have an instruction on the

21  broker part of this problem.

22          THE COURT:  All right.

23          MR. HARRISON:  But nowhere is there addressed the issue

24  of what happens when you just have a simple buyer from a

25  seller -- a simple transaction of an economic sort that doesn't

1 include the agreement to distribute required by the conspiracy

2 charge.  You see, I'm asking for two different types of concepts.

3 The buyer -- the buy-sell instruction is not the same thing as

4 locating a willing -- putting together a willing buyer and a

5 willing seller.

6          **THE COURT:**  What if we took the last sentence and then

7 put it there where this proposed sentence would go, so that it

8 would read, "Similarly, simply helping a willing buyer locate a

9 willing seller does not, standing alone, establish an agreement

10 between the facilitator and either the buyer or seller.  The

11 proof must show beyond a reasonable doubt that the defendant was

12 a willful participant in the agreement alleged and not merely a

13 knowing spectator"?

14     In other words, the agreement alleged refers back to the

15 indictment which is an agreement to distribute.

16          **MR. HARRISON:**  If I am not precluded by the absence of

17 those suggested instructions to make the argument that what

18 happened between Cleve and Melvin in November was a simple sale

19 of methamphetamine that didn't carry with it conspiratorial

20 overtone.

21          **THE COURT:**  I don't think there is any problem with you

22 making the factual argument that you interpret the facts to

23 suggest that.  The only thing I am concerned about is what the

24 jury is led to believe as to what the law will require.  My only

25 concern is it is a little confusing and vague to me as to what it

 1  means that there must be, one, a further crime because there

 2  really hasn't been a crime yet is what you are saying.

 3          **MR. HARRISON:**  No.  No.  I'm saying there wasn't a

 4  crime -- well, there could be if -- there is two different --

 5  there are two different factual bases.  Putting together the

 6  willing buyer and willing seller comes out of the facts

 7  surrounding that whole period of negotiation with the pound deal.

 8  Then my concern about the opportunity to argue that the law does,

 9  in fact, require more of a transaction than a simple sale of some

10  amount of --

11          **THE COURT:**  I don't think you will be prohibited from

12  arguing that --

13          **MR. HARRISON:**  Okay.

14          **THE COURT:**  -- without that sentence -- let me finish

15  my other thought, and that was the suggested sentence, as I now

16  am looking at it, concerns me also because, in addition to

17  referring to a, quote, further crime, closed quote, which is

18  suggestive of a preexisting crime and the jury doesn't know

19  anything about that, it also says a further crime, quote, in

20  concert with the party to the sale; and it is not clear which

21  party we are talking about because there are two parties to a

22  sale.

23       So for that reason, I am a little concerned about it being

24  misleading.  I do think the last sentence will permit you to

25  argue that what is required to prove a conspiracy is a conspiracy

1  to --

2          **MR. HARRISON:**  -- to distribute.

3          **THE COURT:**  -- to distribute, which is --

4          **MR. HARRISON:**  -- acting in concert, yes.  That's what

5  I want.

6          **THE COURT:**  If you go back and look at the bottom of

7  page 6 and the top of page 7, that part of the instruction allows

8  you to argue that that's, in fact, what's been alleged here.

9          **MR. HARRISON:**  All right, sir.

10         **THE COURT:**  I have no objection to you arguing your

11  interpretation --

12         **MR. HARRISON:**  Then I --

13         **THE COURT:**  -- of the facts.

14         **MR. HARRISON:**  I'm pleased then with the Court's

15  decisions.

16         **THE COURT:**  Anything else from the Government?

17         **MR. GALYON:**  No, Your Honor.

18         **THE COURT:**  All right.  Give me five minutes.  I am

19  going to get a final copy.  Then we'll be ready to close.

20      I am going to have you formally rest on the record.  I will,

21  as I said, take your Rule 29 argument -- or motion deemed to have

22  been made at the time.  If you want to come to the bench to do

23  it, you are welcome to do that for the record.

24         **MR. HARRISON:**  I am satisfied with the Court's plan.

25         **THE COURT:**  Then we will go directly from there into

1    closing arguments.  Then I will read the instructions.

2              **MR. HARRISON:**  We will have a moment to get organized?

3              **THE COURT:**  You might want to go ahead and get

4    organized now in the five minutes while I am getting this fixed

5    up because we try to go right from one to the next.  Take a

6    five-minute recess.

7         (The Court recessed at 1:42 p.m.)

8         (The Court was called back to order at 1:52 p.m.)

9         (The Defendant was present.)

10             **THE COURT:**  I've handed out the proposed verdict form,

11   which I should have handed out.  Any comments or objections to

12   it?

13             **MR. GALYON:**  No, Your Honor.

14             **MR. HARRISON:**  No, Your Honor.

15        (Deputy Clerk handed Counsel documents.)

16             **THE COURT:**  Here is a final copy of the proposed

17   instructions.  If you would, look at the sections that we just

18   talked about so I can direct your attention to where they should

19   be.  First one is on page 7.  It includes the sentence that lists

20   the factors from the Thomas case, and the last sentence then

21   references the agreement alleged.

22             **MR. GALYON:**  Your Honor, I may not have been very clear

23   as to the objection.  My objection was to that last sentence and

24   then the Thomas factors because I thought that that whole sort of

25   discussion sort of put more at issue than it resolves.

 1      So I meant to continue with the objection on the factors.  I

 2  apologize for that if I didn't.  I guess because we discussed

 3  more on the issue of the further crime that I didn't continue to

 4  argue about the Thomas factors.

 5      I don't think the Thomas factors are as important given the

 6  fact that the Court didn't do the further crime analysis -- or

 7  further crime portion of the defendant's proposed instruction

 8  because -- as I understood the way the Court was going to do it

 9  was to have the further crime portion and then the factors to

10  sort of help explain --

11          **THE COURT:**  Is it the juxtaposition of them that's the

12  problem?

13          **MR. GALYON:**  Quite honestly, I have an issue with both.

14  It is not simply a juxtaposition concern because I don't know

15  that we and -- well, maybe Mr. Harrison would still want those

16  factors in there, but given that Mr. Harrison -- I think his

17  argument was the ability to argue about buy-sell relationships in

18  and of themselves.

19          **THE COURT:**  Let me ask Mr. Harrison.  You make your own

20  decision.  I think the factors may cut both ways in this case.

21          **MR. HARRISON:**  I think they do.

22          **THE COURT:**  Let me ask you, do you want them in or not?

23  I am only putting them in because I understood you, maybe

24  incorrectly, to have requested something to that effect.  If we

25  don't reference the issues of quantity and things like that --

1  you are free to argue whatever you want to argue, and I'll be

2  happy to leave those factors out.  They are not supported

3  directly by law of this circuit.

4          **MR. HARRISON:**  Well, it is not that crucial as long as

5  I am, again, not precluded from arguing the inferences from those

6  facts that there was no agreement; that, instead, there was a

7  simple transfer.

8          **THE COURT:**  I have no objection to you arguing whatever

9  inferences are reasonable from the facts, and that would be an

10  inference that I think you are permitted to argue.

11      My only objection would be to tell the jury that unless they

12  find X -- how do I say this? -- that the judge will tell you that

13  that's not enough, because I am not going to tell them that

14  that's not enough.  Do you follow me?

15      You can argue what you want to argue as you've mentioned.  I

16  am concerned about listing factors, and I only put them in there

17  because I thought you wanted your other factors listed, the

18  absence of quantity or the absence of knowledge; and I got

19  concerned that once we went down that road, the only real way to

20  deal with it is to list all the factors they should consider.  I

21  think we are a little far afield because we are not in the law of

22  our circuit.

23      If you are satisfied to remove the paragraph -- the sentence

24  in the paragraph that references the factors -- the Government is

25  objecting to it -- I would still permit you to argue that a

1  reasonable inference from the evidence is that all this was was a

2  buy-sell agreement.

3          **MR. HARRISON:**  I am completely satisfied with that.

4          **THE COURT:**  Then we will remove that then.

5      Take a look also on page 10 paragraph -- second paragraph,

6  "mere intent."  I just changed the last sentence along the lines

7  we discussed.  It now reads, "In other words, preparation must

8  come so near to the accomplishment of the crime that it becomes

9  probable that the crime would have been committed, at least as

10  perceived by the defendant, had an intervening circumstance not

11  occurred."

12      That's virtually verbatim from the Pratt case.  Is that

13  acceptable to the defendant?

14          **MR. HARRISON:**  Yes, sir.

15          **THE COURT:**  Then the last change is the one I mentioned

16  on page 11.  The last sentence, quote, before the defendant may

17  be found guilty of the charge in Count One" -- and it should read

18  or Count Two -- "you must agree unanimously upon each legal

19  element of the offense."

20      Anything else?  I am going to remove the Thomas sentence

21  then.  We can go ahead and call for the jury, and that's the way

22  these will be read; and I will get a clean copy for you.

23      Miss Harvey, if you wouldn't mind having this printed while

24  we call for the jury.

25      So the record is clear, as the charge now stands, it is

 1   acceptable to the defendant; is that right, Mr. Harrison?

 2           MR. HARRISON:  Yes, Your Honor.

 3           THE COURT:  And to the Government?

 4           MR. GALYON:  Yes, sir.

 5           THE COURT:  All right.  While we are waiting on them,

 6   let me say one more thing and, that is, as I recall -- and I

 7   don't recall if this change was made just now or before I brought

 8   it out the last time.  I want to bring it to your attention.

 9       The very last sentence of the first paragraph of every count

10   was not in agreement.  The last sentence from the first count was

11   not in agreement -- wasn't parallel with the last sentence of the

12   second count.  So just read the last sentence of the first

13   paragraph on each count.  After the center of page, it says,

14   "Count."

15           MR. HARRISON:  I'm sorry, Your Honor, I am confused.

16           MR. GALYON:  "A person who conspires to knowingly"?

17           THE COURT:  Yes.  The first one said something to the

18   effect of a person who knowingly --

19           MR. GALYON:  -- or willfully?

20           THE COURT:  Knowingly and willfully distributes is

21   guilty of 841(a)(1), and then the second one, I think, on attempt

22   said, anybody who attempts to do that is guilty of 846; and they

23   weren't parallel.  So I made them parallel so that whoever either

24   attempts or conspires to do the underlying offense is guilty of

25   846.  It should read that way now as to what you are looking at.

