IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA    )   DOCKET NO. 1:08CR233-1
    )
    vs.    )
    )   Winston-Salem, North Carolina
CLEVE ALEXANDER JOHNSON    )   August 18, 2009
_____    11:26 a.m.


TRANSCRIPT OF THE **SENTENCING HEARING**
BEFORE THE HONORABLE THOMAS D. SCHROEDER
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Government:    RANDALL GALYON, AUSA
    Office of the U.S. Attorney
    251 N. Main Street, Suite 726
    Winston-Salem, North Carolina 27101

For the Defendant:    WAYNE HARRISON, ESQ.
    101 S. Elm Street, Suite 230
    Greensboro, North Carolina 27401


Court Reporter:    BRIANA NESBIT, RPR
    Official Court Reporter
    P.O. Box 20991
    Winston-Salem, North Carolina 27120


Proceedings recorded by mechanical stenotype reporter.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

1      (The Defendant was present.)

2            **MR. GALYON:**  Good morning, Your Honor.  The last

3   matter for the Court is 1:08CR233-1.  It is United States of

4   America versus Cleve Alexander Johnson.  He is represented by

5   Wayne Harrison.  The matter is on for imposition of sentence.

6            **THE COURT:**  Mr. Harrison, good morning.

7            **MR. HARRISON:**  Good morning, Your Honor.

8            **THE COURT:**  Let the record reflect that Ms. Thompson

9   is here as well on behalf of the probation office.

10      We are here today for sentencing.  Before we proceed with

11  sentencing, I recall that you had renewed your motions for Rule

12  29 after the verdict in this case; and I believe I asked

13  whether you had wanted to consider filing anything, and you had

14  indicated you had.  I have not received anything.

15           **MR. HARRISON:**  There is nothing.

16           **THE COURT:**  I have not formally ruled on those

17  motions.  So let me do that at this time then.

18      The motions made after the return of the verdict are

19  denied.  They are denied for the same reasons that I expressed

20  on the record, and I believe they are found on the December 18,

21  2008, transcript.  According to CM/ECF, it is pages 59 through

22  66 where I indicated the reasons I was allowing the case to go

23  to the jury, and I reserved ruling on the Rule 29 motion at

24  that time; but for those same reasons, at this time I formally

1  deny the motions.

2          **MR. HARRISON:**  We are in possession of the

3  transcript, Your Honor.

4          **THE COURT:**  All right.  Thank you.  I just wanted to

5  make sure that was in the record and part of the record.

6      We are here today for sentencing.  Have you received a

7  copy of the presentence report?

8          **MR. HARRISON:**  Yes, Your Honor, we have.

9          **THE COURT:**  Have you reviewed it with your client?

10          **MR. HARRISON:**  I have.

11          **THE COURT:**  Are you prepared to proceed today with

12  sentencing?

13          **MR. HARRISON:**  Yes, sir.

14          **THE COURT:**  Let me ask your client, Mr. Johnson, sir,

15  have you reviewed the presentence report in your case, sir?

16          **THE DEFENDANT:**  Yes, sir, I have.

17          **THE COURT:**  And have you done that with the aid of

18  your counsel?

19          **THE DEFENDANT:**  Yes, sir, I have.

20          **THE COURT:**  Are you satisfied that you understand the

21  contents of your presentence report?

22          **THE DEFENDANT:**  Yes, sir, I am.

23          **THE COURT:**  Thank you, sir.  You may have a seat.  I

24  have received and read the presentence report.  I have also

25  received a position paper by the defendant, Document 34, and a

1 position paper by the United States, Document 35.

2     Are there any other materials that have been filed that I

3 am not aware of?

4         **MR. HARRISON:** No, Your Honor.

5         **THE COURT:** Are there any objections to the

6 presentence report?

7         **MR. HARRISON:** As outlined in the position of the

8 party's paper, which you referred to, it is our position that

9 the amount of cocaine purported to be -- that my client is

10 purported to be held liable for involved a statement made by

11 him to an undercover agent on January 23, 2008 --

12         **THE COURT:** This is paragraph 10?

13         **MR. HARRISON:** Correct, Your Honor. It involves, I

14 think, 226.8 grams of methamphetamine. It is our position that

15 the source of that evidence is strictly and solely a statement

16 of the defendant. It is not corroborated in any way by other

17 witness observations or by observations of the alleged amount

18 of methamphetamine.

19     It is not evidence aliunde; the content of the statement

20 is not sufficiently supportive. It frankly doesn't exist at

21 all. The only evidence is the evidence contained in a

22 statement made by my client to an undercover officer, and I

23 cite a couple of cases for the proposition that -- this is

24 actually a general proposition --

25         **THE COURT:** Are those not, though, for the

1 proposition that a conviction cannot be had solely on an

2 uncorroborated statement?

3     **MR. HARRISON:**  They do -- they are framed in that

4 wording.  I was unable to find a case that says a sentencing

5 factor cannot be based on evidence aliunde, cannot be based on

6 evidence that does not have support aliunde.

