# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **CLEVE ALEXANDER JOHNSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **1:8CR233-1** |
| v. | ) | **1:12CV571** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Petitioner, Cleve Alexander Johnson, a federal prisoner, filed a Motion (Docket Entry 53)* to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. On July 1, 2008, Petitioner and a co-defendant were indicted for (1) conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B) and (2) attempt by Petitioner and the same co-defendant to possess with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). (Docket Entry 8.) Petitioner was convicted after a jury trial on both counts. (Docket Entry 27.) He was sentenced on August 18, 2009 to 200 months of imprisonment. (8/18/2009 Minute Entry; Docket Entry 37.) After an unsuccessful appeal, *United States v. Johnson*, No. 09-483711, 2011 WL 288611 (4th Cir. Jan. 31, 2011), Petitioner filed the instant Motion. Respondent has filed a Response. (Docket Entry 66.) Petitioner was notified of his right to file a reply (Docket Entry 67), however, no reply was filed. The matter is now before the Court for a ruling. *See* Rule 8, Rules Governing Section 2255 Proceedings.

---

* This and all further cites to the record are to the criminal case.

## Background

The evidence at trial showed the following. During November of 2007, the Mt. Airy Police Department had an informant named Robby Todd contact Melvin Herbert Johnson, also known as "Wizard," regarding methamphetamine. (Docket Entry 32 at 9, 11.) Todd had previously sold methamphetamine to Melvin Johnson. (*Id.* at 10-11.) Todd did not front methamphetamine, *i.e.*, give the drugs on consignment, because "it would be like him [the person being fronted the drugs] selling my drugs for me." (*Id.* at 85.) Sometime in November of 2007, Todd and his girlfriend, Lori Wilson, transported Melvin Johnson—Petitioner's cousin—to Petitioner's cabin. (*Id.* at 86, 89.) Todd, Wilson, and Melvin Johnson entered the cabin and Petitioner fronted one half ounce of methamphetamine to Melvin Johnson. (*Id.* at 14-15.)

On December 4, 2007, Todd (wearing a concealed audio recording device) and Wilson met with Melvin Johnson regarding the sale of anhydrous ammonia and ephedrine pills (precursor chemicals used in the manufacture of methamphetamine) to Melvin Johnson. (*Id.* at 18-19.) As part of the law enforcement plan, Todd told Melvin Johnson that he also had a drug supplier who would sell methamphetamine for $16,000 a pound. (*Id.* at 18, 21.) Melvin Johnson said that Petitioner would be supplying the money. (*Id.* at 22.)

On December 7, 2007, Todd (wearing a concealed audio recording device) and Wilson met with Melvin Johnson at his camper in Surry County, North Carolina, to discuss the purchase of a pound of methamphetamine. (*Id.* at 22-23.) Todd asked Melvin Johnson "[I]s he wanting to buy a quantity[?] . . . Cuz [Petitioner]?" (*Id.* at 23, 67-69.) Melvin

2

Johnson responded "[H]e was wanting a damn pound, I think." (*Id.* at 24, 91.) During the conversation, Melvin Johnson indicated that he owed his cousin, Petitioner, money for methamphetamine and that Petitioner wanted the money that day (December 7, 2007), but that Melvin Johnson only had half of the money. (*Id.* at 24-25.)

The telephone call between Melvin Johnson and Petitioner was corroborated by telephone records for Petitioner's cell phone number. (*Id.* at 68.) Melvin Johnson asked if Petitioner wanted to buy the anhydrous ammonia or a pound of methamphetamine. (*Id.* at 71.) The plan was that when Melvin Johnson sold the methamphetamine, Petitioner would come to receive payment for the methamphetamine he fronted to Melvin Johnson and also to complete the one pound purchase. (*Id.* at 24-25.) Of the $16,000 per pound price, Melvin Johnson hoped to receive $1,000 for helping broker the deal. (*Id.* at 73.)

On December 11, 2007, Melvin Johnson informed Todd that he and Petitioner were near Todd's community (Low Gap) and that Petitioner was ready to purchase the pound of methamphetamine. (*Id.* at 30.) Todd called the detectives and informed them that both Melvin Johnson and Petitioner were at Todd's residence in a black Acura. (*Id.* at 32.) Todd saw two rolls of money between the passenger and driver seat in the black Acura parked at Todd's residence. (*Id.*) Petitioner told Todd that he "wanted to be the one to hand the Mexican the money for the pound and to try out the meth to make sure it was good before any money switched hands." (*Id.* at 33.) Todd and Wilson then drove in their car with Petitioner and Melvin Johnson following in the black Acura to meet the fictional Hispanic supplier in Mount Airy to purchase one pound of methamphetamine. (*Id.* at 32-33, 171.)