1  I wanted to make sure you were aware that that change had been

2  made.

3          (The jury returned to the courtroom at 2:03 p.m.)

4          **THE COURT:**  Ladies and gentlemen, I appreciate your

5  patience.  I apologize for any delays.  We normally try to move

6  as quickly as we can.  I want to assure you that we've been

7  working in your absence.  You should draw no inference from the

8  fact that we took a little time.  We had a few matters just to

9  resolve.  That's now done, and we are ready to proceed.

10      Mr. Harrison, the case is with the defendant.

11         **MR. HARRISON:**  Thank you, Your Honor.

12         **THE COURT:**  Do you wish to present any evidence at this

13  time, sir?

14         **MR. HARRISON:**  No.

15         **THE COURT:**  All right.  Ladies and gentlemen, the

16  evidence is now all in and you will now hear final arguments from

17  the lawyers; and following that, I will charge you on what the

18  applicable law is in the case.

19      The jury is now the Government.

20         **MR. GALYON:**  Thank you, Your Honor.  May it please the

21  court, Mr. Harrison, ladies and gentlemen, now that the evidence

22  is all in, the evidence has established beyond a reasonable doubt

23  that this defendant, Cleve Johnson, did, in fact, conspire with

24  his cousin Melvin Johnson to distribute 50 grams or more of

25  methamphetamine during the timeframe alleged, and that he also

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER      (336) 254-7464

1  was involved in an attempt to possess methamphetamine, more than

2  50 grams, on December 11th of 2007.

3      Now, the Court will instruct you about the fact that there,

4  as to Counts One and Two, is a portion of the law that says

5  whether the substantive crime, that is, the object of the

6  conspiracy or attempt, was impossible to achieve due to facts

7  unknown to the defendant does not by itself prohibit the

8  conspiracy or attempt from qualifying as an offense for which a

9  person may be prosecuted.

10     I point that out to you because of this:  The argument is

11 that, well, there was no methamphetamine; therefore, they could

12 not have completed the crime.  Well, the crime alleged on

13 December 11th of 2007 was an attempt, not the completed drug

14 crime, an attempt to possess with intent to distribute.  Never

15 had to possess the methamphetamine.  Therefore, didn't have to be

16 any methamphetamine.

17     The question is, Did this defendant have the intent to

18 commit the crime and did he take a substantial step toward

19 committing that crime; and the judge will instruct you about what

20 the factors are for attempt.  It doesn't say he had to complete

21 the crime.  That's why it is attempt.

22     So what the judge will instruct you about is he had intent

23 to possess with intent to distribute 50 grams or more of

24 methamphetamine.  There is not any question that he an intent --

25 that he had the intent to do that.

1      The judge will also instruct you about the fact that this

2  defendant was involved or involved himself in a course of conduct

3  related to trying the achieve that goal; that is, he did

4  something wherein he attempted to get the methamphetamine.  He

5  undertook a direct act in a course of conduct planned to

6  culminate in the commission of the crime.  He took a direct act.

7      He talked to his cousin about getting a pound of

8  methamphetamine.  He knew that the pound of methamphetamine cost

9  $16,000.  He went from High Point, North Carolina, all the way up

10 to Lowgap in Surry County with $16,000 in cash to make this deal

11 happen and, not only that, but actually showed up at the

12 informant's house in order to make the deal happen; and then

13 further indicates that they want the deal to happen right then.

14 Call your Hispanic supplier up so we can buy the pound of

15 methamphetamine.

16     And, thereafter, when the deal is set up and arrangements

17 are made to meet at a particular location, this defendant drives

18 he and his cousin, his co-conspirator, over to the location where

19 the deal is going to happen; and then law enforcement stopped

20 them.

21     And so the question as to Count Two on Element Three is that

22 the act was substantial in that it was strongly corroborative of

23 the defendant's criminal intent.

24     Is it substantial to get $16,000 to make a drug deal happen?

25 Sure.  Is it substantial that you drive more than 60 miles to

1   help make the drug deal happen?  Sure.  Is it substantial that

2   you wait there with the informant so that he can get in contact

3   with the Hispanic supplier so that you can make the deal happen?

4   Sure.  Is it important that you know how much the drug deal is

5   for?  Absolutely.

6       And then, fourthly, as to the attempt -- and the reason that

7   it is attempt is that the act fell short of the commission of the

8   intended crime because of intervening circumstances, and the

9   intervening circumstance is because law enforcement wasn't going

10  to sell him a pound of methamphetamine.  You heard from Detective

11  Hodges.  It is not what law enforcement does.  It fell short only

12  because of intervening circumstances.

13      Ladies and gentlemen, as to the conspiracy itself, the

14  attempt charge goes to illustrate the nature of the relationship

15  between the conspirators; that is, this defendant, Cleve

16  Alexander Johnson, and his cousin Melvin Johnson were involved in

17  distributing methamphetamine.  That's based on the evidence that

18  you heard, both from the witnesses and, I would argue to you,

19  also from the defendant's own statements, particularly during the

20  course of the January 23, 2008, conversation that he had with the

21  undercover officer wherein he talks about the fact that he's been

22  engaged in distributing, that he had very recently gotten eight

23  ounces of methamphetamine and that he had to take three of them

24  back because they weren't any good.

25      And that, of course, is part of the reason why he wants to

1  get with the Hispanic supplier because he needs a good source of

2  supply.  He needs -- as he says, this is going to be steady

3  because it is a business.  Just like trucking is a business,

4  selling drugs is a business; and you need a steady source of

5  supply, and you need people who, like drivers in a trucking

6  business, can sell the methamphetamine for you; and that's one of

7  the functions that Melvin Johnson was engaged in.

8       And another was that because you need a good source of

9  supply -- if your co-worker or, in this case really employee,

10 we'll say, as to Melvin Johnson -- if one of your distributors

11 finds somebody who can supply the goods that you are involved in

12 for a good price, all the better because the essence of a

13 conspiracy is an agreement.  It is an agreement to do the illegal

14 act.

15      And this defendant and his cousin had an agreement that they

16 were going to distribute methamphetamine.  Whether it was in

17 Surry County or somewhere else in the Middle District, that was

18 the agreement, and that's clearly illustrated to you not only

19 from the recorded conversations that you heard with Melvin

20 Johnson where he's talking on the phone to this man (indicating)

21 about the fact that he had half, and they are discussing future

22 purchase of the pound of methamphetamine -- even had code, even

23 had a code, LB to refer to pound so we don't have to say pound of

24 methamphetamine on the phone.  And LB, no less than, he said

25 because they knew it was going to be at least pound quantities.

1  That's what the supplier would provide.

2      This is not the first time these guys talked on the phone

3  about drug dealing.  This is not some arm's length negotiation

4  where I one time decide that I want to buy drugs from somebody

5  and I go up to a person and say, Let me get drugs from you.  No.

6  We've got a long-term relationship here because we have a code

7  established on how we are going to talk about these things, and

8  we talk on the phone about it and we meet about it and I get

9  drugs from you.  I, Melvin Johnson, get drugs from my cousin on

10  the front.  I am not paying.  I get it on consignment; and then

11  after I sell it all, then I give you your money back and,

12  hopefully, I've made some profit in the meantime because it is a

13  business.

14      Now, ladies and gentlemen, as to the conspiracy charge as

15  well, you've heard the rest of the evidence; that is, that there

16  was methamphetamine, 14 grams, which is much more than personal

17  use amount, that was fronted, or given on consignment, by this

18  defendant to his cousin in the presence of both the CIs.

19      You also heard the recorded tapes of those meetings, the two

20  meetings in December, early December, with Melvin Johnson.  As

21  part of those meetings, you, of course, heard the conversation as

22  well between this defendant and his cousin -- or at least Melvin

23  Johnson's side of that conversation, and you know that just four

24  days after that conversation, wherein it was discussed that he is

25  wanting to buy a damn pound, that, low and behold, they showed up

1  to buy a pound for the agreed-upon price at the CIs' home.

2      And that after that money was taken off, there were still

3  further discussions and still there was also an opportunity

4  for -- wherein Melvin had to pay back some additional money.  You

5  heard Robby Todd talk about the fact that the Mount Airy Police

6  Department provided him $600 because Melvin was short part of

7  what he owed to this defendant on a drug day.

8      And, thereafter, as part of the investigation, in an attempt

9  to basically take the middleman out, because Melvin was working

10  as the middleman in conjunction with his cousin to make the deal

11  happen for the pound, they then went directly to this defendant

12  because he had given his phone number.  You heard the

13  conversation and saw the videotape of this defendant meeting with

14  the undercover officer to discuss a pound distribution and also a

15  kilo of cocaine and also do you have any weed.

16      And all of those things, ladies and gentlemen, inform on the

17  conspiracy because, even on that January 23 incident, this

18  defendant talks about Melvin.  He talks about Robby and says

19  Robby doesn't want to be part of this.  We are not going to have

20  him involved.  Do you know my cousin Melvin?  UC says,

21  "Probably."

22      Ladies and gentlemen, this evidence that you've heard over

23  the past day, day and a half -- this evidence is evidence that

24  demands a guilty verdict as to Counts One and Two.  Thank you.

25          **THE COURT:**  Thank you Mr, Galyon.  Mr. Harrison?

1          **MR. HARRISON:**  Thank you, Your Honor.  Well, let me get

2   organized here for a minute.  As you probably already noticed,

3   real trials are not like *Matlock* or things like that.  The

4   presence of genius is not necessary except, of course, at the

5   bench in this room.  What we are trying to do is do our best to

6   present our view of what these facts are and what they mean in

7   terms of the charges in the indictment.

8          I was a law student once about 40 years ago; and as a law

9   student, my first-year criminal law professor told us a story.  I

10  was so affected by that story that I asked him -- because I

11  didn't trust my memory, I asked him to write it down for me, and

12  he did; and I was so impressed with the content of the story that

13  I have never forgotten it, and with your permission, I will

14  relate that story to you to set into context what the essence of

15  our defense in this case is.

16         It is a story that really is based on a movie called *Man for

17  all Seasons*.  I suspect not many of you are of the age that you

18  may have seen that.  At any rate, the movie was concerned with

19  the personality and the life and death of a man called Thomas

20  Moore in England during the time of Henry VIII.  A lot of people

21  lost their heads literally during that time and so did Thomas

22  Moore.  He did lose his head because of his adherence to his

23  convictions, his morality, the rules that he knew he had to live

24  by.