7     My theory is, though, that if it's not really sufficient

8 for a conviction, why should it be sufficient for -- to bolster

9 a sentencing factor because it is not -- they are not talking

10 about the conviction.  The reason that we have this holding is

11 because we are dealing with the standard of beyond a reasonable

12 doubt.  If we were dealing with preponderance, then, of course,

13 it wouldn't matter.  I don't think that appears in any case

14 I've been able to find.

15     I think that it indicates a preference, certainly a

16 necessity, in the area that it has been brought up for some

17 evidence aliunde.  So it should be because it is extremely

18 undependable, and it goes deep in the English common law that a

19 man's statement in itself is just inherently undependable.  I

20 think common sense holds that out and the framework, Your

21 Honor, in which this particular statement was made would go, in

22 my view, towards a finding of undependability.

23     It is in this salesmanship between two willing --

24 allegedly willing buyers and sellers who were trying to support

25 their bona fides:  Well, you know, I don't take bad stuff, and

1  the guy says, well, I won't give you nothing but good stuff.

2  It is all part of this puffing in a sales sort of atmosphere.

3  It is not to be trusted any more than the typical -- well, I

4  don't want to color with a dark paint brush all used salesmen,

5  but that's the classic example.  It is just part of the kind of

6  interaction that is expected between people who don't know each

7  other and are feeling each other out and are trying to

8  establish that they want this deal, if it's going to happen --

9  this one never did it, but if it's going to happen, then it

10  better be okay.  It better be on solid ground.

11      I think both the law and the factual basis, the atmosphere

12  in which this statement occurred, argue for its own

13  dependability.  It certainly shouldn't be considered the

14  preponderance of evidence sufficient to base a sentencing

15  factor.  Thank you.

16          **THE COURT:**  Thank you.  Mr. Galyon?

17          **MR. GALYON:**  Your Honor --

18          **THE COURT:**  Are you aware of any cases that address

19  this in the context of sentencing under a preponderance

20  standard as opposed to a conviction under beyond a reasonable

21  doubt standard?

22          **MR. GALYON:**  No, I am not, and I think perhaps the

23  reason for that is simply because -- since it is on a

24  preponderance standard and in looking at the relevant conduct

25  requirements under 1.3, I think that the standard is such that

1  it sort of rarely comes up.  I mean, the reality is that,

2  typically, we are going to have a cooperating witness or

3  someone who's talking about drug amounts and that that is sort

4  of the more typical scenario.

5      And even if we looked at it in that context, I think it

6  would still -- you know, this statement would certainly qualify

7  in the context of what we are talking about here.  If the

8  statements made by Mr. Johnson were made by a CI as part of a

9  three-party negotiation, then I think they certainly would

10  satisfy the requirements as far as relevant conduct during the

11  course of conspiratorial activity.  I don't think there should

12  be any difference in that than trying to say, well, this is

13  just the uncorroborated statement of this defendant about his

14  involvement in a prior drug deal because the reality is, of

15  course, it is not viewed separate and apart from what's going

16  on in total.

17      All of his statements, whether it is in the buyer/seller

18  context, whether it is in the puffing context, whatever -- you

19  know, the reality is that all the stuff that he talked about

20  during the course of that January 23rd meeting were entirely

21  consistent with what we know to be the truth; that is, his

22  statements about having previously gotten in trouble, his

23  involvement in trafficking in marijuana that was the subject of

24  his prior federal conviction, the fact that he had had money

25  seized by feds.  He didn't say they have taken $100,000 from me

1  and that be a lie.  He was absolutely correct.  He knew exactly

2  how much money had been taken from him.  There was the 16,000

3  that was part of the prior deal, and then there was an

4  additional 15,000 that was taken, or some amount that was

5  taken, as part of a previous seizure about ten or twelve months

6  before.  So he knew exactly how much money had been taken, that

7  that was part of his issue with why he wanted to get a good

8  supplier.

9       One of the things that I didn't point out in the position

10  paper perhaps as strenuously as now seems important is he had

11  methamphetamine with him.  So if you want to talk about

12  evidence aliunde -- that is, evidence that he had gotten

13  methamphetamine from someone on a prior occasion -- the fact

14  that he has meth with him, he shows it to the undercover to say

15  is your stuff as good as this, not only goes a long way in the

16  context of this man is involved in the distribution of

17  methamphetamine, but also that he had some methamphetamine from

18  someone else because, as we know, he had $16,000 for the deal

19  in December that got seized, and he even references that in the

20  January 23rd meeting, saying, I had that money -- I guess I was

21  going to give that to you.  I was going to get a pound of meth

22  from you, referring to the undercover, thinking that was the

23  supplier, and then he talks about how in great detail -- you

24  know, he just didn't say, I got some meth a while ago, but it

25  wasn't as good as I wanted it; he says, I got meth.  I picked

1    up a half pound the other day.  I had about five ounces out of

2    eight ounces was good and the other three I had to take it

3    back.  That's what I hate, you know, having to take it back.