3

Law enforcement formulated a plan to conduct a traffic stop of Petitioner and Melvin Johnson in Mount Airy. (*Id.* at 170-71.) Uniformed officers were notified by the detectives to stop the Acura based on its lack of vehicle insurance and notified further that the vehicle would contain a large sum of currency, and they were also provided descriptions of Petitioner and his cousin. (*Id.* at 115-16, 171.) The uniformed officers stopped the Acura. (*Id.* at 117-120.) When Petitioner got out of the vehicle, the officer saw two large rolls of currency between the driver seat and the center console. (*Id.* at 119-120.) After some initial questions, the officer asked for consent to search the vehicle for weapons, which was granted and the officer retrieved the two rolls of cash from between the driver seat and center console. (*Id.* at 119-20; Govt's Trial Ex. 8; Docket Entry 32 at 123.) When the officer asked Petitioner how much the two rolls represented, Petitioner said he had "$16,000 total" in two $8,000 "stacks." (Docket Entry 32 at 121.) During the course of the stop, Petitioner gave his cell phone number. (*Id.* at 120.) Narcotics detectives were called to the scene and seized the cash and Petitioner was issued a citation by the officer for an insurance violation, and a verbal warning for an inspection violation, and released. (*Id.* at 129-30.)

On January 7, 2008, Todd and Wilson drove Melvin Johnson to meet with Petitioner so that Melvin Johnson could pay off a drug debt he owed Petitioner. (*Id.* at 37-38.) At the direction of law enforcement, Todd gave Melvin Johnson $600 to help Melvin Johnson pay off his drug debt. (*Id.*) Todd drove Melvin Johnson to a residence in High Point and Melvin and Petitioner met in Petitioner's SUV in order to pay off the drug debt. (*Id.* at 38-40.) A few minutes later, Petitioner gave Todd his cell phone number. (*Id.* at 39.)

4

On January 23, 2008, an undercover officer, equipped with a concealed audio/video recording device and posing as a Hispanic drug supplier, was introduced by Todd to Petitioner in Greensboro, North Carolina, to discuss the purchase of one pound of methamphetamine. (*Id.* at 136-140.) During the meeting, videotaped by a concealed recording device in the undercover officer's vehicle, Petitioner advised the undercover officer that "the feds" had seized $30,000 of his money. (*Id.* at 140.)

Petitioner also noted that "he went to Robby's house with $16,000, but it was taken off by the feds[.]" (*Id.* at 141.) Petitioner showed the undercover officer a small quantity of methamphetamine that he had in his possession and asked if the undercover officer's methamphetamine was as good as the methamphetamine Petitioner was displaying. (*Id.* at 140-41.) In addition to showing a small quantity of methamphetamine, Petitioner informed the undercover officer that he had gotten eight ounces of methamphetamine a few days earlier and had to take three ounces back because they were of poor quality. (*Id.* at 141.) He complained that the methamphetamine currently available tended to have too much "cut" in it. (*Id.*)

Melvin Johnson was arrested on the instant charges on June 16, 2008. (Docket Entry 33 at 16.) On July 24, 2008, officers with the San Bernardino County Sheriff's Office, the U.S. Marshals Service, and the DEA office in Riverside, California, conducted a traffic stop of a tractor-trailer on Interstate 95 near Needles, California. (*Id.* at 22-23.) The officers used a public address system to inform Petitioner that they had a federal warrant for his arrest out of North Carolina. (*Id.* at 27.) After an hour long standoff in the desert in over 100 degree

5

heat (*id.* at 22, 30), the officers put a flash bang and tear gas in the cab of the truck and then extricated Petitioner from the cab of the truck (*id.* at 29-30). As officers pulled him from the truck, Petitioner continued to resist. (*Id.* at 30.)

Following his arrest in California on the instant federal charges, Petitioner was transported back to the Middle District of North Carolina and his jury trial began on December 16, 2008. (12/16/2008 Minute Entry.) During the testimony of the first Government witness, Robby Todd, the Court called counsels to the bench and remarked that one of the jurors had "her eyes down." (Docket Entry 32 at 41.) The Court noted "I'm sure she was awake." (*Id.*) After inquiring if the jury needed to take a break, the Court reminded the jury of the need to pay "close attention to the evidence." (*Id.*) Following Robby Todd's testimony, the Court noted that "while I did bring you to the bench about Juror Number 11, so just it is clear, I at no time ever saw her asleep. I just simply saw that it looked like she was getting tired." (*Id.* at 56.)

On December 18, 2008, the jury unanimously found Petitioner guilty of the drug conspiracy and attempt charge and determined that, as to both counts, the defendant was accountable for 50 or more grams of methamphetamine. (Docket Entry 27.)