25         It was a time of great unrest between Catholics and

1  Protestants and Thomas Moore -- Sir Thomas Moore was appointed by

2  the Lord Chancellor of England.  In that position he held power

3  second only to the king.  He could make decisions, life-and-death

4  decisions just like that (indicating); but Thomas Moore was a man

5  of great conviction, of great courage.

6      He was assailed on all sides, both Catholic and Protestant,

7  to take the law and do what they wanted him to do with it.  Oh,

8  these scurrilous Catholics, we got to eliminate them.  Oh, these

9  crazy Protestants, they are trying to overthrow the church.  He

10 was constantly being bombarded with requests to go beyond the law

11 and to punish people without being in the framework of the law.

12     And this story's end comes about as his young law clerk --

13 the Brits called him Clarks I think -- but his young law clerk

14 was propounding again that Thomas Moore must do something about

15 this particular group of people that the law clerk thought should

16 be eliminated; and Thomas Moore pointed out to the clerk that in

17 order to do that, in order to take such action would violate some

18 of the most fundamental rules of English common law.  The clerk

19 replied, well, such persons are little better than devils and

20 should not have the protection afforded even common criminals.

21 Thomas Moore paused and delivered one of the most moving

22 propositions that I have ever heard.

23     He asked, Will, would you cut down the trees of the law to

24 get at the devil?  And then he asked his clerk, If so, if you did

25 so, who among us could stand in the winds that would then blow?

1      We are faced in this case with just that sort of dilemma.

2  The Government has proven to you various things that are not very

3  appealing about Cleve Johnson.  My client is no angel, and I

4  don't mean to make him one; but he is not charged with general

5  bad behavior.  He is charged with two specific crimes.

6      I am not going to read all of the indictment.  You can have

7  a copy if you would like, of course, in your deliberations; but

8  the first count specifically names one man, Melvin Herbert

9  Johnson, with whom Cleve knowingly, intentionally, and unlawfully

10  conspired, combined, confederated, and agreed together with to do

11  what?  To distribute, transfer to other people, both of them to

12  distribute.  Cleve Johnson is not charged, not charged with the

13  possession of methamphetamine with the intent to sell it by

14  himself.

15      If the Government were to have put on evidence that sometime

16  in December, a year and a half ago or a year ago, that Cleve

17  Johnson had sold a pound of methamphetamine to a guy named Jack

18  Reynolds in Dobson, North Carolina, and Jack Reynolds showed up

19  and testified to that and there was only this indictment in

20  existence, could you have convicted my client of either Count One

21  or Count Two?  I suggest to you that on that evidence alone you

22  simply could not do that it.

23      Now, it is a bad act.  There is no doubt about that, but he

24  is not charged with something other than the two matters that

25  appear in this indictment; and the judge will charge you that he

1  can only be convicted of those specific charges.

2      You may not like him.  You may think he is scandalous.  You

3  may think like Will the Clerk that he needs to be punished.  If

4  so, let him be punished; but let it be done within the law and

5  not through bringing in all these outside bad acts that are not

6  contained in this indictment.

7      Let's talk for a while about Count One and what Melvin and

8  Cleve's relationship was.  The Government claims the relationship

9  was a conspiracy; that is, that both Melvin and Cleve had an

10  agreement to take methamphetamine and collectively, that is to

11  say, mutually, in a concert of action to then not only possess --

12  to not just possess methamphetamine, but then the two of them

13  mutually, to their mutual benefit, to then distribute that

14  methamphetamine.

15      Well, now, let's look at the evidence that the Government

16  put on relevant to that charge.  There is this whole series of

17  negotiations where you heard some of them on tape, and what was

18  going on was this:  A confidential informant, Robby Todd, and his

19  girlfriend were trying to get people busted so they could get out

20  of their problems, which they've successfully done; and in doing

21  so, they contacted Melvin Johnson.

22      Well, Melvin Johnson was -- it was suggested to him by Robby

23  that -- you know, I know a Mexican, he said, and he can supply

24  one to six pounds of methamphetamine.  Well, Melvin Johnson

25  didn't have -- he didn't have the resources -- didn't have to

1  money to do it himself.  So what happens?  He calls Cleve and

2  gets Cleve interested in the possibility about it, but the

3  possibility was not that Melvin and Cleve were going to buy the

4  methamphetamine and then take it and distribute it for profit.

5  The relationship between my client and Melvin was that Melvin was

6  going to get him in touch with the right people so that he by

7  himself, without Melvin's involvement in either the procurement

8  of or the distribution of the methamphetamine, could do just

9  that.

10      I say to you, ladies and gentlemen, that you can search your

11  notes and you can search your memory -- the latter, of course,

12  should prevail -- and you will not find, you will not find a

13  scintilla of information to show you what was going to happen to

14  this imaginary pound of methamphetamine if it had been purchased.

15  There is not one piece of evidence tying Melvin into any scheme,

16  plan, business, combination, agreement whatever.  There is no

17  evidence that he was going to be involved, good, bad, or

18  indifferent.

19      Now, when there is an absence of any evidence, to be sure,

20  if the law is to be followed, there can't be a conviction.  If

21  the charge is to mutually agree to distribute something and there

22  is no evidence whatsoever of that happening, all this other

23  business that the Government has come up with doesn't make any

24  difference.

25      This business of the arrest and whether Cleve came out of

1  the truck at the right time or whether he was sitting in there

2  asleep or whether he was scared to death or what, what difference

3  does that make?  What does that prove to you about what Melvin

4  and Cleve were going to do with the methamphetamine?  It is just

5  something that the Government was able to get in to show you that

6  my client is a bad guy.  He didn't do what the police wanted him

7  to do when they came to arrest him.

8      The January 23 deal with the undercover Mexican gentleman,

9  what did that show -- what did that show you about whether or not

10  Melvin and Cleve were involved in a mutual endeavor to sell

11  methamphetamine?  Well, Mr. Galyon says the fact that he asked --

12  that he asked whether or not the undercover guy knew Melvin, I

13  suppose that's supposed to be some kind of evidence that they

14  were in a conspiracy, that he inquired as to whether or not the

15  undercover guy knew Melvin.  Well, I don't know, probably or

16  something.  Oh, well, okay.  Do you know Robby, you know, he is

17  asking.  And then he says specifically -- the undercover agent

18  guy goes, I want to be in this, just you and me; and then Cleve

19  goes, Sure, just you and me.

20      How is that January 23 thing any evidence of the crime

21  charged?  Well, the answer is it isn't.  Its effect or intended

22  effect by the Government is to have you say, wow, this guy is a

23  bad dude.  This guy is a drug dealer (indicating).

24      He is not charged with some general pie-in-the-sky status of

25  being a drug dealer.  He said at various times that he had sold

BRIANA NESBIT, RPR        OFFICIAL COURT REPORTER        (336) 254-7464

1  methamphetamine, but at no time did he say it in connection with

2  an agreement with Melvin Johnson to distribute methamphetamine.

3      Robby Todd made clear in his observation that you heard that

4  Melvin was not being paid in connection with this negotiation of

5  the fake pound.  Melvin was not to be paid by Cleve.  Melvin was

6  not going to buy the methamphetamine himself.

7      Now, I am telling you what my recall of the evidence is

8  based on this information that I have.  Your recall is what you

9  need to depend upon.

10         "Q    He didn't tell you that he and Cleve

11      were going to share in the profits or the

12      losses from this imaginary pound, did he?

13         "A    No, sir.

14         "Q    In fact, he made no statement about

15      what might happen to the pound once it was

16      procured, did he?

17         "A    No.

18         "Q    So this was a situation where Melvin

19      and you were of kind arranging the sale to

20      Cleve?

21         "A    Yes, sir."

22      Melvin had bought some methamphetamine from Robby.  I asked

23  him whether he knew what he had done with it.  He said, "No,

24  sir."  I said:

25         "Q    You all were not partners together?

1          "A    No, sir.

2          "Q    You just had an agreement to buy or

3     sell some limited amount of methamphetamine; is

4     that right?

5          "A    Yes, sir."

6     So the relationship -- and here I was asking him about that

7     incident in November.  Remember when they went to somewhere near

8     High Point and my client transferred half an ounce to Melvin?  I

9     said:

10          "Q    So the transactional relationship on

11     this occasion was just like you selling half an

12     ounce to Melvin; right?  You sold Melvin on a

13     few occasions some amount of methamphetamine;

14     correct?

15          "A    Yes.

16          "Q    So you told me and the jury that in

17     your transaction with Melvin, when you just

18     sold him some amount -- you didn't consider

19     that to be a partnership, did you?

20          "A    No, sir."

21     Well, of course not, he didn't consider it to be a

22     partnership.  I say to you that neither did Cleve consider

23     himself to be in a partnership with his cousin either when his

24     cousin had absolutely no involvement in the distribution of the

25     imaginary pound and the plans for that distribution, nor when

1  Cleve gave him the half ounce and then expected to be paid for

2  it.  Cleve wasn't depending on the success that Melvin had in

3  reselling that half ounce.

4      There is no -- the Government wants to make a big deal about

5  this fronting business.  Well, that's like -- well, does it make

6  any difference whether you go up to a car dealership and pay in

7  cash for a car or go up to a car dealership and they give you a

8  payment book?  They still expect to be paid.  It is a

9  transaction.  It doesn't mean that you are a partner with the car

10 dealership because you buy a car and pay for it on time.

11     But you see Cleve didn't -- he wasn't interested in whether

12 the methamphetamine he gave to Melvin was sold or not.  He just

13 wanted his money back.  It was really -- he got it back before

14 Melvin sold the stuff.  What happened is there was an

15 accommodation sale, a buy-sell agreement.  That's all the

16 agreement was.  There was no agreement that this man was going to

17 share in the profits of some sale.  He wanted his money based on

18 what the drugs cost him not on some business arrangement

19 resulting in an agreement, mutual partnership with Melvin.

20     In fact, I want to pursue that little car purchase with you

21 for just a moment.  I think it is a good analysis, a good analogy

22 of what we are -- exactly what's going on here.  When you go to

23 purchase a car down at the Chevrolet place, you deal with one or

24 maybe more, couple of salesmen, sales manager, or whatever,

25 however the style of the dealership is.  You negotiate with him

1  and you buy an automobile.