4    He wants a good supplier.

5        So just coming up with that -- if we were going to argue

6    that that's a lie, I mean, that's a pretty sophisticated lie in

7    the context of this conversation.  That in context -- the

8    specificity of those statements, I would argue, go to the fact

9    that it is evidence of recently remembered activity consistent

10   with the fact that he has a quantity of meth on him to show to

11   the undercover to say I want to make sure that your

12   methamphetamine is as good as this methamphetamine.

13           **THE COURT:**  So you are saying that that's consistent

14   with a finding that the meth he was showing to the undercover

15   agent was the good part of the half pound he got?

16           **MR. GALYON:**  Certainly.  And, again, if -- at the

17   very least, it shows that he was procuring methamphetamine

18   during the course of the conspiracy in addition to the meth

19   that he was trying to get from the undercover and that he had

20   tried to get in December as part of this, that he was able to

21   get methamphetamine.  And consistent with that, I would argue,

22   that, yes, because he says -- he gives a timeframe, too.  He

23   didn't say a year ago I got meth and, you know, a lot of it was

24   bad, and that's why I have been trying to find a good source.

25   He says, the other day, the other day I picked up a half pound.

1      And so, yes, I think that goes to the idea that this small

2   sample is certainly a portion of that; and even if it isn't, it

3   goes to the fact that very recently, during that timeframe in

4   January, he had procured methamphetamine.

5      So I think that those -- the statements that he made not

6   only are corroborated by -- internally corroborated by the

7   circumstances under which they are made, but they are also

8   corroborated by the fact that he has methamphetamine in his

9   possession.  All of that, I would argue, strongly support the

10  statement itself and the fact that he should be held

11  accountable for that relevant conduct.

12     I think the other part of that argument has already been

13  laid out related to the cases and, of course, Mr. Harrison has

14  already described the fact that those are made in the context

15  of the typical confession to law enforcement post-Miranda as

16  opposed to this situation where they are made as part of a

17  negotiation, not as part of a statement to law enforcement.  He

18  didn't know the undercover was a law enforcement officer.  He

19  thought he was talking with a potential supplier for

20  methamphetamine.

21     I would argue in that context that he is providing

22  information, and that that information, as far as the previous

23  amounts, is consistent with his involvement in methamphetamine

24  trafficking and his willingness to engage in the

25  methamphetamine trafficking.

1        THE COURT:  Thank you.  Anything further?

2        MR. HARRISON:  Just one brief observation, Your

3    Honor.  Another factor here is that we are certainly not given

4    any showing that this -- even if he acquired other

5    methamphetamine, whether or not it was in connection with the

6    conspiracy charge.  In fact, he makes some statements to this

7    undercover guy, saying these people aren't going to be

8    involved.

9        There is no showing that it is in -- that it is activity

10   that is connected with the conspiracy count of conviction.  No

11   showing, in fact, that it is a conspiracy.  It could be him

12   just acting alone, and that in itself, it would seem to me,

13   would take it out of the relevant conduct issue.

14       THE COURT:  Mr. Galyon, do you want to respond to

15   that argument?

16       MR. GALYON:  Well, Your Honor, you've -- you will

17   recall that from the trial itself, not only did we have the

18   evidence from the beginning of the timeframe of the conspiracy

19   from Robby Todd and Lori Wilson related to their accompanying

20   Melvin Johnson to this defendant's residence or a dwelling to

21   get methamphetamine, that Melvin Johnson was getting

22   methamphetamine from this defendant, and that there, of course,

23   were numerous conversations during the course of the timeframe

24   related to trying to get the pound of methamphetamine.

25       After that money was seized, there was continued

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1  negotiation.  You will recall there was in January a

2  circumstance where, again, Lori Wilson and Robby Todd went with

3  Melvin Johnson to see Mr. Johnson, this defendant, down in High

4  Point; and on that occasion, they discussed phone numbers in

5  order to have sort of a direct link with Robby Todd.

6      But even during the course of this January conversation,

7  there is discussion about -- where this defendant talks about,

8  Do you know my cousin Melvin Johnson?  Much was made of that

9  during the course of the trial, but the reality is that he

10  asked about that.  The introduction was made through Robby

11  Todd, but he actually asks the undercover if the undercover

12  knows Melvin Johnson, his cousin.

13      And, again, I think that's all sort of part and parcel of

14  the fact that this is part of a conspiracy involving those two

15  individuals; and while this defendant may, as part of that

16  conspiracy, get methamphetamine from additional sources, that

17  doesn't change the fact that those individuals were involved in

18  a conspiracy, and the conspiracy was to distribute

19  methamphetamine.  I mean, that's why he is getting these

20  quantities of methamphetamine.

21          **THE COURT:**  Do I have to find that the amount of the

22  half pound was actually part of the conspiracy in order to

23  attribute that amount for sentencing purposes here?  Do I have

24  to find that under 1B1.3?

25          **MR. GALYON:**  Well, under 1B1.3, it talks about all

1  acts and omissions caused by the defendant as part of this

2  offense.  So I think it has to be --

3         **THE COURT:**  It says at the bottom, "that occurred

4  during the commission of the offense" -- I'm reading from the

5  bottom of 1B1.3 -- "of conviction, in preparation for that

6  offense, or in the course of attempting to avoid detection or

7  responsibility for that offense."