## Petitioner's Claims

Petitioner's Motion raises four claims and multiple sub-claims. Petitioner's first claim alleges ineffective assistance of pretrial counsel. (Docket Entry 53, Ground One.) Second, Petitioner asserts that trial counsel was ineffective (*Id.*, Ground Two.) Third, Petitioner asserts ineffective assistance of counsel at sentencing. (*Id.*, Ground Three.) Last, Petitioner

asserts ineffective assistance of appellate counsel. (*Id.*, Ground Four.) As explained below, none of these claims has merit.

## Discussion

## Claim One

Petitioner's first claim alleges ineffective assistance of pretrial counsel. (Docket Entry 53, Ground One.) In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668, 691-92 (1984). A petitioner bears the burden of affirmatively showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 232-33 (4th Cir. 1994). To establish prejudice, Petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Petitioner has met neither prong of *Strickland* here.

More Specifically, Petitioner faults counsel for failing to move to suppress a search of his vehicle. (Docket Entry 53, Ground One.) Petitioner faults counsel further for failing to negotiate a plea deal or inform him of the risks associated with proceeding to trial as opposed to pleading guilty. (*Id.*) Petitioner asserts that had he known of the risks of proceeding to trial, or had he been informed that he was eligible for an acceptance of responsibility reduction in his guideline calculation, he would have insisted upon pleading guilty with or without a plea agreement. (*Id.*) As explained below, neither sub-claim has merit.

7

## A. The Vehicle Search

Petitioner contends that he did not give law enforcement permission to search his vehicle; however, the record does not bear this out.[1]  As explained in greater detail above, Petitioner's vehicle was stopped on December 11, 2007, in Mount Airy after he met in person with a government informant and arranged the purchase of one pound of methamphetamine for $16,000. Petitioner's car was stopped as he traveled to the meet location to consummate the drug deal, based on lapsed automobile insurance.  After some initial questions, the officers asked Petitioner for consent to search the vehicle.  A review of the audio-visual recording of the stop corroborates the Government's assertion that Petitioner consented to the vehicle search.[2]  The officers seized $16,000 from the area between the driver seat and center console. Because officers may conduct a warrantless search of a vehicle based on consent, there was no basis to contest the seizure of the $16,000. *See Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) (approving consent search of vehicle that led to discovery of one kilogram of cocaine).  Counsel's decision not to file a motion to suppress was entirely reasonable under these circumstances.

---

[1] Petitioner does not contest the stop of his vehicle, but rather only contests the subsequent search.

[2] Petitioner's consent to the search of his vehicle can be found on the audio-video recording at 12.11.2007 9:21, where Petitioner consents to a search for weapons, and again at 12.11.2007 9:53, where Petitioner consents to a general search of the entire vehicle.  (Docket Entry 32 at 123; Govt's Trial Ex. 8.)

8

## B. Plea Negotiations

Petitioner next asserts that counsel was ineffective prior to trial for failing to advise Petitioner regarding the benefits and risks as to pleading guilty or going to trial. Specifically, Petitioner states:

> Counsel failed to negotiate for a plea agreement or inform Petitioner of the risks associated between proceeding to trial versus pleading guilty, even though Petitioner asked counsel about the possibility of pleading guilty and informed counsel that he was willing to plead guilty to a fair sentence. Had Petitioner been informed of the risks associated between proceeding to trial and pleading guilty, or that by pleading guilty he was eligible for an acceptance of responsibility reduction, Petitioner would have insisted on pleading guilty with or without a plea agreement. As seen by co-defendant Melvin Johnson's judgment, a sentence of approximately 78 months would have been available.

(Docket Entry 53, Ground One.) Thus, Petitioner argues here that counsel failed to provide him with the information necessary to make an informed choice about whether to proceed to trial or to plead guilty, particularly as it relates to acceptance of responsibility.

The Government, in turn, has filed a Response, asserting that this claim lacks merit, along with counsel's affidavit. It states:

> With regard to the process of plea negotiation, it is my distinct recollection that my client was adamant about our taking an aggressive attitude about our intention to plead not guilty. It is my practice in every case to inform the client of the potential sentences based on whether the case is tried before a jury or disposed of by a guilty plea. We did discuss the general range of potential sentences, but Petitioner indicated from the beginning his desire to take his case to trial. At no time, even after the trial began, did Petitioner communicate to me that he wanted to plead guilty, with or without a plea agreement. Because of Petitioner's desire to plead not guilty, I informed the

9

Assistant United States Attorney that the case was for trial. No plea agreement was offered in the case due to Petitioner's decision to dispose of his case by trial.

(Docket Entry 66, Exhibit 1.)

The Supreme Court has recognized the right to "effective counsel during plea negotiations." *Missouri v. Frye*, 132 S. Ct. 1399, 1407-08 (2012); *see Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). "While there is no constitutional right to a plea agreement, and the decision to initiate plea negotiations is ordinarily a strategic decision within the purview of defense counsel, counsel is still required to be a reasonably effective advocate regarding the decision to seek a plea bargain." *United States v. Lopez*, 570 F. App'x 291, 292-93 (4th Cir. 2014) (remanding where appellant claimed "district court erred by crediting trial counsel's affidavit over his claims," without holding a hearing or permitting appellant to swear to his own claims) (citations and quotations omitted).