2      Now, you can either write him a check for ten grand or

3  twenty or thirty, or you can give him some down or arrange a sale

4  with the bank and pay the bank monthly but what you've done --

5  all you've done at that point is engage in a buyer-seller

6  transaction.  How have you become a partner with the Chevrolet

7  people because you bought a car from them?  You don't.  You don't

8  even become a partner with them if you take your Chevrolet and a

9  year later sell it to some fool for more than what you paid for

10 it.

11     Do you think that you would anticipate having to go back to

12 the Chevrolet place and split the profits with them?  No, because

13 you are not in a partnership with them.

14     Now, there is a conspiracy, a partnership, in this little

15 example, but where is it?  It is inside the Chevrolet building.

16 It is among the owners and employees and secretaries and guys

17 that are mechanics, the people that work together mutually for

18 their common benefit.  There is their conspiracy, but not at all

19 does that relationship exist between a purchaser of a vehicle and

20 that dealership.

21     It is the same sort of thing with regard to that sale of

22 14 grams to Melvin.  It is just a one-time thing.  There is no

23 evidence of a further activity, no evidence of plans to have an

24 expanding business base.  It is just a single buy-sell agreement,

25 and he is not charged with that.

1    Now, if he were, that would be another question.  If Cleve

2 was charged with distributing methamphetamine to Melvin on

3 November 15th, then he could be convicted based on truthful

4 testimony; but he is not charged with selling to Melvin.  He is

5 charged with distributing with Melvin.

6    Well, let's go to the attempt issue.  The judge is going to

7 charge you, among other things, that mere intent or preparation

8 to commit a crime does not constitute an attempt to commit a

9 crime.  There is no doubt that the Government showed that my

10 client prepared, prepared to purchase this imaginary

11 methamphetamine; but that, as the Court will tell you, is not

12 enough alone.

13    It is essential, the Court will tell you, that a defendant

14 with that intent, with the intent of committing the particular

15 crime do some overt act which -- please, listen to me on this --

16 which in the ordinary and likely course of things will result in

17 the commission of the particular crime.

18    Now, in other words, preparation must come so near to the

19 accomplishment of the crime that it becomes probable that the

20 crime will be committed -- again, please hear me when I say

21 this -- at least as perceived by the defendant.

22    You see, you've got to put yourself in his place.  Is he in

23 a position mentally that if it weren't for the fact that the cops

24 came in and stopped him -- without that intervention, was he so

25 headlong certain to buy that imaginary methamphetamine that it

1  would have happened without the intervention?

2      Well, the answer to that lies in all the other proof

3  concerning how he operated.  The record is absolutely

4  chock-a-block full of references to the fact that he isn't going

5  to do any kind of buying of any kind of methamphetamine that he

6  doesn't get a chance to check out.  He is not going to buy bad

7  stuff.

8      Okay, now, see there, I have to stand here in front of you

9  and say to you my client might have been prepared to buy the

10  drugs; but he wouldn't have, he wouldn't have because in his

11  mind, as the law requires, in his mind he certainly would have

12  said before any money ever passed hands, I want to see the dope;

13  show me the stuff.

14      Well, what would happen then?  Some rouse would have been

15  attempted.  Well, it is under the apple tree or something.  Well,

16  I don't care.  I want to see what I'm -- if I am going to buy

17  something, I want to see it.  Can't see it.  Well, adios.

18      In the normal course of dealings and in the mind of this

19  defendant, that purchase would have never taken place, not

20  because of impossibility because there actually wasn't any dope,

21  but because of the way that he approached the situation.  He

22  wouldn't have bought it if it was there or not if he couldn't see

23  it.

24      Still at the end of the day, I am deeply, deeply concerned

25  and the reason is because it is just human nature to be affected

1  when people -- when the Government is wanting you to punish

2  somebody like in Thomas Moore's position.  That's the position

3  you are in right now.  The Government wants you to punish a bad

4  guy, and I will be frank with you; I am scared to death that all

5  these other things that he is not charged with will so fill you

6  with disgust that you will be tempted to cut down the trees of

7  the law to get at the devil.

8      He is not charged with generally being less than he should

9  be.  He is charged with two specific crimes.  You are not

10 responsible for the decisions of the United States Government

11 concerning what particular charges are brought in a particular

12 case, but your duty and your responsibility, however difficult it

13 may be, is to require the Government to bring the proper charges;

14 and until they do, your duty is to acquit.  Thank you.

15         **THE COURT:**  Thank you, Mr. Harrison.  Mr. Galyon?

16         **MR. GALYON:**  May it please the Court, Mr. Harrison, let

17 me start with the concealment information.  The judge is going to

18 instruct you about concealment; that is, if a person conceals

19 themselves after they have been accused of a crime, that can be

20 used by you as consciousness of guilt, not to prove he is a bad

21 guy, but to show that he knew what he had done and that he was

22 guilty of it.

23     That's what that concealment out in California -- when he

24 hid in a truck there out in California for an hour in the desert

25 heat with them calling over the PA, Cleve Johnson, we've got a

1  federal warrant for your arrest out of North Carolina, come out,

2  that's what that's about, not to prove that he is a bad guy; to

3  prove that he didn't want to face the charges because he knew he

4  was guilty, consciousness of guilt.

5      Let me start with the conspiracy and talk just for a minute

6  about the conspiracy evidence and what -- a couple of things that

7  are particularly important.  First of all, as to that initial

8  November incident of the 14 grams for distribution where this

9  defendant provided it to Melvin so that he could sell it and the

10 fact that he was fronted that methamphetamine -- you know,

11 Mr. Harrison read from the transcript of the cross-examination of

12 Robby Todd and recall, if you will, the recross of Robby Todd

13 where Mr. Harrison asked him, he said, What difference does

14 fronting make as far as whether or not you would have fronted

15 methamphetamine to Melvin Johnson?  And Robby Todd said, Well,

16 that would be like he was selling it for me.

17     Fronting is not arm's length.  Fronting is somebody you

18 trust, and that's part of what you look at in a conspiracy.  Do

19 you trust -- is there a level of trust because of the agreement?

20 Does this defendant have a stake in the fact that he's providing

21 distribution quantities of methamphetamine to a distributor, that

22 is, Melvin?  Does he have a stake in it?  Sure, he does because

23 he is not getting paid right then.  It is on credit.  Of course,

24 he's got a stake in it.

25     What is the nature of how they do the transactions or how

1  the -- what are the mechanics of the conspiracy?  You can

2  consider that sort of thing.  The fact that Melvin gets fronted

3  methamphetamine, that's consistent with the conspiracy.  The

4  nature and length of their relationship -- I mean, besides they

5  are cousins.  You know that there is at least three or four

6  months' worth of drug dealing activity between them, at least;

7  and you know just from hearing a few conversations, that Melvin

8  and this defendant had code worked out on what an LB was, no less

9  than, simple things like that.  From one conversation, you can

10 tell that about the nature of his relationship with his cousin.

11     And as part of that evidence, you know that -- recall that

12 on December 7th, there was a discussion about the fact that this

13 defendant wasn't going to come up to Surry County until Melvin

14 had gotten his money from selling his drugs, and then when that

15 happened, they were supposed to call -- Melvin was supposed to

16 call this defendant, and he would come up to Surry County to buy

17 the pound of methamphetamine and collect his money for Melvin's

18 debt.

19     Well, apparently, that happened between December 7th and

20 December 11th because this defendant and his cousin showed up at

21 the CIs' residence that morning; and then, thereafter, even

22 though that deal didn't happen on December 11th, apparently,

23 additional drugs were fronted to Melvin because we know in early

24 January that he had a debt, a drug debt, that needed to be paid

25 back to this defendant.

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1       And what did you hear Melvin say on December 7th as well
2   about what he was doing in terms of the distribution?  He said
3   just the night before he had three people call.  One guy got a
4   large amount, one guy got a small amount, and one guy said, I'll
5   basically get back with you and he never showed up again.  That's
6   one day.  That's a slow day in the drug business with Melvin
7   Johnson.

8       That's from one conversation, ladies and gentlemen, about
9   the ongoing nature of their relationship and about the ongoing
10  nature of the sales.

11      Again, the car dealer example, the people in the car
12  dealership are in a conspiracy.  You bet you, and Melvin was
13  showroom folks.  He was working retail, and this defendant is the
14  general manager, okay, because he is in charge of stock.  He is
15  in charge of getting supply.  You don't change that.  Just
16  because you work showroom doesn't mean that you are not going to
17  try to tell management how they can get a better deal on
18  something.  That's what happened here.

19      It is not just one thing, ladies and gentlemen.  When you
20  are in a conspiracy, you don't have to serve just one purpose
21  because the point of the conspiracy is for the criminal objective
22  to go forward; that is, that we are going to supply dope in this
23  area because we all make money that way.

24      And as to drug amounts related to the conspiracy and the
25  50 grams, you heard this defendant say during the course of that

1  meeting on January 23rd that he had gotten eight ounces of

2  methamphetamine and had to take three back.  You know that there

3  are 28 grams in an ounce.  So it only takes a little bit less

4  than two ounces to get to 50 grams.

5      By this defendant's admission alone, there is more than

6  50 grams involved in this conspiracy, but that's not all.  I

7  mean, you've got the 14 grams from the front.  You've got

8  whatever was provided after December 11th on a front that then

9  ended up getting owed in January.  You've got the discussion at

10 the end of January about how -- some discussion about Melvin.

11 For whatever reason, this defendant wants to mention Melvin as

12 part of that conversation.

13     And so I would argue to you, ladies and gentlemen, that when

14 you look at the verdict sheet after you've been charged -- and

15 the verdict sheet will ask you, as to the conspiracy charge,

16 whether or not the defendant is guilty of the charged conspiracy,

17 the conspiracy to distribute 50 grams or more with Melvin

18 Johnson; and the answer to that is he is guilty.

19     And then the second question is how much?  Fifty grams or

20 more, or less than fifty grams.  You should check fifty grams or

21 more and not just because of the two phone calls -- or the two

22 meetings that you heard about and the one phone call between this

23 defendant and his cousin and not because of the video where this

24 defendant says he was -- when he gets stopped, that he was just

25 visiting his cousin -- that was the reason he was in Mount Airy;

BRIANA NESBIT, RPR        OFFICIAL COURT REPORTER     (336) 254-7464

1    he was just visiting his cousin, as you may recall -- and not

2    because of the meetings with the UC where he talks about all of

3    the drug dealing, but just consider these phone records.