8         **MR. GALYON:**  Right.

9         **THE COURT:**  So you believe that -- I am just getting

10 your view on this.  Do you believe that the half pound has to

11 be within the ambit of the conspiracy in some fashion in order

12 to have it attributed to Mr. Johnson?

13        **MR. GALYON:**  Well, I do only because as Part B

14 there -- under (a)(1)(B), "in the case of a jointly undertaken

15 activity" --

16        **THE COURT:**  Uh-huh.

17        **MR. GALYON:**  -- it talks about reasonably foreseeable

18 acts in furtherance of the jointly undertaken activity.  I

19 think that -- in my estimation, that sort of informs on it as

20 well, that it has to in some way be related.  That's why it is

21 considered to be this relevant conduct, and I would argue that

22 it is; that just because he doesn't say Melvin and I got the

23 eight ounces or anything like that, that doesn't change the

24 fact that it is during the timeframe of the conspiracy and is a

25 reasonably foreseeable act.

```
 1      Even if he didn't say to -- even if this defendant didn't
 2 say to Melvin Johnson, I am going to go get eight ounces,
 3 that's a reasonably foreseeable act during the course of the
 4 conspiracy because there is no evidence that they quit being
 5 partners.  There is no evidence of that.
 6      The fact that he goes with Robby Todd to meet the
 7 source -- the source that he met or was intending to meet in
 8 December through Robby Todd, that's the same individual that he
 9 met -- that he was introduced to through his association with
10 his co-conspirator Melvin Johnson because, as the Court
11 recalls, Melvin Johnson was the link essentially to Robby Todd.
12      There was a discussion about how they were initially going
13 to -- Robby Todd, as the cooperator, was initially going to
14 provide precursor materials essentially.  This defendant was
15 going to help pay for the precursor materials, and that Melvin
16 Johnson was essentially the go-between and that he owed money,
17 that he had been working to sell methamphetamine for Cleve
18 Johnson -- all of that.
19      So nothing changed during the course of all that.  He was
20 still -- this defendant and Melvin Johnson were still involved
21 in the drug business together, but Melvin Johnson wasn't -- he
22 wasn't the main person, and so this defendant was trying to
23 procure additional methamphetamine during the course of that
24 conspiracy; but whether or not he said, Melvin, I am going to
25 go out and get more meth so you can sell it doesn't change the
```

1  fact that they were still in a conspiracy and that the

2  defendant -- by getting those additional eight ounces, that

3  would have been during the course of the conspiracy and would

4  have been related to it.

5      So that's a long way of getting around to saying that I do

6  think that it was related or would need to be related to the

7  conspiracy; but that being able to establish that under the

8  relevant conduct standard, given the conspiracy charge, is not

9  a difficult hurdle.

10         **THE COURT:**  All right.  Thank you.  Anything further,

11  Mr. Harrison?

12         **MR. HARRISON:**  Your Honor, I mean, to stand up and

13  recite what the Government has already alleged and, to a jury's

14  satisfaction, proven and then includes any purchase of

15  methamphetamine ever is just -- runs right in the face of the

16  requirement in the sentencing guidelines that the activity be

17  connected with the charged conspiracy, and there is

18  absolutely -- Mr. Galyon has talked about a lot of evidence

19  that he introduced during the trial, none of which includes any

20  explanation for the purpose of buying the alleged half pound

21  that he said he bought.  He didn't say he bought it for a

22  particular person.  He didn't say -- and the fact that there is

23  no evidence of that cannot be evidence of it.

24      That's essentially what the Government is doing is saying,

25  well, we proved this conspiracy, and Melvin was one of the

BRIANA NESBIT, RPR       OFFICIAL COURT REPORTER   (336) 254-7464

1  members and Cleve Johnson was one of the members.  Therefore,

2  if Cleve Johnson -- if you believe Cleve Johnson bought any

3  methamphetamine, he bought it for purposes of advancing the

4  charged conspiracy of which there is no evidence.  You just say

5  it; that every time you buy anything, it is for that charged

6  conspiracy.

7      Why have the requirement in the language of the guidelines

8  that an establishment of a relationship be shown?  There is no

9  such showing.  Thank you.

10      **THE COURT:**  Give me just a minute.  (Reading.)

11      Mr. Galyon, tell me again how do you tie the half pound in

12  with the purpose of the conspiracy?  How is it either

13  reasonably -- how is it reasonably foreseeable and in

14  furtherance of the conspiracy based on the evidence in the

15  case?

16      **MR. GALYON:**  Well, that's -- perhaps I made it a

17  little bit more difficult than it needs to be.

18      It would be -- the issue on joint undertaken activity is

19  if this eight ounces is being used against Melvin, which it

20  wasn't, you know -- and perhaps because at that time there

21  wasn't a fine-toothed comb going through the statements of this

22  defendant and the video and that sort of thing.

23      We didn't have the benefit of the transcript at that

24  point, but that's where the reasonably foreseeable would come

25  in as to whether or not it would get attributed to the

BRIANA NESBIT, RPR     OFFICIAL COURT REPORTER    (336) 254-7464

1  co-defendant because the co-defendant wasn't present when that

2  happened.