### *Evidentiary Hearing*

The Court held an evidentiary hearing at which Petitioner was represented by newly appointed counsel. (Docket Entry 73.) Counsel informed the Court that Petitioner was not contending that there had been a failure to communicate a plea offer from the Government. (*Id.* at 5.) Rather, counsel asserted that Petitioner "was not properly advised of his options, and what difference it might have made . . . at sentencing, had he pled guilty as a straight-up plea or as part of a plea agreement." (*Id.*) The Government also represented that no plea offer had been made to Petitioner in this case and Petitioner's counsel agreed that there was "no evidence" or "no reason to believe" a plea offer had been made. (*Id.* at 4-5.) The

10

Government further represented that Petitioner's prior counsel, Wayne Harrison, was unavailable to testify because he had "passed away prior to these proceedings." (*Id.* at 19.)

On direct examination, Petitioner testified that he first met with his prior counsel, Mr. Harrison, on the charges filed in the instant case at the end of September or on October 1, 2008 in the Hillsborough County Jail. (*Id.* at 6.) According to Petitioner, Mr. Harrison "wanted to know the truth about what happened, the reason why I was arrested, and I basically told him." (*Id.* at 7.) Petitioner stated that he and Mr. Harrison did not review the evidence at that point, but instead Mr. Harrison "left and he said he would get back with me. So he had went and reviewed it like maybe two, three weeks later, and then he came back to see me and told he what my options was, basically." (*Id.*) Petitioner testified that he did not discuss with Mr. Harrison whether he should plead guilty or go to trial, did not discuss "possible sentencing ranges," did not discuss "the difference in sentencing that there might be between pleading guilty or going to trial," but did discuss going to trial. (*Id.*)

Petitioner next testified that he was familiar with the phrase "acceptance of responsibility" but that he did not know what it meant "at the time, until I had been incarcerated." (*Id.* at 7-8.) He testified that he learned of acceptance of responsibility when he was "at the Federal Correctional Institution at McDowell" when another inmate he called a "jailhouse lawyer" told him about it. (*Id.*) Petitioner stated that at that time he said, "[W]ell I was never offered that[.]" (*Id.*) Petitioner then contacted "U.S. Freedoms Foundation," which was "somewhere in Tennessee," and "hired them and they done my 2255." (*Id.*)

11

Petitioner next testified that Mr. Harrison never discussed with him a three-point deduction in the guideline range for acceptance of responsibility, nor did Mr. Harrison discuss with him acceptance of responsibility in general. (*Id.* at 8-9.) Petitioner stated that if Mr. Harrison had told him about a guideline reduction for acceptance of responsibility, he would have pled guilty. (*Id.* at 9.) This is because "it would have been a lesser sentence instead of the one [he] ha[d] now." (*Id.* at 9.)

Next, the Government cross-examined Petitioner. (*Id.* at 9.) Petitioner stated that he never spoke to Mr. Harrison about pleading guilty. (*Id.*) He then conceded that he was "previously convicted of felony forgery back on August the 19th of 1980." (*Id.* at 11.) He conceded further that he was "convicted of felony fraudulently burning a dwelling back on November 13 of 1986." (*Id.* at 12.) Petitioner next conceded that he was "convicted on October the 1st of 1993, of misdemeanor fictitious driver's license." (*Id.* at 12.) Petitioner next conceded that he was "previously convicted February the 9th of 1994, of felony possession of stolen goods." (*Id.* at 12.)

The Government then asked Petitioner what he meant when he stated that Mr. Harrison presented him with "options." (*Id.*) Petitioner testified that he "just give me an option, like he said that he had a 60 to 70 percent chance of beating this at trial, the way he explained conspiracy to me, and I said, you know, and I just went on with it, basically." (*Id.*) The Government then pointed out that "an option implies that you had choices, right? The choice was either plead guilty or go to trial. Isn't that correct?" (*Id.*) To this, Petitioner responded, "Yeah, okay. I misworded it. I'm sorry then." (*Id.*) The Government pressed

Petitioner on this point: "Well, so he did talk to you about pleading guilty then, didn't he? I mean, if you were given a percentage on what your chances of success were, then you also had to think about the possibility that you could lose and you might need to plead guilty. Isn't that correct?" (*Id.* at 12-13.) Petitioner responded, "No. That's not correct. He didn't mention nothing to me but going to trial. Mr. Harrison was mainly wanting to go to trial to try to beat – he had me convinced that I was not in a conspiracy, so I just left it in his hands. I hired him and told him I thought he knew best." (*Id.* at 13.)