4        I gave you one example, that example from December 7th and

5    the phone call and the phone record that was consistent with the

6    time that Melvin Johnson called -- when he called his cousin when

7    they had this discussion and you -- I mean, there are tons of

8    references during the course of this case about the fact that

9    this defendant's phone number was 442-7144. He gave it to the UC

10   for goodness sake. He gave it to the undercover. You've got

11   that as one of the pieces of evidence.

12       It is not that one call. December 4th, 2007, to the end of

13   January 2008, a month and a half, two months -- we'll call it two

14   months -- 355 phone calls between this defendant and his cousin

15   Melvin Johnson. Three-hundred-fifty-five times that they talked

16   on the phone about their conspiracy, because you have to

17   communicate in the drug business. You've got to be in contact

18   with your people.

19       And on the attempt, beyond the issues of impossibility, you

20   know what the law is on that. You will be instructed on that.

21   The fact that it couldn't have happened because of the fact that

22   the officers didn't have meth doesn't change the fact that he

23   could have attempted, and the argument you heard was he doesn't

24   buy bad dope because he wants to be able to test it; right?

25       But what did he say January 23 when he met with that UC? I

 1  bought eight ounces; three of it was bad.  I had to take it back.

 2  So we're sure he would have tested it?  Are we sure that in his

 3  mind that dope deal wasn't going forward?  Absolutely not because

 4  that meeting on January 23rd -- that was a meeting to discuss.

 5  That wasn't a set-up-to-we-are-going-to-buy.  The meeting on

 6  December 11th, they came for the purpose of buying.  That was

 7  set.  He admitted later on, during the course of conversations

 8  that he had, that he didn't have the money on January 23rd; and

 9  when he had discussions with the undercover later on, he told the

10  undercover that he had put money into a truck.  He didn't have

11  the money to make a deal happen at that point.

12      And January 23rd, he says, "I have had 30 fucking thousand

13  dollars took from me.  The feds took it, right, the DEA.  Just

14  got out of federal prison for trafficking in marijuana, okay.  I

15  can -- I can move this shit.  I was on my way up there to buy a

16  fucking pound then, you know, if it was right.  I guess I was

17  going to see you," referring the undercover.

18      He was giving the bona fides to say I am a legit drug

19  dealer; and the truth is, ladies and gentlemen, that on December

20  11th of 2007 he wanted to purchase, intended, and took a

21  substantial step toward the purchase of a pound of

22  methamphetamine, 450 grams of meth; and that he was involved in a

23  conspiracy with his cousin Melvin Johnson during the timeframe

24  alleged in the indictment.

25      And the United States asks that you return a just verdict in

1  this case, not because he is a bad guy, but because that's what

2  the law demands.  Thank you.

3        **THE COURT**:  Thank you, Mr. Galyon.  Ladies and

4  gentlemen, at this time it is my duty to instruct you on the

5  rules of law in the case.

6        Let me ask you before I begin doing that, does anybody need

7  to take a break before I do it?  It will take me ten to fifteen

8  minutes to instruct you on the rules of law?  If so, simply raise

9  your hand and, I will be happy to take a break.

10       (Negative response from members of the jury panel.)

11       As I said, ladies and gentlemen, it is my duty now to

12  instruct you on the rules of law that you must follow and apply

13  in deciding this case.  Let me tell you at the outset that I will

14  give you a copy of my instructions for your use in your

15  deliberations.

16       When I have finished, you will go to the jury room and begin

17  your deliberations.  It will be your duty to decide whether the

18  Government has proved beyond a reasonable doubt the specific

19  facts necessary to find the defendant guilty of the offenses

20  charged in the indictment.

21       You must make your decision only on the basis of the

22  testimony and other evidence presented here during the trial, and

23  you must not be influenced in any way by bias, sympathy, or

24  prejudice for or against the defendant or the Government.

25       You must also follow the law, as I explain it to you,

1  whether you agree with that law or not; and you must follow all

2  of my instructions as a whole.  You may not single out or

3  disregard any of the Court's instructions on the law.

4      The indictment, or formal charge, against any defendant is

5  not evidence of guilt.  Indeed, every defendant is presumed by

6  the law to be innocent.  The law does not require a defendant to

7  prove his innocence or produce any evidence at all; and if a

8  defendant elects not to testify, you may not consider that in any

9  way during your deliberations.  The Government has the burden of

10 proving a defendant guilty beyond a reasonable doubt; and if it

11 fails to do so, you must find him not guilty.

12     While the Government's burden of proof is a strict or heavy

13 burden, it is not necessary that a defendant's guilt be proved

14 beyond all possible doubt.  It is only required that the

15 Government's proof exclude any reasonable doubt concerning a

16 defendant's guilt.  Possible doubts or doubts based purely on

17 speculation are not reasonable doubts.  A reasonable doubt is a

18 doubt based on reason and common sense.  It may arise from the

19 evidence, the lack of evidence, or the nature of the evidence.

20     As I stated earlier, you must consider only the evidence

21 that I have admitted in the case.  The term "evidence" includes

22 the sworn testimony of the witnesses and the exhibits admitted in

23 the record.  Remember that anything the lawyers say is not

24 evidence in the case nor is it binding on you.  Questions to

25 witnesses are not evidence.  Rather, it is the witness' answer

1   that constitutes evidence.

2        It is your own recollection and interpretation of the

3   evidence that controls.  If I have excluded any evidence or

4   directed you to disregard any evidence, you must not consider

5   such evidence.

6        Also, you should not assume from anything I may have said

7   that I have any opinion concerning any of the issues in this

8   case.  Except for my instructions to you on the law and your

9   obligations as jurors, you should disregard anything I may have

10  said during the trial in arriving at your own decision concerning

11  the facts.

12       In considering the evidence, you may make deductions and

13  reach conclusions which reason and common sense lead you to make;

14  and you should not be concerned about whether the evidence is

15  direct or circumstantial.  Direct evidence is the testimony of

16  one who asserts actual knowledge of a fact, such as an

17  eyewitness.  Circumstantial evidence is proof of a chain of facts

18  and circumstances indicating that a defendant is either guilty or

19  not guilty.  Circumstantial evidence is evidence which tends to

20  prove a disputed fact by proof of other facts.  You infer on the

21  basis of reason, experience, and common sense from one

22  established fact the existence or nonexistence of some other

23  fact.

24       The law makes no distinction between the weight you may give

25  to either direct or circumstantial evidence.  It requires only

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER     (336) 254-7464

 1   that you weigh all of the evidence and convict a defendant only

 2   if the evidence proves his guilt beyond a reasonable doubt.

 3        Now, in saying that you must consider all the evidence, I do

 4   not mean that you must accept all the evidence as true or

 5   accurate.  You should decide whether you believe what each

 6   witness had to say and how important that testimony was.  In

 7   making that decision, you may believe or disbelieve any witness

 8   in whole or in part.  Also, the number of witnesses testifying

 9   concerning any particular dispute is not controlling.

10        You may ask yourself whether there was evidence tending to

11   prove that during the trial one or more witnesses may have

12   testified falsely concerning some important fact or whether there

13   was evidence that at some other time the witness said or did

14   something or failed to do or say something which was different

15   from the testimony he or she gave you before you during the

16   trial.

17        You should keep in mind, of course, that a simple mistake by

18   a witness does not necessarily mean that the witness was not

19   telling the truth as he or she remembers it because people

20   naturally tend to forget some things or remember other things

21   inaccurately.  So if a witness has made a misstatement, you need

22   to consider whether that misstatement was simply an innocent

23   lapse of memory or an intentional falsehood, and that may depend

24   on whether it has to do with an important fact or with only an

25   unimportant detail.

 1      In deciding whether you believe or do not believe any

 2 witness, I suggest you ask yourself a few questions:  Did the

 3 person impress you as one who is telling the truth?  Did he or

 4 she have any particular reason not to tell the truth?  Did he or

 5 she have a personal interest in the outcome of the case?  Did the

 6 witness seem to have a good memory?  Did the witness have the

 7 opportunity and ability to observe accurately the things he or

 8 she testified about?  Did he or she appear to understand the

 9 questions clearly and answer them directly?  Did the witness'

10 testimony differ from the testimony of other witnesses?

11      You have heard the testimony of law enforcement officials.

12 The fact that a witness may be employed as a law enforcement

13 official does not mean that his or her testimony is necessarily

14 deserving of more or less consideration or greater or lesser

15 weight than that of an ordinary witness.  It is your decision,

16 after reviewing all of the evidence, whether to accept the

17 testimony of the law enforcement witness and to give to that

18 testimony whatever weight, if any, you find it deserves.

19      The testimony of some witnesses must be considered with more

20 caution than the testimony of other witnesses.  In this case, the

21 Government called as two of its witnesses informants, Robby Todd

22 and Lori Wilson, who, although not charged by law enforcement

23 officers, have provided testimony in the hopes of avoiding

24 charges and/or the possibility of a lesser sentence than they

25 would otherwise be exposed to for their drug-related conduct.

 1      A witness who hopes to bargain for more favorable treatment

 2   in his or her own case may have a reason to make a false

 3   statement because he or she wants to strike a good bargain with

 4   law enforcement.  While the testimony of a person hoping to

 5   receive favorable consideration for having provided testimony may

 6   be entirely truthful, you should receive it with more care than

 7   you would that of an ordinary witness.  The testimony of such a

 8   witness may alone be of sufficient weight to sustain a verdict of

 9   guilty.  However, you should never convict a defendant upon the

10   unsupported testimony of an alleged informant unless you believe

11   that testimony beyond a reasonable doubt.

12      Evidence that a defendant may have tried to conceal himself

13   after having been accused of committing a crime is a circumstance

14   that, if proven, can be considered in determining a defendant's

15   consciousness of guilt for the crimes charge.  Evidence of

16   concealment does not create any presumption of guilt, and you are

17   specifically cautioned that such evidence cannot be used by you

18   as a substitute for proof of guilt.