3      So it is more akin, actually, I guess to the (A) because

4  we are talking about the act of that defendant during the

5  course of the conspiracy because that's -- he is the one that

6  said, I went out and got eight ounces. He didn't say somebody

7  else did it, you know, and then now I am getting blamed for it

8  essentially. He is the one that made that statement.

9      So the fact that that eight ounces is procured during the

10 timeframe of the conspiracy I think actually gets us back to, I

11 guess, the point that the Court asked about initially and, that

12 is, you know, what essentially do you have to show as the tie;

13 and the reality is the tie is, I would argue, the drug itself.

14     I mean, we are talking about the fact that a conspiracy

15 has been established and just as if the jury had been asked to

16 determine whether -- exactly which amounts -- beyond just a

17 threshold amount but exactly how much he would have been

18 responsible for during the course of what was involved in the

19 conspiracy.

20     You know, the reality is once we establish that there was

21 a conspiracy, then I think the relevant conduct question is a

22 much easier question to answer because --

23         **THE COURT:** Conspiracy and at the threshold drug

24 quantity level?

25         **MR. GALYON:** Right. I mean, because the first

1  question that would have been answered by the jury, of course,

2  was the question of whether or not there was a conspiracy, and

3  that question has already been answered; and then the question

4  was, in order for statutory purposes, was there at least

5  50 grams involved and, of course, they answered yes.

6      But beyond -- regardless of the statutory issue the jury

7  had to decide, the issue of -- once you establish the

8  conspiracy itself, then arguably all these other actions that

9  the defendant takes during the course of the conspiracy are

10  going to be attributable to him to the extent that they are

11  relevant.

12      You know, we are not talking about -- when Mr. Harrison

13  talks about basically any other drug deal that he was involved

14  in during that time or any other drug deal would be in -- would

15  be attributed to him, well, during that timeframe of the

16  conspiracy and involving methamphetamine, it certainly could be

17  because we don't have evidence to the contrary.

18      I mean, he was involved in a conspiracy to distribute

19  methamphetamine.  He admits during the course of that timeframe

20  of the conspiracy that he had gotten additional methamphetamine

21  consistent with a distribution amount.  We are not talking

22  about I got, you know, three grams.  He says, I got a half

23  pound, which is eight ounces, and that he had to take some of

24  it back because it wasn't good quality.

25      Again, that goes to the idea -- I mean, he was there to

get a half pound again.  That was the whole point.  We are not
talking about personal amounts, personal use amounts.  We are
talking about amounts for distribution, which is the object of
the conspiracy.

So I would argue that, yes, during that timeframe, the
timeframe alleged in the indictment and with the person that he
met through Melvin Johnson, that it certainly stands to reason
that when he says I got methamphetamine the other day, that
that methamphetamine is going to be attributable to him as part
of that same conspiracy whether or not he says specifically I
was going to give some of it to Melvin to distribute --

**THE COURT:**  So your argument is this would be a
different issue if it were Melvin Johnson's sentencing?

**MR. GALYON:**  Right.  Then we would look under (B).
The reason I pointed out (B) is just because it talks about
what's part of the conspiracy and that you have that sort of
additional requirement if you weren't the one who did it, but
here Mr. Cleve Johnson admits I was the one that got -- you
know, I got a half pound the other day.  I had to take three
ounces of it back because it wasn't any good.

So when it says "all acts and omissions committed" by the
defendant are going to be attributable to him, I think that the
guideline means what it says.

**THE COURT:**  All right.  Thank you.  There is an
objection before the Court as to the drug quantity of half a

1  pound that's been attributed to the defendant, Cleve Johnson,

2  as referenced in paragraph 10 of the presentence report.

3      The Court finds by a preponderance of the evidence that

4  Mr. Johnson's statements that he had recently purchased or

5  gotten one-half pound of methamphetamine are credible, and the

6  Court finds that Cleve Johnson, in fact, said that he had

7  recently gotten a half pound of methamphetamine and had to take

8  some back -- several ounces back because they were poor

9  quality.

10      So the Court makes that finding by a preponderance of the

11  evidence and finds that the amount of 226.8 grams is the amount

12  that Mr. Johnson stated in the commission of the offenses in

13  question that he had earlier purchased and that those amounts

14  should be attributable to the defendant, and the Court finds

15  that those are appropriately attributable under U.S. Sentencing

16  Guideline 1B1.3 and the commentary and application notes that

17  follow from that.

18      The defendant is accountable for all the quantities of

19  contraband with which he was directly involved.  So the

20  objection is overruled.

21      Now, are there any other findings with respect to that

22  that either party believes I need to make for the record?

23          **MR. GALYON:**  No, Your Honor.

24          **THE COURT:**  All right.  Any other objections,

25  Mr. Harrison, to the presentence report?

1        **MR. HARRISON:**  No, Your Honor.

2        **THE COURT:**  All right.  I should say as well that

3   there were other indicia of reliability that persuaded me that

4   Mr. Johnson's statements should be credited, and that is that

5   he does reference a specific amount and he references that it

6   was recently purchased.