Petitioner next conceded that he had previously pled guilty in federal court to a charge of possession with the intent to distribute marijuana. (*Id.*) Petitioner stated that he had an attorney in that case. (*Id.*) The Court then accepted into evidence the February 2002 executed plea agreement in that prior criminal case. (*Id.* at 13-14 *referencing* Ex. 2.) The Government then directed Petitioner's attention to the portion of that plea agreement in which Petitioner stipulated that he had clearly demonstrated his acceptance of personal responsibility for his criminal conduct and that he was therefore entitled to a two level reduction in his guideline calculation. (*Id.* at 14 *referencing* Ex. 2 at 4.)

When presented with his prior plea agreement, Petitioner stated, "I've never went off of this with — she just — Bernadette Sedillo, my attorney, she just told me to sign here, and I was given 24 months and she never mentioned to me nothing to me about three points." (*Id.* at 14.) Petitioner then stated that he had "no idea" he "got acceptance of responsibility pursuant to [his] plea in New Mexico in 2002." (*Id.* at 15.) Petitioner stated that he did not remember if the New Mexico district court that sentenced him asked him questions about

13

whether he reviewed the plea agreement with his attorney. (*Id.*) He stated that his prior counsel in the New Mexico case, "never went over that paper [the plea agreement] with me." (*Id.*) Petition stated further that he did not know whether he had a pre-sentence investigation report in his 2002 federal marijuana conviction in New Mexico. (*Id.* at 16.)

Last, Petitioner testified that the first time he heard of acceptance of responsibility was after he was convicted on the instant methamphetamine charge in which Mr. Harrison had represented him. (*Id.*) Petitioner testified too that "he never had any discussions with [Mr. Harrison] about pleading guilty or that [he] could get a lesser sentence if [he] pled guilty[.]" (*Id.*) Petitioner also stated that "if [he] had known that [he] could get acceptance of responsibility, [he] would have pled guilty." (*Id.*) Petitioner stated that this was because he had "too much to lose" like "a trucking company, rental property, house and things like that [and] [a] daughter, 8-year old daughter at the time." (*Id.*)

The Government pointed out that Petitioner had all those things to lose regardless, because if he pled guilty, Petitioner was "going to spend a significant period of time in custody, whether [he] pled guilty or not." (*Id.*) Petitioner stated that he understood this but that he "had resources of – or at least as far as my company also, I wasn't – the only – what I was going to lose is being with my family. I still don't have my other stuff; my house, trucking company, stuff like that." (*Id.* at 16-17.)

### *The Court's Findings and Conclusions*

"In assessing the credibility of witnesses, trial courts consider 'variations in demeanor and tone of voice." *Rahman v. United States*, No. 7:08-CR-126-D, 2013 WL 5222160, at *5

14

(E.D.N.C. Aug. 27, 2013) (quoting *Anderson v. City of Bessemer City, NC.*, 470 U.S. 564, 575 (1985)), *adopted by* 2013 WL 5230610 (E.D.N.C. Sept. 16, 2013). "In addition, '[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.' " *Rahman*, 2013 WL 5222160, at *5 (citing *United States v. Marcavage*, 609 F.3d 264, 281 (3d Cir. 2010)). "Additional considerations can include the witness's motive to lie and the level of detail in the witness's statements." *Id.* (citing *United States v. Wilson*, 624 F.3d 640, 665 (4th Cir. 2010)).

Here, the Court finds that Petitioner is not a credible witness as to the material facts of his claim. First, as a general matter, the Court observed Petitioner's tone, demeanor, and body language during the hearing and does not find his allegations of ineffective assistance of counsel on this issue persuasive. Petitioner is not a credible witness.

Second, Petitioner's hearing testimony undermines his claim. As explained, Petitioner testified that prior counsel provided him with "options." The Court agrees with the Government that "options" implies choice and that choice is inconsistent with Petitioner's assertion that counsel essentially forced him to go to trial and failed entirely to discuss anything with Petitioner beyond going to trial. Nor were Petitioner's efforts to rehabilitate himself on this point—amounting to a statement that he "misworded it"—persuasive.

Third, Petitioner's credibility is further damaged by his repeated assertions that he did not understand the concept of acceptance of responsibility in the federal system until after he was convicted in this case. As noted, a 2002 plea agreement signed by Petitioner states

otherwise. In fact, immediately above Petitioner's signature on that document was the statement "I have read this document and carefully reviewed every part of it with my attorney. I understand the agreement and voluntarily sign it." (Docket Entry 73, Ex. 2 at 7.) Again, Petitioner's efforts to rehabilitate himself are unpersuasive. Petitioner insists that though he signed this plea agreement, he never read it. The Court does not believe that Petitioner—who owned and ran a trucking company for seven years, employed others, and accumulated considerable assets—would blindly sign a document pleading guilty to a federal felony that put his liberty at stake. (PSR ¶¶ 100-01, 104.)