19      In your evaluation of this evidence, you may consider that

20   there may be reasons fully consistent with innocence that could

21   cause a person to conceal himself.  Fear of law enforcement or a

22   reluctance to become involved in an investigation or simple

23   mistake may cause a person who has committed no crime to

24   immediately conceal themselves whether or not such evidence on

25   the part of a defendant gives rise to an inference of guilt, and

1  the significance of such as evidence is entirely up to you as the

2  sole judges of the facts; and you may consider this evidence,

3  along with all other evidence, in deciding whether the Government

4  has proved beyond a reasonable doubt that the defendant committed

5  the crimes charged.

6      Remember that a defendant never has the burden to present

7  any evidence.  If a defendant does not testify or does not

8  present any evidence, you may not hold those facts against him.

9      I want to turn now to the charges in the indictment against

10  the defendant.  Defendant Cleve Alexander Johnson is charged in

11  both counts of the indictment.  Count One of the indictment

12  charges a violation of Title 21, United States Code, Section 846,

13  which makes it a separate federal crime, or offense, for anyone

14  to conspire or agree with someone else to do something which, if

15  actually carried out, would be a violation of Title 21, United

16  States Code, Section 841(a)(1).

17      Section 841(a)(1) makes it a crime for a person to knowingly

18  or intentionally manufacture, distribute, or dispense a

19  controlled substance within the meaning of the law.  A person who

20  conspires to knowingly or intentionally distribute

21  methamphetamine to others would violate Title 21 of the United

22  States Code, Section 846.

23      A conspiracy is a combination of two or more persons to

24  accomplish some unlawful purpose or to accomplish some lawful

25  purpose by unlawful means.  So a conspiracy is a kind of

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 123 of 147

1   partnership in criminal purposes in which each member becomes the

2   agent or partner of every other member.  The gist of the offense

3   is a combination or agreement to disobey or to disregard the law.

4        In order to establish a conspiracy offense, it is not

5   necessary for the Government to prove that the people named in

6   the indictment had entered into any formal agreement.  Also,

7   because the essence of a conspiracy offense is the making of the

8   scheme itself, it is not necessary for the Government to prove

9   that the conspirators actually succeeded in accomplishing their

10  unlawful plan.

11       What the evidence in the case must show beyond a reasonable

12  doubt before the defendant can be found guilty of the charge is

13  that, first, from on or about December 7th, 2007, continuing up

14  to and including July 1, 2008, two or more persons came to a

15  mutual agreement, or understanding, to accomplish a common and

16  unlawful plan as charged in the indictment; that is, to knowingly

17  or intentionally distribute 50 grams or more of a mixture and

18  substance containing a detectable amount of methamphetamine, a

19  Schedule II controlled substance within the meaning of Title 21,

20  United States Code, Section 812 in violation of Title 21, United

21  States Code, Section 841(a)(1).

22       Second, that the defendant knew of the conspiracy; and,

23  third, that the defendant knowingly and willfully became a part

24  of the conspiracy.

25       The Government has the burden of proving each essential

1  element of the offense beyond a reasonable doubt.  The law never

2  imposes upon a defendant in a criminal case the burden of calling

3  any witnesses or introducing any evidence.

4      A person may become a member of a conspiracy without full

5  knowledge of all of the details of the unlawful scheme or the

6  names and identities of all the other alleged conspirators.  If a

7  defendant has an understanding of the unlawful nature of a plan

8  and knowingly and willfully joins in that plan on one occasion,

9  that is sufficient to convict him of conspiracy even though he

10  had not participated before and even though he played only a

11  minor part.

12      However, mere presence at the scene of a transaction or

13  event or the mere fact that certain persons may have associated

14  with each other and may have assembled together and discussed

15  common aims and interests does not necessarily establish proof of

16  a conspiracy.

17      Similarly, simply helping a willing buyer locate a willing

18  seller does not, standing alone, establish an agreement between

19  the facilitator and either the buyer or seller.  A person who has

20  no knowledge of a conspiracy but who happens to act in a way

21  which advances some purpose of one does not thereby become a

22  conspirator.  The proof must establish beyond a reasonable doubt

23  that the defendant was a willful participant in the agreement

24  alleged and not merely a knowing spectator.

25      In your consideration of the evidence, you should first

1  determine whether or not the conspiracy existed as alleged in the

2  indictment.  In determining whether a conspiracy existed, you

3  should consider the actions and declarations of all the alleged

4  conspirators.

5      If you conclude that the conspiracy did exist, you should

6  next determine whether the defendant knowingly and willfully

7  became a member of the conspiracy.  In determining whether the

8  defendant was a member of the conspiracy, you should consider

9  only the defendant's statements and the facts pertaining to him.

10     If it appears beyond a reasonable doubt through evidence in

11 the case that the conspiracy alleged in the indictment was

12 willfully formed and that the defendant knowingly and willfully

13 became a member of the conspiracy, either at its inception or at

14 any time during its existence, then, and only then, can the

15 defendant be bound by the acts or declarations of other

16 participants; and there may be a conviction even though the

17 conspirators may not have succeeded in accomplishing their common

18 object or purpose and, in fact, may have failed in doing so.

19     The indictment charges a conspiracy among the defendant and

20 others.  A person cannot conspire with himself; however, nor can

21 a person conspire with a Government agent.  Therefore, you cannot

22 find the defendant guilty unless you find beyond a reasonable

23 doubt that he participated in the conspiracy as charged with at

24 least one other person, not a Government agent, whether named in

25 the indictment or not.

1    Proof of an overt act or active step in furtherance of the
2  conspiracy is not required to sustain a drug conspiracy
3  conviction.  Instead, the evidence is sufficient if it proves the
4  three elements I mentioned; that is, that there was an agreement
5  to violate the federal drug law, that the defendant knew of the
6  conspiracy, and that the defendant knowingly and voluntarily
7  became part of the conspiracy.

8    Count Two of the indictment charges a violation of Title 21,
9  United States Code, Section 846, which makes it a separate
10 federal crime, or offense, for anyone to attempt to do something
11 which, if actually carried out, would be a violation of Title 21,
12 United States Code, Section 841(a)(1).

13   Section 841(a)(1) makes it a crime for any person to
14 knowingly or intentionally possess with intent to manufacture,
15 distribute, or dispense a controlled substance.  A person who
16 attempts to possess with intent to distribute 50 grams or more of
17 methamphetamine would be in violation of Title 21, United States
18 Code, Section 846.

19   What the evidence in the case must show beyond a reasonable
20 doubt before the defendant can be found guilty of the charge is
21 that, first, the defendant had the requisite intent to commit the
22 crime; that is, on or about December 11, 2007, to knowingly or
23 intentionally possess with intent to distribute 50 grams or more
24 of a mixture and substance containing a detectable amount of
25 methamphetamine, Schedule II controlled substance within the

1  meaning of Title 21, United States Code, Section 812 in violation

2  of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B).

3      The second element is the defendant undertook a direct act

4  in a course of conduct planned to culminate in the commission of

5  the crime.

6      Three, the act was substantial in that it was strongly

7  corroborative of the defendant's criminal intent; and, four, the

8  act fell short of the commission of the intended crime because of

9  intervening circumstances.

10      By definition, a conviction for attempt requires less

11  evidence than a conviction for the complete crime.  However, I

12  instruct you that in order to find a defendant guilty of attempt

13  the evidence must establish, at a minimum, both intent to commit

14  the crime and a substantial step toward completion of the crime

15  in question.

16      Mere intent or preparation to commit a crime, however, does

17  not constitute an attempt to commit a crime.  It is essential

18  that the defendant, with the intent of committing the particular

19  crime, do some overt act which, in the ordinary and likely course

20  of things, will result in the commission of a particular crime.

21  In other words, preparation must come so near to the

22  accomplishment of the crime that it becomes probable that the

23  crime would have been committed, at least as perceived by the

24  defendant, had an intervening circumstance not occurred.

25      As to both Count One and Count Two, whether the substantive

1  crime, that is, the object of the conspiracy or attempt, was

2  impossible to achieve due to facts unknown to the defendant does

3  not by itself prohibit the conspiracy for attempt from qualifying

4  as an offense for which a person may be prosecuted.

5     The word "knowingly," as that term has been used in these

6  instructions, means that the act was done voluntarily and

7  intentionally and not because of mistake or accident.

8     The word "willfully," as that term has been used from time

9  to time in these instructions, means that the act was committed

10  voluntarily and purposefully with the specific intent to do

11  something the law forbids, that is to say, with bad purpose

12  either to disobey or disregard the law.

13     As used in these instructions, the word "distribute" means

14  the transfer of a controlled substance to another person with or

15  without any financial interest in the transaction.  The phrase

16  "to distribute" includes the sale of something by one person to

17  another but it need not involve a sale.

18     I will now define possession as used in these instructions.

19  The law recognizes several kinds of possession.  A person may

20  have actual possession or constructive possession.  A person may

21  also have sole or joint possession.  A person who knowingly has

22  direct physical control over a thing at a given time is then in

23  actual possession of it.  A person who, although not in actual

24  possession, knowingly has both the power and the intention at a

25  given time to exercise dominion or control over the thing, either

1    directly or through another person or persons, is then in

2    constructive possession of it.

3         To prove constructive possession, the Government must prove

4    beyond a reasonable doubt that the defendant had knowledge of the

5    presence of the item or items in question and that he had both

6    the power and the intention to later to take control over the

7    item or items.  Constructive possession may be inferred from the

8    facts and circumstances, including evidence that a person

9    exercised control over a home in which he knew the item in

10   question was present.

11        The law recognizes also that possession may be sole or

12   joint.  If one person alone has actual or constructive possession

13   of a thing, possession is sole.  If two or more persons share

14   actual or constructive possession of a thing, possession is

15   joint.

16        When I use the word "possession," I am referring to actual

17   as well as constructive possession and sole as well as joint

18   possession.  You may find that the element of possession, as that

19   term is used in these instructions, is present if you find beyond

20   a reasonable doubt that the defendant had actual or constructive

21   possession, either alone or jointly, with others.

22        Before the defendant may be found guilty of the charge in

23   Count One or Count Two, you must agree unanimously upon each

24   legal element of the offense.

25        You will note that the indictment charges that the offense

1  was committed, quote, on or about, closed quote, a certain date.

2  The proof need not establish with certainty the exact date of an

3  alleged offense.  It is sufficient if the evidence in the case

4  establishes beyond a reasonable doubt that an offense was

5  committed on a date reasonably near the date alleged.