7        I understand the argument of the defendant that the

8   defendant may have been puffing his drug trafficking

9   credentials.  That goes to the credibility of the statement.  I

10  will find that it is credible.

11       Okay.  The Court has one other typographical error that

12  appears in the presentence report.  I want to bring your

13  attention to page 7, paragraph 19, under base offense level.

14  It indicates a base offense level of 32, which I believe is

15  correct; but the paragraph describing that that's provided in

16  paragraph 19 concludes that the base offense level is 30.  I

17  believe that should be 32.

18       That's paragraph 19, Mr. Harrison.

19       **MR. HARRISON:**  Yes, I see that and agree that that

20  must be typographical.

21       **THE COURT:**  Mr. Galyon, are you in agreement with

22  that?

23       **MR. GALYON:**  Yes, sir.

24       **THE COURT:**  So paragraph 19 will be amended to

25  reflect that the base offense level is 32, and I'm referring to

1  the last clause of the second sentence of that paragraph.  It

2  presently reads that the base offense level is 30, and it cites

3  to Sentencing Guideline 2D1.1(a)(3) and (c)(4), and it should

4  read the base offense level is 32, which is, in fact, what was

5  indicated to the right of where the calculations are being

6  made.

7      All right.  The Court adopts the presentence report with

8  that one change.  As to all matters in the presentence report

9  then, the Court adopts as findings of fact.

10     We are here today to consider the imposition of a

11 sentence.  The defendant was convicted by a jury of Counts One

12 and Two of the indictment:  Count One charging conspiracy to

13 distribute methamphetamine in violation of Title 21 of the U.S.

14 Code, Sections 846 and 841 (b)(1)(B); and Count Two charging

15 attempt to possess with intent to distribute methamphetamine in

16 violation of Title 21 of the U.S. Code, Sections 846 and

17 841(a)(1) and (b)(1)(B).

18     Taking the guidelines into account then on an advisory

19 basis, it appears that the following calculations result:

20 Total offense level is 32; criminal history category is 5; the

21 guideline range of imprisonment is 188 to 235 months.  There is

22 a statutory minimum of ten years and a maximum of life on each

23 of Counts One and Two.  The guideline supervised release range

24 available upon revocation is 8 years on each count.  The fine

25 range is $17,500 to $8 million, but restitution on Count One is

1  there is none; as to Count Two, there is community restitution

2  of not more than $4 million.

3      Do the parties agree that these are the guideline ranges

4  in the case?

5              **MR. HARRISON:**  I do, Your Honor.

6              **MR. GALYON:**  Yes, Your Honor.

7              **THE COURT:**  The Court has considered the calculations

8  resulting from an application of the guidelines.  The Court

9  finds that they have been appropriately determined.

10      In addition to considering the guidelines on an advisory

11  basis and considering the factors under Title 18 of the U.S.

12  Code, Section 3553(a), I'll hear from you now, starting with

13  Mr. Harrison, as to any factor you would like to present to

14  assist me in determining a reasonable and appropriate sentence

15  in this case.

16              **MR. HARRISON:**  Well, sir, the first thing that

17  strikes me, of course, is the fact that even at the bottom end

18  of the guidelines here we are dealing with a man considerably

19  advanced in age relative to the sentence that he is facing.  It

20  is the functional equivalent of a life sentence.  It is to be

21  imposed within the framework of conduct that never really got

22  off the ground.  The amounts involved are attempts and

23  conspiracies that never came to bear fruit.

24      I'm not trying to excuse that totally by the fact that

25  nothing ever really happened, but the law recognizes that kind

1  of thing.  If I take a shot at somebody sitting in that chair

2  over there and miss, then my punishment -- even though I wanted

3  to shoot him right between the eyes, my punishment is

4  considerably less than if I had been -- if my aim had been up

5  to my equipment.  There is an enormous difference in assault

6  with a deadly weapon and murder, and that only is true because

7  of what actually happened.

8       I think there is an element of that to be taken into

9  consideration under 3553 in this or any other case wherein you

10  have attempts essentially -- a fundamental attempt rather than

11  a successful completion.

12      I remember the first thing that my criminal law professor

13  back in Chapel Hill, so many decades ago that it begins to

14  become depressing, told me and that is that you've got to both

15  have the evil in your mind and you've got to have the evil

16  result; and that here has its effect, or should in my opinion,

17  on reducing the depth of the wound that is extracted from my

18  client.  One-hundred-eighty-eight months is a long time.  Thank

19  you.

20          **THE COURT:**  All right.  Mr. Galyon?  Before I get to

21  you, are you arguing for a low guideline --

22          **MR. HARRISON:**  Yes, sir.

23          **THE COURT:**  -- range?

24          **MR. HARRISON:**  Yes, sir.  I think 188 months is

25  sufficient and that more would be excessive.