Fourth, even if the Court were to credit as true Petitioner's testimony that he never discussed the potential benefits of a guilty plea with counsel, the Court does not find credible Petitioner's testimony that he would have pled guilty in this case had he known that a guilty plea would reduce his sentence. Petitioner knew or should have known that a guilty plea would likely reduce his sentence. Specifically, Petitioner has a lengthy criminal record, and has resolved many previous cases by pleading guilty or no contest. (PSR ¶¶ 29, 30, 33, 34, 35, 38, 40, 42, 43, 44, 45, 46, 47, 49, 50, 51.) In many of these instances he was represented by an attorney. (PSR ¶¶ 30, 33, 35, 38, 40, 42, 43, 45, 46, 47, 49, 50, 51, 53.) And, as explained above, Petitioner knew that pleading guilty in federal court could lead to a sentence shorter than a sentence handed down after conviction at trial. Petitioner was therefore well aware that there could be tangible benefits to a guilty plea and that these issues could be explored with his attorney. Petitioner's testimony to the contrary is not persuasive.

16

Moreover, at his evidentiary hearing before this Court, Petitioner never testified that he expressed any interest to counsel in pleading guilty or in learning about the specific potential benefits of pleading guilty. Absence of such testimony is telling, because Petitioner faced a lengthy sentence regardless of whether he pled guilty. The Court finds it more likely that Petitioner decided to seek an acquittal at trial, and potentially receive no term of imprisonment, rather than enter a guilty plea and necessarily face a lengthy one.[3] For these reasons, the Court finds that Petitioner's testimony that he would have pled guilty if fully informed is not credible. Petitioner's overall credibility is diminished as a result. The Court finds further that any omissions by counsel here regarding informing Petitioner of the risks and benefits of a guilty plea were not prejudicial because there is no reason to believe that had Petitioner been fully informed as to all the consequences of a guilty plea, he would have pled guilty.

Fifth, Petitioner had a considerable motivation to fabricate testimony at his hearing. As noted, his prior counsel died before this evidentiary hearing and is therefore unable to rebut Petitioner's testimony. Consequently, Petitioner had quite a bit to gain in the form of

---

[3] Petitioner, whose guideline range was 188-235 months, received a received a 200 month sentence. (PSR Sentencing Recommendation (Total Offense Level 32, Criminal History Category V).) *See* U.S.S.G. Ch. 5, Pt. A, Sentencing Table (2008). A guilty plea without a plea agreement, but with a two level deduction for acceptance of responsibility, would have left Petitioner with a guideline range of 151 to 188 months of imprisonment. *See* U.S.S.G. Ch. 5, Pt. A, Sentencing Table (2008) (Total Offense Level 30, Criminal History Category V). A guilty plea without a plea agreement, but with a three level deduction for acceptance of responsibility would have left Petitioner with a guideline range of 140 to 175 months of imprisonment. (*See* U.S.S.G. Ch. 5, Pt. A, Sentencing Table (2008) (Total Offense Level 29, Criminal History Category V.)

17

a potentially reduced sentence and very little to lose by fabricating the story he told at the evidentiary hearing about what transpired, or failed to transpire, between he and counsel. As explained throughout this section, the Court believes that Petitioner's version of events is not credible.[4]  Petitioner has failed to demonstrate either prong of *Strickland* here and consequently this claim fails.

## Claim Two

Petitioner next contends that his trial counsel was ineffective for eight reasons. (Docket Entry 53, Ground Two.) First, Petitioner alleges that counsel failed to challenge the admission of "Petitioner's statements to the CI and following his arrest. Neither statement was probative or relevant to the charges. As such, the argument at the district level and on appeal should have been that the statements were prejudicial to Petitioner in the eyes of the jury." (*Id.*)  However, Petitioner fails to point to the two statements he made to the confidential informant, and also fails to point to any statements made post arrest, which were introduced at trial, which his counsel was constitutionally ineffective for failing to contest. Vague, unsupported, and conclusory allegations like this do not entitle Petitioner to even a hearing, much less to the sort of relief sought here. *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992), *abrog'n on other grounds recog'd, Yeatts v. Angelone*, 166 F.3d 255 (4th

---

[4] The Court notes that Petitioner has a number of prior criminal convictions for offenses that involve dishonesty. Specifically, Petitioner had previously been convicted of felony forgery, felony fraudulently burning a dwelling, and misdemeanor fictitious driver's license. For the reasons set forth above, Petitioner is not a credible witness regardless of whether the Court considers these convictions. However, the Court notes that if it were permissible to consider these convictions, they would further diminish Petitioner's already damaged credibility.