6      If, and only if, you find the defendant guilty of one or

7  both of the offenses charged in Count One and Two, then you must

8  answer the questions related to drug amounts.  The burden is on

9  the Government to prove beyond a reasonable doubt the quantity of

10  controlled substance that is involved in the crime.  You must

11  unanimously agree on your response to any question about drug

12  amount.  If the Government failed to prove beyond a reasonable

13  doubt the quantity of the controlled substance the defendant

14  conspired to distribute, then you must answer zero to the

15  question of the amount of controlled substances involved in each

16  offense.

17      You have heard evidence that the defendant engaged in

18  certain bad conduct in the past.  The law allows this kind of

19  evidence for certain limited purposes.  For example, this

20  evidence may properly be considered in determining intent,

21  knowledge, such as knowledge of the drug trade, and motive.

22      Please keep in mind the limited purposes for which this

23  evidence is admitted.  Most importantly, do not conclude from

24  this evidence that the defendant has bad character in general;

25  nor should you conclude that because the defendant may have

1  engaged in bad conduct in the past, he is more likely to have

2  done so in this case.

3      You are to consider the evidence only if you find that the

4  defendant committed the acts charged in the indictment and, if

5  so, to consider it only as evidence of the intent of which he did

6  those acts.

7      I caution you, members of the jury, that you are here to

8  determine from the evidence in the case whether the defendant is

9  guilty or not guilty.  He is on trial only for the specific

10 offenses alleged against him in the indictment and not for any

11 act or conduct or offense not alleged in the indictment.  Neither

12 are you all called upon to return a verdict as to the guilt or

13 innocence of any other person or persons not on trial as a

14 defendant in this case.

15     A separate crime for offenses is charged against the

16 defendant in each count of the indictment.  The number of charges

17 against the defendant is no evidence of guilt; and your decision

18 on any one charge, whether it is guilty or not guilty, should not

19 influence your decision on any of the other charges.  Each

20 offense and the evidence pertaining to it should be considered

21 separately.  The fact that you may find the accused guilty or not

22 guilty of one of the offenses charged should not control your

23 verdict as to the other offense.

24     The question of punishment should never be considered by the

25 jury in any way in deciding the case.  Should a defendant be

1  convicted, the matter of punishment is for the Court alone to

2  determine.

3      Any verdict you reach in the jury room, whether guilty or

4  not guilty, must be unanimous.  In other words, to return a

5  verdict, you must all agree.  Your deliberations will be secret.

6  You will never have to explain your verdict to anyone.

7      It is your duty to discuss the case with one another in an

8  effort to reach an agreement, if you can do so.  Each of you must

9  decide the case for yourself but only after full consideration of

10  the evidence with the other members of the jury.

11      While you are discussing the case, do not hesitate to

12  re-examine your own opinion and change your mind if you become

13  convinced that you were wrong, but do not give up your honest

14  believes solely because the others think differently or merely to

15  get the case over with.

16      Remember, you are the judges of the facts.  Your only

17  interest is to seek the truth from the evidence in the case.

18      When you go to the jury room, you should first select one of

19  your members to act as your foreperson.  The foreperson will

20  preside over your deliberations and will speak for you here in

21  the courtroom.

22      A form of verdict has been prepared for your convenience.

23  You will take the verdict form to the jury room; and when you

24  have reached unanimous agreement, you will have your foreperson

25  fill in the verdict form in ink, date and sign it, and then

1  inform the court security officer that you have reached a
2  verdict.  Do not give the verdict to the court security officer.
3  I will have you returned to the courtroom to deliver your
4  verdict.

5      If you should desire to communicate with me at any time,
6  please write down your message or question, have the foreperson
7  write in the date and the time, sign it, and notify the court
8  security officer that you have a note.  The court security
9  officer will then call Miss Solomon, the clerk, who will collect
10 the note and bring it to my attention.  I will then talk to the
11 parties and respond as promptly as possible, either in writing or
12 by having you returned to the courtroom, so that I can address
13 you orally.

14     I caution you, however, that with regard to any message or
15 question you might send, you should not tell me your numerical
16 division at that time.  In fact, at no time should you tell
17 anyone, not even your spouse, how you as a jury stand on your
18 vote in the case.  This is for you, and only you, to know.

19     You should discuss the case only in the jury room and only
20 when all 12 of you are present.  If one person needs to be
21 excused even briefly, suspend all discussions until you are all
22 back together again.  If you would like to take a break, you may
23 do that without getting permission from the Court to do so.

24     As I said, I will have a copy of the instructions delivered
25 to the jury room for your reference in your deliberations.

1    At this time, I am going to ask Miss Solomon to give you a

2  copy of the form of verdict; and I am going to ask the original

3  12 members of the jury and not the two alternates to now begin

4  your deliberations.  I am going allow you to continue -- we will

5  presumptively end at 5:00 if you so choose.  If you want to keep

6  going, you are welcome to do that.  So I will wait to hear from

7  you; and if you decide you want to stop at 5:00, simply notify

8  the court security officer that you would like to stop at 5:00

9  and I will then bring you back into the courtroom.  You may take

10  your envelopes and your notes with you.

11    So at this time we are going to dismiss you for your

12  deliberations and ask the two alternates to remain in the

13  courtroom.

14    (The jury retired to the jury room to begin its

15    deliberations at 3:36 p.m.)

16    **THE COURT:**  The two alternates, I am going to ask you

17  to stay until 5:00, if you don't mind, just -- I don't know that

18  we will need your involvement but until 5:00 comes, if you don't

19  mind -- I am going to allow you to relax up on the fourth floor

20  where you were before you came here, but I do need to give you

21  your cautionary instruction and, that is, that you -- there is a

22  possibility that you could serve as a juror in the case.  So you

23  are not to deliberate on the case.  You are not to talk about the

24  case.  Do not do any research on the case.  Do not listen to

25  anything about the case.  Do not talk to any of the parties in

1  the case.

2       So, as I indicated in my standard admonition, do not do any

3  of the things I have mentioned before.  If you would, just relax

4  up on the fourth floor.  I will call for you at approximately

5  5:00 and then we'll see where we go from there.

6       Since it is only an hour and 20 minutes from now, hopefully,

7  that won't be too much of a burden.  You may leave your notes in

8  the courtroom, please.  Everybody else remain in the courtroom.

9       (The alternate jurors departed the courtroom.)

10          **THE COURT:**  I don't know whether we are going to need

11  any alternates in the case; but since it is not but an hour and

12  20 minutes until 5:00, I thought we would just retain them and

13  see where we go.

14       Any objections to the instructions as read?

15          **MR. GALYON:**  No, Your Honor.

16          **MR. HARRISON:**  No, sir.

17          **THE COURT:**  All right.  Now, as to exhibits, my normal

18  practice is to go ahead and send the exhibits back to the jury.

19  Any objection to that?

20          **MR. HARRISON:**  None.

21          **MR. GALYON:**  No, sir.

22          **THE COURT:**  All right.  If you could collect the

23  exhibits and then give them to Miss Solomon, we'll have them

24  delivered as well.  They have the verdict form, and they have a

25  copy of my written instructions.

1    Is there any objection to them having a copy of the written

2 instructions?

3         **MR. HARRISON:**  No.  In fact, I would encourage it.

4         **THE COURT:**  Mr. Galyon?

5         **MR. GALYON:**  No, Your Honor.

6         **THE COURT:**  All right.  Anything else we need to

7 address at this point?

8         **MR. HARRISON:**  Will the indictment be available?

9         **THE COURT:**  Mr. Galyon, do you have any view on giving

10 the indictment to the jury?

11        **MR. GALYON:**  No.  I think that's a good idea.

12        **THE COURT:**  The only question I have is that -- the

13 indictment has been amended with the change in date.  I guess I

14 would ask you, how do you propose that we deal with that?

15    It was only for that reason that I didn't raise sending it

16 back there because we need to come to some conclusion about what

17 form to send it.

18    Let me rephrase the question.  Is anybody at this time

19 requesting a copy of the indictment going back to the jury?  It

20 is only an issue if you want it back there.  It is not a problem.

21        **MR. HARRISON:**  Yes, sir, I would request it.

22        **THE COURT:**  Okay.  So then we need to figure out how we

23 are going to amend the date on the indictment.

24        **MR. HARRISON:**  I am not particular about that.  Any

25 practical solution.  I wouldn't mind just a mark out and writing

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 137 of 147

 1  in.  I don't know what Mr. Galyon would want.

 2          **THE COURT:**  The alternative would be to type up a

 3  stipulation between the parties that there was a typographical

 4  error and that the date should read such and such, and we'll send

 5  the indictment with the attached stipulation.

 6          **MR. HARRISON:**  Very good idea.

 7          **THE COURT:**  Now, I have not instructed them on

 8  stipulations.

 9          **MR. GALYON:**  You did on the front.  You did in your

10  preliminary instructions.

11          **THE COURT:**  All right.  Is that satisfactory to the

12  parties?

13          **MR. HARRISON:**  It certainly is.

14          **MR. GALYON:**  Yes, sir.

15          **THE COURT:**  If somebody can prepare a stipulation.

16          **MR. GALYON:**  I'll do that.

17          **THE COURT:**  Whenever it is ready, just notify

18  Miss Solomon.  I'll take a look at it.  Until then, we'll send

19  the other exhibits back; and then we'll send the indictment at

20  the time, and we'll see if they call for it or not before then.

21      Is that acceptable, Mr. Harrison?

22          **MR. HARRISON:**  Yes, sir.

23          **THE COURT:**  Anything else?

24          **MR. HARRISON:**  No, sir.

25          **THE COURT:**  All right.  We'll stand in recess until you

1  all have a stipulation.  I'll be glad to look at it and go from

2  there.

3        I want to say on the record you all did a very nice job on

4  the case.  I want to compliment the lawyers on the presentation

5  of the arguments.  It is always good to try cases with good

6  lawyers.  I appreciate that.

7        (The Court recessed at 3:43 p.m.)

8        (The Court was called back to order at 4:27 p.m.)

9        (The Defendant was present.)

10        **THE COURT:**  I've been informed that we have a verdict.

11  Anything we need to discuss before we bring the jury back in?

12        **MR. GALYON:**  No, Your Honor.

13        **MR. HARRISON:**  No, sir.

14        **THE COURT:**  Miss Solomon, if you would alert the CSO to

15  bring the jury back.

16        (The jury returned to the courtroom.)