1          **MR. GALYON:** Just a couple of things.  One, in

2    looking at the presentence report, Ms. Thompson has pointed out

3    on page 39, Part E, about factors that may warrant departure,

4    that this defendant's but for timeframe would have been a

5    career offender.  He had a crime of violence or what would have

6    qualified as a crime of violence, but because of operation of

7    the guidelines that was not counted; and so as a result, he is

8    not a career offender, but that is one of the things that the

9    Court can look at in consideration of an appropriate sentence.

10         Even more than the potential career offender issue is

11   looking at how Mr. Johnson has done following his conviction

12   for marijuana trafficking in federal court in New Mexico.  I

13   think that is as telling as any part of the presentence report,

14   what's involved in that beyond the offense itself, what

15   happened subsequent to his conviction and the time he spent in

16   prison.  There were several modifications of his supervised

17   release.  There was a revocation of his supervised release.

18         All of those things I think go to the fact that

19   Mr. Johnson -- despite what the Court sees related to a trust

20   account and the fact that his family had provided for him, that

21   he had continued to engage in this criminal activity.  I mean,

22   he's a Criminal History Category V, and that's without a vast

23   number of these misdemeanor and felony convictions counting

24   because they are older.

25         So the reality is that you've got an individual who, even

1  with their most recent criminal activity, has a felony in

2  federal court, that that was apparently insufficient to deter

3  him from continuing to engage in criminal activity; and I think

4  that, as much as anything, is an appropriate reason for

5  sentencing at the high end of the guideline range consistent

6  with probation's recommendation, and that would be the

7  Government's request.  Thank you.

8        **THE COURT:**  All right.  Mr. Johnson, is there

9  anything you would like to say in your own behalf before I

10  render a decision?  I will advise you that you have no

11  obligation to speak, but I will be happy to hear from you now,

12  sir, if you wish to address the Court.

13        **THE DEFENDANT:**  Your Honor, I would just to like

14  apologize to the Court for any inconvenience to him.  My wife

15  and my aunt are sitting back there behind me.  That's the only

16  two people I have in my family left.  My mother and brother is

17  deceased.  I had a brother get killed in a car wreck.  I

18  just -- I got a 7-year-old daughter, that she just don't

19  understand what is going on.  I just ask for mercy.  That's all

20  I have to say.

21        **THE COURT:**  All right.  Thank you, sir.

22  Ms. Thompson, can you approach the bench, please.

23      (Off-the-record discussion between the Court and the

24      Probation Officer.)

25        **THE COURT:**  All right.  The Court has taken the

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

guidelines into account on an advisory basis.  The Court notes
that the total offense level is 32, the criminal history
category is 5, and the guideline imprisonment range is 188 to
235 months.

The Court has taken into account the arguments of counsel,
their position papers, and the statements of the defendant.

The Court has also taken into account all of the 3553(a)
factors in determining an appropriate sentence in this case.
The sentence the Court will impose will be that which will be
sufficient but not greater than necessary to meet the
sentencing objectives of Section 3553(a) and any sentencing
objectives that may apply as well under the advisory
guidelines.

The Court finds that the sentence that it will impose is
200 months and that such a sentence is reasonable.  The Court
notes that the sentence is within the guideline range.

This sentence is imposed because the Court feels that the
nature and circumstances of the offense and history of this
defendant require and justify such a sentence.  This sentence
involves large quantities of methamphetamine -- I'm sorry, this
offense, rather, involves large quantities of methamphetamine.

I've also, though, been persuaded by the need for the
sentence to promote respect for the law and to afford adequate
deterrence to criminal conduct.  The defendant has one prior
drug charge, paragraph 49 of the presentence report.  The

defendant was convicted in federal court and sentenced to 24

months imprisonment and 2 years of supervised release.  The

defendant violated his supervised release not once but twice,

testing positive for methamphetamine and for marijuana use and

for cocaine.  The defendant also has a substantial criminal

history, including multiple breaking and enterings and felony

burning of a building.

     The Court notes that the defendant could have been

subjected to an upward departure in this case based on his

extensive criminal history for which no points were given to

him in this case.

     So having considered the advisory guidelines and the

factors under Title 18 of the U.S. Code, Section 3553(a), the

Court finds that a sentence of 200 months is reasonable under

the facts of this case and is appropriate.

     It is, therefore, ordered that the defendant be committed

to the custody of the United States Bureau of Prisons for a

term of 200 months on each of Count One and Count Two to run

concurrently followed by 8 years of supervised release to run

concurrently.

     The defendant is ordered to pay a special assessment of

$100 on each of Count One and Count Two.  That will be due and

payable immediately.  To the extent he cannot immediately

comply, the Court will recommend that he participate in the

Inmate Financial Responsibility Program.

1    Bear with me.  In addition to the usual terms of

2  supervised release, it is ordered that the defendant shall

3  provide any requested financial information to the probation

4  officer.  The defendant shall not incur new credit charges or

5  open additional lines of credit without the approval of the

6  probation office.

7    The defendant shall submit to substance abuse testing at

8  any time as directed by the probation officer, and the

9  defendant shall cooperatively participate in a substance abuse

10 treatment program, which may include drug testing and inpatient

11 and residential treatment, and to pay for treatment services as

12 directed by the probation officer.  During the course of

13 treatment, the defendant shall abstain from the use of

14 alcoholic beverages.