Cir. 1999). Generally speaking, and as the Government correctly points out, statements by a defendant are admissible as admissions of a party-opponent under Fed. R. Evid. 801(d)(2)(A) and can be relevant to show the drug relationship between a confidential informant and a defendant. *See also United States v. McMillon*, 14 F.3d 948, 955 (4th Cir. 1994) (admitting the testimony of witnesses whose "testimony was helpful in providing the jury with an understanding of how they knew [the defendant] and how it came about that they were trusted brokers or other participants in her dealings"). In any event, this sub-claim fails for lack of any meaningful argument.

In his second claim, Petitioner alleges trial counsel failed to properly argue the Rule 29 motion and closing arguments. (Docket Entry 5, Ground Two.) Specifically, Petitioner alleges "Counsel failed to properly argue the Rule 29 motion, as well as closing arguments. The only evidence for Count One was the alleged sale of 14 grams to Melvin Johnson prior to the date of the conspiracy charged. Even if true, simply helping a willing buyer locate a willing seller does not establish a conspiracy. Likewise, the evidence of Count Two was based on a phantom seller of non-existent drugs, and no actual attempt ever occurred." (*Id.*)

Again, however, Petitioner fails to provide anything other than a conclusory statement, devoid of specific and meaningful factual support. Petitioner has failed to provide any facts to support his claim that counsel's efforts in arguing the Rule 29 motion or the closing argument fell below the threshold constituting reasonable representation. Accordingly, his claim should be denied and dismissed pursuant to *Nickerson*, 971 F.2d at 1136. Additionally, if Petitioner is attempting to contest the sufficiency of the evidence, that

claim fails too. Petitioner already contested the sufficiency of the evidence with the Fourth Circuit. The Fourth Circuit concluded (1) "that the evidence was sufficient to support [Petitioner's] conspiracy conviction," and (2) "[t]he evidence presented at trial, viewed in the light most favorable to the Government, establishes that Johnson was guilty of attempt." *Johnson*, 2011 WL 288611, at *2-3. Given that there was sufficient evidence on both counts to support conviction, any error by counsel in making his Rule 29 motion was harmless.

Third, Petitioner contents that trial counsel failed to argue that the "government and the Court constructively amended the indictment to allow Petitioner to be convicted on proof outside the conduct charged in the indictment." (Docket Entry 53, Ground Two.) Petitioner's argument rests on the false premise that evidence of prior drug activity constructively amends the indictment. As demonstrated earlier in the Background portion of this Recommendation, during trial the Government introduced evidence regarding drug distribution by Petitioner to an indicted co-conspirator, Melvin Johnson, in November of 2007, a few weeks prior to the December 7, 2007, conspiracy date alleged in the indictment. However, "[e]vidence of a defendant's involvement in drug transactions prior to the dates charged in a conspiracy is also admissible as substantive evidence of a defendant's guilt." *United States v. Lowery*, 284 F. App'x 64, 71 (4th Cir. 2008). Moreover, "the mere fact that the evidence involved activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into 'other crimes' evidence." *Id.* citing *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (collecting cases). "Evidence of uncharged conduct is not considered 'other crimes' evidence if it 'arose out of the same . . . series of

20

transactions as the charged offense, . . . or if it is necessary to complete the story of the crime (on) trial.'" *Id.* (internal citation omitted).

Additionally, Petitioner contended on appeal that his indictment had been constructively amended for the reasons described above. The Fourth Circuit rejected this claim. Specifically, the Fourth Circuit noted that:

> Johnson also claims that the evidence of the deal before the charged dates in the conspiracy resulted in a constructive amendment to his indictment. However, the beginning and ending dates of a conspiracy are not elements of the offense, so proof of different dates could never raise the specter of conviction for a different crime. *See United States v. Benson*, 591 F.3d 491, 497 (6th Cir. 2010) (holding that "[w]hen an indictment uses the language 'on or about,' a constructive amendment does not exist when 'the proof offered regards a date reasonably near the date alleged in the indictment' ").

*Johnson*, 2011 WL 288611, at *1. Counsel had no obligation to raise this meritless argument. For all these reasons, there was no support here for concluding that the indictment was constructively amended and that counsel was constitutionally ineffective for failing to raise this issue. Thus, Petitioner's sub-claim should be denied and dismissed.

In his fourth claim, Petitioner argues that trial counsel "failed to request a cautionary jury instruction." (Docket Entry 53, Ground Two.) Without more, this claim is simply too vague and conclusory to proceed. *Nickerson*, 971 F.2d at 1136. Likewise, in his fifth claim, Petitioner contends that trial counsel "failed to effectively cross-examine government witnesses." (Docket Entry 53, Ground Two.) Again, Petitioner provides no specific facts to support that allegation and so this sub-claim also fails. *Nickerson*, 971 F.2d at 1136.

21

In his sixth and seventh claims, Petitioner asserts that trial counsel "failed to challenge the government's improper characterization of the evidence" and the "admission of evidence in violation of his right to confrontation." (Docket Entry 53, Ground Two.) However, Petitioner provides no specific facts to identify either the alleged mischaracterization of evidence or what evidence violated his right of confrontation. These sub-claims should be denied and dismissed. *Nickerson*, 971 F.2d at 1136.