17        **THE COURT:**  Ladies and gentlemen of the jury, have you

18  elected a foreperson?  If you would please, raise your hand.

19  Juror Number 7.

20        Have you, Mr. Foreperson, unanimously agreed on a verdict?

21        **JUROR NO. 7:**  Yes, sir.

22        **THE COURT:**  If you would please, hand the verdict to

23  Miss Solomon.

24        (Juror No. 7, Jury Foreperson, complied.)

25        (Deputy Clerk handed verdict to the Court.)

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 139 of 147

1          **THE COURT:**  Ladies and gentlemen of the jury, your

2   verdict will now be published.  Please listen carefully.  One or

3   both of the parties may ask that the jury verdict be polled; that

4   is, to ask each juror, one by one, if the verdict as published

5   constitutes his or her individual verdict in all respects.

6       I am going to ask now, Miss Solomon, if you would, please

7   publish the verdict.

8          **THE CLERK:**  Let the record reflect that Juror Number 7,

9   Mr. Ousley, is the jury foreperson.

10      Members of the jury, please stand as the verdict is read.

11  Members of the jury, in Case Number 1:08CR233-1, United States of

12  America versus Cleve Alexander Johnson, you have answered as

13  follows:

14      We, the jury, find the defendant, Cleve Alexander Johnson,

15  guilty of the offense charged in Count One of the indictment;

16  that is, from on or about December 7, 2007, up to and including

17  July 1, 2008, the defendant conspired to distribute 50 grams or

18  more of a mixture and substance containing a detectable amount of

19  methamphetamine, a Schedule II controlled substance within the

20  meaning of Title 21, United States Code, Section 812 in violation

21  of Title 21, United States Code, Section 841(a)(1).

22      We, the jury, having found the defendant, Cleve Alexander

23  Johnson, guilty of the offense of conspiring to distribute

24  50 grams or more of a mixture and substance containing a

25  detectable amount of methamphetamine from on or about December 7,

1  2007, continuing up to and including July 1, 2008, find that the

2  quantity of methamphetamine attributable to the defendant, Cleve

3  Alexander Johnson, is 50 grams or more.

4       We, the jury, find the defendant, Cleve Alexander Johnson,

5  guilty of the offense charged in Count Two of the indictment;

6  that is, on or about December 11, 2007, the defendant attempted

7  to knowingly or intentionally possess with intent to distribute

8  50 grams or more of a mixture and substance containing a

9  detectable amount of methamphetamine, a Schedule II controlled

10  substance with the meaning of Title 21, United States Code,

11  Section 812 in violation of Title 21, United States Code, Section

12  841(a)(1) and (b)(1)(B).

13       We, the jury, having found the defendant, Cleve Alexander

14  Johnson, guilty of the offense of attempt to possess with intent

15  to distribute 50 grams or more of a mixture and substance

16  containing a detectable amount of methamphetamine on or about

17  December 7, 2007, find that the quantity of methamphetamine

18  attributable to the defendant, Cleve Alexander Johnson, is 50

19  grams or more.

20       Dated the 18th day of December, 2008, and signed by the jury

21  foreperson.  Thank you.  Please be seated.

22          **THE COURT:**  Anybody request poll of the jury?

23          **MR. HARRISON:**  Yes, Your Honor.

24          **THE COURT:**  All right.  Miss Solomon, if you would,

25  please poll the jury.

```
 1            THE CLERK:  Members of the jury, as your name is
 2   called, please stand.
 3       Juror Number 1, Miss Jones, does the verdict as published
 4   constitute your individual verdict in all respects?
 5            JUROR NO. 1:  Yes, it does.
 6            THE CLERK:  Thank you.  You may be seated.  Juror
 7   Number 2, Miss Campbell, does the verdict as published constitute
 8   your individual verdict in all respects?
 9            JUROR NO. 2:  Yes.
10            THE CLERK:  Thank you.  You may be seated.  Juror
11   Number 3, Mr. Mitchell, does the verdict as published constitute
12   your individual verdict in all respects?
13            JUROR NO. 3:  Yes.
14            THE CLERK:  Thank you.  You may be seated.  Juror
15   Number 4, Mr. Tuttle, does the verdict as published constitute
16   your individual verdict in all respects?
17            JUROR NO. 4:  Yes.
18            THE CLERK:  Thank you.  You may be seated.  Juror
19   Number 5, Miss Stevens, does the verdict as published constitute
20   your individual verdict in all respects?
21            JUROR NO. 5:  Yes.
22            THE CLERK:  Thank you.  You may be seated.  Juror
23   Number 6, Mr. Rawlinson, does the verdict as published constitute
24   your individual verdict in all respects?
25            JUROR NO. 6:  Yes.
```

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 142 of 147

```
 1              THE CLERK:  Thank you.  You may be seated.  Juror
 2    Number 7, Mr.Ousley, does the verdict as published constitute
 3    your individual verdict in all respects?
 4              JUROR NO. 7:  Yes.
 5              THE CLERK:  Thank you.  You may be seated.  Juror
 6    Number 8, Miss Owens, does the verdict as published constitute
 7    your individual verdict in all respects?
 8              JUROR NO. 8:  Yes.
 9              THE CLERK:  Thank you.  You may be seated.  Juror
10    Number 9, Miss Bryson, does the verdict as published constitute
11    your individual verdict in all respects?
12              JUROR NO. 9:  Yes.
13              THE CLERK:  Thank you.  You may be seated.  Juror
14    Number 10, Miss Cochran, does the verdict as published constitute
15    your individual verdict in all respects?
16              JUROR NO. 10:  Yes.
17              THE CLERK:  Thank you.  You may be seated.  Juror
18    Number 11, Miss Holland, does the verdict as published constitute
19    your individual verdict in all respects?
20              JUROR NO. 11:  Yes.
21              THE CLERK:  Thank you.  You may be seated.  Juror
22    Number 12, Miss Blackwelder, does the verdict as published
23    constitute your individual verdict in all respects?
24              JUROR NO. 12:  Yes.
25              THE CLERK:  Thank you.  You may be seated.
```

1          **THE COURT:**  All right.  The Court directs the clerk to
2    file and record the verdict.

3          Ladies and gentlemen of the jury, I want to thank you for
4    your service.  As I said at the outset, the parties and the Court
5    are all aware that you have been summoned to serve your civic
6    duties here at some sacrifice to other plans you have in your
7    life.

8          As you've now seen firsthand, jury service is one of the
9    highest callings of citizenship.  Our right to a jury trial and
10   our jury system truly set our great nation apart because of the
11   day-to-day commitment of its dedicated citizens to serve each
12   other and to be willing to serve as jurors and to listen to the
13   evidence carefully and patiently and to deliberate
14   conscientiously to resolve disputes.

15         Jury service is indeed a privilege in this great country of
16   ours.  You have discharged it faithfully.  For that, I, on behalf
17   of myself, and the parties and your fellow citizens want to thank
18   you.

19         You are now free to discuss your verdict, if you choose to
20   do so, but you have no such obligation.  No one should ever
21   harass you because of your verdict or your service.

22         Miss Solomon has a certificate of appreciation for your
23   service here on the jury.  You are now discharged with the
24   Court's thanks and wishes for a happy holiday season.  Have a
25   good day and thank you very much.  You may now leave.

Case 1:08-cr-00233-TDS   Document 33   Filed 06/22/09   Page 144 of 147

1          Everybody else remain in the courtroom, please.

2          (The jury departed the courtroom at 4:36 p.m.)

3          **THE COURT:**  Do you wish to be heard on anything further

4    at this time?

5          **MR. HARRISON:**  No, Your Honor.  I just want to make the

6    appropriate motions notwithstanding the verdict and renew my

7    motion for 29.

8          **THE COURT:**  Do you wish to submit anything in writing

9    on that?  You, of course, have the right to do that.

10          **MR. HARRISON:**  No, sir -- well, I would on the 29.

11          **THE COURT:**  All right.  Okay.  Well, I've reserved

12    ruling on the motions, and I will wait to receive your written

13    paperwork.  Just file it within the time required by the rules,

14    if you would please, sir.

15          **MR. HARRISON:**  Yes, sir.

16          **THE COURT:**  All right.  Mr. Johnson, if you would,

17    please stand, sir.

18      Mr. Johnson, the verdict has now been rendered in the case,

19    and the jury has now found you guilty.  A written presentence

20    report will be prepared by the United States probation officer,

21    and you will be asked to provide information for that report in

22    advance of any sentencing in your case.  Your attorney may be

23    present for your interview if you would like for him to be there.

24      You will be given the opportunity to read and review your

25    presentence report and file any objections you may have to the

BRIANA NESBIT, RPR          OFFICIAL COURT REPORTER     (336) 254-7464

1    report.  If any objections are not resolved prior to your

2    sentencing hearing, then I will resolve them at that time.  You

3    and your counsel will have an opportunity to speak at the

4    sentencing hearing.

5         The Court directs that the probation office prepare a

6    presentence report in this case.  Miss Solomon, are we still --

7              **THE CLERK:**  May 22nd.

8              **THE COURT:**  The Court will set sentencing -- sentencing

9    is set for Friday, May 22, 2009, at 9:30 a.m. here in

10   Winston-Salem, Courtroom Number 2.

11        The defendant is still in custody; is that right?

12             **MR. HARRISON:**  Yes, Your Honor.

13             **THE COURT:**  Anything further at this time?

14             **MR. HARRISON:**  No, Your Honor.

15             **THE COURT:**  I will look for your written submissions on

16   the Rule 29 motions.

17             **MR. HARRISON:**  Thank you, Your Honor.

18             **THE COURT:**  Anything further from the Government?

19             **MR. GALYON:**  No, Your Honor.

20             **THE COURT:**  Recess for the day.  Let me say just for

21   the record, I have two alternate jurors up on the fourth floor,

22   and they will be dismissed at this time, too.

23        (End of proceedings at 4:39 p.m.)

24

25                                    * * * * * *

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1   UNITED STATES DISTRICT COURT

2   MIDDLE DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF REPORTER

4

5

6           I,  Briana L. Nesbit, Official Court Reporter, certify

7   that the foregoing transcript, Volume III of III, is a true and

8   correct transcript from the record of the proceedings in the

9   above-entitled matter.

10

11          Dated this 18th day of June 2009.

12

13

14                  //s//Briana L. Nesbit
                    Briana L. Nesbit, RPR
15                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25