15    The defendant shall notify the probation officer of any

16 material changes in economic circumstances that may affect his

17 ability to pay restitution, a fine, and special assessment.

18    Let me ask Ms. Thompson to approach the bench one more

19 time, please.

20    (Off-the-record discussion between the Court and the

21    Probation Officer.)

22    **THE COURT:**  The defendant will be ordered to pay a

23 fine in the amount of $10,000.  In the event the entire amount

24 of this penalty is not paid prior to the commencement of the

25 term of supervised release, the defendant shall make payments

1   in equal monthly installments of $100 to begin 60 days after

2   the commencement of the term of supervised release and

3   continuing during the entire term of supervised release or

4   until paid in full.

5        Let me hear from the parties as to denial of federal

6   benefits under Title 21, Section 862.  Do you wish to be heard

7   on that?

8               **MR. GALYON:**  No, Your Honor.

9               **MR. HARRISON:**  No.

10              **THE COURT:**  All right.  The instant offense is the

11  defendant's second conviction for an offense involving

12  distribution of a controlled substance.  Pursuant to Title 21

13  of the U.S. Code, Section 862, the defendant is declared

14  ineligible for any and all federal benefits for a period of ten

15  years, as those benefits are defined under statute.

16       The Court will recommend that the defendant be designated

17  to a facility where he may participate in an intensive

18  substance abuse treatment program.

19       Any other requests with respect to BOP?

20              **MR. HARRISON:**  In view of the fact that he has a

21  minor child and family here, I would ask that he be housed --

22  or recommended by the Court to be housed in a facility as near

23  as possible to High Point, North Carolina.

24              **THE COURT:**  The Court will recommend that the

25  defendant be designated to a facility as near as possible to

1 his residence in High Point, North Carolina.

2      Do you understand, Mr. Johnson, that's a recommendation?

3 It is up to the Bureau of Prisons as to how they comply with

4 that based on their load at the time and needs that they have.

5      Any other things from the defendant?

6           **MR. HARRISON:**  No, Your Honor.

7           **THE COURT:**  Mr. Galyon, anything further from the

8 Government?

9           **MR. GALYON:**  No, Your Honor.

10           **THE COURT:**  Do we need a -- was anything seized as a

11 result of this?  Is there any need for a destruction order?

12           **MR. GALYON:**  No, Your Honor.  Some cell phones and

13 personal items, that sort of thing.  We can -- we would request

14 at the end of the appellate period that they be returned unless

15 they are of a non-evidentiary value and a return pursuant to

16 DEA policy.

17           **THE COURT:**  It will be so ordered.

18      Have you advised your rights about any rights of appeal

19 that he may have?

20           **MR. HARRISON:**  Yes, Your Honor.  And I have signed,

21 and so has he, a notice concerning right to appeal that was

22 supplied to me by the court official.

23           **THE COURT:**  All right.  Please make sure that

24 Mr. Johnson is aware that, if he chooses to file notice of

25 appeal, he must do so in writing within ten days of the entry

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1  of the Court's judgment.

2          **MR. HARRISON:**  Yes, sir.

3          **THE COURT:**  Mr. Johnson, you are looking at a

4  substantial period of time.  I am very aware of that.  I tell

5  everybody that you have choices when you are in prison.  I

6  think for you it looks like getting some drug treatment is

7  going to be an important step for you in being able to get on

8  the right path, but you are going to have choices in prison.

9          It looks like the last time you went to federal prison you

10  continued to engage in your same conduct, and it got you here

11  today.  I encourage you to do all you can within your power to

12  make the right choices and to be careful of some of the

13  associations you may have in prison.  There are not necessarily

14  all good opportunities there.

15          You have a substantial sentence, but you are still at the

16  point where you will be given potential credit and be able to

17  be released and still have a productive life afterwards to

18  spend some time with your child.

19          So I wish you good luck in the process.  I encourage you

20  to focus yourself on the right decisions you need to make

21  because all of this is a consequence that you choose to make in

22  your life and how they affect other people.

23          And when you are released this time, since you had trouble

24  with it in the past, please be aware that if you violate your

25  supervised release and get involved in drugs or other criminal

1  activity that your supervision can be revoked and you can be

2  sent back to prison.  In your case that is a substantial period

3  of supervised release, and that can be a substantial prison

4  sentence.

5          **THE DEFENDANT:**  I understand that.

6          **THE COURT:**  Anything further from the Government?

7          **MR. GALYON:**  No, Your Honor.

8          **THE COURT:**  We'll be in recess until 2:00.

9      (END OF PROCEEDINGS AT 12:32 P.M.)

10

11

12                          * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER      (336) 254-7464

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Nesbit, Official Court Reporter,

7  certify that the foregoing transcript is a true and correct

8  transcript from the record of the proceedings in the

9  above-entitled matter.

10

11         Dated this 4th day of November 2009.

12

13

14                      //S//Briana L. Nesbit
                        Briana L. Nesbit, RPR
15                      Official Court Reporter

16

17

18

19

20

21

22

23

24

25

BRIANA NESBIT, RPR        OFFICIAL COURT REPORTER    (336) 254-7464