In his eighth claim, Petitioner contends that trial counsel failed to move for a mistrial based on a sleeping juror and failed to develop a record that a juror slept "for a large part of the trial." (Docket Entry 53, Ground Two.) The juror issue was raised to and rejected by the Fourth Circuit in Petitioner's appeal. Now Petitioner attempts to state the claim as an ineffective assistance of counsel claim. As the Fourth Circuit noted in Petitioner's appeal, "there is no evidence that the juror was sleeping." *Johnson*, 2011 WL 288611, *3.

Specifically, the Fourth Circuit concluded that:

> Here, there is no evidence that the juror was sleeping. At worst, the record reflects that the juror was tired and perhaps inattentive for an undefined period of time during the Defense's opening argument and the informant's direct testimony. In addition, once the court noticed the juror, the court took a momentary break and instructed the jury on the importance of being alert. Absent any evidence that the juror was unable to consider the case fairly, Johnson has failed to show error, much less plain error.

*Id.*

Moreover, any attempt to move for a mistrial after the Court had noted, in referring to the allegedly sleeping juror, "I'm sure she was awake," would have been futile. (Docket Entry 32 at 41.) It is clear from the statement of the trial court as well as the holding of the

22

Fourth Circuit that had trial counsel sought a mistrial on the basis of a sleeping juror, the request would have justifiably been denied. There is no evidence that either prong of *Strickland* has been met here. This sub-claim, and this entire claim, should be denied.

## Claim Three

In Ground Three, Petitioner claims ineffective assistance by trial counsel at sentencing related to the drug amount calculation, which he contends was based on "ice" versus a mixture and substance containing a detectable amount of methamphetamine. (Docket Entry 53, Ground Three.) Petitioner's claim is without merit. Here, the PSR indicates that Petitioner was held accountable for 680.4 grams of methamphetamine. (PSR ¶¶ 15, 19; Docket Entry 43 at 22 (adopting PSR in whole except for the correction of a typographical error).) Because 680.4 grams of a methamphetamine is more than 500 grams but less than 1.5 kilograms, Petitioner's base offense level was 32. (PSR ¶ 19 as corrected.) *See* U.S.S.G. §2D1.1(c)(4) (2008). In contrast, had the PSR and the Court held Petitioner accountable for 680.4 grams of "ice," his base offense level would have been 36. *See* U.S.S.G. §2D1.1(c)(2). Because Petitioner's sentence was based on the methamphetamine, and not the "ice" or pure methamphetamine, his claim is unsupported and should be denied.

## Claim Four

Last, Petitioner alleges ineffective assistance of counsel by appellate counsel in five instances, many involving the same trial and sentencing issues described in Grounds One through Three above. (Docket Entry 53, Ground Three.) Each sub-claim is without merit and should be denied and dismissed by this Court.

23

In his first and second sub-claims, Petitioner contends that his appellate counsel failed to challenge the admission of statements Petitioner made to the confidential informant and to law enforcement following his arrest and failed to argue that Petitioner's Sixth Amendment right to confrontation was violated. (*Id.*) Again, however, Petitioner provides no specifics as to which statements should have been challenged, why the statements were irrelevant, or how his right of confrontation was violated. These sub-claims are too vague and conclusory to proceed. *Nickerson*, 971 F.2d at 1136.

As to the third sub-claim, Petitioner contends appellate counsel should have argued that Petitioner's sentence was erroneously based on "ice." (Docket Entry 53, Ground Three.) However, there is no evidence for this allegation. As previously noted, a review of the PSR and the related guidelines demonstrates that Petitioner's base offense level was calculated based on a mixture and substance containing a detectable amount of methamphetamine and not the higher guideline for "ice" methamphetamine. As with his claim in Ground Three, this sub-claim should be denied and dismissed.

Finally, in sub-claims four and five, Petitioner contends appellate counsel "failed to argue that a cautionary jury instruction was mandated by controlling precedent" and that counsel "failed to challenge the government's improper characterization of the evidence." (Docket Entry 53, Ground Four.) As with the identical claims in Ground Two, Petitioner provides no facts to identify what evidence required a cautionary jury instruction or what statements Government counsel made that constituted improper characterization of the evidence. Because he has failed to articulate or provide any facts to support these claims, this

24

Court should deny and dismiss Petitioner's claim and sub-claims. *Nickerson*, 971 F.2d at 1136.

## Conclusion

For the reasons set forth above, Petitioner's Motion (Docket Entry 53) should be denied and this case should be dismissed.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Motion to Vacate, Set Aside or Correct Sentence (Docket Entry 53) be **DENIED** and that this action be dismissed.

_____
Joe L. Webster
United States Magistrate Judge

Date: September 28, 2015